IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID FLEURY, individually and on behalf of a class of similarly situated individuals, | ) ) ) ) | |
| | ) | Case No. 20-cv-00390 |
| Plaintiff, | ) | |
| v. | ) ) | Judge Jorge L. Alonso |
| UNION PACIFIC RAILROAD COMPANY, a Delaware corporation, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Union Pacific Railroad Company ("Union Pacific") moves to dismiss Plaintiff David Fleury's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court denies the motion [35].

## BACKGROUND

Fleury filed a putative class action against Union Pacific, alleging that Union Pacific violated the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 *et seq*. ("BIPA"). Unless otherwise noted, the Court takes the following facts from Fleury's First Amended Complaint, which are accepted as true for purposes of deciding the instant motion. *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013).

Union Pacific operates a network of railroads in North America that includes facilities located in Illinois. For a certain period of time, including throughout 2019, Fleury worked as a truck driver, and as part of his job, he visited rail yards in Illinois owned and operated by Union Pacific. Union Pacific required Fleury to scan his "biometric identifiers and/or biometric information" into certain "identity verification kiosks" when Fleury visited Union Pacific's

facilities. Through these kiosks, Union Pacific collected, captured, and stored biometric identifiers and biometric information from Fleury and others that visited Union Pacific facilities. Union Pacific collected and stored the biometric information via these kiosks without informing Fleury or others in writing that it was doing so, and Union Pacific failed to get written consent from Fleury or others before collecting and storing their biometric information. Union Pacific further failed to provide Fleury or others with written disclosures describing the specific purpose and length of time for which their biometric information was being collected and stored. Finally, Union Pacific also transmitted the biometric information it collected from Fleury and others to unknown third parties without consent. Fleury acknowledges that, after he filed his lawsuit, Union Pacific added a "disclosure and consent" virtual form to its kiosks that Fleury and others use. Fleury acknowledged and signed off on the disclosure and consent form in June 2020.

BIPA imposes certain restrictions on how entities like Union Pacific collect, retain, use, disclose, and destroy "biometric identifiers" and "biometric information." *See* 740 ILCS 14/1 *et seq*. BIPA mandates that before obtaining an individual's biometric identifiers or information, a private entity must inform the individual in writing about several things, including that biometric information is being collected, the specific purpose of collecting or using the biometric information, and the length of time for which the biometric information will be collected, stored, and used. 740 ILCS 14/15(b). The entity must also obtain a signed "written release" from an individual before collecting the individual's biometric information. *See id*. Further, BIPA also requires a private entity to obtain consent before disclosing or disseminating an individual's biometric information to a third party. 740 ILCS 14/15(d). Finally, a private entity in possession of biometric information must make publicly available a "retention schedule and guidelines" it

uses for permanently destroying biometric identifiers and information it has collected after a certain time period. 740 ILCS 14/15(a).

Fleury claims that, although he does not know whether Union Pacific's recent efforts to add notice and consent forms now bring it into compliance with BIPA, Union Pacific's past conduct has nevertheless violated BIPA in multiple ways. Union Pacific now moves to dismiss Fleury's First Amended Complaint, arguing that Fleury's BIPA claim is preempted by both the Federal Railroad Safety Act and the Interstate Commerce Commission Termination Act and that Fleury fails to state a claim because he consented to the collection of his biometric information.

## **LEGAL STANDARD**

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). To survive a motion to dismiss for failure to state a claim, a plaintiff's complaint must contain "a short and plain statement of the claim[s] showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under federal notice-pleading standards, a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013). Further, because affirmative defenses generally do not justify dismissal under Rule 12(b)(6), a

plaintiff need not try to anticipate and plead around an affirmative defense, *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003), but a plaintiff can plead himself out of court if the pleadings admit all the facts that establish an affirmative defense. *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002).

**DISCUSSION**

Union Pacific offers three bases to dismiss Fleury's First Amended Complaint. Union Pacific argues two separate federal statutes preempt Fleury's BIPA claim. Union Pacific also argues Fleury fails to state a BIPA claim because he consented to Union Pacific's collection and use of his biometric information. The Court addresses Union Pacific's preemption arguments and then turns to its consent argument.

**I.**     **Preemption**

The Supremacy Clause of the United States Constitution states the Constitution and federal laws are "the supreme Law of the Land . . . Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. In other words, federal law "preempts state laws that interfere with, or are contrary to, federal law." *Union Pac. R. Co. v. Chicago Transit Auth.*, 647 F.3d 675, 678 (7th Cir. 2011) (quoting *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002)). "In the interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption. Thus, pre-emption will not lie unless it is the clear and manifest purpose of Congress." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663, 113 S. Ct. 1732, 1737 (1993) (quotations omitted). To determine Congress' intent regarding the preemptive scope of a statute, a court looks to the text and structure of the statute at issue. *Id.* "If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain

wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Id*.

Union Pacific argues Fleury's BIPA claim is preempted by either the Federal Railroad Safety Act ("FRSA") or the Interstate Commerce Commission Termination Act ("ICCTA"). The Court addresses each statute in turn. At the outset, the Court notes Union Pacific raises preemption here as an affirmative defense, and as such, Union Pacific bears the burden of proof. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019). Dismissal based on an affirmative defense is appropriate only when the pleadings and matters properly subject to judicial notice make clear that a plaintiff's claim is barred as a matter of law. *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017); *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6).").

### A. FRSA

Congress enacted the FRSA to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101; *Easterwood*, 507 U.S. at 661. To achieve that aim, the FRSA grants the Secretary of Transportation and Secretary of Homeland Security the power to issue regulations and orders relating to railroad safety and railroad security. 49 U.S.C. § 20103(a); *Burlington N. & Sante Fe Ry. Co. v. Doyle*, 186 F.3d 790, 794 (7th Cir. 1999). In an effort to make all "laws, regulations, and orders" relating to railroad safety and security "nationally uniform to the extent practicable," the FRSA contains an express preemption clause, which states in relevant part:

> A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C. § 20106(a). A federal regulation or order "covers" the subject matter of a state requirement when it "substantially subsumes" the subject matter of the relevant state law, regulation, or order. *Doyle*, 186 F.3d at 795 (citing *Easterwood*, 507 U.S. at 664-665 (holding that "covering" is a restrictive term and requires a party asserting preemption to show more than that the federal regulations or orders at issue merely "touch upon" or "relate to" the subject matter of the state requirement)). Moreover, "'[t]he subject matter of the state requirement' is the safety concern that the state law addresses." *Doyle*, 186 F.3d at 796.

Union Pacific argues the FRSA preempts Fleury's BIPA claim here because the Department of Homeland Security ("DHS") has promulgated certain regulations and standards that, taken together, cover the subject of using biometric information as a security measure to access railroad facilities. Union Pacific stacks certain standards on top of regulations to make its argument. (*See* Def.'s Memo. in Support of Mot. to Dismiss at 7-8, ECF No. 36; *see also* Def.'s Reply at 5-6, ECF No. 46.) Union Pacific argues DHS regulations require that entities handling certain hazardous materials to use "physical security measures to ensure no unauthorized individuals gain access" to certain secure areas. 49 C.F.R. §§ 1580.205 and 1580.5 (citing 49 U.S.C. § 20106 and expressly preempting state rules covering same subject matter). Other DHS regulations require entities shipping certain hazardous materials to develop and follow a "transportation security plan" that fulfills certain requirements, 49 C.F.R. § 172.800(b), but the regulations also allow entities to fulfill this obligation by following other "regulations, standards, protocols, or guidelines" issued by federal agencies or industry organizations so long as they

6

address the requirements laid out in 49 C.F.R. §§ 172.800-172.822. *See* 49 C.F.R. § 172.804. Union Pacific contends that it fulfills this regulatory requirement of a "transportation security plan" through its membership in DHS's Customs-Trade Partnership Against Terrorism ("C-TPAT") program.

C-TPAT is a voluntary government-private sector program that seeks to strengthen the security of the international supply chain; in exchange for meeting certain minimum security requirements, members may enjoy certain benefits, including for example, easier entry at U.S. borders. *See* 6 U.S.C. § 961.[1] Union Pacific states that C-TPAT's minimum security standards include "physical access controls" for identifying all employees, visitors, and vendors who access a member entity's facilities; as part of its implementation guidance, C-TPAT mentions that access control devices can include "biometric identification systems." (ECF No. 36 at 7 (citing C-TPAT November 2019 Minimum Security Criteria for Rail Carriers).) Union Pacific points out C-TPAT's minimum security standards are consistent with two other DHS guidelines that also apparently reference use of biometric-based systems. (*Id*. at 8.) Union Pacific argues that these standards and regulations, taken together, trigger FRSA preemption.

The Court disagrees. To begin with, the Court views Union Pacific's argument as resting on certain assumptions that are premature at this stage. For example, to the extent Union Pacific tries to use 49 C.F.R. § 172.804 to bootstrap C-TPAT's minimum security requirements into constituting a "regulation" within the meaning of § 20106, it assumes as fact that C-TPAT's requirements also satisfy the security requirements referred to in 49 C.F.R. § 172.805. That may be the case, but this fact is not anywhere in Fleury's First Amended Complaint, nor does Union Pacific provide an adequate basis for the Court to properly make this determination in the context

---

[1] *See CTPAT: Customs Trade Partnership Against Terrorism*, U.S. Customs and Border Protection, https://www.cbp.gov/border-security/ports-entry/cargo-security/ctpat (last accessed March 17, 2021).

7

of a Rule 12(b)(6) motion. To the extent that Union Pacific argues C-TPAT's minimum security requirements—or the other two DHS guidelines it references—can constitute a "regulation" or "order" that triggers FRSA preemption, Union Pacific does not adequately develop this argument, and the Court declines to conduct the analysis on its own. *See Doyle*, 186 F.3d at 795 (noting "[w]hat constitutes an 'order' for FRSA preemption" is not clear and applying without adopting district court's approach of using APA definition); *see also Indiana Rail Rd. Co. v. Illinois Com. Comm'n*, No. 19-CV-06466, 2020 WL 5848426, at *3 (N.D. Ill. Sept. 30, 2020) (discussing issue); *Int'l Aerobatics Club Chptr. 1 v. City of Morris*, 76 F. Supp. 3d 767, 786 (N.D. Ill. 2014) (denying motion to dismiss based on affirmative defense where argument was not adequately developed).[2]

But even putting these issues aside, the Court finds the standards and regulations raised by Union Pacific cannot act to preempt Fleury's BIPA claim. Again, a state may enforce a law related to railroad safety or security until the Secretary of Homeland Security promulgates a regulation or issues an order covering the subject matter of the state requirement. 49 U.S.C. § 20106(a)(2). BIPA was enacted to protect individuals from certain irreparable harms arising from the use of their biometric information by imposing notice and consent requirements and standards for collection, storage, and use of biometric information. *See* 740 ILCS 14/1 *et seq*; *see also Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 619 (7th Cir. 2020). BIPA makes no mention whatsoever of railroads, but for purposes of FRSA preemption, BIPA "relates" to railroad security because it can impose legal duties on a railroad, i.e., obligations regarding the collection, storage, and use of biometric information. *See Easterwood*, 507 U.S. at 664; *see also Vill. of Mundelein v. Wisconsin*

---

[2] Union Pacific argues the C-TPAT minimum security requirements and other DHS guidelines constitute "standards" that can trigger FRSA preemption and relies on the former version of the FRSA's preemption clause, previously codified at 45 U.S.C. § 434, which contained the term "standard." While it is true Congress intended to recodify the FRSA without substantive change, *Doyle*, 186 F.3d at 795 n. 3, Union Pacific still makes no attempt to address whether § 20106 encompasses the DHS guidelines it invokes. This gives the Court pause, especially considering, for example, the voluntary nature of the C-TPAT program.

*Cent. R.R.*, 227 Ill. 2d 281, 290, 882 N.E.2d 544, 550 (Ill. 2008) (citing *Easterwood* and noting § 20106's "phrase 'relating to' has been given a broad meaning"). So then, the question is: do the federal regulations and standards discussed above cover the subject matter of the state requirement?

In answering this question, the Court must first determine what the "subject matter" of BIPA is. In the FRSA context, "'[t]he subject matter of the state requirement' is the safety concern **that the state law addresses**." *Doyle*, 186 F.3d at 796 (emphasis added). As Union Pacific points out, defining the state law's safety concern "necessarily involves some level of generalization," but the Court must not generalize too much, or else the "analysis would be meaningless." *Id*. Keeping this in mind, the safety or security concerns BIPA addresses are the potential harms inflicted on members of the public, such as identity theft and economic injuries, that flow from the unfettered collection and use of biometric information. 740 ILCS 14/5. At a more general level, then, BIPA's subject matter is *how* biometric information is collected and used. The regulations and standards Union Pacific raises do not cover, or "substantially subsume," this subject matter. The regulations do not address or even mention the collection or storage of biometric information, which is clearly insufficient to trigger FRSA preemption. *See Rogers v. BNSF Ry. Co.*, No. 19 C 3083, 2019 WL 5635180, at *4 (N.D. Ill. Oct. 31, 2019) (denying motion to dismiss BIPA claim based on FRSA preemption invoking many of the same regulations). And the C-TPAT security requirements and DHS standards, which Unions Pacific attempts to hang its hat on, merely mention the use of biometric identification systems. At most, these DHS standards "touch upon" or "relate to" the collection of biometric information (one aspect of BIPA), but this is not enough for FRSA preemption. *Easterwood*, 507 U.S. at 664; *Doyle*, 186 F.3d at 795. Considered together, the regulations and standards do not cover the subject matter of the state requirement here.

9

Union Pacific argues that this conclusion defines the subject matter of BIPA too narrowly; Union Pacific contends the regulations and standards do cover the subject matter of BIPA because the federal standards address the use of biometric devices to control access to rail facilities. (*See* ECF No. 36 at 9; *see also* ECF No. 46.) The problem with this argument is not that it generalizes too much, it is that it fails to acknowledge what the subject matter of the state requirement here is. *Doyle*, 186 F.3d at 796. Access to rail facilities may be the security concern addressed by the federal regulations and standards highlighted by Union Pacific, but it is not the security concern of BIPA. Again, BIPA addresses the security concern of how an individual's biometric information is collected and used, not why it is collected. *See* 740 ILCS § 14/15. Other than prohibiting profiting directly from biometric information as a product in and of itself, 740 ILCS § 14/15(c), BIPA does not attempt to regulate for what specific purposes an entity can collect and use biometric information. So although BIPA may "relate to railroad security" (given the broad interpretation of that phrase in § 20106), the subject matter of BIPA and the subject matter of the federal regulations and standards do not meaningfully overlap so that the Court can say the federal regulations and standards cover the subject matter of BIPA. Because this is the case, Union Pacific's reliance on decisions finding preemption even where federal regulations provide more flexibility than a state requirement or do not address a precise safety issue but address the issue more generally is misplaced. (*See* ECF No. 36 at 9-10; *see also* ECF No. 46 at 4-6.) The Court declines to discuss each decision but notes that the common thread is that, in each case, there was some evidence that federal regulators were deemed to have considered the subject matter of the state requirement and to have made a decision regarding it, either by choosing not to regulate a specific issue, by giving a regulated party flexibility in how it approached the issue, or by regulating related issues so as to render regulation of the more specific issue superfluous. *See*

*Doyle*, 186 F.3d 790, 795-96 (noting in context of what constitutes an "order" that "[f]or preemption, the important thing is that the FRA considered a subject matter and made a decision regarding it"). That does not appear to be the case here. Union Pacific cites standards that merely mention, quite briefly, the use of biometric devices for security; Union Pacific presents nothing indicating these standards reflect consideration of how to handle biometric information, which again, is the subject matter of BIPA. Accordingly, the FRSA does not preempt Fleury's BIPA claim.[3]

> B.     **ICCTA Preemption**

In enacting the ICCTA, Congress created the Surface Transportation Board ("STB") and conferred upon the STB exclusive jurisdiction over the regulation of "rail transportation." 49 U.S.C. § 10501(b). Like the FRSA, the ICCTA contains an express preemption provision, which states:

> (b) The jurisdiction of the [STB] over—
>
> > (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> > (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

---

[3] The Court also disagrees with Union Pacific's argument that *Miller v. Southwest Airlines Co.*, 926 F.3d 898 (7th Cir. 2019) supports a finding of preemption. *Miller* dealt with a materially different analysis pursuant to the RLA and is thus distinguishable. 926 F.3d at 904 (BIPA claims preempted because resolving plaintiffs' claims inevitably required looking to collective bargaining agreement for issue of consent).

11

*Id*. Congress defined "transportation" more broadly than the term's ordinary meaning. Under the ICCTA, "transportation" includes a "yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail . . . [and] services related to that movement, including receipt, delivery . . . transfer in transit . . . handling, and interchange of passengers and property . . . ." 49 U.S.C. § 10102(9)(A)-(B). Courts have characterized § 10501(b)'s preemptive scope as "broad and sweeping." *Chicago Transit Auth.*, 647 F.3d at 678 (collecting cases). However, it is also well-settled that although ICCTA's preemption language is unquestionably broad, "it does not encompass everything touching on railroads." *Delaware v. Surface Transp. Bd.*, 859 F.3d 16, 18 (D.C. Cir. 2017) (collecting cases). Notably, "the ICCTA does not [necessarily] usurp the right of state and local entities to impose appropriate public health and safety regulation on interstate railroads." *King Cty., Wa—Petition for Declaratory Order*, STB Finance Docket No. 32974, 1996 WL 545598, at *3 (S.T.B. Sept. 25, 1996); *see also Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005) (noting a state's "generally applicable, non-discriminatory [law] would seem to withstand [ICCTA] preemption").

Against this backdrop, the Seventh Circuit has adopted a two-tiered analysis offered by the STB to determine whether a state law or regulation is preempted by § 10501(b). Generally speaking, "there are two manners in which state or local actions could be preempted: (1) categorical, or *per se*, preemption, and (2) as-applied preemption." *Wedemeyer v. CSX Transportation, Inc.*, 850 F.3d 889, 894 (7th Cir. 2017). "Categorical preemption occurs when a state or local action is preempted on its face despite its context or rationale." *Chicago Transit Auth.*, 647 F.3d at 679. The STB has explained that "two broad categories of state and local actions [are categorically] preempted regardless of the context or rationale for the action":

> The first is any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized . . .
>
> Second, there can be no state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines (see 49 U.S.C. [§§] 10901-10907); railroad mergers, line acquisitions, and other forms of consolidation (see 49 U.S.C. [§§] 11321-11328); and railroad rates and service (see 49 U.S.C. [§§] 10501(b), 10701-10747, 1101-11124) . . . .

*CSX Transp., Inc.—Petition for Declaratory Order*, STB Finance Docket No. 34662, 2005 WL 1024490, at *2-3 (S.T.B. May 3, 2005) (citations to supporting cases omitted); *Chicago Transit Auth.*, 647 F.3d at 679 n. 3. State and local laws that fall within one of these categories "are a *per se* unreasonable interference with interstate commerce. For such cases, once the parties have presented enough evidence to determine that an action falls within one of those categories, no further factual inquiry is needed." *Id*. at *3. "If an action is not categorically preempted, it may be preempted 'as applied' based on the degree of interference that the particular action has on railroad transportation—this occurs when the facts show that the action would have the effect of preventing or unreasonably interfering with railroad transportation." *Chicago Transit Auth.*, 647 F.3d at 679 (quotations omitted).

Union Pacific argues that Fleury's BIPA claim is both categorically preempted and preempted as applied. The Court disagrees. Regarding categorical preemption, Union Pacific fails to show—and the Court fails to see how—BIPA falls into either category of state action that is preempted *per se*. BIPA imposes no "permitting or preclearance" requirement that would compel Union Pacific to obtain some type of permit or prior approval to conduct its business. Nor does BIPA regulate a matter "directly regulated by the [STB]," i.e., construction, operation, and abandonment of rail lines, railroad mergers, line acquisitions, and consolidation, or railroad rates and service. *CSX Transp., Inc.—Petition for Declaratory Order*, 2005 WL 1024490, at *2-3.

13

Union Pacific avoids these *per se* categories and instead argues that Fleury's BIPA claim is categorically preempted because it amounts to "regulation of rail transportation." Union Pacific explains that complying with BIPA would necessarily effect how it could let truck drivers like Fleury access its facilities and, thus, would regulate "rail transportation." The Court is not persuaded. For one, this argument ignores the STB's approach described above. More importantly though, on its face, "BIPA has nothing to do with regulating rail transportation." *Rogers*, 2019 WL 5635180, at *2 (N.D. Ill. Oct. 31, 2019) (denying motion to dismiss BIPA claim based on ICCTA preemption). The Court agrees with the conclusion reached in *Rogers*: even though the ICCTA's broad definition of "transportation" means its preemption provision applies to railroad facilities as well as to services related to the movement of persons or property, that does not mean BIPA amounts to regulation of rail transportation. *Id*. BIPA imposes no restrictions on the movement of property by rail nor on the receipt of property at railroad facilities. "Rather, it imposes disclosure, consent, and recordkeeping requirements related . . . certain types of information." *Id*.

In support of its argument, Union Pacific cites cases outside this circuit finding that certain zoning laws or permitting requirements affecting operations at a railroad's ancillary facilities can be categorically preempted. *See Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 159 (4th Cir. 2010); *see also Del Grosso v. STB*, 898 F.3d 139, 146-50 (1st Cir. 2018). The Court agrees with Fleury that these cases are distinguishable; perhaps most notably, the courts in *City of Alexandria* and *Del Grosso* had the benefit of a developed factual record. This Court does not. As it stands, the Court has no facts bearing on the question of whether BIPA's requirements would necessarily impact Union Pacific's ability to receive property or move property by rail. Further, Union Pacific does not attempt to square its argument with the well-settled idea that "the ICCTA does not preempt those state or local laws that have a more remote or incidental impact on rail

14

transportation." *City of Alexandria*, 898 F.3d at 158-60 (noting a state's exercise of its police power can escape ICCTA preemption, even if regulation technically affects "transportation," if it does not discriminate against rail carriers or unreasonably burden rail carriage); *Del Grosso*, 898 F.3d at 142; *see also Delaware*, 859 F.3d at 18.

The Court also disagrees with Union Pacific that dismissal of Fleury's BIPA claim is appropriate based upon "as applied" preemption. Again, even if a state law is not categorically preempted, it can still be preempted as applied if it "prevents or unreasonably interferes with railroad transportation." *Chicago Transit Auth.*, 647 F.3d at 680. Generally, courts view "as applied" preemption as a fact-intensive inquiry. *See Chicago Transit Auth.*, 2009 WL 448897, at *8 (noting "as applied" test is "more fact intensive"); *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1144 (8th Cir. 2015) ("The [STB's] unreasonable-burden-or-interference test is fact intensive."). Union Pacific argues that BIPA would act to regulate its security measures at certain facilities and would thus create the sort of "patchwork" regulation that would unreasonably interfere with its operations. Tellingly, Union Pacific supports its argument by introducing facts and materials relating to the scope of its operations, which as Fleury points out, cannot be properly considered at this stage. *See Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) (explaining standard). This underscores the dearth of facts currently in the record; any determination by the Court as to what impact BIPA would have on Union Pacific's operations would be "highly speculative." *See Rogers*, 2019 WL 5635180, at *3. The Court denies Union Pacific's motion to dismiss based on ICCTA preemption, but Union Pacific is free to renew its arguments at a later stage.

**II. Consent**

Finally, Union Pacific argues Fleury fails to state a BIPA claim because Fleury consented to the collection of his biometric information. The Court need not linger long here because it finds,

again, the current record cannot support Union Pacific's argument. Fleury filed this lawsuit in December 2019. (*See* Not. of Removal at 1, ECF No. 1.) Thereafter, in June 2020, Union Pacific provided Fleury with written notice that it would collect, store, and share his biometric information, and Fleury provided his written consent. Union Pacific attaches to its motion the written notice and consent form as well as a sworn declaration that Fleury provided his written consent. (*See* Decl. of Katrina King-Lopes, Ex. A to Memo. in Support of Mot. to Dismiss, ECF No. 36.)[4] Union Pacific argues that, in giving his consent in June 2020, Fleury acknowledged an earlier unwritten agreement with Union Pacific to knowingly provide his biometric information to them. In other words, the June 2020 written consent acted to memorialize the initial consent Fleury provided to Union Pacific at some point, and so, Union Pacific argues, Fleury fails to allege that Union Pacific violated BIPA's notice and disclosure requirements of 740 ILCS 14/15(b).

Even assuming whatever initial unwritten understanding or agreement Fleury had could satisfy the requirements of 740 ILCS 14/15(b), the June 2020 consent cannot, on its face, act to confirm this initial understanding. Nothing in the consent form addresses prior verbal agreements or understandings of prior collection, use, storage, or dissemination of the individual's biometric information, and the Court certainly cannot draw an inference (against Fleury) that the parties understood the consent forms to retroactively authorize this. BIPA requires an entity to provide the requisite notice and obtain consent "**[b]efore** obtaining any fingerprint." *See Miller*, 926 F.3d at 900 (emphasis added). While the June 2020 consent may ultimately limit the damages Fleury can recover or possibly bar his claim altogether (assuming BIPA allows for retroactive consent and that the parties did, in fact, intend to have the June 2020 consent memorialize an earlier BIPA-

---

[4] As Union Pacific correctly points out, the Court can properly consider the June 2020 written consent. *See Cothron v. White Castle Sys., Inc.*, 467 F. Supp. 3d 604, 614 (N.D. Ill. 2020) (citing *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013)).

16

compliant consent given by Fleury), Union Pacific fails to show dismissal is appropriate at this time.

## CONCLUSION

For the foregoing reasons, the Court denies Defendant Union Pacific's motion to dismiss [35].

SO ORDERED.                                    ENTERED: March 24, 2021

                                               _____
                                               **HON. JORGE ALONSO**
                                               **United States District Judge**