**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DAVID FLEURY and ALVIN TURNER, individually and on behalf of a class of similarly situated individuals, | |
| Plaintiffs, | Case No. 20-cv-390 |
| v. | District Judge LaShonda A. Hunt |
| UNION PACIFIC RAILROAD COMPANY, a Delaware Corporation, | Magistrate Judge Jeffrey Cole |
| Defendant. | |

**DEFENDANT UNION PACIFIC RAILROAD COMPANY'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Sean M. Berkowitz
Gary Feinerman
Johanna Spellman
Kathryn A. Running
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700

Michael S. Rubin
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600

*Counsel for Defendant Union Pacific Railroad Company*

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND ..................................................................................3

    A.     Union Pacific's Illinois Intermodal Facilities .........................................3

    B.     Union Pacific Implemented The AGS To Ensure Safe And Efficient Operations At Its Intermodal Facilities ....................................................4

    C.     Union Pacific Is A Government Contractor And Subcontractor ............7

        1.     State And Local Contracts Related To Freight Rail ...................7

        2.     Metra Contracts.........................................................................9

        3.     Union Pacific Has Long Served As A Federal Government Subcontractor ........................................................................10

    D.     Plaintiffs' Claims .................................................................................10

III.     ARGUMENT ........................................................................................................11

    A.     The Finger Scans Provided By Plaintiffs Were Not Fingerprints, And Thus Were Not Biometric Identifiers or Biometric Information, Defeating Plaintiffs' Claims In Their Entirety ......................................11

        1.     The Lumidigm Device Does Not Capture Fingerprints...........12

        2.     Section 25(d) Excludes Plaintiffs' Finger Scans From Coverage Under BIPA Because They Cannot Be Used As Fingerprints By The ISP................................................................................14

    B.     Section 25(e) Exempts Union Pacific From BIPA Because It Is A Government Contractor, Defeating Plaintiffs' Claims In Their Entirety .............15

        1.     Union Pacific Was A State And Local Government Contractor Under Section 25(e) At All Relevant Times..............................16

        2.     Union Pacific's State Contracts Bear A Substantive Relationship To Operations At Its Illinois Intermodal Facilities....................18

        3.     Union Pacific Is Also Exempt From BIPA Liability As A Federal Subcontractor ........................................................................19

C.     ICCTA Preempts Plaintiffs' BIPA Claims In Their Entirety ...............................21

D.     Plaintiffs Claims Based On Verification Scans Fail As A Matter Of Law............27

E.     The Section 15(a) Retention Claim (Count III) Fails As A Matter Of Law .........28

F.     The Section 15(d) Claim Fails As A Matter Of Law...............................................31

G.     Each Plaintiff To, At Most, One Recovery For Alleged Violations Of Section 15(b) And One Recover For Alleged Violations Of Section 15(d) .........32

       1.     Under Illinois Law, Statutory Amendments Impacting The Remedies Available To Plaintiffs Are Applied Retroactively.................33

       2.     The 2024 Amendment Affects Only The Remedies Available Under BIPA, Not The Act's Substantive Provisions, And Thus Applies Retroactively To This Case ........................................................34

       3.     The 2024 Amendment Limits Plaintiffs To, At Most, One Recovery Of Damages Under Sections 15(b) and 15(d) ..........................36

H.     Judicial Estoppel Bars Plaintiff Fleury's Claims ....................................................36

I.     Plaintiff Fleury Cannot Recover Damages Based On Finger Scans Or Disclosures After He Signed His Consent ............................................................39

IV.     CONCLUSION.................................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................................11

*Arendovich Invs., Inc. v. NNR Glob. Logistics, Inc.*,
2017 WL 11540589 (N.D. Ill. Sept. 11, 2017) ...........................................................33

*Barnett v. Apple, Inc.*,
225 N.E.3d 602 (Ill. App. 2022) ................................................................................27

*Brandl v. Superior Air-Ground Ambulance Serv., Inc.*,
2012 WL 7763427 (N.D. Ill. Dec. 7, 2012)................................................................34

*Chessie Logistics Co. v. Krinos Holdings, Inc.*,
867 F.3d 852 (7th Cir. 2017) .....................................................................................30

*Citizens' Util. Bd. v. Ill. Com. Comm'n*,
735 N.E.2d 92 (Ill. App. 2000) ..................................................................................17

*City of Cayce v. Norfolk S. Ry. Co.*,
706 S.E.2d 6 (S.C. 2011) ...........................................................................................24

*Cothron v. White Castle Sys. Inc.*,
216 N.E.3d 918 (Ill. 2023).....................................................................18, 32, 33, 36

*Cothron v. White Castle Sys.*,
Inc., 20 F.4th 1156, 1163 (7th Cir. 2021) .................................................................31

*Cox Enters. v. Hiscox Ins. Co.*,
478 F. Supp. 3d 1335 (N.D. Ga. 2020) ......................................................................31

*CSX Transp. Inc.*,
2005 WL 584026 (S.T.B. May 3, 2005)................................................................22, 24

*CSX Transp., Inc. v. City of Sebree*,
924 F.3d 276 (6th Cir. 2019) ...............................................................................21, 25

*Dardeen v. Heartland Manor, Inc.*,
710 N.E.2d 827 (Ill. 1999)....................................................................................34, 35

*Delaware v. STB*,
859 F.3d 16 (D.C. Cir. 2017)......................................................................................25

*Enriquez v. Navy Pier, Inc.*,
  2022 IL App (1st) 211414-U, *appeal denied*, 201 N.E.3d 582 (Ill. 2023) .................15, 16, 19

*Esparza v. Costco Wholesale Corp.*,
  2011 WL 6820022 (N.D. Ill. Dec. 28, 2011).................................................................37, 38, 39

*Fayus Enters. v. BNSF Ry. Co.*,
  602 F.3d 444 (D.C. Cir. 2010) ...................................................................................................22, 25

*Fleury v. Union Pacific R.R. Co.*,
  528 F. Supp. 3d 885 (N.D. Ill. 2021) .......................................................................................21

*Green Mtn. R.R. Corp. v. Vermont*,
  404 F.3d 638 (2d Cir. 2005).......................................................................................................25

*Hartford Ins. Co. of Midwest v. Am. Auto. Sprinkler Sys., Inc.*,
  201 F.3d 538 (4th Cir. 2000) .....................................................................................................20

*Heisler v. Convergent Healthcare Recoveries, Inc.*,
  2018 WL 4635674 (E.D. Wis. Sept. 27, 2018)........................................................................37

*Hernandez v. Forest Pres. Dist. of Cook Cnty.*,
  2010 WL 1292499 (N.D. Ill. Mar. 29, 2010)...................................................................38, 39

*Ind. Harbor Belt R. Co. v. Am. Cyanamid Co.*,
  916 F.2d 1174 (7th Cir. 1990) ...................................................................................................4

*Jones v. Microsoft Corp.*,
  649 F. Supp. 3d 679 (N.D. Ill. 2023) .......................................................................................27

*Khan v. Deutsche Bank AG*,
  978 N.E.2d 1020 (Ill. 2012) .......................................................................................................18

*Kislov v. Am. Airlines, Inc.*,
  2022 WL 846840 ...........................................................................................................................24

*Law v. GM Corp.*,
  114 F.3d 908 (9th Cir. 1997) .....................................................................................................24

*Lucas v. CTA*,
  367 F.3d 714 (7th Cir. 2004) .....................................................................................................11

*Martin v. Martinez*,
  934 F.3d 594 (7th Cir. 2019) .....................................................................................................33

*McHenry Cnty. v. Raoul*,
  44 F.4th 581 (7th Cir. 2022) .....................................................................................................20

iv

*MCI WorldCom Commc'ns, Inc. v. Metra Commuter Rail Div. of RTA*,
786 N.E.2d 621 (Ill. App. 2003) ...................................................17

*Miranda v. Pexco, LLC*,
No. 2021-CH-02127 (Ill. Cir. Ct. Sept. 11, 2023) ........................16, 17

*Mora v. J&M Plating, Inc.*,
213 N.E.3d 942 (Ill. App. 2022) ..................................................40

*Moss v. Martin*,
473 F.3d 694 (7th Cir. 2007) .......................................................17

*N.Y. Susquehanna & W. Ry. Corp. v. Jackson*,
500 F.3d 238 (3d Cir. 2007)......................................................25, 27

*Norfolk S. Ry Co. v. City of Alexandria*,
608 F.3d 150 (4th Cir. 2010) .......................................................25

*Norfolk S. Ry. Co. v. Kirby*,
543 U.S. 14 (2004)........................................................................3

*People v. Atkins*,
838 N.E.2d 943 (Ill. 2005) ..........................................................34

*People v. Dumas*,
2011 IL App (2d) 100006-U ........................................................27

*People v. Glisson*,
782 N.E.2d 251 (Ill. 2002) ..........................................................34

*Perry v. Dep't of Fin. and Prof. Regul.*,
106 N.E.3d 1016 (Ill. 2018) .........................................................34

*Pogorzelska v. VanderCook Coll. of Music*,
2024 WL 1578715 (N.D. Ill. Apr. 11, 2024) .............................34, 35

*Rosenbach v. Six Flags Ent. Corp.*,
129 N.E.3d 1197 (Ill. 2019) .........................................................27

*Sekura v. Krishna Schaumburg Tan, Inc.*,
115 N.E.3d 1080 (Ill. App. 2018) ................................................28

*Smith v. Am. Gen. Life Ins. Co.*,
544 F. Supp. 2d 732 (C.D. Ill. 2008) ...........................................38

*Tillman v. Pritzker*,
183 N.E.3d 94, 102 (Ill. 2021) .....................................................16

*U.S. v. Kitchen*,
    57 F.3d 516 (7th Cir. 1995) .................................................................................................28

*U.S. v. Washington*,
    596 U.S. 832 (2022) ..........................................................................................................20

*Union Pacific v. RTA*,
    2021 WL 4318106 (N.D. Ill. 2021) ....................................................................................9

*Washington v. U.S.*,
    460 U.S. 536 (1983) ..........................................................................................................20

*Wedemeyer v. CSX Transp., Inc.*,
    850 F.3d 889 (7th Cir. 2017) .....................................................................................21, 22

## STATUTES

5 ILCS 70/4 ..........................................................................................................................34

30 ILCS 805/3(a) ..................................................................................................................17

225 ILCS 447/5-10 .......................................................................................................2, 14, 15

740 ILCS 14/10 ..............................................................................................................11, 23

740 ILCS 14/15 ....................................................................................................................35

740 ILCS 14/15(a) .....................................................................................................28, 29, 31

740 ILCS 14/15(b) ..........................................................................................................23, 39

740 ILCS 14/15(b)(1), (3) ....................................................................................................28

740 ILCS 14/20 ....................................................................................................................35

740 ILCS 14/20(b) .....................................................................................................33, 35, 36

740 ILCS 14/20(b)-(c) ..........................................................................................................36

740 ILCS 14/20(c) .........................................................................................................33, 37

740 ILCS 14/25(d) ................................................................................................................14

740 ILCS 14/25(e) ..........................................................................................................*passim*

49 U.S.C. § 10501(b) ............................................................................................................21

Cal. Civ. Code § 1798 ..........................................................................................................23

Ill. Pub. Act 103-0769 .................................................................................32, 35

Illinois Statute Amendment,
    § 4 .................................................................................................34

N.Y. Gen. Bus. Law
    § 899-aa .........................................................................................23
    § 899-aa(b)(5) ..................................................................................23

Tex. Bus. & Com. Code Ann. § 503.001 .........................................................23

Wash. Rev. Code Ann.
    § 19.375 ..........................................................................................23
    § 19.375.010(1) ................................................................................23

Wash Rev. Code Ann. § 19.375.020(1) ............................................................24

## RULES

Fed. R. Civ. P. 56(c) .......................................................................................11

Federal Rule of Evidence 702 ..........................................................................13

Local Rule 56.1(a)(2) .........................................................................................3

## TREATISES

Black's Law Dictionary .....................................................................................31

## REGULATIONS

23 C.F.R. § 646.210(b)(1) ..................................................................................8

## OTHER AUTHORITIES

C. Hernandez, *UP North Polar, Metra adds holiday train to Union Pacific North
    rail line* ..........................................................................................10

Chi. Sun Times, https://chicago.suntimes.com/news/2023/11/27/23978272/ ...............10

*Contractor*, Black's Law Dictionary (11th ed. 2019) ......................................16

*Thomas Tubbs—Petition for Declaratory Order*, No. 35792, 2014 WL 5508153
    (S.T.B. Oct. 31, 2014) .....................................................................24

Pursuant to Federal Rule of Civil Procedure 56(a), Defendant Union Pacific Railroad Company respectfully moves for summary judgment on Plaintiffs' claims.

## I.    INTRODUCTION

Union Pacific owns and operates an extensive freight rail network that is instrumental to the movement of goods throughout the country. As a critical part of its operations, Union Pacific operates intermodal facilities to facilitate the transfer of goods between different modes of transportation, including between rail and trucks. To ensure the safe and efficient operation of its four Illinois intermodal facilities, Union Pacific began using an automated gate system ("AGS") in 2013 to verify the identities of truck drivers seeking to access those facilities. Once the AGS was installed, truck drivers could register by scanning their fingers on a sensor. The AGS used multispectral technology to view subdermal (*i.e.*, below the skin) information and encoded the information to create a template against which subsequent verification scans could be compared.

Plaintiffs allege that Union Pacific violated the Illinois Biometric Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA" or the "Act"), by collecting, retaining, and disclosing their finger scan data. Dkt. 208 ¶¶ 44-84. Union Pacific is entitled to summary judgment on several independent grounds. The first three grounds warrant summary judgment on Plaintiffs' claims in their entirety, while the remaining grounds seek partial summary judgment.

*First*, Union Pacific did not scan Plaintiffs' "fingerprints," and thus did not collect their "biometric identifiers" or "biometric information" under BIPA. The AGS finger scan data was *subdermal* information, which the record indisputably shows does not give rise to a "fingerprint." In any event, Section 25(d) of BIPA requires that the Act be construed consistent with the Illinois Private Detective, Private Alarm, Private Security, Fingerprint Vendor, and Locksmith Act of 2004. Under the Private Detective Act, fingerprints are defined as images that the Illinois State

Police ("ISP") may use for criminal background checks, *see* 225 ILCS 447/5-10, and the record indisputably demonstrates that AGS finger scan data cannot be so used.

*Second*, as a state and local government contractor at all relevant times, Union Pacific is exempt from BIPA liability under Section 25(e), which provides that "[n]othing in this Act shall be construed to apply to a contractor, subcontractor, or agent of a State agency or local unit of government when working for that State agency or local unit of government." 740 ILCS 14/25(e). Moreover, Union Pacific is exempt based on its status as a federal government subcontractor, for under the intergovernmental immunity doctrine, Illinois may not apply BIPA to federal subcontractors while exempting state and local subcontractors.

*Third*, the Interstate Commerce Commission Termination Act ("ICCTA") preempts Plaintiffs' BIPA claims because allowing such claims threatens to create a patchwork of railroad regulations across the country—a problem exacerbated by the burden BIPA imposes on the efficient operation of rail transportation through Union Pacific's intermodal facilities.

*Fourth*, Plaintiffs' verification scans—*i.e.*, the scans that took place when drivers returned to Union Pacific's facilities after providing a registration scan—are not governed by BIPA because they were ephemeral and deleted almost instantaneously. Verification scan data was therefore not collected, captured, or otherwise obtained under Section 15(b), and partial summary judgment is warranted insofar as Plaintiffs seek damages for verification scans.

*Fifth,* Union Pacific's retention of Turner's registration finger scan data did not violate Section 15(a). (Fleury does not assert that claim. Dkt. 208 ¶¶ 69-77.) Neither Turner nor anyone acting on his behalf informed Union Pacific that he no longer intended to access its intermodal facilities. And Union Pacific's retention of his data served the purpose for which it was collected— facilitating the efficient verification of drivers seeking to enter its facilities.

*Sixth*, Union Pacific did not disclose Plaintiffs' finger scan data to third parties. While Union Pacific granted two contractors access to AGS to troubleshoot technical issues, such access was not the disclosure, redisclosure, or dissemination of biometric data under Section 15(d).

*Seventh*, the Illinois General Assembly amended BIPA in 2024 to limit plaintiffs to "one recovery" for a "single violation" each of Sections 15(b) and 15(d). The amendment operates retroactively, warranting partial summary judgment on Plaintiffs' damages claims and limiting Plaintiffs to "one recovery" under each of Sections 15(b) and 15(d).

*Eighth*, because Fleury failed to disclose his BIPA claims in his personal bankruptcy for more than two years after filing this case, judicial estoppel bars those claims.

*Ninth*, Fleury consented to the collection and retention of his finger scan data on June 10, 2020, and summary judgment is warranted as to claims related to scans he provided after that date.

## II.     FACTUAL BACKGROUND

### A.     Union Pacific's Illinois Intermodal Facilities

Union Pacific is a Class I interstate freight railroad that owns and operates an extensive rail network of over 32,000 miles of track nationwide—including 2,300 miles in Illinois, concentrated primarily in Chicago, the busiest rail hub in the country. *See* Local Rule 56.1(a)(2) Statement ("SUMF") ¶ 4. Union Pacific owns and operates intermodal facilities in most major cities in the central and western United States, including in the Chicago area. *Id*. ¶ 5.[1] Intermodal rail is critical to the swift and efficient movement of goods in the United States—connecting ports, warehousing distribution centers, logistics parks, manufacturing facilities, and consumer-facing retailers. *Id.* ¶ 8; *see Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 25 (2004) (intermodal transportation boosts the efficient transportation of goods in commerce). Promoting an efficient and competitive rail

---

[1] Union Pacific's Chicago-area intermodal facilities are called: Global I, Global II, Global III, and Global IV. *See* SUMF ¶¶ 5-6. Global I and Global III are no longer in operation. *Id*. ¶6.

intermodal system provides myriad public benefits, including reductions in greenhouse gas emissions, roadway congestion and maintenance, and roadway accidents—all realized by shifting containerized freight to rail and decreasing traffic on roads. *See* SUMF ¶ 10.

Approximately 25% of all freight trains and 50% of all intermodal trains in the country pass through the Chicago area, the nation's busiest railroad hub. *Id.* ¶ 14. Railroads rely on high-velocity, secure intermodal facilities to ensure the efficient and timely movement of originating, terminating, and transiting interstate freight. *Id.* ¶ 15. The Chicago area rail network handles the movement of, on average, approximately 1,300 trains (including 500 freight and 760 passenger), totaling 37,500 rail cars, every day. *Id.* ¶ 14. Illinois and Chicago thus play a significant role in the transport of freight by rail throughout the nation. *See Ind. Harbor Belt R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1180 (7th Cir. 1990) ("Chicago is one of the nation's largest railroad hubs.").

Union Pacific's intermodal railroad network is essential to Chicago's role in interstate rail transportation. Commercial truck drivers bring shipping containers into Union Pacific's facilities, where they are loaded onto trains and transported to destinations around the country. *See* SUMF ¶ 16. Drivers also pick up shipping containers that arrive via train, loading them onto trucks for further movement. *Id.* ¶ 17. In 2020, Union Pacific's Illinois intermodal facilities handled nearly 1.2 million containers lifted on or off trains. *Id.* ¶ 18. To ensure the safety and security of individuals, physical infrastructure, and customer cargo at its facilities, Union Pacific verifies the identities of commercial truck drivers visiting its intermodal facilities. *Id.* ¶ 41.

**B.     Union Pacific Implemented The AGS To Ensure Safe And Efficient Operations At Its Intermodal Facilities**

From Fall 2013 through 2021, Union Pacific used the AGS, which used a finger-scanning device, to verify the identity of drivers seeking to access its Illinois intermodal facilities. *Id.* ¶ 42. The use of finger scans was intended to promote the efficiency, safety, and security of operations,

allowing drivers quick access while verifying their identities. *Id*. The AGS allowed drivers to enter Union Pacific's facilities more quickly, thereby increasing the number of containers drivers could pick up and drop off in a given day, while decreasing exposure to potentially dangerous rail movement and operations. *Id*. ¶ 44. Using finger scans also allowed Union Pacific to bar entrance of drivers who had been banned for workplace violence or safety violations. *Id*. ¶ 43.

Union Pacific licensed the AGS technology from Nascent Technology, LLC. *Id*. ¶ 47. As the "architect" of the AGS, Nascent manufactured the system and designed its software, which dictated the system's "base functionality," including how the software interacted with the databases on which AGS data was stored. *Id.* ¶ 48. Union Pacific licensed Nascent's system through Remprex, LLC, an "operations service provider" that provided project management services, including maintenance and support relating primarily to the system's hardware—*i.e.*, the physical finger scanning device. *Id.* ¶ 49. Certain Remprex or Nascent employees accessed AGS servers only to troubleshoot technical issues with the AGS. *Id*. ¶¶ 51, 53-54. Neither Remprex nor Nascent personnel possessed or received copies of the finger scan data on the servers, nor did they have the ability to download finger scan data from the databases. *Id.* ¶ 55.

The AGS used multispectral imaging technology to scan drivers' fingers to verify their identity. *Id.* ¶ 56. The AGS incorporated a sensor developed by Lumidigm Inc., which was acquired by HID Global Corporation in 2014. *Id*. ¶¶ 56-57. The sensor used multispectral imaging technology to visually penetrate the skin and scan "subdermal" information—as opposed to the friction ridge skin of the fingertip. *Id.*

Truck drivers using the AGS for the first time had to undergo a registration process. *Id.* ¶ 59. As part of that process, drivers entered a driver's assistance office to access a driver registration station. *Id.* Drivers would place their commercial driver's license ("CDL") face down

on a scanner and place at least one finger on the Lumidigm sensor to be scanned. *Id.* The sensor used multispectral imaging to scan the driver's subdermal information and encode the information into "CompositeIM"—a string of hexadecimal code representing the subdermal information detected by the sensor. *Id.* ¶ 60. The sensor then further translated the CompositeIM into "TemplateBIN," a shorter template code. *Id.* ¶ 62.[2]

Once registered with the AGS, a driver could enter Union Pacific's Illinois intermodal facilities by scanning his finger on a Lumidigm device at a kiosk in an entrance lane. *Id.* ¶ 63. As part of the verification process, drivers entered their CDL on the device. *Id.* ¶ 64. The device then used the driver's CDL number to pull the template data (*i.e.*, TemplateBIN) collected during registration. *Id.* The driver then scanned his finger on the Lumidigm sensor, generating a CompositeIM. *Id.* At that point, the device compared the CompositeIM with the registration TemplateBIN and indicated whether the driver's identity had been verified. *Id.* ¶ 65. The CompositeIM from the verification process existed only fleetingly in temporary random access memory ("RAM") on the local, in-lane device, and was deleted immediately after verification. *Id.* ¶ 66.[3] That data was never stored. *Id.* ¶¶ 66-68. The entire process, from scanning a driver's finger on the sensor to deletion of the data, took "between 1.3 and 2 seconds." *Id.* ¶ 69.

Instead of undergoing the finger scan verification process, drivers who did not want to scan their fingers could confirm their identification directly with a Union Pacific employee. Those drivers would provide their CDL number to a Union Pacific employee, who would confirm that the individual was registered in the Union Pacific driver database system. *Id.* ¶ 71.

---

[2] Hexadecimal code is a system in which data is expressed using 16 possible symbols (0-9 and A-F)—unlike binary code, which uses only two symbols (0 and 1). *See* SUMF ¶ 61. TemplateBIN is a series of hexadecimal code that represents the digitization of only some subdermal information, and reflects the location and angles at which certain physiological structures below the skin exist. *Id.* ¶ 62.

[3] RAM is temporary computer storage where applications can process data on a short-term basis—often instantaneously—without storing or retaining the data. *See* SUMF ¶ 67.

Union Pacific continually evaluates the gate access processes at its Illinois intermodal facilities and looks for ways to improve those processes, including technological improvements. *Id.* ¶ 75. By the end of 2021, Union Pacific no longer used the AGS for driver verification at its intermodal facilities. *Id.* ¶ 77. The AGS was decommissioned altogether in 2023. *Id.*

## C.     Union Pacific Is A Government Contractor And Subcontractor

Union Pacific has long been a state and local government contractor, including from Fall 2013, when it began using the AGS at its Illinois intermodal facilities, through the present. Union Pacific has also long been a federal government subcontractor, handling shipments for federal government agencies directly through its Illinois intermodal facilities.

### 1.     State And Local Contracts Related To Freight Rail

Because the Chicago metropolitan area plays such a critical role in the nation's freight transportation network, the State of Illinois, local governments, and Union Pacific (along with other Class I railroads) since 2003 have participated in a public-private partnership called the CREATE program. *See* SUMF ¶ 20. CREATE is a $4.6 billion program comprising 70 rail improvement projects designed to increase rail capacity, improve connections between rail lines, and benefit the communities through which the lines run. *Id.* ¶ 21. CREATE has reduced the time it takes an intermodal train to pass through the region from approximately 48 hours to 32 hours. *Id.* On many occasions, including in February 2011, May 2015, September 2022, and August 2024, Union Pacific entered contracts with the Illinois Department of Transportation ("IDOT") to support various CREATE projects. *Id.* ¶ 22. Specifically, Union Pacific agreed to provide track and signal construction work, design work related to bridges, engineering services, and services relating to track work, signaling systems, and safety enhancements throughout the Chicago area. *Id.* Union Pacific's work under most of these contracts remains ongoing. *Id.* ¶ 23.

Union Pacific has entered other state and local government contracts that improve the

safety and efficiency of freight and commuter rail in Illinois. *Id.* ¶¶ 24, 27. In particular, it has contracted with state agencies and municipalities to improve rail crossings over Union Pacific's tracks at various locations in Illinois. *Id.* ¶¶ 24-26. These improvements help ensure the rail network, including at Union Pacific's intermodal terminals, operates efficiently and for the benefit of the public. *Id.* ¶ 27; *see also* 23 C.F.R. § 646.210(b)(1) ("Projects for grade crossing improvements are deemed to be of no ascertainable net benefit to the railroads and there shall be no required railroad share of the costs."). For example, Union Pacific entered a June 2013 contract with the Illinois Commerce Commission ("ICC"), the Union County Highway Department, and IDOT relating to safety improvements at a highway-rail grade crossing near Mill Creek. *See* SUMF ¶ 25. Under the contract, Union Pacific agreed to install automatic flashing light signals and gates with bells. *Id.* Union Pacific performed the contracted work, which was completed in approximately April 2014. *Id.*

Union Pacific also entered a May 2014 contract with IDOT to improve crossing warning signal devices at Union Pacific tracks in St. Elmo. *Id.* ¶ 26. Under the contract, Union Pacific agreed to remove the existing crossing, raise the track to meet the proposed highway grade, and install a new crossing. *Id.* Union Pacific performed the contracted work, which was completed in approximately April 2016. *Id.* Union Pacific has performed work under similar contracts in Chicago and across Illinois from 2013 through present. *Id.*

The work Union Pacific performed—and continues to perform—under these contracts is important to ensuring railroad infrastructure and adjacent roadways are safe and well maintained, and to improving the efficiency of rail freight flows. *Id.* ¶ 27. Rail networks are highly interdependent, such that disruptions on one part of the network can cause significant disruptions across the entire network, including for other railroads. *Id.* ¶ 28. Failure to maintain a railroad

8

crossing can result in trains moving at slower speeds or lead to accidents, which can bring traffic on the line to a halt. *Id.* ¶ 29. Whenever a train is stopped, especially in the dense Chicago area network, the stoppage can have ripple effects on the flow of freight, preventing trains from arriving and departing on time and delaying customer shipments to and from Union Pacific's intermodal facilities. *Id.* When trains are delayed and cannot arrive at or depart from intermodal facilities as scheduled, it takes significant time to return to normal operations. *Id.* ¶ 30. Railroads must minimize unplanned delays and stoppages, especially for intermodal trains upon which shippers and truck drivers rely for a steady flow of intermodal containers. *Id.* ¶ 32.

Decreases in efficient rail operations also jeopardize the public benefits associated with shipping containerized freight by rail, including reductions in greenhouse gas emissions, roadway congestion and maintenance, and roadway accidents. *Id.* ¶ 33. The work Union Pacific performed under its state and local contracts helped prevent disruptions to the rail system that could have adversely impacted the efficient flow of freight through its intermodal facilities and broader network. *Id.* ¶ 34. Thus, Union Pacific's state and local government contractor projects all contributed to CREATE's mission to increase rail capacity, improve connections between rail lines, and benefit the communities through which the lines run. *Id.* ¶ 21.

### 2. Metra Contracts

Metra is a municipal corporation that provides commuter rail service. *Id.* ¶ 35; *see Union Pac. R.R. Co. v. RTA*, 2021 WL 4318106, *1 (N.D. Ill. 2021). Union Pacific operates commuter passenger service on three rail lines—the UP North, UP Northwest, and UP West lines—as a contractor for Metra. *See* SUMF ¶ 36. Union Pacific employees operate and maintain the trains and perform functions such as selling tickets and collecting fares. *Id.* Union Pacific's contract with Metra pre-dates the introduction of the AGS at its Illinois intermodal facilities. *Id.* ¶ 19. The Metra commuter rail lines are the same lines that bring freight in and out of Union Pacific's intermodal

terminals. *Id.* Union Pacific's relationship with Metra is common knowledge throughout the Chicago area. *See* C. Hernandez, *UP North Polar, Metra adds holiday train to Union Pacific North rail line*, 11/27/2023, Chi. Sun Times, https://chicago.suntimes.com/news/2023/11/27/23978272/metra-holiday-train-union-pacific-north-rail-line.

### 3. Union Pacific Has Long Served As A Federal Government Subcontractor

For years, Union Pacific has transported federal intermodal shipments for the U.S. Department of Defense ("DOD"), the U.S. Postal Service ("USPS"), and other federal agencies. *See* SUMF ¶ 38. Union Pacific has done so as a subcontractor for other shipping entities. *Id.* Those shipments regularly passed through Union Pacific's Illinois intermodal facilities. *Id.* ¶ 39.

### D. Plaintiffs' Claims

Plaintiffs are truck drivers who registered with the AGS and visited Union Pacific's Illinois intermodal facilities. Dkt. 208 ¶ 18. They claim that Union Pacific, through its use of the AGS, (i) captured their fingerprints, and thus their biometric identifiers or biometric information, in violation of Section 15(b) of BIPA (Count I); (ii) possessed their biometric identifiers and biometric information without making publicly available a retention schedule and destruction guidelines, in violation of Section 15(a) (Count II); (iii) retained their biometric identifiers and biometric information after the purpose for which it was collected had been satisfied, in violation of Section 15(a) (Count III); and (iv) disclosed their biometric identifiers and biometric information to Remprex and Nascent without their consent, in violation of Section 15(d) (Count IV). *Id.* ¶¶ 44-84. Plaintiffs seek $5,000 in statutory damages under Sections 15(a), (b), and (d) for each CompositeIM and TemplateBIN created during the registration process. *See* SUMF ¶ 70. They also seek $5,000 in statutory damages under Section 15(b) for each verification scan. *Id.* All told, Plaintiffs seek upwards of nearly $22 billion in classwide damages. *Id.*

Additional facts are set forth below.

### III.    ARGUMENT

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once a movant shows that no genuine dispute exists, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Conclusory statements ungrounded in specific facts do not defeat summary judgment. *Id.* at 256; *see also Lucas v. CTA*, 367 F.3d 714, 726 (7th Cir. 2004).

### A.    The Finger Scans Provided By Plaintiffs Were Not Fingerprints, And Thus Were Not Biometric Identifiers or Biometric Information, Defeating Plaintiffs' Claims In Their Entirety

Section 10 of BIPA defines the material—"biometric identifiers" and "biometric information"—governed by the Act. A "biometric identifier" is defined as a "retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10. "Biometric information," in turn, means "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.* Plaintiffs allege that because Union Pacific collected their fingerprints, it collected their biometric identifiers and biometric information. Dkt. 208 ¶ 3.

The record indisputably shows that Union Pacific did not collect Plaintiffs' fingerprints. This is so for two separate reasons. First, the Lumidigm device used multispectral technology to scan fingers and view subdermal information (below the skin)—not information from the fingertip's friction ridge skin. Subdermal information does not give rise to a "fingerprint." Second, Section 25(d) of BIPA directs that the Act be construed consistent with the Private Detective Act, which in turn defines fingerprints as images that the ISP can use to conduct criminal background

checks. Finger scans from the Lumidigm device indisputably are not (and cannot be) used by the ISP, and thus are not "fingerprints" under the Private Detective Act and, thereby, under BIPA.

### 1. The Lumidigm Device Does Not Capture Fingerprints

Plaintiffs' claims rest on the premise that the Lumidigm device collected fingerprints and generated biometric identifiers and/or information (CompositeIMs and TemplateBINs) based on those fingerprints. Dkt. 208 ¶ 3. That premise is demonstrably incorrect. A fingerprint is an impression or mark left by the unique ridges and patterns on the surface of a finger. *See* SUMF ¶ 78. Because the Lumidigm sensor scanned only subdermal information from drivers' fingers, it did not capture Plaintiffs' "fingerprints" and thus was not governed by BIPA.

Scott Swann, a biometric expert retained by Union Pacific, analyzed the Lumidigm device and the finger scan data it generated. *Id.* ¶ 80. Swann has over 27 years of experience in biometric technology, including 18 years working for the FBI. *Id.* ¶ 81. Among other roles, Swann was the Unit Chief of Research, Development, Test, and Evaluation for all of the FBI's biometric and identification technologies, where he developed FBI biometric standards and testing programs used around the world to measure biometric accuracy and effectiveness. *Id.* Swann also was responsible for managing the FBI's Certified Products List to ensure that only those products that meet fingerprint image quality specifications are used in the criminal justice system. *Id.*

After analyzing a Lumidigm sensor and the data in the AGS database, Swann determined that the sensor captured only subdermal information, not the skin's surface ridges and patterns. *Id.* ¶ 86. The sensor did so through the use of multispectral imaging technology, which uses various wavelengths of light to extract specific properties beneath an object's physical surface. *Id.* In the case of the AGS, when a driver placed his finger on the Lumidigm sensor, the sensor used wavelengths of light to penetrate the outer layer of skin and take multiple images of physiological structures at different distances below the surface, such as papillae (tissue that connects the outer

layer of skin to subsurface layers) and capillaries (blood vessels). *Id.* ¶ 87. Using a proprietary algorithm, the device fused this data to create CompositeIM. *Id*. ¶ 88. The data came from subdermal information, *not* from the skin surface ridges and patterns necessary to generate a fingerprint. *Id.* ¶ 86. The leading scientific bodies with expertise on fingerprints, including the FBI and National Institute of Standards and Technology, have created international standards that define collection, storage, and image quality requirements for fingerprints. *Id.* ¶ 89. The Lumidigm device does not satisfy any of those standards, because it does not capture fingerprints. *Id.*

Plaintiffs undoubtedly will respond that their expert, Joseph Caruso, testified that the AGS database contains biometric identifiers and information derived from drivers' fingerprints. *Id.* But, as Caruso admitted at his deposition, he is not an expert in biometrics: "I'm not a biometric expert in the sense of the device that captures it"; "I'm not an expert in biometrics per se where I can build a biometric scanner or, you know, write the firmware for a biometric fingerprint scanner." *Id.* ¶ 83.[4] In fact, at the trial of the BIPA case against BNSF, Caruso answered "I am not" when asked, "[Y]ou are not an expert in biometrics, right?" *Id.* ¶ 84. Given that his background is in computer forensics and database analysis, not biometrics, it is unsurprising that Caruso conceded that his expertise "starts *after* the fingerprint reader generates the data that's sent to the database." *Id.* ¶ 84. Accordingly, because Caruso admittedly is not qualified to opine on whether the finger scan data at issue here are fingerprints, biometric identifiers, or biometric information, his testimony and opinions do not create a genuine dispute on that material question.

---

[4] Union Pacific will move under Federal Rule of Evidence 702 to exclude Caruso's opinions characterizing the finger scan data as fingerprints, biometric information, or biometric identifiers.

In sum, because the record indisputably shows that the Lumidigm device did not scan "fingerprints," the data generated from those scans—CompositeIM and TemplateBIN—do not constitute biometric identifiers or biometric information, and thus are not governed by BIPA.

## 2. Section 25(d) Excludes Plaintiffs' Finger Scans From Coverage Under BIPA Because They Cannot Be Used As Fingerprints By The ISP

Section 25(d) states: "Nothing in this Act shall be construed to conflict with the [Private Detective Act] and the rules promulgated thereunder" 740 ILCS 14/25(d). The Private Detective Act sets forth licensure, training, and recordkeeping requirements for "fingerprint vendors." 225 ILCS 447/5-10. A "fingerprint vendor" is "a person that offers, advertises, or provides services to fingerprint individuals, through electronic or other means, for the purpose of providing fingerprint images and associated demographic data to the ISP for processing fingerprint based criminal history record information inquiries." *Id.* The Private Detective Act therefore limits "fingerprint vendors" to individuals or entities that can provide "fingerprint images" to the ISP. *Id.* And to qualify as a "fingerprint image," an image must be able to be used by the ISP for processing criminal history inquiries. *Id.* ("purpose of providing fingerprint images" is "processing fingerprint based criminal history record information inquiries" by the ISP).

The Lumidigm device is not (and cannot be) used by the ISP to "process[] fingerprint based criminal history record information inquiries." *Id.* The ISP is permitted to use fingerprint devices for biometric identification or verification only if they have been approved by the FBI. *See* SUMF ¶ 92. That requirement ensures that state and federal fingerprint identification systems are interoperable, meaning that state and federal systems can exchange data. *Id.* ¶ 93.

The FBI maintains a list of products—the Certified Products List—that meet image quality specifications required for a fingerprint technology used in the criminal justice system. *Id.* ¶ 94. The Lumidigm sensor is not on the FBI Certified Products List. *Id.* In fact, HID Global tried and

failed to obtain approval for the Lumidigm sensor to be placed on the FBI Certified Products List because it was unable to meet the FBI's image quality standards. *Id.* ¶ 95. Put plainly, HID attempted to show the FBI that it could capture a fingerprint with its device, but the FBI determined that it could not. *Id.* ¶ 96.

Because the Lumidigm device is not on the FBI Certified Products List, it is not (and cannot be) used by the ISP for conducting criminal history inquiries. *Id.* ¶ 94. Thus, the device does not capture "fingerprint images" as that term is understood by the Private Detective Act. This, in turn, means that construing the Lumidigm finger scans to be "fingerprint images" would conflict with the Private Detective Act, as they cannot be provided "to the ISP for processing fingerprint based criminal history record information inquiries." *See* 225 ILCS 447/5-10. And because Section 25(d) of BIPA expressly precludes the Act—including the term "fingerprint"—in a manner that conflicts with the Private Detective Act, Plaintiffs' claims fail as a matter of law.

### B. Section 25(e) Exempts Union Pacific From BIPA Because It Is A Government Contractor, Defeating Plaintiffs' Claims In Their Entirety

Section 25(e) of BIPA states: "Nothing in this Act shall be construed to apply to a contractor, subcontractor, or agent of a State agency or local unit of government when working for that State agency or local unit of government." 740 ILCS 14/25(e). By its plain terms, Section 25(e) "explicitly exempts government contractors" from liability under BIPA. *Enriquez v. Navy Pier, Inc.*, 2022 IL App (1st) 211414-U, ¶ 6, *appeal denied*, 201 N.E.3d 582 (Ill. 2023).

It is undisputed that Union Pacific was a state and local government contractor from 2013, when it began using the AGS, through 2023, when the AGS was decommissioned. Throughout that time, Union Pacific had contracts with Illinois state and local entities to improve rail lines and crossings, all of which ensured the fluidity of the rail network. It is likewise undisputed that Union Pacific was a contractor providing services to Metra and a federal subcontractor during that time.

15

Section 25(e) therefore exempts Union Pacific from BIPA liability as a matter of law.

### 1. Union Pacific Was A State And Local Government Contractor Under Section 25(e) At All Relevant Times

Union Pacific is exempt under Section 25(e) because, throughout the time it used the AGS finger scan technology, it was a "contractor … of a State agency or local unit of government when working for that State agency or local unit of government." 740 ILCS 14/25(e).

*First*, Union Pacific was a "contractor." The plain meaning of "contractor" is "one who contracts to do work for or supply goods to another." *Contractor*, Black's Law Dictionary (11th ed. 2019); *see Tillman v. Pritzker*, 183 N.E.3d 94, 102 (Ill. 2021) ("The best indicator of legislative intent is the language of the statute, given its plain, ordinary meaning."). Union Pacific was a party to contracts with Illinois state agencies and municipalities pursuant to which it performed work for those government entities—specifically, operating commuter rail lines, improving railway facilities, providing advice regarding public construction projects, and enhancing crossings used by the traveling public and rail infrastructure throughout Illinois. *See* SUMF ¶ 24. Union Pacific thus is a "contractor" under Section 25(e). *See Enriquez*, 2022 IL App (1st) 211414-U, ¶ 22 (because defendant performed services for Metropolitan Pier and Exposition Authority "pursuant to a contract, it is a government contractor within the ordinary meaning of that term"); Transcript of Proceedings, at 21:8-13, *Miranda v. Pexco, LLC*, No. 2021-CH-02127 (Ill. Cir. Ct. Sept. 11, 2023) ("Pexco Tr.") (holding that Section 25(e) applied where defendant had subcontract with company that was a contractor for the City of Chicago) (attached hereto as Ex. B to the Declaration of Johanna Spellman ("Spellman Decl.")).

*Second*, Union Pacific's contracts are with state agencies and local units of government. *See* SUMF ¶¶ 19-37 (contracts with IDOT, ICC, and Metra). IDOT, the ICC, and Metra are "State or local government agenc[ies]" under Section 25(e). *See* 30 ILCS 805/3(a) ("'Local government'

means a municipality, county, township, other unit of local government, school district, or community college district."); *MCI WorldCom Commc'ns, Inc. v. Metra Commuter Rail Div. of RTA*, 786 N.E.2d 621, 624 (Ill. App. 2003) (Metra is "a unit of local government."); *Moss v. Martin*, 473 F.3d 694, 697 (7th Cir. 2007) (IDOT is a "department in Illinois' state government."); *Citizens' Util. Bd. v. Ill. Com. Comm'n*, 735 N.E.2d 92, 98 (Ill. App. 2000) (same for ICC).

*Third*, Union Pacific's alleged conduct occurred "when [it was] working for" state and local units of government. 740 ILCS 14/25(e). From Fall 2013 through 2021, Union Pacific used the AGS at its Illinois intermodal facilities to verify drivers' identities when they accessed those facilities. *See* SUMF ¶ 42. Union Pacific had contracts with Illinois state and local agencies and was performing work under those contracts throughout that period. *Id.* ¶¶ 19-27, 48.

This temporal connection between Union Pacific's status as a state and local government contractor, on the one hand, and its alleged BIPA violations, on the other, satisfies the "when working for" requirement of Section 25(e). In *Miranda v. Pexco*, *supra*, the plaintiff claimed that her former employer violated BIPA by using a device that required her to scan her finger when clocking in and out of work. *See* Compl., *Miranda v. Pexco, LLC*, No. 2021-CH-02127 (Ill. Cir. Ct. Apr. 30, 2021) (attached hereto as Ex. A to Spellman Decl.). Invoking Section 25(e), the defendant argued that it was exempt from BIPA liability because it was a City of Chicago subcontractor during the time it employed the plaintiff. *See* Pexco Tr. at 4:5-15. The plaintiff countered that Section 25(e) did not apply because the defendant's use of the finger scan technology bore no substantive relationship to the defendant's work under the subcontract. *Id.* at 7:14-23. The court agreed with the defendant, holding that the proper interpretation of "when working for" in Section 25(e) is a "temporal" one, requiring a court to determine if the defendant was a government contractor or subcontractor during the period coinciding with plaintiff's claims.

17

*Id.* at 21:3-7.

The court's decision in *Miranda* is consistent with the settled principle of Illinois law that statutory terms should be given their "popularly understood meaning[s]." *Khan v. Deutsche Bank AG*, 978 N.E.2d 1020, 1043 (Ill. 2012). By its nature, the term "when" is temporal, meaning the time at which something occurs. *See When*, Merriam-Webster (2024) (defining "when" as "at or during the time that"). The Illinois Supreme Court has applied this textualist interpretive principle in construing BIPA. *See Cothron v. White Castle Sys. Inc.*, 216 N.E.3d 918, 923 (Ill. 2023) ("The best indicator of legislative intent is the statutory language itself, given its plain and ordinary meaning."). Thus, because Union Pacific was working as a government contractor throughout the period it used the AGS (and beyond), Section 25(e) exempts it from BIPA.

### 2. Union Pacific's State Contracts Bear A Substantive Relationship To Operations At Its Illinois Intermodal Facilities

Even if, contrary to *Miranda*, Section 25(e) required a substantive relationship between the defendant's government contracts, on the one hand, and the defendant's conduct that allegedly violated BIPA, on the other, Union Pacific would be exempt because its railroad-focused state and local contracts bear a substantive relationship with its Illinois intermodal facilities. For example, and as discussed above, Union Pacific's May 2015 contract with IDOT is part of the CREATE program, a multi-billion program to improve the efficient movement of freight throughout the greater Chicago region. *See* SUMF ¶¶ 20-22. Union Pacific's other state and local contracts similarly improved the safety and efficiency of freight along its rail lines in Illinois. *Id.* ¶¶ 24-34. Inefficiencies, such as slow trains or stoppages resulting from accidents at crossings, affect operations at intermodal facilities by creating backlogs of containers that can take significant time to clear. *Id.* ¶ 31. Simply put, trains must run on time, especially intermodal-bound trains upon which truck drivers and shippers rely for a steady flow of intermodal containers. Union Pacific's

numerous contracts that improve the efficiency and resilience of the rail network for both freight and commuter service help to allow trains to run on time throughout Illinois. *See id*. ¶¶ 20-34.

Accordingly, the work Union Pacific performed under its railroad-related state and local contracts—designed to improve the safety and, as a result, efficiency of operations on its rail lines in Illinois—promoted efficient operations at the Union Pacific intermodal terminals Plaintiffs visited. And while nothing more need be said to establish a substantive relationship between those contracts and intermodal facilities, the finger scanning technology used at those facilities was also intended to serve that same goal by improving the efficiency of driver access to those intermodal facilities. *Id*. ¶ 42. Accordingly, Union Pacific meets the substantive relationship test that the *Miranda* plaintiff urged and the *Miranda* court rejected.

### 3. Union Pacific Is Also Exempt From BIPA Liability As A Federal Subcontractor

Union Pacific is also exempt under Section 25(e) because it is a federal government "subcontractor." 740 ILCS 14/25(e). By transporting goods for DOD and other federal agencies, Union Pacific serves as a subcontractor for the federal government. *See* SUMF ¶ 38. Union Pacific transports federal shipments through its intermodal facilities in the Chicago area. *Id*. ¶ 19; *see supra* at 10. Union Pacific's shipment of goods for federal agencies makes it a "subcontractor" within the meaning of Section 25(e). *See Enriquez*, 2022 IL App (1st) 211414-U, ¶ 20 (a contractor includes "a person or company that agrees to do work or provide goods for another company"); *Hartford Ins. Co. of Midwest v. Am. Auto. Sprinkler Sys., Inc.*, 201 F.3d 538, 541 (4th Cir. 2000) (explaining that the statutory term "contractor" encompasses subcontractors and describing "subcontractors" as "responsible for only a portion of a job") (citation omitted). And there can be no doubt that Union Pacific's federal subcontracts satisfy Section 25(e), even under the substantive standard, because it effectuated that work at its intermodal facilities.

True enough, Section 25(e) references only state and local governments. However, the Supremacy Clause, U.S. const., art. IV, cl. 2, precludes Illinois from exempting state and local government contractors, but not federal contractors, from BIPA. As the Supreme Court explained, the "intergovernmental immunity doctrine" bars state laws that "discriminat[e] against the Federal Government or those with whom it deals (*e.g.*, contractors)." *U.S. v. Washington*, 596 U.S. 832, 838 (2022) (quotations and citation omitted). And "a state law discriminates against the Federal Government or its contractors if it singles them out for less favorable treatment." *Id.* at 839 (quotations and alterations omitted) (quoting *Washington v. U.S.*, 460 U.S. 536, 546 (1983)).

Thus, the intergovernmental immunity doctrine prohibits Illinois from exempting state and local contractors from BIPA while applying the Act to federal subcontractors. Such a scheme would impermissibly single out federal subcontractors "for less favorable treatment," as it would not "impose[] … costs in a neutral, nondiscriminatory way." *McHenry Cnty. v. Raoul*, 44 F.4th 581, 593 (7th Cir. 2022). To remedy the constitutional flaw in Section 25(e), it must be interpreted to apply with equal force to federal government subcontractors. *See Washington*, 596 U.S. at 838.

Section 25(e) thus applies here because Union Pacific is a federal government subcontractor. *See* SUMF ¶¶ 19, 38. And even if this Court were to disagree with *Miranda* and hold that Section 25(e) requires a substantive relationship between Union Pacific's work as a federal subcontractor and the operations at its Illinois intermodal facilities, Union Pacific passes that test because the intermodal containers that it transported as a federal subcontractor passed through those very facilities. *Id*. ¶ 19. Accordingly, Union Pacific's status as a federal government subcontractor exempts it from BIPA liability.

### C.      ICCTA Preempts Plaintiffs' BIPA Claims In Their Entirety

Earlier in this litigation, Union Pacific moved to dismiss Plaintiffs' claims based on ICCTA preemption. Dkt. 36 at 11-17. In denying the motion, this Court explained that although it could not evaluate the "fact-intensive inquiry" required by ICCTA preemption at the pleading stage, "Union Pacific [wa]s free to renew its arguments at a later stage." *Fleury v. Union Pacific R.R. Co.*, 528 F. Supp. 3d 885, 896 (N.D. Ill. 2021). Because the factual record shows that BIPA subjects Union Pacific to "the sort of 'patchwork' regulation that would unreasonably interfere with its operations," *id.*, and also that applying BIPA would otherwise unreasonably burden Union Pacific, ICCTA preempts BIPA as applied here.

ICCTA expressly preempts state law "with respect to regulation of rail transportation" by creating "exclusive" federal jurisdiction "over transportation by rail carriers." 49 U.S.C. § 10501(b). "It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 283 (6th Cir. 2019); *see also Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 894 (7th Cir. 2017) (ICCTA's preemptive effect is "broad and sweeping"). Moreover, "[t]ransportation" is defined broadly to include not just railcars themselves, but also "propert[ies], facilit[ies], and instrumentalit[ies] … related to the movement of passengers or property, or both, by rail" as well as "services related to that movement." *Id.* § 10102(9)(A)-(B). ICCTA thus applies to Union Pacific's Illinois intermodal facilities.

There are two principal categories of ICCTA preemption. First, "[c]ategorial preemption occurs when a state … action is preempted on its face … , such as when state preclearance could be used to deny a railroad the ability to conduct some part of its operations." *Wedemeyer*, 850 F.3d at 894-95 (quotations omitted). Second, state law claims may "be preempted 'as applied' based on

the degree of interference that it has on railroad transportation—that is, if the action would have the effect of preventing or unreasonably interference with railroad transportation." *Id.* at 895. The second form of ICCTA preemption applies here: By threatening to impose a patchwork of state and local rules inconsistent with the uniform regulation demanded by ICCTA, applying BIPA here would unreasonably burden the efficient operation of rail transportation, and that burden would be exacerbated by the inefficiencies and delays it causes to Union Pacific's operations.

Because ICCTA envisions consistent regulation across the nation, BIPA's application to Union Pacific is preempted here because it would impose a "patchwork of railroad regulation" at the state or local level. *Fayus Enters. v. BNSF Ry. Co.*, 602 F.3d 444, 445 (D.C. Cir. 2010) (quotations and citation omitted); *see also CSX Transp. Inc.*, 2005 WL 584026, at *9 (S.T.B. May 3, 2005) (ICCTA was "intended to prevent a patchwork of local regulation from unreasonably interfering with interstate commerce."). BIPA threatens precisely such a patchwork. If applied to Union Pacific's Illinois intermodal facilities, BIPA would introduce a burdensome Illinois-specific regulatory regime that would force Union Pacific to develop processes and procedures unique to their Illinois-based operations. *See Fayus*, 602 F.3d at 445 (affirming dismissal of claim where applying state law would "creat[e] just the patchwork of railroad regulation that ICCTA sought to preempt").

As a Class I rail carrier, Union Pacific transports goods and freight in interstate commerce—a single rail car might pass through a dozen different states (or more) before reaching its destination. *See* SUMF ¶ 39. Other states, including Texas, California, and Washington, have privacy laws that mirror BIPA in some respects but differ in others. *See* Capture or Use Biometric Identifier Act (CUBI), Tex. Bus. & Com. Code Ann. § 503.001; Washington Biometric Privacy Act (WBPA), Wash. Rev. Code Ann. § 19.375; Stop Hacks and Improve Electronic Data Security

(SHIELD) Act, N.Y. Gen. Bus. Law § 899-aa; California Consumer Privacy Act (CCPA), Cal. Civ. Code § 1798. Union Pacific at all relevant times had intermodal facilities in Texas, California, and Washington and operated the AGS in those states (among others). *See* SUMF ¶ 40. As a result, applying BIPA here would contribute to Union Pacific being subject to the very patchwork of regulations that Congress enacted ICCTA to prevent.

The differences between BIPA and the other state biometric privacy laws are material. BIPA defines biometric identifiers to include "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10. WBPA has a broader definition, including all "automatic measurements of an individual's biological characteristics." Wash. Rev. Code Ann. § 19.375.010(1). And SHIELD defines biometric identifier to include "data generated by electronic measurements of an individual's unique physical characteristics." N.Y. Gen. Bus. Law § 899-aa(b)(5). Due to differences in what the different statutes cover, the collection of certain information might be unregulated in one state but heavily regulated in another.

The differences between BIPA and the other state laws extend to the kinds of data collections that are permitted. BIPA states that no party "may collect, capture, purchase, receive through trade, or otherwise obtain a person's or customer's biometric identifier or biometric information" unless it first informs the person and obtains written consent. 740 ILCS 14/15(b). By contrast, WBPA provides that "[a] person may not enroll a biometric identifier in a database for commercial purpose, without first providing notice, obtaining consent, *or providing a mechanism to prevent the subsequent use of a biometric identifier for a commercial purpose*." Wash Rev. Code Ann. § 19.375.020(1) (emphasis added). As a result, there are situations where a party's collection of biometric data might be unlawful in Illinois but not in Washington.

By defining biometric information differently than other state laws, and by prohibiting conduct in Illinois that would be allowed elsewhere, applying BIPA here would violate ICCTA's command that freight transportation operators in interstate commerce not be subject to a "patchwork" of state and local regulations that would impede the seamless operation of interstate transportation. *CSX Transp.*, 2005 WL 584026, at *9. The regulatory patchwork would unreasonably interfere with Union Pacific's interstate operation of its national rail network, especially its intermodal facilities. *See Kislov v. Am. Airlines, Inc.*, 2022 WL 846840, at *5, 7 (BIPA preempted by the Airline Deregulation Act because "BIPA requirement[s] … necessarily involve[d] wholesale changes to [defendant's] customer service practices").

In enacting ICCTA, Congress recognized that "[s]ubjecting rail carriers to regulatory requirements that vary among the States would greatly undermine the industry's ability to provide the 'seamless' service that is essential to its shippers and would weaken the industry's efficiency and competitive viability." S. Rep. No. 104-176, at 6. As the Surface Transportation Board noted, "[t]he interstate rail network could not function properly if states and localities could impose their own potentially differing standards for … activities … that are an integral part of, and directly affect, rail transportation." *Thomas Tubbs—Petition for Declaratory Order*, No. 35792, 2014 WL 5508153, at *5 (S.T.B. Oct. 31, 2014); *see also Law v. GM Corp.*, 114 F.3d 908, 910 (9th Cir. 1997) ("with most railroad routes wending through interstate commerce," the "virtue of uniform national regulation 'is self-evident'"); *City of Cayce v. Norfolk S. Ry. Co.*, 706 S.E.2d 6, 11, 12 (S.C. 2011) (crediting testimony that "it would be difficult to operate a system of over 20,000 miles of track if the regulations in each community were different," and affirming ICCTA preemption because "[t]he need for uniformity is readily apparent"). If BIPA's application were *not* preempted by ICCTA—and assuming (incorrectly) that BIPA, by its terms, governed the finger

scans at issue here—Union Pacific would have had to modify its operations at each location to meet the unique and potentially fluid requirements imposed by California, Washington, Texas, and—relevant here—Illinois. As a result, applying BIPA here would threaten precisely the kind of regulatory chaos that ICCTA was enacted to prevent, and thus is preempted as applied. *See Fayus*, 602 F.3d at 445.

Applying BIPA here would further burden Union Pacific in a manner prohibited by ICCTA by imposing delays and inefficiencies that would have hampered Union Pacific's operations. *See CSX Transp.*, 2005 WL 1024490, at *3 (holding a state requirement preempted as applied under ICCTA where it "would have the effect of preventing or unreasonably interfering with railroad transportation"); *Delaware v. STB*, 859 F.3d 16, 19 (D.C. Cir. 2017) (same). ICCTA burden analysis demands "a factual assessment," *CSX*, 2005 WL 1024490, at *3, that looks to several factors, including whether the regulations "entail … extended or open-ended delays." *Green Mtn. R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005); *see also Norfolk S. Ry Co. v. City of Alexandria*, 608 F.3d 150, 160 (4th Cir. 2010) (quoting *Green Mountain* in finding a truck hauling permitting scheme preempted as applied); *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 254 (3d Cir. 2007) (applying *Green Mountain* to hold that state regulations may not "be used unreasonably to delay or interfere with rail carriage"); *Delaware*, 859 F.3d at 19 (applying *Green Mountain* in the as-applied preemption context).

In addition to preventing Union Pacific from operating its intermodal facilities in a uniform manner, applying BIPA to Union Pacific's use of the AGS would impose a severe burden on the efficient operation of freight transportation at its intermodal facilities. The AGS deployed at Union Pacific's intermodal facilities prevented unauthorized visitors from accessing those facilities and increased efficiency of driver processing, which conferred additional safety benefits by decreasing

exposure to potentially dangerous rail movement and operation. *See* SUMF ¶ 42. The AGS system was reasonably designed to increase "safety, security, and efficiency at Union Pacific's facilities." *Id.* ¶ 45.

Plaintiffs' invocation of BIPA here would hamper these goals—by prohibiting Union Pacific from scanning drivers' fingers to quickly confirm their identities and to prevent unauthorized access to its intermodal facilities. For example, requiring consent before registering for the AGS would cause delays of three to four minutes per driver, which in turn would cause in-gate back-ups and even missed cargo connections. *Id*. ¶ 73. Adriene Bailey, an expert on intermodal rail operations with 38 years in the industry, demonstrated how a seemingly modest delay in a driver's entering Union Pacific's intermodal gate can compound to create a significant burden to Union Pacific's operations, and to interstate commerce broadly. *Id*. ¶ 74. She demonstrated that when the average in-gate processing time was 1.7 minutes, only about ten percent of drivers spent more than three minutes in-gating. *Id.* But if the average in-gate processing time increased by 80 seconds—to just three minutes—it would take ten percent of drivers more than 29 minutes to enter the facility. *Id.* Similarly, if a BIPA consent regime applied to Union Pacific, drivers could withhold consent, which would require an alternative and more time-intensive mode of identity verification.

This is not idle speculation. During the Covid-19 pandemic, a significant number of drivers declined to use the finger scanner to enter facilities due to potential health risks. *Id.* ¶ 72. Union Pacific employees therefore had to confirm drivers' identities using alternative methods, causing considerable delays. *Id.* This phenonemon illustrates how applying BIPA to Union Pacific's finger scan technology at its Illinois intermodal facilities would slow the efficient transportation of interstate freight and jeopardize the safety of critical facilities. *Id*. ¶ 42. Therefore, because

applying BIPA in this context operates to "unreasonably … delay or interfere" with "rail carriage," it is preempted under ICCTA. *N.Y. Susquehanna & W. Ry. Corp.*, 500 F.3d at 254.

### D. Plaintiffs Claims Based On Verification Scans Fail As A Matter Of Law

Plaintiffs seek damages under Section 15(b) for each verification scan on a Lumidigm device. Dkt. 208 ¶ 49; *see* SUMF ¶ 70. Even assuming that the Lumidigm device scanned "fingerprints," Union Pacific did not capture, collect, or otherwise obtain finger scan data during the verification process because that data was ephemeral and immediately deleted.

Because BIPA does not define "capture," "collect," and "obtain," those terms must be given their "popularly understood meaning." *Rosenbach v. Six Flags Ent. Corp.*, 129 N.E.3d 1197, 1205 (Ill. 2019) (when a "statutory term is not defined, we assume the legislature intended for it to have its popularly understood meaning"). Each term entails sustained control over the item that is "collected," "captured," or "obtained." *Barnett v. Apple, Inc.*, 225 N.E.3d 602, 611 (Ill. App. 2022) (defining "collect" and "capture" as to "record in a permanent file (as in a computer)").

Union Pacific did not exercise sustained control of Plaintiffs' verification scans. Verification scan data was ephemeral—it appeared only on the in-lane Lumidigm device, was instantaneously scored against the driver's registration TemplateBIN, and then was immediately deleted. *See* SUMF ¶ 66. The entire process—from scan to deletion—took two seconds or less. *Id.* ¶ 69. That does not rise to the degree of sustained control required by Section 15(b). *See Jones v. Microsoft Corp.*, 649 F. Supp. 3d 679, 683 (N.D. Ill. 2023) ("collect" and "capture" require "something beyond" the mere possession of biometric data) (collecting cases); *see also People v. Dumas*, 2011 IL App (2d) 100006-U, ¶¶ 7, 17, 27 (holding that defendant did not have "dominion or control" over cocaine after holding it "for about 30 seconds" and returning it to an undercover officer); *U.S. v. Kitchen*, 57 F.3d 516, 521 (7th Cir. 1995) (rejecting argument that possession is established by holding something for a "fleeting moment" of "2 or 3 seconds").

The context provided by Section 15 as a whole confirms this reading of Section 15(b). Section 15(a) requires a private entity "in possession" of biometric data to establish and comply with a "retention" schedule for destroying it. 740 ILCS 14/15(a). It would make no sense to require a "retention schedule" for data that is not retained. Section 15's other operative provisions regulate the ways in which entities "in possession" of biometric data may "sell" it, *id.* 14/15(c), "disclose" it, *id.* 14/15(d), or "store, transmit, and protect" it, *id.* 14/15(e). Selling, disclosing, storing, transmitting, and protecting data require a degree of non-ephemeral control that is inconsistent with the creation and near-instantaneous deletion of verification scans. Section 15(b) fits into the picture by regulating how retained data is obtained: It requires a "written release" from a subject whose biometric data "is being *collected or stored*." 740 ILCS 14/15(b)(1), (3) (emphasis added). Section 15(b) cannot sensibly be read to require a written release for ephemeral scans.

Even beyond Section 15's text and structure, this interpretation of Section 15(b) implements the purpose of BIPA, as the General Assembly was concerned about safeguarding biometric data from unauthorized disclosure. *See Sekura v. Krishna Schaumburg Tan, Inc.*, 115 N.E.3d 1080, 1092-94 (Ill. App. 2018). The verification scans here created no risk of unauthorized disclosure. Once matching was complete (within two seconds of a verification), the verification scan disappeared. The scan never left the Lumidigm device (*i.e.*, was never on any Union Pacific database or server) and ceased to exist after matching was complete. *See* SUMF ¶¶ 67-68. There accordingly is no lawful basis for liability under Section 15(b) for verification scans.

### E. The Section 15(a) Retention Claim (Count III) Fails As A Matter Of Law

Section 15(a) requires an entity in possession of biometrics to develop a retention schedule for permanently destroying the data, and to comply with that schedule by permanently deleting biometrics within the sooner of (i) when the "initial purpose" for obtaining the biometrics has been satisfied; or (ii) three years after the individual's last interaction with the private entity. 740 ILCS

14/15(a). Turner (but not Fleury) alleges that Union Pacific violated Section 15(a) by retaining his biometric data for "months or years" after Union Pacific learned that he was no longer registered to haul freight on behalf of the employer for which he had worked when he completed his AGS registration, and thus after the initial purpose of their collection had been satisfied. Dkt. 208 ¶¶ 73-75. There is no merit to his claim.

*First*, contrary to his conclusory allegations, there is no evidence that Turner ever informed Union Pacific that he was no longer registered to haul freight on behalf of his employer. When a driver stops working for a trucking carrier, the carrier is obligated to advise relevant intermodal facilities (like Union Pacific) of this fact through the Intermodal Driver Database (IDD). *See* SUMF ¶ 100. Turner's former employer, Hughes Brothers, did not do so (or otherwise communicate his change in employment status) to Union Pacific. *Id.* ¶ 102. To date, other than through this litigation, Union Pacific has not been informed that Turner no longer works for Hughes Brothers. *Id.* ¶ 103.

Thus, until Turner joined this suit in October 2023, Dkt. 208, Union Pacific was not informed that he no longer intended to access Union Pacific's intermodal facilities using the AGS. *See* SUMF ¶ 103. And in April 2021, over two years before it was informed that Turner no longer worked for Hughes Brothers, Union Pacific deleted any finger scan data for drivers, including Turner, who had not accessed its facilities in the prior year—with the exception of one copy of the data solely for document preservation purposes for this case. *Id.*

*Second,* consistent with Section 15(a), Union Pacific's privacy policy stated that Union Pacific would permanently delete finger scan data from its systems "no later than three years" from a driver's last use of the AGS to access an intermodal facility. *Id.* ¶ 106. Turner last accessed a Union Pacific intermodal facility on August 4, 2019, shortly after which he purportedly stopped

29

working for Hughes Brothers. *Id.* ¶ 98. And in April 2021, Union Pacific deleted finger scan data for drivers, including Turner, who had not accessed any Union Pacific facilities in the prior thirteen months. *Id*. ¶ 104. Thus, Union Pacific's alleged retention of Turner's data was consistent with its privacy policy and thus with Section 15(a).

In their class certification motion, and by contrast to the operative complaint, Plaintiffs argue that Union Pacific violated Section 15(a) by retaining drivers' CompositeIM after their "initial purpose" had been served, *i.e.*, which Plaintiffs contend was after the Lumidigm sensor had create TemplateBIN for use in verification scans. Dkt. 318 at 21. As an initial mater, Plaintiffs cannot change the factual allegations underlying their claim. *See Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017) (affirming dismissal where plaintiff attempted at summary judgment to change the factual allegations underlying its legal theory).

In any event, even under Turner's new theory, the undisputed facts show Union Pacific is entitled to summary judgment. The initial purpose for maintaining a driver's CompositeIM was not satisfied at the moment the Lumidigm sensor created a TemplateBIN at registration. Rather, the initial purpose of collecting CompositeIMs and TemplateBINs at registration was to facilitate the efficient verification of drivers entering Union Pacific's Illinois intermodal facilities. *See* SUMF ¶ 42. Union Pacific continually evaluated the gate access processes at its Illinois intermodal facilities and looked for ways to improve those processes, including technological improvements. *Id*. ¶ 75. As expert Swann explained, best practice is to keep CompositeIMs to ensure that Union Pacific could later use a newer algorithm to more reliably extract templates from existing CompositeIMs, if such an algorithm became available. *Id*. ¶ 76. As Swann explained, "[i]f you don't keep the original image, you'll have no way to take advantage of the latest breakthroughs in

technology for matching." *Id*. Thus, maintaining Turner's CompositeIM after his registration served the "initial purpose" for which it was collected. *See* 740 ILCS 14/15(a).

### F.    The Section 15(d) Claim Fails As A Matter Of Law

Plaintiffs allege Union Pacific violated Section 15(d) by disclosing, redisclosing, and/or disseminating their finger scan data to Remprex and/or Nascent. Dkt. 208 ¶ 81; *see also* Dkt. 318 at 1, 5. To "disclose" finger scan data requires an affirmative "revelation" of such data. *Cothron v. White Castle Sys.*, Inc., 20 F.4th 1156, 1163 (7th Cir. 2021) (disclosure "connotes a new revelation," as Black's Law Dictionary defines the term to mean "[t]o make (something) known or public; to show (something) after a period of inaccessibility or of being unknown; to reveal."). And "disseminate" means "spreading, diffusing, or dispersing." *Cox Enters. v. Hiscox Ins. Co.*, 478 F. Supp. 3d 1335, 1344 (N.D. Ga. 2020) (citing Black's Law Dictionary). There is no evidence that would allow a reasonable jury to find that Union Pacific showed, revealed, or disseminated Plaintiffs' finger scan data to anyone from Remprex or Nascent.

The record indisputably shows that Union Pacific maintained all finger scan data on its own servers. *See* SUMF ¶ 50. Certain Remprex or Nascent employees accessed AGS servers to troubleshoot technical issues. *Id*. ¶ 54. They did not, however, receive copies of the data stored on those servers, nor did they have the ability to download finger scan data from them. *Id*. ¶ 55. There is no evidence that any Remprex or Nascent employees looked at Plaintiffs' finger scan data.

In 2014, Remprex assisted Union Pacific in setting up a central database in Omaha to hold AGS registration data from all Union Pacific's intermodal facilities. *Id*. ¶ 51. In doing so, Union Pacific granted Remprex access to its servers, but it did not hand over that registration data to Remprex or provide Rempres with a copy of the data. *Id*. Indeed, Remprex would not have been able to accept a copy of the AGS data because it "doesn't have servers" on which to maintain that data. *Id*. ¶ 52. Nor did Nascent ever receive the AGS data. *Id*. ¶ 53. Nascent did not have direct

access to finger scan data, and instead had only temporary access to the AGS servers when
providing technical support to Union Pacific with Remprex personnel. *Id.*

Because there is no evidence that Plaintiffs' finger scan data was revealed or disseminated
to Remprex or Nascent, summary judgment is warranted on the Section 15(d) claim.

### G. Each Plaintiff To, At Most, One Recovery For Alleged Violations Of Section 15(b) And One Recover For Alleged Violations Of Section 15(d)

Plaintiffs seek statutory damages for each alleged violation of Sections 15(b) and 15(d).
Dkt. 208 ¶ 49 (alleging that Union Pacific violated Section 15(b) "on each subsequent occasion
[Plaintiffs] had their fingerprints scanned using" the AGS system); *id.* ¶¶ 80, 82 (same for "each
occasion that [Union Pacific] disclosed, redisclosed, and/or disseminated Plaintiffs' and the Class
members' biometrics"). In 2024, however, the General Assembly amended Section 20, BIPA's
remedial provision, to limit a plaintiff to one recovery under each of Section 15(b) and Section
15(d). *See* Ill. Pub. Act 103-0769.

The General Assembly adopted the amendment at the Illinois Supreme Court's suggestion
in *Cothron*, which addressed whether a Section 15(b) claim accrues *each* time an entity scans a
person's biometric identifier, "or *only* upon the first scan." 216 N.E.3d at 920. While ruling that a
separate claim can accrue for each scan, the Court recognized that its holding may be "harsh,
unjust, absurd or unwise" and lead to "potentially excessive damage awards." *Id.* at 928-29. The
Court thus "respectfully suggest[ed] that the legislature review these policy concerns and make
clear its intent regarding the assessment of damages under the Act." *Id.* at 929.

The General Assembly took the Court's suggestion to heart, amending Section 20 to limit
a plaintiff to one recovery under Section 15(b) when the defendant collected the plaintiff's same
biometric identifier or information using the same method:

> For purposes of subsection (b) of Section 15, a private entity that, in more than
> one instance, collects, captures, purchases, receives through trade, or otherwise

> obtains the same biometric identifier or biometric information from the same person using the same method of collection in violation of subsection (b) of Section 15 has committed a single violation of subsection (b) of Section 15 *for which the aggrieved person is entitled to, at most, one recovery* under this Section.

740 ILCS 14/20(b) (emphasis added). Section 20 was amended to impose a materially identical limit on damages for disclosure violations under Section 15(d). *See* 740 ILCS 14/20(c).

As an amendment to BIPA's remedial provisions, the 2024 amendment applies retroactively. Thus, even if Plaintiffs prove that Union Pacific violated Sections 15(b) or 15(d) more than once, and even if they prove that they are entitled to statutory damages, *see Cothron*, 216 N.E.3d at 929 (statutory damages are discretionary), the amendment entitles each Plaintiff to only one recovery for Section 15(b) violations and one recovery for Section 15(d) violations. Union Pacific is therefore entitled to partial summary judgment limiting Plaintiffs' damages under Section 15(b) and 15(d). *See Martin v. Martinez*, 934 F.3d 594, 606 (7th Cir. 2019) (affirming partial summary judgment that cabined plaintiff's potential damages); *Arendovich Invs., Inc. v. NNR Glob. Logistics, Inc.*, 2017 WL 11540589, at *3 (N.D. Ill. Sept. 11, 2017) (same).

### 1. Under Illinois Law, Statutory Amendments Impacting The Remedies Available To Plaintiffs Are Applied Retroactively

The 2024 amendment does not expressly say whether it applies retroactively to cases pending at its effective date. Where, as here, "the legislature has not expressly indicated its intent as to [the] temporal reach" of an amendment, Section 4 of the Illinois Statute on Statutes, 5 ILCS 70/4, provides "default" rules. *Perry v. Dep't of Fin. and Prof. Regul.*, 106 N.E.3d 1016, 1026-27 (Ill. 2018). Section 4 "forbids retroactive application of *substantive* changes to statutes," *People v. Glisson*, 782 N.E.2d 251, 256 (Ill. 2002) (emphasis added), meaning "amendments … that alter the scope or the [statute's] elements," *People v. Atkins*, 838 N.E.2d 943, 947 (Ill. 2005). By contrast, "courts can apply retroactively statutory changes to procedural or *remedial* provisions."

*Glisson*, 782 N.E.2d at 257 (emphasis added); *see also Pogorzelska v. VanderCook Coll. of Music*, 2024 WL 1578715, at *3 (N.D. Ill. Apr. 11, 2024) ("Changes to remedies are considered procedural under Illinois law."); *Brandl v. Superior Air-Ground Ambulance Serv., Inc.*, 2012 WL 7763427, at *2 (N.D. Ill. Dec. 7, 2012) (retroactively applying an amendment because it "affects only the remedy available for a violation of the substantive provisions of the statute").

*Dardeen v. Heartland Manor, Inc.*, 710 N.E.2d 827 (Ill. 1999), illustrates these principles. *Dardeen* addressed "whether an amendment to … the Nursing Home Care Act … should be given retroactive effect." *Id.* at 828. The amendment "repealed [a] treble damages provision," thereby "limit[ing] recovery for violations of the Act to actual damages, costs, and attorney fees." *Id.* at 829. The Court held "that because the amendment … affects *only the procedures and remedies* used to enforce a plaintiff's rights"—that is, because "[t]he grounds for recovery have remained unchanged," meaning that the "plaintiff's substantive rights have also remained unaffected," *id*. at 832—the amendment applied retroactively. *Id.* at 831 (emphasis added).

### 2. The 2024 Amendment Affects Only The Remedies Available Under BIPA, Not The Act's Substantive Provisions, And Thus Applies Retroactively To This Case

The 2024 amendment affects only the remedies available to BIPA plaintiffs and does nothing to alter the Act's substantive provisions. The amendment does not alter the *conduct* BIPA prohibits, *see* 740 ILCS 14/15; how BIPA *defines* biometric identifiers or biometric information, *see id*. 14/10; or which *entities* are subject to BIPA's requirements, *see id*. 14/10, 14/25. Instead, it alters only the "recovery" to which an "aggrieved person" is entitled under Section 20, the Act's remedial provision. *Id*. 14/20(b), (c). Specifically, the amendment impacts only the remedy available to plaintiffs who prove that the defendant committed more than one violation of Section 15(b) by collecting the same biometric identifier or information using the same method; or more than one violation of Section 15(d) by disclosing the same biometric identifier or information.

Thus, for example, if a company obtains an employee's "fingerprint" one thousand times using the same method of collection, and is found to have violated Section 15(b) one thousand times, Section 20 limits the employee to, "at most, one recovery." As in *Dardeen*, because the amendment does not alter in any way "the elements of a violation" of BIPA, 710 N.E.2d at 832, it applies retroactively.

The amendment's text confirms that it affects only BIPA's available remedies, not its substantive provisions. By its terms, the amendment targets the "right of action" codified in Section 20. Ill. Public Act 103-0769 (amending the "right of action" under 740 ILCS 14/20). And Section 20(b)'s text expressly focuses on a plaintiff's "recovery" under the Act. 740 ILCS 14/20(b). Section 20(b) provides that where a private entity collects the "same" biometric data "from the same person using the same method of collection … the aggrieved person is entitled to, at most, *one recovery under this Section*." *Id.* (emphasis added). The amendment therefore serves only to cap the damages an "aggrieved person" can "recover[]," affecting only "remedies" and not BIPA's substantive provisions. *See Pogorzelska*, 2024 WL 1578715, at *3 ("Changes to remedies are considered procedural under Illinois law.").

This conclusion is reinforced by the context of the 2024 amendment's consideration and enactment. The General Assembly enacted the amendment directly in the wake of *Cothron*'s call for it to "review the[] policy concerns" raised by "excessive damage[s] awards under the Act" and to "make clear its intent regarding the assessment of *damages*." 216 N.E.3d at 929 (emphasis added). That is, the legislature followed the Court's "respectful[] suggest[ion]" that it amend the statute to address the damages regime set forth in the pre-amendment version of BIPA. *Id*. It did so by directly amending Section 20, the Act's remedial provision.

In sum, because the 2024 amendment altered only BIPA's remedial provision, it applies

35

retroactively to this case.

### 3. The 2024 Amendment Limits Plaintiffs To, At Most, One Recovery Of Damages Under Sections 15(b) and 15(d)

As noted, the 2024 amendment caps a plaintiff's damages "to, at most, one recovery under" Section 20 where the defendant allegedly collected or disclosed the plaintiff's "same biometric identifier or biometric information … using the same method of collection" in violation of Sections 15(b) and 15(d). 740 ILCS 14/20(b)-(c). Here, when a driver registered with the AGS, his finger was scanned, generating a CompositeIM and TemplateBIN. *See* SUMF ¶¶ 59-62. The CompositeIM and TemplateBIN are the "same [alleged] biometric information from the same person using the same method of collection." 740 ILCS 14/20(b). They thus give rise to, "at most, one recovery" under Section 15(b). *Id*. And when that same driver later provided a verification finger scan, the CompositeIM generated was the "same [alleged] biometric information from the same person using the same method of collection" as the registration scan. *Id*. Thus, verification scans do not give rise to additional recoveries; a driver is entitled to "at most, one recovery" for collection of his finger scan data. *Id*.

The same holds for alleged disclosures under Section 15(d). The only finger scan data that Union Pacific retained were Plaintiffs' CompositeIMs and TemplateBINs created at registration. *See* SUMF ¶¶ 67-68. Plaintiffs therefore are entitled, at most, to "one recovery" for each alleged disclosure of that data to the same recipient. *See* 740 ILCS 14/20(c).

Accordingly, this Court should grant Union Pacific partial summary judgment as to Plaintiffs' Section 15(b) and (d) claims, limiting them to, at most, one recovery under each.

### H. Judicial Estoppel Bars Plaintiff Fleury's Claims

Fleury filed for Chapter 13 bankruptcy in December 2017. *See* SUMF ¶ 111. In doing so, he was required to identify, under penalty of perjury, all "claims against third parties, whether or

not [he had] filed a lawsuit." *Id.* Fleury did not identify his BIPA claims at that time. *Id.* As a debtor, Fleury had a "continuing duty to schedule newly acquired assets." *Heisler v. Convergent Healthcare Recoveries, Inc.*, 2018 WL 4635674, at *4 (E.D. Wis. Sept. 27, 2018). Fleury modified his disclosures on January 15, 2018, but he again did not disclose his BIPA claims. *See* SUMF ¶ 112. Shortly thereafter, on April 5, 2018, the Debtors' Chapter 13 Plan (the "Plan") was confirmed. *Id.* ¶ 113. On November 5, 2018, Fleury filed a motion to modify the Plan, which was granted on December 13, 2018. *Id.* ¶ 114. He did not disclose his BIPA claims at that time. *Id.* Fleury filed this lawsuit on December 11, 2019, yet did not amend his bankruptcy disclosures at that time. *Id.* ¶ 115. On May 10, 2021, Fleury again filed a motion to modify the Plan, which was granted on June 10, 2021. *Id.* ¶ 116. He again failed to disclose his BIPA claims. *Id.* It was not until January 11, 2022—five months after losing a motion to strike Union Pacific's judicial estoppel defense in this case—that Fleury amended his bankruptcy filings to reflect the BIPA claims against Union Pacific, which he had been litigating for over two years. *Id.* ¶ 117. His bankruptcy case closed five months later, on June 16, 2022. *Id.*

Judicial estoppel precludes plaintiffs from pursuing claims where, as here, they failed to disclose those claims in bankruptcy proceedings. *See Esparza v. Costco Wholesale Corp.*, 2011 WL 6820022, at *4 (N.D. Ill. Dec. 28, 2011). Judicial estoppel applies even when a debtor amends his bankruptcy filings to include a claim he initially omitted. *See id.* ("Most courts have found that judicial estoppel bars previously undisclosed claims, whether or not plaintiff attempts to amend the filings."); *Hernandez v. Forest Pres. Dist. of Cook Cnty.*, 2010 WL 1292499, at *5 (N.D. Ill. Mar. 29, 2010) ("District courts in this circuit likewise have concluded that the doctrine of judicial estoppel applies despite the plaintiff's effort to amend his bankruptcy schedule.").

Fleury asserts that his delay in informing the bankruptcy court of his BIPA claims was "just oversight." *See* SUMF ¶ 118. Although courts may (but are not required to) relieve debtors from judicial estoppel when they make inadvertent omissions or mistakes, the exception requires that the "debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment." *Esparza*, 2011 WL 6820022, at *5. Fleury cannot make that showing here. He filed this suit on December 19, 2019. There is no dispute that Fleury knew of his claims at that time (if not before) and was obligated to disclose his claims in his bankruptcy proceeding at that time. *See Smith v. Am. Gen. Life Ins. Co.*, 544 F. Supp. 2d 732, 736 (C.D. Ill. 2008) (finding plaintiff "clearly had knowledge of his claim" that had already been initiated, and holding that "judicial estoppel bars [plaintiff's] claims."). Fleury did not, and he then made matters worse by modifying the Plan without amending his disclosures. *See* SUMF ¶¶ 115-17.

All told, Fleury failed to disclose his BIPA claims to the bankruptcy court for more than two years after filing this case. *See* SUMF ¶ 117. He finally made the required disclosure only *after* realizing he would have to contend with a judicial estoppel defense here. On July 9, 2021, Union Pacific filed its Answer and Affirmative Defenses, asserting an estoppel defense. Dkt. 64 at 13. On July 30, 2021, Fleury moved to strike that defense. Dkt. 65. The court denied the motion on August 5, 2021. Dkt. 67. *Five* months later, Fleury finally amended his bankruptcy disclosures to include his BIPA claims. *See* SUMF ¶ 117.

Courts strongly disapprove of such "procedural sleight-of-hand," holding that "corrective action taken only after being caught and compelled to do so by one's opponent is not a defense to the application of judicial estoppel." *Hernandez*, 2010 WL 1292499, at *5. Indeed, allowing Fleury "to avoid the consequences of [his] deception by amending [his] filings only after being caught

would diminish the incentive to provide truthful disclosures to the bankruptcy court." *Esparza*, 2011 WL 6820022, at \*4. Accordingly, judicial estoppel bars Fleury's claims.

## I. Plaintiff Fleury Cannot Recover Damages Based On Finger Scans Or Disclosures After He Signed His Consent

Sections 15(b) and 15(d) permit private entities to collect and disclose biometric identifiers or biometric information from individuals who provide consent. *See* 740 ILCS 14/15(b) (collection permitted where subject provides a written release); *id*. 14/10 (defining "written release" as "informed written consent" or an "electronic signature"); *id*. 14/15(d) (disclosure permitted where subject "consents to the disclosure or redisclosure").

On June 10, 2020, Fleury completed a Finger Scan Collection Authorization form, consenting to Union Pacific's collection and retention of his finger scan data, along with the disclosure of such data to certain third-party biometric identifier collection vendors or licensors. *See* SUMF ¶ 105. The form complied with BIPA, as it (along with the Privacy Policy referenced therein) informed him that his finger scan data would be collected and retained; that it would be used to control access to Union Pacific's intermodal facilities; that it would be retained as long as he needed it to access those facilities; that it might be disclosed to certain third parties that service the AGS; and that it would be permanently deleted within three years from the date of his last use of the data to access Union Pacific facilities and property. *Id.* In signing the form, Fleury was required to open Union Pacific's Privacy Policy for Motor Carriers, and he "read the Privacy Policy for Motor Carriers" and "authorize[d] UP to collect, capture, obtain, use, disclose, re-disclose, disseminate, transmit, and store [his] finger scan." *Id.* ¶ 109. Fleury testified he understood the content and purpose of the Finger Scan Collection Authorization form. *Id.* ¶ 110.

Given these undisputed facts, Union Pacific is entitled to summary judgment based on claims arising from finger scans Fleury provided, and any disclosures made, after June 10, 2020.

*See Mora v. J&M Plating, Inc.*, 213 N.E.3d 942, 951 (Ill. App. 2022) (Section 15(b) claim dismissed where Plaintiff consented to collection).

## IV.    CONCLUSION

The Court should grant summary judgment to Union Pacific in whole or in part.

Dated: March 13, 2025

Respectfully submitted,

/s/ *Johanna Spellman*
Johanna Spellman, One of the Attorneys for Defendant Union Pacific Railroad Company

Sean M. Berkowitz (Illinois Bar No. 6209701)
    sean.berkowitz@lw.com
Gary Feinerman (Illinois Bar No. 6206906)
    gary.feinerman@lw.com
Johanna Spellman (Illinois Bar No. 6293851)
    johanna.spellman@lw.com
Kathryn A. Running (Illinois Bar No. 6330369)
    kathryn.running@lw.com
LATHAM & WATKINS LLP
330 N. Wabash Ave., Suite 2800
Chicago, IL 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

Michael H. Rubin (*pro hac vice*)
    michael.rubin@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone:  (415) 391-0600
Facsimile:  (415) 395-8095

*Counsel for Defendant Union Pacific Railroad Company*

**<u>CERTIFICATE OF SERVICE</u>**

I, Johanna Spellman, hereby certify that on March 13, 2025, I caused a copy of the foregoing to be filed using the Court's CM/ECF system, which provides service to all counsel of record. Due to certain exhibits being under seal, I also served copies of the foregoing via email on all counsel of record.


Dated:  March 13, 2025

<u>*/s/ Johanna Spellman*</u>
Johanna Spellman, One of the Attorneys for
Defendant Union Pacific Railroad Company

41