# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

DAVID FLEURY and ALVIN TURNER,  )
individually and on behalf of a class of  )
similarly situated individuals,  )
                        )       Case No. 20-cv-00390

         *Plaintiffs*,  )
                        )       Hon. LaShonda A. Hunt
v.  )
                        )       Magistrate Jeffrey Cole

UNION PACIFIC RAILROAD  )
COMPANY, a Delaware Corporation,  )
                        )
         *Defendant*.  )
                        )

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Myles McGuire
Evan M. Meyers
David L. Gerbie
Brendan Duffner
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Floor
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
dgerbie@mcgpc.com
bduffner@mcgpc.com

Jon Loevy
Michael I. Kanovitz
Tom Hanson
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
Tel: (312) 243-5900
jon@loevy.com
mike@loevy.com
hanson@loevy.com

*Attorneys for Plaintiffs and the putative Class
and Subclass*

**TABLE OF CONTENTS**

I.     INTRODUCTION ...........................................................................................................1

II.    BACKGROUND AND FACTS ...................................................................................3

     A.    The Illinois Biometric Information Privacy Act. ...................................................3

     B.    Purchase and Installation of Union Pacific's Automatic Gate Systems. .................4

     C.    How Union Pacific's AGS Worked ........................................................................5

         i.    Registration Process ........................................................................................5

         ii.    Technical Processes During Registration ........................................................7

         iii.    Union Pacific's Storage of the Biometric Data Captured at Registration ........8

         iv.    Technical Process During Re-Entry Scans ......................................................9

     D.    Union Pacific's Attempts to Comply with BIPA ................................................. 10

     E.    Production and Analysis of Union Pacific's Biometric Data ............................... 11

III.    LEGAL STANDARD ..................................................................................................12

IV.    ARGUMENT ..............................................................................................................13

     A.    SUMMARY JUDGMENT ISSUE 1: The Fingerprint Images and Fingerprint Templates Union Pacific Collected, Stored, Retained, and Disseminated Constitute Biometric Identifiers and Biometric Information Under BIPA ...........................13

         i.    There is no Material Factual Dispute About the Data Collected by Union Pacific and Stored in the AGS Databases ................................................................... 13

         ii.    The Fingerprint Images and Fingerprint Templates Constitute Biometric Identifiers and Biometric Information Under BIPA ....................................... 13

     B.    SUMMARY JUDGMENT ISSUE 2: Union Pacific Collected Plaintiffs' and Class Members' Biometric Data Without First Gaining Informed Written Consent .....16

     C.    SUMMARY JUDGMENT ISSUE 3: Union Pacific Possessed the Policy Subclass Members' Biometric Data Without Timely Developing a Section 15(a) Policy ..24

D.      SUMMARY JUDGMENT ISSUE 4: Union Pacific Retained the Illegal Retention Subclass Members' Fingerprint Images After the Purpose for Collecting them had been Satisfied ....................................................................................................26

E.      SUMMARY JUDGMENT ISSUE 5: Union Pacific Disclosed the Class Members' Biometrics Without Consent ...............................................................................28

F.      SUMMARY JUDGMENT ISSUE 6: Union Pacific Collected or Otherwise Obtained, and Disclosed 101,637 Distinct Composite Images and 106,264 Distinct Fingerprint Templates from Class Members Without Written Consent ...............30

V.      CONCLUSION...................................................................................................33

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Amigon v. Old Dominion Freight Line, Inc.*,
No. 24-cv-01934 (N.D. Ill. Nov. 15, 2024) ................................................................. 31

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................................................................... 12

*Ayesha Hawkins v. Lenny Gas N Wash Sauk Trail, LLC*,
Case No. 2024 CH 00697 .......................................................................................... 31

*Boatman v. Riveredge Hosp., Inc.*,
2024 L 3329 (Nov. 7, 2024) ...................................................................................... 31

*Cothron v. White Castle Sys., Inc.*, 216 N.E.3d 918, as modified on denial of reh'g (July 18, 2023)
.............................................................................................................................. 29, 30

*Gaffney v. Riverboat Servs. of Ind., Inc.*,
451 F.3d 424, 458 (7th Cir. 2006) ........................................................................ 13, 16

*Gagen v. Mandell Menkes, LLC*,
No. 2023 L 008294 ..................................................................................................... 31

*Giles v. Sabert Corp.*,
No. 1:24-cv-02996, 2025 U.S. Dist. LEXIS 12888 (N.D. Ill. Jan. 21, 2025) .............. 31

*Gregg v. Cent. Transp. LLC*,
No. 24-cv-1925, 2024 WL 4766297 (N.D. Ill. Nov. 13, 2024) .................................. 31

*Harvey v. Resurrection Univ.*,
2022 WL 3716213 (N.D. Ill. Aug. 29, 2022) ......................................................... 13, 16

*Howe v. Speedway LLC*,
19-cv-01374, 2024 WL 4346631 (N.D. Ill. Sept. 29, 2024) ............................... passim

*Konow v. Brink's, Inc.*,
No. 23-CV-760, 2024 WL 942553 (N.D. Ill. Mar. 5, 2024) ...................................... 18

*LaRiviere v. Bd. of Trustees of S. Illinois Univ.*,
926 F.3d 356 (7th Cir. 2019) ..................................................................................... 12

*Marshall et al. v. Grand Avenue Manager VII LLC*,
No. 2024 L 004745 (Cook Cnty. Jan. 13, 2025) ...................................................... 31

*Mora v. J&M Plating, Inc.*,
2022 IL App (2d) 210692 .................................................................................... 24, 26

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
629 F.3d 697 (7th Cir. 2011) .................................................................................... 12

*Paniagua v. Blommer Chocolate Co.*,
No. 2024 L 004347 (Cook Cnty. Dec. 17, 2024) ...................................................... 31

*Rivera v. Google Inc.*,
238 F. Supp. 3d 1088 (N.D. Ill. 2017) ...................................................................... 18

*Rogers v. BNSF Railway Co.*,
No. 19-cv-03083 (N.D. Ill.) ................................................................................. 3, 28

*Rogers v. CSX Intermodal Terminals, Inc.*,
No. 19-cv-2937 (N.D. Ill.) .......................................................................................... 3

*Rogers v. Illinois Central Railroad Co.*,
No. 19-cv-03647 (N.D. Ill.) ........................................................................................ 3

*Rojo v. Homer Tree Care, Inc.*,
No. 23 L 8588 (Oct. 30, 2024) .................................................................................. 31

*Schwartz v. Supply Network, Inc.*,
No. 23-cv-14319, 2024 WL 4871408 (N.D. Ill. Nov. 22, 2024) ............................... 31

*Scott v. Harris*,
550 U.S. 372 (2007) ................................................................................................... 12

*Sekura v. Krishna Schaumburg Tan, Inc.*,
2018 IL App (1st) 180175 ............................................................................................ 3

*Thompson v. Matcor Metal Fabrication (Illinois) Inc.*,
No. 2020-CH-00132 (Tazewell Cnty., Ill.) (Dec. 7, 2023) ....................... 17, 19, 20, 22

*Vance v. Int'l Bus. Mach. Corp.*,
No. 20-cv-577, 2020 WL 5530134 (N.D. Ill. Sept. 15, 2020) .................................. 20

*Wallace v. Vee Pake, LLC d/b/a Voyant Beauty*,
No. 24 L 4560 (Oct. 10, 2024) .................................................................................. 31

*Watson v. Legacy Healthcare Fin. Servs., LLC*,
2021 IL App (1st) 210279 .......................................................................................... 22

## <u>Statutes</u>

740 ILCS 14/1 .......................................................................................................... 1

740 ILCS 14/10 ................................................................................................. 17, 19

740 ILCS 14/15(a) .......................................................................................... 24, 26, 27

740 ILCS 14/20 ...................................................................................................... 32

740 ILCS 14/20(2) .................................................................................................. 28

## <u>Other Authorities</u>

740 ILCS 14/5 ......................................................................................................... 3

Illinois House Transcript, 2008 Reg. Sess. No. 276 ......................................................... 3

Webster's Third New International Dictionary 645 (1993) ............................................... 29

## <u>Rules</u>

Fed. R. Civ. P. 34(a)(1) ............................................................................................ 25

Fed. R. Civ. P. 56(a) ............................................................................................... 12

Fed. R. Civ. P. 56(c)(2) ............................................................................................ 12

## I.    <u>INTRODUCTION</u>

This case concerns Defendant Union Pacific Railroad Company's ("Union Pacific" or "Defendant") illegal collection, possession, retention, and disclosure of tens of thousands of truck drivers' biometric identifiers and biometric information (collectively, "biometrics" or "biometric data") in Illinois through its Automatic Gate System ("AGS" or "Auto-Gate System"). Plaintiffs' claims are brought pursuant to the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"). On behalf of a Class, a Policy Subclass, and an Illegal Retention Subclass,[1] Plaintiffs seek remedy for Defendant's hundreds of thousands of violations of Sections 15(a), (b) and (d) of BIPA.

Each of Defendant's BIPA violations rests on whether the data at issue constitute the types of information protected under BIPA. Fortunately, Union Pacific's own records (produced in discovery) establish beyond dispute that Union Pacific collected and stored the Class Members' fingerprint images and fingerprint templates without informed written consent. As numerous courts have held, fingerprint images and fingerprint templates constitute biometric identifiers and biometric information under BIPA as a matter of law, and Plaintiffs seek such a determination by this Motion. Union Pacific's lack of compliance with Sections 15(a), 15(b) and 15(d) of BIPA then flows from such determination because: (1) Union Pacific owned the biometric data from the moment it was collected; (2) Union Pacific collected the biometric data in Illinois using hardware Union Pacific owned and software Union Pacific licensed; (3) Union Pacific stored the biometric data on servers Union Pacific owned, and stored those servers at Union Pacific's Illinois railyards; (4) Union Pacific retained control over the biometric data, and disclosed it to third parties; (5)

---

[1] Plaintiffs' Motion for Class Certification (Dkt. 318) is pending; accordingly, all reference to the "Class" or "Class Members" should be read as putative. Furthermore, unless otherwise noted, references to the "Class" or "Class Members" shall include the Policy Subclass and Illegal Retention Subclass as identified in Plaintiffs' pending Motion for Class Certification.

Union Pacific collected the Policy Subclass' biometric data prior to its adoption of a written policy regarding its collection of biometrics; and (6) Union Pacific retained the Illegal Retention Subclass' biometric data after the initial purpose for collection of such data had been satisfied.

It is undisputed that Union Pacific did not even attempt to comply with BIPA until *after* it had broken the law for the vast majority of the statutory period, and, even worse, for many months after Plaintiffs' filed suit. Because BIPA requires *proactive* compliance, Union Pacific violated BIPA by collecting or otherwise obtaining, possessing and disseminating the Class Members' biometrics without first complying with BIPA. In expert discovery, the total number of instances of permanently stored biometrics (and thus violations) were quantified by Plaintiffs' expert. Defendant's experts declined to quantify the total instances of biometrics. Accordingly, because only Plaintiffs' expert's evidence of the number of BIPA violations is in the record, summary judgment as to the number of BIPA violations is appropriate as well.

By this Motion, Plaintiffs seek to resolve questions of law and issues for which there are no genuine issues of material fact, thereby simplifying the case to be presented to the jury. Specifically, Plaintiffs seek rulings as a matter of law that: (1) the fingerprint images and fingerprint templates Union Pacific collected, stored, retained, and disseminated constitute biometric identifiers and biometric information, respectively, under BIPA;[2] (2) Union Pacific collected the Class Members' biometrics prior to gaining their informed written consent; (3) Union Pacific obtained possession of the Policy Subclass members' biometrics prior enacting a publicly-available BIPA policy; (4) Union Pacific retained the Illegal Retention Subclass Members'

---

[2] The Court should not mistake the Parties' differing nomenclature for the data at issue in this case for evidence that there is a factual dispute with respect to such data. Indeed, Plaintiffs refer to the data as "fingerprint images" and "fingerprint templates" because that is what the evidence in this case shows the data to be. Conveniently, while Defendants' communications during the statutory period similarly referred to this data as "fingerprints" or "biometrics," after the filing of this litigation, Defendant adopted terms like "finger scan" and "finger scan data" in a ham-fisted attempt to distance the data at issue here from BIPA.

fingerprint images beyond the point at which the initial purpose for collecting such images was satisfied; (5) Union Pacific disclosed the Class Members' biometrics to other entities without obtaining the Class Members' consent to do so; (6) Union Pacific collected and disclosed 101,637 unique fingerprints and 106,264 unique fingerprint templates from Class Members without written consent.

## II.    BACKGROUND AND FACTS

### A.    The Illinois Biometric Information Privacy Act

BIPA was enacted in 2008 in response to the bankruptcy of a biometric payments company, Pay By Touch, that had been providing major retailers throughout Illinois with fingerprint scanners in their checkout lanes to facilitate payment. *See* Illinois House Transcript, 2008 Reg. Sess. No. 276; 740 ILCS 14/5. This was alarming to the Illinois Legislature because Pay By Touch's database was set to be sold in bankruptcy—leaving thousands of Illinoisans wondering about the status and ownership of their biometric and financial data. *Id.; see also Sekura v. Krishna Schaumburg Tan, Inc.,* 2018 IL App (1st) 180175, ¶ 59 (1st Dist. 2018), appeal denied, 119 N.E.3d 1034 (Ill. 2019) ("A person cannot obtain new DNA or new fingerprints or new eyeballs for iris recognition . . . . Replacing a biometric identifier is not like replacing a lost key or a misplaced identification card or a stolen access code."). Accordingly, the Illinois Legislature enacted BIPA, a generally applicable law governing private entities' use of biometric technology in Illinois. *Id.* Since its enactment in 2008, courts have applied BIPA across dozens of industries to safeguard individuals' immutable biometric information, including against several major national railroads who have used the same AGS technology as Union Pacific. *Rogers v. BNSF Railway Co.,* No. 19-cv-03083 (N.D. Ill.); *Rogers v. Illinois Central Railroad Co.,* No. 19-cv-03647 (N.D. Ill.); *Rogers v. CSX Intermodal Terminals, Inc.* No. 19-cv-2937 (N.D. Ill.).

### B.      Purchase and Installation of Union Pacific's Automatic Gate Systems

Union Pacific is one of seven Class I railroads and is the largest publicly traded North American railroad. (Plaintiffs' Statement of Material Facts ("PSOMF"), at No. 1). Union Pacific uses automatic gating systems at its facilities for various reasons, including to monitor ingress and egress at its railyards. (PSOMF Nos. 6-7, 10). In 2010, Defendant solicited bids from third-party companies by means of a Request for Proposal ("RFP") for an automatic gate system to replace its legacy biometric fingerprint system because the provider of its legacy system was exiting the business. (PSOMF Nos. 8-10). Union Pacific's RFP for its AGS replacement specifically sought an automatic gate system that, like the legacy system, obtained fingerprint biometrics from truck drivers as a means of identifying and recording their identity—listing such fingerprint scanning technology as a "requirement." (PSOMF Nos. 9-10).

Union Pacific received and ultimately accepted a bid to source the AGS hardware and software from two third parties: Remprex, LLC ("Remprex") and Nascent Technology, LLC ("Nascent"), with Remprex acting as an authorized "value-added reseller" of Nascent's AGS technology. (PSOMF Nos. 4-6, 8, 10). The AGS purchased and licensed by Union Pacific, which was used to collect the drivers' biometrics in this case, integrated biometric fingerprint reading and capture devices that were manufactured by another company, Lumidigm (which was later purchased by HID Global Corporation). (PSOMF No. 13, 27-28). Defendant's purchase of the AGS for its Illinois intermodal railyards[3] included its purchase and installation of the gate system itself (the hardware) and a license to use the AGS software from Nascent. (PSOMF Nos. 14-17). Defendant contracted with Remprex to install and maintain certain portions of the AGS at its facilities, and all three entities (Union Pacific, Remprex, and Nascent) worked together to ensure

---

[3] Union Pacific utilized the AGS at four of its Illinois intermodal facilities, known as Global 1, Global 2, Global 3, and Global 4, abbreviated respectively as G1, G2, G3, and G4. (PSOMF Nos. 6, 8).

that the AGS at each Illinois facility functioned to Union Pacific's (the client's) liking. (PSOMF No. 20). Pursuant to Union Pacific's contracts with Remprex and Nascent, Union Pacific owns the data collected by its AGS, including the biometric data at issue in this lawsuit. (PSOMF No. 19). Union Pacific retained ultimate control over who could access the biometric data and permitted Remprex and Nascent to access the biometric data in the normal course of business. (PSOMF Nos. 19, 57).

### C.      How Union Pacific's AGS Worked

#### i.      Registration Process

Plaintiffs and the Class Members worked as truck drivers for third-party companies and drove to Defendant's railyards in Illinois to drop off and pick up loads of freight. (PSOMF Nos. 2-3, 23). In the course of doing so, Plaintiffs and Class Members were required to register their identities with Defendant's AGS. (PSOMF No. 24). For each Class Member, the registration was the same and included three components: A picture of their face, a scan of their commercial driver's license ("CDL"), and a capture of multiple fingerprints. (PSOMF No. 25). This process is depicted as follows:



*Driver Registration Station Driver Guide*
DRS-5

 

Place ID card face down on card scanner.
*Wait for OK from clerk.*

 

 

**Clerk will indicate which finger to scan!**

A. Blue light will flash.
   Place finger on fingerprint scanner.

  

B. After blue light dims and red light
   flashes 3 times, lift finger.

  

C. Repeat A and B for next finger as clerk indicates.

 

Look into camera from about 2 feet away as instructed by clerk.

2 ft.



**CONFIDENTIAL**
P/N: M-100-DRS0008-01   23950

UP-00000307

*technology for transportation*
© NASCENT Technology, LLC 2008.  All rights reserved.

ii.    **Technical Processes During Registration**

The fingerprint readers that were integrated into Union Pacific's AGS were manufactured by Lumidigm, and the same model of Lumidigm fingerprint reader – the V-Series fingerprint sensor – was used at Defendant's Illinois facilities throughout the statutory period. (PSOMF Nos. 28-29).

The Lumidigm V-Series fingerprint sensor uses multispectral imaging technology, which is one of several fingerprint scanning technologies in use today. (PSOMF Nos. 29-30). When an individual registered their fingerprint at a Union Pacific Illinois railyard via a Lumidigm V-Series fingerprint sensor, they pressed their finger(s)[4] onto a platen,[5] and a series of images of their fingerprint were taken using different wavelengths of light and digitally stitched together to create a composite image of the fingerprint (herein "Composite Image" or "Fingerprint Image"). (PSOMF Nos. 30-31). Each fingerprint registered at Union Pacific's Illinois facilities was stored as a Composite Image on servers owned by Union Pacific which were located at each Illinois facility. (PSOMF Nos. 35-36). Immediately after the Composite Images were captured an algorithm was applied to them to create a biometric template (herein "Fingerprint Templates" or "Biometric Template(s)"). (PSOMF Nos. 32-33). To create a Fingerprint Template, the algorithm looked for specific points on a fingerprint called minutiae, and cataloged those minutiae in a vector file, which contains a mathematical representation of those minutiae points. (PSOMF Nos. 32-33). These minutiae, and accordingly the Fingerprint Templates, are uniquely identifying physical characteristics of individuals' fingerprints. (PSOMF Nos. 32-33). The Fingerprint Templates were then stored to be used for comparison and identification when truck drivers returned to Union

---

[4] The vast majority of Class Members scanned multiple fingers at registration. (PSOMF Nos. 25-26).
[5] A platen is the transparent surface upon which individuals place their finger for scanning. (PSOMF No. 31).

Pacific's railyard. (PSOMF Nos. 39, 41, 45). After the near-instantaneous creation and storage of the truck drivers' Fingerprint Templates, Union Pacific also retained the Composite Images even though the Composite Images were never used again for any purpose. (PSOMF Nos. 52-53). Put simply, while the AGS captured and stored both the Composite Images and Fingerprint Templates, after the initial registration and capture, the Composite Images were not used.

### iii.       Union Pacific's Storage of the Biometric Data Captured at Registration

At each of Defendant's Illinois facilities, Defendant stored all of the information it collected at registration – the Fingerprint Images, the Fingerprint Templates, the scanned images of Commercial Drivers Licenses, and the images of the drivers – in computer servers located on site at Union Pacific's Illinois facilities. (PSOMF No. 35). The information was stored in Microsoft SQL, a common software used for database management. (PSOMF Nos. 37-39). The Composite Images were stored as bitmap images in hex format using the image datatype. (PSOMF No. 40). The Fingerprint Templates were stored as ANSI 378 fingerprint templates, which is a standard fingerprint template format designed to promote interoperability across different fingerprint technologies. (PSOMF No. 41). The Composite Images were stored within each of the identically structured Illinois Microsoft SQL Databases in a data field called "CompositeIM." (PSOMF No. 38). The Fingerprint Templates were stored in a data field called "TemplateBIN." (PSOMF No. 39). The CompositeIM and TemplateBIN fields existed within the Union Pacific Illinois databases in tables titled "PartyBiometrics" located on servers at each Union Pacific railyard. (PSOMF Nos. 35, 38-39). Each field in the PartyBiometrics table was linked by a unique "PartyID" to other tables within the database which stored the drivers' personally identifiable information, such as their name, date of birth, and CDL number. (PSOMF No. 43). This data was not encrypted. (PSOMF No. 42).

Union Pacific controlled access to the data collected by its Illinois AGS, including the biometric data. (PSOMF Nos. 57-58). Over the course of its relationship with Remprex, which had installed the Illinois AGS and managed several of its functions, Union Pacific knowingly disclosed Plaintiffs' and the Class Members' biometrics by giving Remprex and Nascent access to the biometric databases and by disseminating to Remprex copies of same. (PSOMF Nos. 57-58).

It is possible to reverse-engineer a fingerprint image from a Fingerprint Template. (PSOMF No. 54). While the reverse-engineered image may not look exactly like the Composite Image it came from, the reverse-engineered image could then be used to create a matching Fingerprint Template. (PSOMF No. 55). The Composite Images at issue here can be used to create additional ANSI 378 fingerprint templates or other types of fingerprint templates that would be compatible with many other fingerprint readers (given the standardized ANSI format) beyond those at issue in this case. (PSOMF No. 56).

### iv.        Technical Process During Re-Entry Scans

Thereafter, while revisiting Defendant's Illinois railyards, Plaintiffs and Class Members were required to scan their fingerprints at a gate lane AGS kiosk (equipped with the same Lumadigm V-Series sensor) to gain access to the facilities – much like a toll booth. (PSOMF Nos. 45-46). On such return visits, the AGS once again captured Class Members' fingerprints as Composite Images and stored the images temporarily on the kiosk fingerprint scanners' RAM (temporary memory). (PSOMF No. 47). The newly-collected Fingerprint Images then had the same algorithm applied to generate another Fingerprint Template. (PSOMF No. 48). Then the new Fingerprint Template was compared against the original biometric registration template stored in Defendant's on-site AGS database. (PSOMF Nos. 49-50). If the new biometric template matched the stored biometric template to a sufficiently high degree, the driver was considered successfully

identified by the AGS, and the driver and their freight were permitted into the facility. (PSOMF No. 50). The newly obtained Fingerprint Images and Biometric Templates were then deleted from the kiosk fingerprint scanners. (PSOMF No. 51). But the originally obtained Composite Fingerprint Images and Fingerprint Templates (from the driver registration process detailed above) remained on Union Pacific's servers indefinitely.[6] (PSOMF No. 52).

### D. Union Pacific's Attempts to Comply with BIPA

In February 2019, Defendant adopted a biometric policy under Section 15(a) of BIPA. (PSOMF No. 61). Union Pacific had no written policy relating to its collection of biometrics prior to that date. (PSOMF Nos. 61-62). Although the new policy expressly called for obtaining consent prior to the collection of biometrics, Union Pacific took no steps to gain truck drivers' consent to collect their biometrics for more than a year, thus violating not only BIPA, but also its own written policy. (PSOMF No. 61). Between February and May 2020, after knowingly violating BIPA (and after this litigation commenced), Defendant attempted to implement a *post-hoc* BIPA compliance regime administered through its mobile phone application UPGO. (PSOMF No. 63). In June 2020, more than a year after Defendant had first collected his biometrics without informed written consent, Defendant sought Plaintiff Fleury's *post hoc* purported consent to collect his biometrics via its mobile application UPGO. (PSOMF No. 64). Plaintiff Turner never provided written consent to Defendant's collection of his biometrics in any manner pre- or post-suit. (PSOMF No. 73). For the truck drivers that provided written consent pursuant to Union Pacific's *post hoc* consent regime, Defendant kept data records of such consent. (PSOMF No. 75). Where Union

---

[6] Notably, the Fingerprint Images collected and stored at registration were not used at all for driver identity verification upon re-entry; rather, the sole comparison was between the re-scan template (derived from the Fingerprint Image collected at the gate lane kiosk fingerprint scanner) and the stored Fingerprint Template. Accordingly, Union Pacific had no purpose for retaining any Fingerprint Image after each driver had registered, though it nonetheless stored said Fingerprint Images indefinitely. (PSOMF Nos. 52-53).

Pacific obtained truck drivers' purported written consent to collect their biometrics, it recorded the date upon which such consent was gained. (PSOMF No. 75). In October 2020, after more than a decade of violating the law, Union Pacific made it mandatory for drivers to provide their written consent prior to scanning their fingerprints in the AGS. (PSOMF No. 65).

      **E.**      **Production and Analysis of Union Pacific's Biometric Data**

During discovery, Defendant produced the Class Members' biometrics from its Global 1, Global 2, and Global 4 AGS databases (the "AGS Databases"). Defendant is unsure of what happened to the biometric database held at Global 3, but it did not produce it. (PSOMF Nos. 21-22). Defendant appears to have deleted the Global 3 biometric database (and the evidence contained on it) *after* the onset of this litigation. (PSOMF No. 21-22). Nevertheless, Defendant's Illinois biometric databases (from the remaining three facilities) were produced in discovery, along with data memorializing the dates that individuals provided their purported consent (the "Consent Database"). (PSOMF No. 74). The Parties each hired experts to analyze the AGS Databases and the Consent Database and to determine the number of unique truck drivers whose Fingerprint Images and/or Fingerprint Templates were obtained and stored by Defendant in Illinois prior to providing consent for the collection of their biometrics. (PSOMF Nos. 74-80).

The Parties' experts agree the AGS Databases are organized and manageable such that the databases can be linked together by common fields that are unique to each driver (such as their CDL number). (PSOMF Nos. 43, 76-78). This data can thus be used to accurately identify individuals based on objective criteria that are relevant to this case, such as the date on which they registered their fingerprints with an Illinois AGS, and the date on which they provided purported consent to the collection of their biometrics (if any such consent was gained). (PSOMF Nos. 76-78).

The AGS Databases also provide Plaintiffs with a manageable framework to quantify the total number of Fingerprint Images and Fingerprint Templates collected and stored by Union Pacific from each Class Member, as the number of illegally obtained unique instances of biometric identifiers and biometric information (Fingerprint Images and Fingerprint Templates) can be associated with each driver and counted. While Defendant's expert did not include these calculations in his report for the entirety of the Class, he admitted that the numbers of unique instances of Fingerprint Images and Fingerprint Templates are calculable. (PSOMF No. 79). Plaintiffs' expert performed said calculation, finding that Defendant's database contained 101,637 unique Fingerprint Images, and 106,264 distinct Fingerprint Templates obtained from Class Members without written consent during the Class period. (PSOMF No. 80).

## III.  **LEGAL STANDARD**

When a party moves for summary judgment, the movant "bears the burden of demonstrating the absence of genuine issues of material fact." *LaRiviere v. Bd. of Trustees of S. Illinois Univ.,* 926 F.3d 356, 359 (7th Cir. 2019). Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Matters of statutory interpretation are questions

of law appropriate for resolution on summary judgment. *Harvey v. Resurrection Univ.,* 2022 WL 3716213, at *3 (N.D. Ill. Aug. 29, 2022) (citing *Gaffney v. Riverboat Servs. of Ind., Inc.,* 451 F.3d 424, 458 (7th Cir. 2006)).

## IV.   ARGUMENT

### A.   SUMMARY JUDGMENT ISSUE 1: The Fingerprint Images and Fingerprint Templates Union Pacific Collected, Stored, Retained, and Disseminated Constitute Biometric Identifiers and Biometric Information Under BIPA

There is no material factual dispute about the process by which Union Pacific collected the data at issue in this lawsuit, nor is there any dispute about what that data includes. Despite Defendant's longstanding efforts to shield the data from discovery, Plaintiffs ultimately obtained copies of the AGS Databases as a result of a heavily litigated Motion to Compel (and subsequent Fed. R. Civ. P. 72 appeal to this Court) (Dkts. 174, 179), and both Parties hired experts to analyze the data. The Parties' experts largely agree that the data contains Composite Images of Class Members' fingerprints, as well as Fingerprint Templates derived from those Composite Images. Given these undisputed facts, the Court should find, as numerous other courts have, that the Fingerprint Images and Fingerprint Templates collected by Union Pacific constitute biometric identifiers and biometric information as a matter of law. [7]

#### i.   There is no Material Factual Dispute About the Data Collected by Union Pacific and Stored in the AGS Databases

Importantly, there is no material factual dispute as to either the basic technical functioning of the AGS or the fact that two types of data are collected and stored when truck drivers register their fingerprints with the AGS. The only dispute is a legal one: whether the fingerprint data collected and stored by Union Pacific is subject to BIPA.

---

[7] In its Answer, Union Pacific admitted that it is a "private entity"[7] to which BIPA applies. (Dkt. 275, at 12). Accordingly, that Union Pacific is a private entity is established as a matter of law with respect to each of Plaintiffs' claims.

As detailed above, the technical and procedural functioning of the AGS was uniform and is undisputed: Each Class Member registered one or more fingerprints with Union Pacific's AGS prior to giving consent for the collection of their biometrics. For each fingerprint, a Composite Image and Fingerprint Template was stored in the Illinois AGS Databases maintained on Union Pacific's on-site servers. (PSOMF Nos. 35-36). The AGS Databases are organized so that each Composite Image and Fingerprint Template collected by Union Pacific at registration is linked with each Class Member's personally identifiable information, including images of their face and scans of their drivers' licenses. (PSOMF No. 43).

Notwithstanding that Union Pacific had not actually yet reviewed or analyzed the data in the AGS Databases, the Court will recall that Union Pacific refused to produce the data in its AGS Databases, vociferously (and, it turns out, wrongly) contending that because the data in the AGS Databases could not be rendered into fingerprint images, the data could not be biometric identifiers or biometric information subject to BIPA. Union Pacific advanced this objectively false argument through the testimony of its lay and corporate designee witnesses, in its court filings, and through its attorneys at every opportunity. (*See* Dkt. 318 Plfs' Mot. for Class Cert. at 16-19). Union Pacific did so despite not even having analyzed the data in the AGS Databases until 2023 (over three years after this case was filed and over four years *after* it enacted its publicly available BIPA policy). (PSOMF No. 67).

After Union Pacific was forced to turn over the AGS Databases in discovery, its defense on this issue fell apart. Plaintiffs' expert analyzed the data and confirmed that it contained fingerprint images. (PSOMF Nos. 38, 40, 69, 72, 78). Union Pacific's own expert initially suggested that he was unable to render fingerprint images from the data, but during his deposition was forced to admit that he, too, was able to render fingerprint images from the data – although he

deceptively failed to include or mention those successful renderings in his initial expert report, choosing instead to attempt to mislead Plaintiffs, and, ultimately, the Court. (PSOMF No. 38, 40). Of course, Defendant could not *actually* have been surprised that the AGS Databases contained images of fingerprints because: (1) Union Pacific specifically required that its AGS technology contain fingerprint capture devices; and (2) its prior counsel witnessed the October 2022 trial in *Rogers v. BNSF Railroad Co.,* No. 19-cv-03083 (N.D. Ill.), which concerned the same fingerprint technology sold by the same vendors deployed by another Class I railroad, Defendant's competitor BNSF. (PSOMF No. 8). As Union Pacific's prior counsel, Judge Kennelly, and the *Rogers* jury witnessed in that case, fingerprint images, just like those at issue in this case, were introduced as trial exhibits in open court and testified to by the same expert, Joseph Caruso of Global Digital Forensics, that Plaintiffs have retained in this matter.[8] When confronted with the Composite Images from Union Pacific's AGS Database in a subsequent deposition, even Union Pacific's corporate designee as to the AGS data, Jeremy Hayden, was forced to contradict his earlier testimony and agreed that the image appeared to be an image of a fingerprint. (PSOMF No. 38).

Unlike the Fingerprint Images, Union Pacific has never meaningfully contested that it collects and stores Fingerprint Templates. Instead, Union Pacific has adopted a defense founded exclusively on nomenclature, re-labelling the Fingerprint Templates as "finger scan data." Union Pacific has never contested that this data was stored in the TemplateBIN data field following truck drivers' registrations on its Illinois AGS Databases. (PSOMF No. 39). Union Pacific simply

---

[8] Excerpts of the Oct. 7, 2022 Direct Examination of Joseph Caruso: Q. Okay. You mentioned that you found fingerprints stored in the data? A. Uh-huh. Q. Were you able to actually visualize the fingerprints from the data? A. We were. Q. And what sort of tool did you need to use to visualize the fingerprints? A. Well, they were stored in binary large objects, so blobs within the database. That's when you take like a JPEG file or a photograph and you store it within the database and it's a big -- it's a field called a blob. So we just extracted the data from that blob and viewed it in Microsoft's image viewer. Q. Okay. Is the Microsoft imager software just publicly available? A. It comes with Windows.

disputes that such data constitutes biometric information because (according to Union Pacific) it is "finger scan" data, not "fingerprint" data.[9]

A dispute over nomenclature, however, is not a dispute of material fact. The undisputed facts are that Union Pacific collected Fingerprint Images by scanning Plaintiffs' and Class Members' fingers, and that data was used to create a template which was subsequently used to verify Plaintiffs' and Class Members' identities. What Union Pacific wants to call that data is irrelevant – what matters is what the data is, and what it is used for. Those facts are not in dispute; the only question is a legal one: whether the data constitutes biometric identifiers and biometric information under BIPA. As set forth below, this Court should find as a matter of law that it does.

### ii. The Fingerprint Images and Fingerprint Templates Constitute Biometric Identifiers and Biometric Information Under BIPA

Summary judgment as to whether the data at issue in this case constitutes biometric identifiers and/or biometric information is appropriate because Parties only dispute the data's legal significance, *i.e.*, whether it is subject to BIPA. *Howe v. Speedway LLC*, 19-cv-01374, 2024 WL 4346631, at *10 (N.D. Ill. Sept. 29, 2024) "[W]ether the scanned image captured by the timeclocks is a "fingerprint" as used in the statutory definition of "biometric identifiers" under BIPA is a question of statutory interpretation for the Court to decide, because no underlying constituent facts are disputed."; *see also id.,* at 11 "This statutory-interpretation question is a legal one." (citing *Harvey v. Resurrection Univ.,* 2022 WL 3716213, at *3 (N.D. Ill. Aug. 29, 2022); *Gaffney v. Riverboat Servs. of Ind., Inc.,* 451 F.3d 424, 458 (7th Cir. 2006)). Accordingly, Plaintiffs seek a summary judgment finding that the data Union Pacific collected is the type of data regulated by BIPA, as other courts have done at the summary judgment stage in BIPA cases. *Howe,* 2024

---

[9] Union Pacific did not adopt this nomenclature until after this litigation was filed, and has produced dozens of contemporaneous emails and other documentation in which Union Pacific correctly identified the data as "fingerprint" data or "biometric" data.

WL 4346631 at 22; *Thompson v. Matcor Metal Fabrication (Illinois) Inc.,* No. 2020-CH-00132 at 6 (Tazewell Cnty., Ill.) (Dec. 7, 2023)[10]

To this end, the Court should find that the Fingerprint Images and Fingerprint Templates constitute biometric identifiers and biometric information under BIPA, respectively. The statute defines "biometric identifier" to include a "fingerprint," and defines "biometric information" as "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10.

The following images are the Composite Images of Plaintiffs Fleury and Turner collected and stored by UP and ultimately produced in this litigation. It is self-evident that they are fingerprints, and thus expressly constitute biometric identifiers under BIPA. 740 ILCS 14/10:

Plaintiff David Fleury:



---

[10] In accordance with the Court's case procedures, the decision in *Thompson v. Matcor Metal Fabrication (Illinois) Inc.,* No. 2020-CH-00132 at 6 (Tazewell Cnty., Ill.) is being filed contemporaneously herewith as Exhibit # OO.

- 17 -



A "biometric identifier" is a "unique personal feature that can be used to identify a person." See *Konow v. Brink's, Inc.,* No. 23-CV-760, 2024 WL 942553, at *2 (N.D. Ill. Mar. 5, 2024) (cleaned up); *Rivera v. Google Inc.,* 238 F. Supp. 3d 1088, 1096 (N.D. Ill. 2017) ("[A] 'biometric identifier' is not the underlying medium itself, or a way of taking measurements, but instead is a set of measurements of a specified physical component (eye, finger, voice, hand, face) used to identify a person."). Per the *Howe* Court, "[t]he term fingerprint refers to the ridges of the finger (or a portion of the distinctive pattern of lines on a finger), as long as that portion of the finger's ridges or pattern is sufficient to be unique to a particular individual and is capable of being used to identify a particular person." 2024 WL 4346631 at 18. In *Rivera,* Judge Chang went on to explain that:

> Nothing in [BIPA] says, one way or the other, how the biometric measurements must be obtained (or stored, for that matter) in order to meet the definition of 'biometric identifier.' The definition simply lists the specific identifiers that are covered. The particular biometric identifiers can, in fact, be collected in various ways without altering the fact that the measurements still are biometric identifiers. Consider, for example, fingerprints: the definition is indifferent as between inked fingerprints versus digital images of fingerprints.

238 F. Supp. 3d 1088, at 1095-65. Here, the digital fingerprint images depict the distinctive ridges of the fingerprints they represent and are clearly capable of identifying an individual and were in fact used to do so. (PSOMF Nos. 47-50). Indeed, if they weren't capable of identifying an

individual, then the Auto-Gate Systems would not have worked. *See Howe,* 2024 WL 4346631, at 20:

> "Speedway asserts that partial fingerprints or scans of less than a full fingerprint may not, as a general matter, be able to accurately identify an individual, but the factual record does not support that Speedway's timeclocks have that problem. In fact, the purpose of Speedway's timeclocks is to figure out which specific employee is clocking in."

Just as the biometric timeclocks in *Howe* were used to figure out which employee was clocking in, the AGSs here were used to verify the identity of truck drivers attempting to enter the railyard. That is identification. (PSOMF Nos. 47-50).

During discovery, Union Pacific's equivocations and evasiveness as to whether individuals' fingerprints were being collected led to intellectually dishonest testimony such as:

> Q: And I know that you want to stay away from the word finger print, but they are, in fact, scanning the tip of the finger, correct?
>
> A: They are scanning the -- their end of their finger, that is correct.
>
> Q: Yep, it is not their knuckle, right?
>
> A: That's correct.
>
> Q: All right. And that is because the tip of the finger has had uniquely identifying finger prints, correct?
>
> A: I don't know.

Ex. G, at 52:4-16; *see also* Plfs' Mot. Class Cert. at 16-19. But even if the Court entertains Defendant's flippant nomenclature defense, "there is no difference between a 'fingerprint' scan and a 'fingertip' scan." *Thompson,* at 6. (citing various definitions of a fingerprint, one of which uses the word "fingertip").

It is similarly self-evident that the Fingerprint Templates constitute biometric information under BIPA. BIPA defines "biometric information" as "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. The first clause of that definition, which reads "*any* information,

*regardless* of how it is captured, converted, stored, or shared," is as broad as the Illinois Legislature could have possibly written it. The Fingerprint Templates here constitute information that was captured, converted, or stored because they are data (which is information) that did not exist until an individual put their finger on the platen to be scanned *i.e.,* was captured from the individual's finger. (PSOMF Nos. 31-33). The Fingerprint Templates are also plainly "based on an individual's biometric identifier." Indeed, the Fingerprint Templates are not just "based on" individuals' fingerprints, they are mathematical representations of the minutiae that comprise those individuals' fingerprints. (PSOMF Nos. 31-33). And lastly, the Fingerprint Templates are used to identify individuals as themselves when they place their finger on the kiosk AGS scanner to re-enter Union Pacific's facilities. (PSOMF Nos. 45-50). Accordingly, the Fingerprint Templates are biometric information as a matter of law. *Vance v. Int'l Bus. Mach. Corp*., No. 20-cv-577, 2020 WL 5530134 (N.D. Ill. Sept. 15, 2020) (collecting a "'dataset" of "biometric measurements that can be used to identify [p]laintiffs … implicate[s] BIPA").

At summary judgment, other courts have found fingerprint templates to be biometric information on very similar facts. *See Thompson v. Matcor Metal Fabrication (Illinois) Inc.,* No. 2020-CH-00132 at 6 (Tazewell Cnty., Ill.) (finding BIPA applies where "the Timeclocks scan a portion of the fingertip, identify prominent features on it, and immediately store those features as an alphanumeric code known as a 'Template,' which is "an identifying number"); *Howe*, 2024 WL 4346631, at *9 ("The character of the Template as an alphanumeric code is irrelevant. As explained, what makes the Template biometric information is that the code is based on protected biometric identifiers.")

It is impossible to overstate the volume of documents produced in this case that support and confirm that even Union Pacific – prior to adopting its nonsense nomenclature defense in this

lawsuit – regarded the data as "fingerprint" and "biometric" data. Plaintiffs do not need to attach them all to obtain partial summary judgment but will identify a few of the most prominent.

- The Union Pacific's RFP for the AGS listed "2-finger biometric scanning unit" as a "requirement" for its gating system, and Remprex and Nascent represented that this requirement was met by the AGS that was ultimately installed. (PSOMF Nos. 8, 10).

- The AGS Clerk Console Reference Manual, which explains to UP employees and others how to register drivers with the AGS, repeatedly refers to "biometrics" and "fingerprints" and at the portion of the manual titled "Register Driver" reads: "You will collect three sets of fingerprints from the driver for use when InGating" (0000026-264). The same manual later describes the following step in the "Ingate Process Screen Flow": "Using the Biometric Scanner, the driver scans the finger used to register with the Biometric Server." (PSOMF Nos. 24-26).

- UP documents describing the AGS refer to the location where registration data is stored as a "fingerprint server." UP-00015390-92 ITOS Manual diagram depicting a "fingerprint server," stating that "Biometric fingerprinting is used to verify the driver's identity. Fingerprint server has the database of driver fingerprints. This is site specific" and also "This is where fingerprints of the driver are captured using a fingerprint reader."). (PSOMF No. 35).

- Internal Remprex emails refer to the fingerprint data collected by the AGS as "biometric data." (PSOMF No. 58).

Despite this common sense application of BIPA's plain language to undisputed fact, during the course of expert discovery, it became apparent that Defendant will still attempt to argue that the Fingerprint Images and Fingerprint Templates do not depict fingerprints or any other data subject to BIPA. Specifically, Plaintiffs expect Defendant to argue that the Fingerprint Images are not biometric identifiers because they are not full rolled ink or digital law-enforcement captured fingerprints or because they lack some FBI certification. The defendant in *Howe* made the same uphill argument on summary judgment—and it failed. *Howe,* 2024 WL 4346631, at *16 (acknowledging defendant's argument that the term "fingerprint" in BIPA refers only to full rolled fingerprints collected by law enforcement.) In short, Union Pacific sent out an RFP for the purchase of a biometric fingerprint system to replace its existing biometric fingerprint system,

bought a new biometric fingerprint system, installed that biometric fingerprint system at its Illinois facilities, and successfully operated that biometric fingerprint system for years while referring internally to it as a "biometric" system that collects "fingerprints." (PSOMF Nos. 10, 35). Analysis of the data has confirmed that it constitutes fingerprint images and ANSI 378 fingerprint templates. (PSOMF Nos. 38, 41, 69, 72). No amount of wordsmithing or definitional shell games can change that, so Plaintiffs are entitled to a finding as a matter of law that the data at issue in this case constitute biometric identifiers and biometric information under BIPA.

**B.  SUMMARY JUDGMENT ISSUE 2: Union Pacific Collected Plaintiffs' and Class Members' Biometric Data Without First Gaining Informed Written Consent**

Plaintiffs Fleury and Turner are the representatives for the Class, which is a group of drivers whose biometrics were obtained by Union Pacific during the statutory period and prior to the provision of any written consent according to Defendant's records. (Dkt. 318 Plfs' Mot. for Class Cert., at 8). Under Section 15(b), before a private entity may "collect, capture, … or otherwise obtain" biometric data from an individual, it must "first" obtain a "written release" from the individual. 740 ILCS § 14/15(b); *see also Thompson,* Ex. OO, at 9. As set forth above, the fingerprint images and fingerprint templates constitute biometric identifiers and biometric information as a matter of law. To "collect" biometric data means "to gather or exact [it] from a number of persons or sources." *Watson v. Legacy Healthcare Fin. Servs.,* LLC, 2021 IL App (1st) 210279, ¶ 59, 196 N.E.3d 571, 581. Moreover, the statute also includes a catch-all which also prohibits "otherwise obtain[ing]", so the Court need not even wade into *another* definitional shell game Plaintiffs expect Defendant to launch.

Here, it is undisputed that Union Pacific collected, captured or otherwise obtained Class Members' biometrics at Defendant's Illinois railyards and stored the data on Defendant's computer

servers in Illinois. (PSOMF Nos. 35-36, 52). In discovery, Defendant itself (rather than Remprex or Nascent) produced the Class Members' biometrics pursuant to Court order. (Dkt. 174). Because Union Pacific has always owned and controlled the biometric data, this is yet another unsurprising result. (PSOMF Nos. 19, 57). Indeed, when Union Pacific employee Jeremy Hayden was tasked with analyzing the biometrics, he needed only to ask another Union Pacific department for access to the data rather than any Remprex or Nascent personnel. (PSOMF Nos. 56-58). Defendant also owns the biometric data pursuant to contract. (PSOMF No. 19). Indeed, Defendant's license agreement with Nascent, wherein Defendant is the Licensee, reserves all of Licensee's "Confidential Information" as the sole property of the Licensee. (PSOMF Nos. 14-19). Confidential Information includes all technical, commercial, and operational information—which clearly encompasses the biometric data here. (PSOMF Nos. 14-19). There is no contractual basis or other evidence to support the claim that any entity other than Union Pacific, including Remprex or Nascent, owns the biometrics. In fact, the corporate representatives from both Remprex and Nascent each testified that those entities do *not* own the biometrics. (PSOMF Nos. 14-19). Accordingly, because the Class Members' biometrics were gathered or extracted using Union Pacific's Lumidigm fingerprint scanners, and then stored on Union Pacific's servers subject to Union Pacific's ownership and control, Union Pacific collected (or otherwise obtained) the biometrics under BIPA.

According to Union Pacific's Rule 30(b)(6) designee as to its BIPA compliance, Union Pacific did not begin obtaining truck drivers' written consent to collect biometrics until sometime between February and May of 2020, and later made consent mandatory in October 2020. (PSOMF Nos. 63-65). It is thus undisputed that Defendant did not obtain prior informed written consent of the Class Members—as Union Pacific recorded the dates of consent and the Class definition

excludes all individuals who provided their informed written consent prior to ever providing their biometrics. (Dkt. 318 Plfs' Mot. for Class Cert., at 8).

Accordingly, as a matter of law Defendant collected Plaintiffs' and Class Member biometric identifiers and biometric information without written consent, and the Court should enter summary judgment in Plaintiffs' favor on this issue.

**C.      SUMMARY JUDGMENT ISSUE 3: Union Pacific Possessed the Policy Subclass Members' Biometric Data Without Timely Developing a Section 15(a) Policy**

Plaintiff Fleury is the representative for the Policy Subclass, which is a group of drivers whose biometrics were possessed by Union Pacific prior to Union Pacific developing a publicly available BIPA policy. (Dkt. 318 Plfs' Mot. for Class Cert., at 8). Section 15(a) of BIPA requires a private entity in possession of biometrics to develop a written policy, made available to the public, that sets forth the entity's retention and destruction schedule for biometrics. 740 ILCS 14/15(a). The requirement is triggered upon the private entity's possession of the biometrics, not some later date, and retroactive compliance is insufficient to extinguish BIPA claims under Section 15(a) when a gap in compliance is established. *Mora v. J&M Plating, Inc.,* 2022 IL App (2d) 210692, ¶ 23, 213 N.E.3d 942, 948 ("[T]he Biometric Act requires a private entity such as defendant to develop a retention-and-destruction schedule upon possession of biometric data. Defendant's establishment of a retention-and-destruction schedule four years after it first possessed such data for plaintiff violated section 15(a)"). As set forth above, the fingerprint images and fingerprint templates constitute biometric identifiers and biometric information as a matter of law and Union Pacific collected and stored them. Naturally, it follows that Union Pacific possessed the Policy Subclass members' biometrics after it collected them.

Indeed, the same facts that prove Union Pacific's collection of the Policy Subclass

Members' biometrics also prove Union Pacific's resulting possession of those biometrics. The biometric data were stored on Union Pacific's computer servers, which were located at Union Pacific's Illinois railyards such that Union Pacific had physical dominion over the biometric data. (PSOMF Nos. 35-36). Union Pacific also owns the biometric data pursuant to its contract with Nascent, and there is no evidence that another entity owns the biometrics. (PSOMF Nos. 14-19). Accordingly, Union Pacific had legal dominion over the biometrics. Union Pacific produced the biometric data in discovery pursuant to Plaintiffs discovery requests (and the subsequent Court order) and thus necessarily had the data in its "possession, custody, or control" at the time that it produced them. Fed. R. Civ. P. 34(a)(1); (PSOMF No. 74). The Union Pacific employee who attempted to analyze and render the fingerprint images received his access to the biometric data through an internal Union Pacific request.[11] (PSOMF No. 57-58). Accordingly, Union Pacific had possession of the Policy Subclass Members' biometrics.

Per testimony from Union Pacific's corporate designee as to its compliance with BIPA, Defendant did not enact a BIPA policy until February 2019.[12] (PSOMF No. 61). By function of the Policy Subclass definition, every member of the Policy Subclass had their biometrics collected, and thus in Defendant's possession, *prior* to February 2019. (Dkt. 318 Plfs' Mot. for Class Cert., at 8). BIPA does not permit retroactive compliance with Section 15(a), meaning that the belated adoption of a 15(a) policy does not extinguish the claims that accrued prior to the posting of the policy. *Mora,* 2022 IL App (2d) 210692, ¶ 38 ("The explicit trigger for the *development* of the

---

[11] To the extent that Union Pacific disputes its possession or control of the biometrics, the Court can review Union Pacific's BIPA policy as further evidence of this control. Indeed, subsequent remedial measures can be used as evidence of control where control is in dispute. Fed. R. Evid. 407. Union Pacific could not make the representations that it made in its *post-hoc* BIPA policy—such as when Union Pacific would delete the biometrics—if it did not have control over the biometrics.

[12] Even when UP did finally publish a BIPA policy, it still failed to comply with it, as UP did not implement a biometric deletion process until 2021. (SOMF No. 66).

written policy (*i.e.*, the retention-and-destruction schedule) is the private entity's *possession* of biometric data.") (emphasis in original).

Accordingly, Union Pacific possessed the Policy Subclass Members' biometric identifier and biometric information without having developed a publicly-available policy in accordance with Section 15(a), and the Court should enter summary judgment in Plaintiffs' favor on this issue.

### D.     SUMMARY JUDGMENT ISSUE 4: Union Pacific Retained the Illegal Retention Subclass Members' Fingerprint Images After the Purpose for Collecting them had been Satisfied

Plaintiffs Fleury and Turner are the representatives for the Illegal Retention Subclass, which is a group of drivers whose Composite Images were retained after the purpose for collecting them had been satisfied. (Dkt. 318 Plfs' Mot. for Class Cert., at 8). Section 15(a) of BIPA requires private entities to delete biometric identifiers "when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, *whichever occurs first*." 740 ILCS 14/15(a) (emphasis added). As set forth above, the Fingerprint Images constitute biometric identifiers as a matter of law and Union Pacific collected and possessed them.

Union Pacific's violation of Section 15(a) as to the Illegal Retention Subclass flows as follows: Union Pacific only utilized the Composite Images to identify the drivers on a single occasion – the time of their AGS registration. As explained above, during such registration Fingerprint Templates were also extracted and stored alongside the Composite Images. But, after this initial use of the Composite Images, they were not subsequently used again. On each subsequent occasion drivers visited Union Pacific's facilities and placed their fingers on the scanner, new Fingerprint Templates were generated, and compared against the original Fingerprint *Template* registration record. That is to say the originally captured Composite Images were never

used in subsequent identifications of the Subclass. Thus, the initial purpose for collecting those Composite Images was satisfied after each drivers' initial AGS registration, and Union Pacific was thereafter required by BIPA to delete the Composite Images, and (had they received consent) would have been able to retain *only* the registration Fingerprint Templates which were subsequently used to identify drivers. 740 ILCS 14/15(a). (PSOMF No. 52-53). Thus, the Composite Images served no further purpose and were thus being needlessly (and illegally) retained. 740 ILCS 14/15(a).

Section 15(a) unequivocally requires a private entity such as Union Pacific to destroy biometrics for which it no longer has a purpose. *Id.* The undisputed facts of this case demonstrate exactly why that language in Section 15(a) exists—to prevent the needless compilation and retention of biometrics that serve no ongoing use to the collector. Indeed, Section 15(a) is designed to force private entities to understand what biometrics they collect; what use they have for those biometrics; and to ensure destruction of unneeded and unused biometrics. 740 ILCS 14/15(a). It is clear that Union Pacific failed to do this when it kept the Illegal Retention Subclass Members' Composite Images *indefinitely* despite having no ongoing use for them.

Even when Union Pacific attempted (long after it was required to do so) to comply with Section 15(a) by enacting a policy in February 2019, it did so without even looking at the data it was collecting in order to attempt to determine whether it was complying with its own enacted policy. It is undisputed that in February 2019, Union Pacific had not even analyzed the biometric data it had collected. (PSOMF No. 67). It inexplicably failed to do so until 2023 – three years *after* the onset of this litigation. (PSOMF No. 67). And even then, it did not task an expert with analyzing the data; rather, it tasked Mr. Hayden, who could not properly assess the data because he has no expertise or experience in biometric data or how such data is stored. (PSOMF No. 67). Indeed, in

his 2023 and 2024 depositions, which occurred more than four and five years after the enactment of Union Pacific's 15(a) policy in February 2019, Mr. Hayden (who was Union Pacific's 30(b)(6) witness on the topic of the data collected by Union Pacific's AGS) testified that if Union Pacific were storing fingerprint images, it "would be, candidly, a horrible design choice" and later stated that if Union Pacific knew it was in fact storing fingerprint images, additional "mitigation strategies would have been put in place." (PSOMF No. 67). In other words, even after being sued in 2019 and watching its competitor that used the same service providers and same AGS be found *recklessly* liable for collecting fingerprint images in violation of BIPA, Union Pacific still allegedly had no clue that it had been collecting fingerprint images until <u>2024</u> when Plaintiffs began showing fingerprint images to UP deponents. *Rogers,* 19-cv-03083, Dkt. 223. Defendant's head remained in the sand as it managed to needlessly compile and indefinitely store individuals' Fingerprint Images while it stayed this case for two years (Dkt. 89), frustrated the entry of a simple confidentiality order for months by claiming that BIPA itself prohibits production of biometrics as evidence in discovery (Dkt. 125), and then refused to produce the biometric data for months until Judge Cole forced it to do so. (Dkts. 174; 179).

As a matter of law based on the undisputed facts, Union Pacific retained the biometric identifiers of the Illegal Retention Subclass when its original purpose for collecting them had been satisfied, and the Court should enter summary judgment in Plaintiffs' favor on this issue.

**E.   SUMMARY JUDGMENT ISSUE 5: Union Pacific Disclosed the Class Members' Biometrics Without Consent**

Plaintiffs Fleury and Turner are the representatives for the Class, which is a group of drivers whose biometrics were obtained by Union Pacific without their informed written consent. (Dkt. 318 Plfs' Mot. for Class Cert., at 8). Section 15(d) of BIPA prohibits a private entity in possession of a biometric identifier or biometric information from disclosing, redisclosing, or otherwise

disseminating a person's biometric identifier or biometric information without their consent or other legal authorization (that is inapplicable here). *Id.* The Seventh Circuit has found that the plain meaning of "disclose" connotes a new revelation. See *Cothron*, 20 F.4th at 1163; see also Webster's Third New International Dictionary 645 (1993) (defining "disclose" as "to make known" or "to reveal *** something that is secret or not generally known"). Section 15(d) prohibits repeated transmissions to the same party. *Id.*

Above, Plaintiffs detailed Union Pacific's belated attempts to gain Class Members' consent to collect and disclose their biometrics. Because Union Pacific had no separate mechanism for gaining Class Members' consent under Section 15(d) to disseminate their biometrics, Plaintiffs seek summary judgment on behalf of the same Class of individuals for Defendant's violations of Section 15(d) as they did for Defendant's violations of Section 15(b). *See Cothron v. White Castle Sys., Inc.,* 216 N.E.3d 918, 925, as modified on denial of reh'g (July 18, 2023) ("Similar to section 15(b), section 15(d) mandates consent or legal authorization before a specific action is taken.")

Union Pacific disclosed and redisclosed Plaintiffs' and the Class Members' biometrics to Remprex by permitting Remprex to maintain access the biometric data. (PSOMF No. 57-60). Union Pacific's corporate designee Jeremy Hayden testified that Union Pacific had control of who could get into the servers that host the biometrics and permitted Remprex and Nascent to access the biometric data. (PSOMF No. 57). Union Pacific allowed Remprex and Nascent to maintain the databases such that Remprex and Nascent maintained access in the normal course of business. (PSOMF No. 58). Internal communications produced by Remprex confirm this access. (PSOMF at Ex. II). (internal email between Remprex employees where a Remprex employee is asking for a "step by step process of our access to the biometric data in UP servers including level of access and who controls those access levels.") Aside from providing Remprex with access to the

- 29 -

biometric databases, UP also provided database backups to Remprex in connection with the Union Pacific Railroad Central Biometrics Action Plan. (PSOMF No. 59). Moreover, Nascent's corporate designee confirmed that Nascent had secondhand, side-by-side access to the biometric data through Remprex. (PSOMF No. 60).

As a matter of law based on undisputed facts, Defendant disclosed Plaintiffs' and Class Members biometrics without consent, and the Court should accordingly enter summary judgment in Plaintiffs' favor on this issue.

> **F.** **SUMMARY JUDGMENT ISSUE 6: Union Pacific Collected or Otherwise Obtained, and Disclosed 101,637 Distinct Composite Images and 106,264 Distinct Fingerprint Templates from Class Members Without Written Consent**

In analyzing the AGS Databases, Plaintiffs' expert determined that Union Pacific collected, stored, and disclosed to Remprex and Nascent 101,637 distinct[13] Composite Fingerprint Images and 106,264 distinct Fingerprint Templates from Putative Class Members without written consent. Despite having access to the same Illinois AGS Databases, Defendant's expert did not quantify the total number of Composite Fingerprint Images or Fingerprint Templates collected from Putative Class Members. Accordingly, given that Plaintiffs' expert has provided the only evidence on this issue (an objective counting of both the number of Composite Fingerprint Images and the number of Fingerprint Templates collected through AGS registration from the Putative Class), there is no issue of material fact that Defendant has collected, captured, or otherwise obtained at least 207,901 uniquely actionable instances of biometric identifiers or biometric information under Section 15(b) of BIPA. The same evidence establishes as a matter of law that Defendant has

---

[13] "Distinct" simply means that the Composite Images and Fingerprint Templates are from different fingers. For example, as shown graphically above, Plaintiff Turner had Fingerprint Images from four different fingers stored in the AGS Databases, and a corresponding number of Fingerprint Templates. Accordingly, Union Pacific collected and disclosed four distinct biometric identifiers and four distinct biometric information from Mr. Turner without his consent.

committed 207,901 illegal disseminations of biometric identifiers and biometric information under Section 15(d) of BIPA, because it disclosed the entire Illinois AGS Databases, which contained the Class Members' biometrics, to Remprex and Nascent. This undisputed evidence also establishes as a matter of law that Defendant has failed to comply with Section 15(a) on 101,637 occasions, one for each Composite Image that Defendant retained after its purpose for collecting those images was satisfied (which was all of them).

Because the total number of Composite Fingerprint Images and Fingerprint Templates does not account for the number of times Union Pacific re-collected Class Members' biometrics when they returned to an Illinois intermodal facility and re-scanned their fingerprint to gain entry, Defendant remains exposed additional Section 15(b) liability to be proven at trial. Thus, Plaintiffs ask that this Court find there is no disputed issue of material fact that Defendant collected or otherwise obtained BIPA prohibited biometric identifiers or biometric information *at least* 207,901 times. As originally enacted, BIPA provided liquidated damages for "each violation" which, in the context of Sections 15(b), was interpreted to mean that every collection of biometrics – including "re-scans" of the same finger, as occurred here – constituted a separate violation of BIPA. *Cothron v. White Castle Sys., Inc.,* 216 N.E.3d 918, 928, as modified on denial of reh'g (July 18, 2023) ("Consequently, we reject White Castle's argument that we should limit a claim under section 15 to the first time that a private entity scans or transmits a party's biometric identifier or biometric information.")

BIPA was amended on August 2, 2024, when Governor J.B. Pritzker signed Senate Bill 2979 into law. Senate Bill 2979 modified BIPA's right of action to limit recoveries for section 15(b) violations to a single recovery per individual where a private entity collects "*the same biometric identifier or biometric information from the same person using the same method of*

collection" in violation of subsection (b). 740 ILCS 14/20 (as amended).[14]

But the language of the amendment is clear that it only applies to "the same biometric identifier or biometric information." Here, Union Pacific collected and disseminated **different** Composite Fingerprint Images and Fingerprint Templates from **different fingers** from each truck driver. (PSOMF Nos. 25-26, 29-33). Thus, each Composite Image and Fingerprint Template is biologically and mathematically unique and independently actionable. 740 ILCS 14/20 (as amended). Indeed, Union Pacific did *not* collect and disseminate "*the same biometric identifier or biometric information from the same person using the same method of collection,*" 740 ILCS 14/20 (as amended), and thus the recent amendment is irrelevant to the finding Plaintiffs seek by this Motion. Union Pacific collected and disseminated two different types of data subject to BIPA (Composite Fingerprint Images and Fingerprint Templates), and in doing so, collected mathematically unique images and templates from multiple different fingers from each driver. (PSOMF Nos. 25-26, 29-33). Accordingly, no matter which version of BIPA applies, the number of potential violations Plaintiffs seek to establish by this Motion is the same.[15]

Accordingly, the Court should find as a matter of law that Defendant has collected or

---

[14] There is a (very lopsided) split amongst Illinois courts over whether the BIPA amendment applies retroactively or only prospectively. The vast majority of courts have found that the amendment does not apply retroactively. *Schwartz v. Supply Network, Inc.,* No. 23-cv-14319, 2024 WL 4871408, at *5 (N.D. Ill. Nov. 22, 2024); *Giles v. Sabert Corp.,* No. 1:24-cv-02996, 2025 U.S. Dist. LEXIS 12888 (N.D. Ill. Jan. 21, 2025); *Paniagua v. Blommer Chocolate Co.*, No. 2024 L 004347 (Cook Cnty. Dec. 17, 2024); *Marshall et al. v. Grand Avenue Manager VII LLC*, No. 2024 L 004745 (Cook Cnty. Jan. 13, 2025); *Wallace v. Vee Pake, LLC d/b/a Voyant Beauty*, No. 24 L 4560 (Oct. 10, 2024) (Hon. Patrick J. Sherlock), Exhibit C; *Gagen v. Mandell Menkes, LLC,* No. 2023 L 008294) (Hon. Daniel J. Kubasiak), Exhibit D; *Rojo v. Homer Tree Care, Inc.,* No. 23 L 8588 (Oct. 30, 2024) (Hon. Mary Colleen Roberts); *Boatman v. Riveredge Hosp., Inc.,* 2024 L 3329 (Nov. 7, 2024) (Hon. Jerry A. Esrig). *Ayesha Hawkins v. Lenny Gas N Wash Sauk Trail*, *LLC*, Case No. 2024 CH 00697. Only two courts have found the opposite and applied the amendment retroactively, and motions for reconsideration are pending in both. *Gregg v. Cent. Transp. LLC,* No. 24-cv-1925, 2024 WL 4766297, at *4 (N.D. Ill. Nov. 13, 2024) (Bucklo, J.); *Amigon v. Old Dominion Freight Line, Inc.,* No. 24-cv-01934 (N.D. Ill. Nov. 15, 2024) (Bucklo, J.). Because this Motion does not seek a determination as to the number of violations from collection of "the same biometric identifier and biometric information," the Court need not reach the retroactivity question at this stage. That said, the majority view that the amendment is not retroactive is particularly persuasive here, because it would make little sense to apply a 2024 BIPA amendment to a BIPA case that was filed in 2019, where the relevant time period stretches back to 2014, and it is undisputed that Union Pacific stopped using the AGS in 2019. (PSOMF No. 68).

[15] Plaintiffs reserve their right to seek additional findings relating to "re-scan" violations at trial.

otherwise obtained at least 207,901 instances of BIPA protected biometrics without written consent (Section 15(b)), disseminated the same 207,901 instances of biometrics to third parties without consent (Section 15(d)), and retained 101,637 instances of biometrics after the initial purpose for their collection had been satisfied (Section 15(a)).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be granted, and the Court should enter an Order holding: (1) the Composite Fingerprint Images and Fingerprint Templates Union Pacific collected (or otherwise obtained), stored, retained, possessed, and disclosed constitute biometric identifiers and biometric information under BIPA; (2) Union Pacific collected the Class Members' biometrics prior to gaining their informed written consent; (3) Union Pacific came into possession of the Policy Subclass Members' biometrics prior enacting a publicly-available BIPA policy; (4) Union Pacific retained the Illegal Retention Subclass Members' fingerprint images long after the initial purpose for collecting such images had been satisfied; (5) Union Pacific violated Section 15(d) of BIPA by disclosing the Class Members' biometrics to other entities without obtaining the Class Members' consent to do so; (6) Defendant has collected or otherwise obtained at least 207,901 instances of BIPA protected biometrics without written consent (Section 15(b)), disseminated the same 207,901 instances of biometrics to third parties without consent (Section 15(d)), and retained 101,637 instances of biometrics after the initial purpose for their collection had been satisfied (Section 15(a)); and (7) for anything further that the Court deems appropriate and just.

Dated: March 13, 2025                              Respectfully submitted,

                                                   RICHARD ROGERS, individually
                                                   and on behalf of classes of similarly
                                                   situated individuals

By: /s/          *Brendan Duffner*
One of Plaintiffs' Attorneys

Evan M. Meyers
David L. Gerbie
Brendan Duffner
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Floor
Tel: (312) 893-7002
Fax: (312) 275-7895
emeyers@mcgpc.com
dgerbie@mcgpc.com
bduffner@mcgpc.com

Jon Loevy
Michael I. Kanovitz
Tom Hanson
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
Tel: (312) 243-5900
jon@loevy.com
mike@loevy.com
hanson@loevy.com

*Attorneys for Plaintiffs and the*
*putative Class and Subclass*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 13, 2025, I filed the foregoing *Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment* via the Court's CM/ECF electronic filing system. A copy of said document will be electronically transmitted to all counsel of record:

/s/    <em>Brendan Duffner</em>