# Exhibit A

SUBJECT TO PROTECTIVE ORDER

# EXPERT REPORT

## of

## Greg J. Regan, CPA/CFF, CFE

*David Fleury and Alvin Turner,*
*individually and on behalf of similarly situated individuals.*

*v.*

*Union Pacific Railroad Company*

United States District Court
Northern District of Illinois, Eastern Division

Case No. 20-cv-00390

SUBJECT TO PROTECTIVE ORDER

## **Table of Contents**

1. Executive Summary ........................................................................................................ 1
   a. Nature of My Assignment ..................................................................................... 1
   b. Qualifications ......................................................................................................... 1
   c. Evidence Considered ............................................................................................. 3
   d. Summary of Opinions ........................................................................................... 3
2. Background ................................................................................................................... 3
   a. Union Pacific's Alleged Use of Biometrics ......................................................... 3
   b. Damage Considerations in BIPA Matters ............................................................ 4
   c. Union Pacific Has a Regulatory Obligation to Provide Reliable Periodic Financial Statements ............................................................................................................. 5
   d. Union Pacific Has Consistently Reported Revenue and Earnings Growth That Is Expected to Continue for the Foreseeable Future ................................................. 6
      i. Historical and Projected Financial Results ............................................. 6
      ii. Strong Financial Results Have Generated Cashflow Enabling Union Pacific to Pay Dividends and Make Discretionary Share Repurchases ........................... 9
      iii. Securities Analysts Have a Positive Outlook for Union Pacific's Stock .............. 10
      iv. Debt Ratings Agencies Consider Union Pacific to Have Low Credit Risk .......... 10
3. Solvency Analyses ...................................................................................................... 11
   a. The Balance Sheet Test ....................................................................................... 12
   b. The Cash Flow Test ............................................................................................. 14
   c. The Capital Adequacy Test .................................................................................. 17
4. Evaluation of Union Pacific's Ability to Pay ........................................................... 20

SUBJECT TO PROTECTIVE ORDER

## 1. **Executive Summary**

### a. Nature of My Assignment

1.      This matter involves claims brought by David Fleury and Alvin Turner ("Plaintiffs"), individually and on behalf of a class of similarly situated individuals against Union Pacific Railroad Company ("Union Pacific Railroad"), which is the principal operating company of Union Pacific Corporation ("Union Pacific" or the "Company").[1] Plaintiffs assert that Union Pacific Railroad requires truck drivers that visit its facilities in Illinois to provide their biometric identifiers in the form of fingerprints and their related biometric information to access facilities.[2] Plaintiffs allege that Union Pacific Railroad violates the Illinois Biometric Information Privacy Act ("BIPA") and seek redress, including statutory damages, for persons injured as a result.[3]

2.      My firm, Hemming Morse LLC ("Hemming"), was retained by McGuire Law, P.C., on behalf of Plaintiffs. I was asked to evaluate Union Pacific Railroad's ability to pay a judgment resulting from this matter.

### b. Qualifications

3.      I am a Partner in the Forensic Consulting Services Group of Hemming. I have been licensed as a CPA in California continuously since 1998. I am also licensed as a CPA in New York. I hold the Certified in Financial Forensics ("CFF") certification from the American Institute of Certified Public Accountants ("AICPA"), which is the national professional organization for CPAs. I am also a Certified Fraud Examiner ("CFE"), which is a certification issued by the Association of Certified Fraud Examiners. I obtained my undergraduate degree from Georgetown University and my Masters in Business Administration with an emphasis in Corporate Finance from the University of San Francisco.

4.      My work in the accounting profession includes experience as an auditor at Ernst & Young LLP, as the Controller of a publicly traded company, and as a consultant. I have worked on many complex litigation matters. My work has involved extensive analysis of economic damages, including damages involving individuals, lost business value, lost profits, and unjust enrichment. I have been retained to perform these analyses by governmental entities such as the Securities and Exchange Commission ("SEC"), the Federal Trade Commission, and

---

[1] Union Pacific 2023 Form 10-K, p.5.

[2] Third Amended Class Complaint ("TACC") ¶¶ 1-3. I understand that a biometric identifier is any personal feature that is unique to an individual (*e.g.*, fingerprints). Biometric information is any information based on a biometric identifier. Collectively, biometric identifiers and biometric information are referred to herein as "biometrics."

[3] *Id.*

SUBJECT TO PROTECTIVE ORDER

various state Attorneys General,[4] as well as to respond to inquiries from entities such as the Consumer Financial Protection Bureau. I have also been retained to perform these types of analyses by companies such as Amazon, Cisco, ASML, Intuit, Synchrony Bank, NetApp, and Honeywell, as well as retained in matters adverse to large companies such as PNC Bank, Google, NCC, Virgin Hotels, and Federal Realty Investment Trust.

5.      The AICPA has 650,000 members. The AICPA delegates policy-setting in areas in which CPAs are active to nineteen different executive committees.[5] I have served as a member of the AICPA's Forensic & Valuation Services Executive Committee. This nine-member committee establishes professional standards and guidance for practitioners performing consulting services that require the application of forensic accounting or valuation-related methodologies. I was the Chair of the AICPA's Economic Damages Task Force from 2010-2013 and served as a member of this task force through 2020. In 2012, I received the AICPA's Forensic Services Volunteer of the Year, which is the award given annually to a member that has made significant contributions to the advancement of the field of forensic accounting.

6.      I am also an active member of the California Society of Certified Public Accountants and was the Chair of its statewide Forensic Services Section.

7.      The AICPA requires its members to comply with its standards. The AICPA has determined that the services I am performing in this matter are subject to its Statement on Standards for Forensic Services ("SSFS"). These standards require CPAs performing analyses such as those at-issue here to operate with integrity, and to be impartial, intellectually honest, and free of conflicts of interest.[6] Typically, an objective approach involves testing and analysis of the data used in our work to gauge its suitability and reasonableness.

8.      My expert qualifications, including testimony in the last four years and publications authored in the past ten years, are described in Appendix A. My firm is being compensated for my review, analysis, and testimony in this matter at my standard hourly rate, which is currently $625 per hour. I have been assisted in this matter by Hemming staff working under my direction and supervision. My compensation is not contingent on the outcome of this matter.

---

[4] For example, I was retained by the California Attorney General's Office to evaluate Rite Aid's ability to pay a judgment in the *State of California ex rel. Loyd F. Schmuckley, Jr. v. Rite Aid Corporation* (E.D. California, Case No. 2:12-CV-1699 KFJ EFB).

[5] *See* https://www.aicpa.org/about/governance/executivecommittees.html.

[6] SSFS ¶¶ 7-8.

SUBJECT TO PROTECTIVE ORDER

c.  Evidence Considered

9.      A list of the sources I consulted in preparing this report, as required by Federal Rule of Civil Procedure 26(a)(2)(B)(ii) may be found in Appendix B to this report. In addition, other evidence may be produced that could be relevant to my conclusions, including the testimony and reports of other witnesses or experts. Accordingly, I reserve the right to amend my report and supplement my opinions after considering such evidence, if necessary.

d.  Summary of Opinions

10.      In this expert report, I set forth my basis to calculate the Company's ability to pay a judgment resulting from this matter. First, I analyzed Union Pacific's historical financial results, projections of its future financial results, as well as currently available data from securities and credit rating analysts (*see* § 2). Second, I performed generally accepted solvency analyses, including the Balance Sheet Test, the Cash Flow Test, and the Capital Adequacy Test, as well as benchmarking of Union Pacific to peer companies (*see* § 3). Ultimately, based on the evidence presently available, I set forth the basis for my conclusion that Union Pacific has the ability to pay a judgment of at least $2.5 billion arising from this matter (*see* § 4).

11.      The opinions expressed in this report and information presented in the accompanying schedules are my present opinions and are based on the documents and other information available to me at the time of drafting. Amendments or supplements to this report may be required because of developments prior to or at the trial, including the production of additional information, Union Pacific Corporation's subsequent SEC filings, Court Orders, or the testimony of witnesses in this matter. I anticipate using documents reviewed in connection with preparing this report, and additional graphics illustrating concepts described herein, at trial.

## 2.  **Background**

a.  Union Pacific's Alleged Use of Biometrics

12.      I understand that Plaintiffs allege that Union Pacific violated BIPA. Specifically, the Plaintiffs allege that Union Pacific collected, captured, received through trade, or otherwise obtained the biometrics of Plaintiffs without first providing adequate written disclosures such collection and use.[7] The Plaintiffs also allege that Union Pacific disclosed, redisclosed and/or disseminated Plaintiffs' and the Class members' biometrics to third-party technology providers, or otherwise provided access to such biometrics, without first gaining Plaintiffs' and the Class members' consent.[8] Finally, I understand that the Plaintiffs allege that Union Pacific retained Class members biometrics after being informed by Intermodal Association of North America

---

[7] TACC ¶ 25.

[8] *Id.*, ¶ 27.

SUBJECT TO PROTECTIVE ORDER

("IANA") that the "initial purpose" for collecting or obtaining their biometrics (delivering or picking up freight on behalf of a specific carrier) had been satisfied.[9]

13.    Additionally, I understand that Plaintiffs may obtain liquidated damages of $1,000 or actual damages, whichever is greater, resulting from negligent violations of BIPA.[10] Alternatively, Plaintiffs may obtain liquidated damages of $5,000 or actual damages, whichever is greater, for intentional or reckless violations of BIPA.[11]

b.    Damage Considerations in BIPA Matters

14.    I understand that a BIPA claim may accrue each time that a biometric identifier or information is collected or disseminated (*i.e.*, not only on the first scan and first transmission).[12] Consequently, it is possible for a substantial statutory damage award to occur in the event of a large class and/or an extended class period and/or where Union Pacific is found to have collected many unique instances of biometrics.[13] For this reason, I understand the following guideline exists:[14]

> *A trial court presiding over a class action—a creature of equity—would certainly possess the discretion to fashion a damage award that (1) fairly compensated claiming class members and (2) included an amount designed to deter future violations, without destroying defendant's business.*

15.    I further understand that specific guidance does not yet exist to determine the conditions of an award that may destroy a defendant's business.[15] Accordingly, an analysis of

---

[9] *Id.*, ¶ 35.

[10] Illinois Biometric Privacy Act (740 ILCS 14/20)

[11] I understand that the Plaintiffs may also be entitled to other forms of recovery.

[12] *Cothron v. White Castle System, Inc.*, 2023 IL 128004 (2023) at ¶ 1.

[13] *E.g.*, Defendant's Opposed Motion to Amend Class Allegations, p. 9, "Plaintiffs now seek years of damages based on a theory that includes potentially millions of violations aggregated across the class, which could result in the exact 'grossly excessive' damages the Fourteenth Amendment prohibits."

[14] *Id.* at ¶ 42 (citing *Central Mutual Insurance Co. v. Tracy's Treasures, Inc.*, 2014 IL App (1st) 123339, ¶ 72, 385 Ill. Dec. 904, 19 N.E.3d 1100). *See also, Id.* at ¶ 42, "[T]here is no language in the Act suggesting legislative intent to authorize a damages award that would result in the financial destruction of a business."

[15] *Cothron v. White Castle System, Inc.*, 2023 IL 128004 (2023) at ¶ 43 (suggesting that the legislature review this issue).

the size of a judgment that a defendant has the ability to pay without destroying its business is relevant.

16.     This type of analysis is comparable to an evaluation of a defendant's ability to pay restitution or punitive damages.[16] CPAs are frequently called upon to perform this type of analysis.[17] This is because the analyses focus on the entity's financial condition (*i.e.*, assets and liabilities), results of financial operations (*i.e.*, revenue and expenses), and cashflow:[18]

> *Various measures of earnings ability - including operating profit, profit before tax, net income, cash flow from operations, cash flow before tax, and net cashflow --* ***can shed light on an entity's ability to pay and to absorb costs****. Other financing information that juries should consider includes the defendant's borrowing capacity, working capital, and the amount of dividends or payments to owners over the recent past.*

17.     For these reasons, the sub-sections below contain my analysis of Union Pacific's ability to pay a judgment in this matter.

### c.     Union Pacific Has a Regulatory Obligation to Provide Reliable Periodic Financial Statements

18.     Union Pacific's common stock is listed on the New York Stock Exchange under the symbol "UNP." As a publicly traded entity, Union Pacific is required to file periodic financial statements with the SEC, including audited annual financial statements ("Form 10-K") and unaudited quarterly financial statements ("Form 10-Q").[19]

---

[16] Litigation Services Handbook, The Role of the Financial Expert, 6th Ed. ("LSH"), Ch. 17, "Punitive Damages," p.3, "A expert should present information that will help a trier of fact show the defendant's financial position, the effects of possible punitive awards, and other information deemed relevant to the choice of an appropriate award to help a jury." These considerations are similar to other guidance applicable to a defendant's ability to pay (*e.g.*, "Imposition and Enforcement of Restitution." Administrative Office of the United States Courts. 2000. p.5.).

[17] *Id.*, p.9. "Because the law has defined few specific guidelines with respect to which financial information is most relevant to determine an appropriate amount of punitive damages, ***accountants can bring a broad spectrum of training, expertise, and creativity to the engagement****. The expert's role in presenting and explaining relevant financial information is critical to providing a useful framework for the trier of fact to evaluate punitive damages." (emphasis added)

[18] *Id.*, p. 6. (emphasis added)

[19] SEC, Topic 1 Registrant's Financial Statements, *§1320 Financial Statements Required.*

SUBJECT TO PROTECTIVE ORDER

19.     The SEC requires registrants to present financial statements in accordance with generally accepted accounting principles ("GAAP").[20] GAAP brings consistency, conformity, and comparability to financial reporting. Ultimately, an objective of such financial reporting is to provide information that helps users assess the entity's liquidity and solvency.[21]

> *Information about the nature and amounts of a reporting entity's economic resources and claims can help users to identify the reporting entity's financial strengths and weaknesses.* ***That information can help users to assess the reporting entity's liquidity and solvency****, its needs for additional financing, and how successful it is likely to be in obtaining that financing.*

20.     GAAP specify how an entity should identify and report the results of its operating segments, if more than one exists.[22] For Union Pacific, the Union Pacific Railroad business is its only reportable operating segment (*i.e.*, constitutes all or substantially all of its operations).[23] Union Pacific's operating revenues are primarily derived from contracts with customers for the transportation of freight from origin to destination.[24]

d.  <u>Union Pacific Has Consistently Reported Revenue and Earnings Growth That Is Expected to Continue for the Foreseeable Future</u>

i.  *Historical and Projected Financial Results*

21.     Union Pacific has operated continuously for 162 years.[25] Accordingly, the starting point in my analysis of the Company's ability to pay a judgment is its historical financial

---

[20] Authoritative GAAP is promulgated by the Financial Accounting Standards Board ("FASB") and is contained within the FASB's Accounting Standards Codification ("ASC").

[21] FASB Concepts Statement 8 ("CON 8"), Conceptual Framework for Financial Reporting Chapter 1, *The Objective of General Purpose Financial Reporting*, ¶ OB13. (emphasis added) *See also, Id.* at ¶ BC1.34, "Some constituents have suggested that the main purpose of the statement of financial position should be to provide information that helps assess the reporting entity's solvency. The question is not whether information provided in the financial reports should be helpful in assessing solvency; clearly, it should. Assessing solvency is of interest to investors, lenders, and other creditors, and the objective of general purpose financial reporting is to provide information that is useful to them for making decisions."

[22] ASC 280, *Segment Reporting* at ASC 280-10-50-1.

[23] Union Pacific 2023 Form 10-K, p.5.

[24] Union Pacific 2023 Form 10-K, p.47.

[25] https://www.up.com/heritage/index.htm, "Our past reminds us of the enormous responsibility we have for our nation's future."

SUBJECT TO PROTECTIVE ORDER

statements. As described below, Union Pacific has a long history of strong financial performance and low financial volatility.

22.     As seen in the table below, Union Pacific's revenue grew from $21.7 billion in 2019 to $24.1 billion in 2023 (its most recent annual period). During this time, Union Pacific consistently generated cashflow from operating its business in the range of $8.4 billion to $9.4 billion annually.

23.     Securities analysts regularly develop financial projections for companies such as Union Pacific, including revenue, earnings, cashflow, debt, and capital expenditure estimates. When the estimates of securities analysts are considered together, the estimates are referred to as consensus estimates. Over the five years from 2019 to 2023, Union Pacific's actual results have been consistent with consensus estimates as seen in the table below:[26]

| Analyst Estimate and Actual Financial Results ($s in millions) | | | | | |
|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Revenue** | | | | | |
| Actual | $21,708 | $19,533 | $21,804 | $24,875 | $24,119 |
| Estimate | $21,808 | $19,501 | $21,649 | $24,961 | $24,025 |
| *% Difference* | *-0.5%* | *0.2%* | *0.7%* | *-0.3%* | *0.4%* |
| **Net Income** | | | | | |
| Actual | $5,919 | $5,349 | $6,523 | $6,998 | $6,379 |
| Estimate | $5,936 | $5,444 | $6,499 | $7,088 | $6,286 |
| *% Difference* | *-0.3%* | *-1.7%* | *0.4%* | *-1.3%* | *1.5%* |
| **Cash from Operations** | | | | | |
| Actual | $8,609 | $8,540 | $9,032 | $9,362 | $8,379 |
| Estimate | $8,520 | $8,074 | $8,869 | $9,577 | $8,369 |
| *% Difference* | *1.0%* | *5.8%* | *1.8%* | *-2.2%* | *0.1%* |
| **Net Debt** | | | | | |
| Actual | $24,309 | $24,870 | $28,723 | $32,307 | $31,508 |
| Estimate | $24,566 | $26,039 | $28,902 | $32,482 | $31,933 |
| *% Difference* | *-1.1%* | *-4.7%* | *-0.6%* | *-0.5%* | *-1.4%* |
| **Capital Expenditures** | | | | | |
| Actual | $3,453 | $2,927 | $2,936 | $3,620 | $3,606 |
| Estimate | $3,120 | $2,917 | $2,859 | $3,385 | $3,686 |
| *% Difference* | *9.6%* | *0.3%* | *2.6%* | *6.5%* | *2.2%* |

24.     The data reflected in the table above supports my conclusion that analyst estimates have been a reliable predictor of Union Pacific's financial results. Accordingly, I

---

[26] CapIQ, Estimates > Consensus.

SUBJECT TO PROTECTIVE ORDER

considered the current consensus estimates for Union Pacific, which indicate an expectation of revenue, profitability, cashflow, debt, and capital expenditure predictions for the foreseeable future as set forth in the table below:

| Analyst Estimates & Percent Growth ($s in millions) | | | | | |
|---|---|---|---|---|---|
| | 2024 | 2025 | 2026 | 2027 | 2028 |
| **Revenue** | | | | | |
| Estimate | $24,786 | $26,122 | $27,151 | $29,110 | $30,625 |
| *YoY Growth* | *2.8%* | *5.4%* | *3.9%* | *7.2%* | *5.2%* |
| **Net Income** | | | | | |
| Estimate | $6,850 | $7,547 | $7,919 | $9,067 | $9,748 |
| *YoY Growth* | *7.4%* | *10.2%* | *4.9%* | *14.5%* | *7.5%* |
| **Cash from Operations** | | | | | |
| Estimate | $9,484 | $10,290 | $11,105 | $12,392 | $13,385 |
| *YoY Growth* | *13.2%* | *8.5%* | *7.9%* | *11.6%* | *8.0%* |
| **Net Debt** | | | | | |
| Estimate | $30,060 | $29,149 | $28,311 | $28,244 | $28,371 |
| *YoY Growth* | *-4.6%* | *-3.0%* | *-2.9%* | *0.2%* | *0.5%* |
| **Capital Expenditure** | | | | | |
| Estimate | $3,383 | $3,634 | $3,765 | $4,032 | $4,172 |
| *YoY Growth* | *-6.2%* | *7.4%* | *3.6%* | *7.1%* | *3.5%* |

25.     As seen in the table above, Union Pacific is expected to experience consistent revenue growth accompanied by earnings and cashflow generation growth. Additionally, Union Pacific is expected to reduce outstanding net debt during this time period.

26.     This revenue and earnings growth outlook for Union Pacific is consistent with the Company's own recent statements concerning its financial health. For example, during Union Pacific's earnings call on January 25, 2024, Jennifer Hamann, CFO, stated:[27]

*What is very encouraging though, as we start out 2024 is our momentum, which you've heard us mention several times today. We demonstrated with our fourth quarter performance, what's possible and we look forward to further improvement in the year ahead.*

---

[27] Union Pacific Earnings Release dated January 25, 2024, p.8. *See also*, Union Pacific Q1'24 Earnings Tr., p.5, where Ms. Hamann stated "And finally, with capital allocation, we plan to start -- restart share repurchases in the second quarter, a further demonstration of the confidence we have in our strategy and the momentum that is building. The actions we're taking to improve safety, service and operational excellence are reflected in our financials, and continuing on with this strategy will drive shareholder value in 2024 and well into the future."

SUBJECT TO PROTECTIVE ORDER

27.    Similarly, on Union Pacific's first quarter of 2024 earnings call, Vincenzo James Vena, CEO, stated:[28]

> *This morning, Union Pacific reported 2024 1st quarter net income of $1.6 billion or $2.69 per share. This compares to 2023 1st quarter net income of $1.6 billion or $2.67 per share…Look, it's a great start to the year. I'm pleased with how the Union Pacific team is coming together to unlock what's possible for our company.*

> ii.    *Strong Financial Results Have Generated Cashflow Enabling Union Pacific to Pay Dividends and Make Discretionary Share Repurchases*

28.    Since 1997, share repurchases have surpassed cash dividends as means to return value to shareholders.[29] The general objective of share repurchases is to improve stock price returns.[30] As described below (*see* ¶ 42), Union Pacific has engaged in both share repurchases and payment of dividends in recent years. For example, Union Pacific's share repurchases have totaled $23.8 billion over the five preceding fiscal years.[31] These share repurchases are authorized by Union Pacific's Board of Directors and executed at the sole discretion of Union Pacific management.[32] In addition, Union Pacific has paid dividends totaling $14.4 billion over the five preceding years. The Company has made public statements confirming its plan to continue this strategy (*i.e.*, consistent with the outlook described above for continued profitability and cashflow generation).[33]

29.    A significant source of the capital used for these purposes is the cashflow generated from the Company's operations. Because these financing activities are discretionary,

---

[28] Union Pacific Earnings Tr. dated April 25, 2024.

[29] S&P Dow Jones, "Examining Share Repurchasing and the S&P Buyback Indices in the U.S. Market," March 2020 by Liyu Zeng and Priscilla Luk.

[30] *Id.*

[31] CapIQ, Union Pacific Financial Statements 2019 - 2023

[32] *E.g.*, Union Pacific Form 10-Q for the period ended March 31, 2024, p.15, "Effective April 1, 2022, our Board of Directors authorized the repurchase of up to 100 million shares of our common stock by March 31, 2025. As of March 31, 2024, we repurchased a total of 19.6 million shares of our common stock under the 2022 authorization. These repurchases may be made on the open market or through other transactions. Our management has sole discretion with respect to determining the timing and amount of these transactions."

[33] Union Pacific FY'23 Earnings Tr., p.8, where Mr. Vena stated, "We prioritize our industry-leading dividend payout and then excess cash will be returned to shareholders through share repurchases."

SUBJECT TO PROTECTIVE ORDER

the cashflow available and used for these purposes could, instead, be used for other purposes, including payment of a judgment in this matter.

### iii. Securities Analysts Have a Positive Outlook for Union Pacific's Stock

30.     I also considered the outlook of securities analysts' ratings on Union Pacific's stock. Ratings such as "Buy" or "Outperform" signal a strong view about the company's financial future. These ratings typically reflect a comprehensive analysis of Union Pacific's financial health, market position, and growth potential. Essentially, when financial experts agree that a positive outlook exists, it not only highlights the company's current stability but also underscores its potential for future growth and profitability. I have summarized recent analyst ratings in the table below, which currently reflects a weighted average rating of 1.9 (*i.e.*, approximately Outperform).[34]

| Union Pacific Analyst Recommendations | |
|---|---|
| 1 - Buy | 15 |
| 2 - Outperform | 4 |
| 3 - Hold | 10 |
| 4 - Underperform | 2 |
| 5 - Sell | 0 |

### iv. Debt Ratings Agencies Consider Union Pacific to Have Low Credit Risk

31.     As described above, Union Pacific has engaged in significant discretionary share repurchase programs (*see* § 2.d.ii). These programs have impacted the credit rating of Union Pacific's outstanding debt. On May 31, 2018, S&P marginally lowered Union Pacific's credit rating from "A" to "A-" following the Company's announcement of a $20 billion share repurchase plan to be completed through 2020.[35] The action by the rating agency to lower the credit rating reflected the fact that Union Pacific planned to partially finance those share repurchases using additional debt.[36] Union Pacific, however, has maintained its A- credit rating

---

[34] CapIQ, Union Pacific Analyst Estimates, 2023, "It is the opinion expressed by the analysts on the stock performance over a short-term period. Capital IQ provides both the Broker Recommendations and Standardized Recommendations. Capital IQ will standardize all the individual recommendations across the brokers on a 1-5 point scale." The 31 analyst recommendations summarized in the table represents all recommendations as of June 12, 2024.

[35] S&P Global Ratings, "Union Pacific Corp Corporate Credit Rating Lowered To 'A-' From 'A' On $20 Billion Share Buyback Plan; Outlook Stable," May 31, 2018.

[36] *Id.*

since that time. This credit rating was most recently affirmed on November 7, 2023 by Fitch Rating, which stated at that time:[37]

> *UNP's ratings reflect its strong business profile, supported by its entrenched position in the duopolistic rail market afforded by its large rail network. Financial flexibility is strong due to its* **highly profitable operations, the resiliency of its cash flows and ability to unlock significant cash flows by reducing share repurchases as needed.**

32.     Union Pacific's A- credit rating indicates that its capacity to meet its financial commitments is strong although it is somewhat susceptible to adverse effects of changes in economic conditions.[38] Further, consistent with my observation above, credit analysts observe Union Pacific has the ability to "unlock significant cash flows" by reducing share repurchase as needed.

### 3.  <u>Solvency Analyses</u>

33.     Experts commonly address whether an entity was solvent as of a particular date.[39] There are three accepted tests used for this purpose that are collectively referred to as solvency analyses. As described further in the sub-sections below, these tests are interrelated and should be reconcilable.[40] I have considered these tests to evaluate the hypothetical solvency of Union Pacific in the event a judgment is awarded in this matter.

34.     The solvency analyses described herein consider Union Pacific's financial information as of December 31, 2022 ("FY'22") and December 31, 2023 ("FY'23"), which are the two most recent periods for which audited financial statements are available. I also consider data from the most recent quarter ended March 31, 2024 ("Q1'24"). It is common for the conclusions of these tests to be bridged to an earlier or later date by considering any material

---

[37] Fitch Ratings, "Fitch Affirms Union Pacific at 'A-'/'F1'; Outlook Stable." Available at https://www.fitchratings.com/research/corporate-finance/fitch-affirms-union-pacific-at-a-f1-outlook-stable-07-11-2023 (accessed May 1, 2024). (emphasis added) Fitch also stated, "Fitch believes liquidity remains comfortable given the company's ability to generate cash from operations, high availability under its credit lines and laddered maturity profile."

[38] Available at https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/504352 (accessed May 1, 2024). The addition of the "-" is a modification indicating relative standing within the rating category.

[39] LSH, Ch. 25, "Typical Roles of a Financial Expert in Bankruptcy Litigation", p.30.

[40] *Id.*, p.30, "Bankruptcy court recognizes three traditional tests of solvency: the balance sheet test, the capital adequacy test, and the cash flow (or ability to pay, or liquidity) test. These three tests are interrelated and address questions of value."

SUBJECT TO PROTECTIVE ORDER

changes experienced by the entity in the intervening time.[41] In the event that additional information becomes available, I intend to supplement this analysis, however, Union Pacific's long-term financial history, low volatility, and consistent projections cause me to consider an adverse change to be a low risk. Union Pacific's disclosures in its financial statement filings with the SEC are consistent with this conclusion.[42]

a. The Balance Sheet Test

35.    This test asks the question: Does the value of the entity's net assets exceed its liabilities?[43] The starting point for this analysis is the entity's balance sheet.[44] It is appropriate to consider whether the amounts presented on the balance sheet in accordance with GAAP require any adjustments to reflect market value and economic substance.[45]

36.    I conclude the value of the Company's assets presented on the balance sheet are appropriately valued for purposes of my analysis.[46] Many of Union Pacific's assets are already reported at fair market value or net realizable value (e.g., cash, accounts receivable, and investments). Union Pacific does have substantial properties on its balance sheet reported at historical cost less accumulated depreciation.[47] Union Pacific expends significant resources each year to invest in these properties and the Company performs regular studies of its depreciation practices to ensure net book value is reported accurately.[48] Further, Union Pacific's independent auditor, Deloitte, has made the reporting of the value of Union Pacific's properties an area of audit emphasis.[49] Additionally, GAAP requires Union Pacific to regularly evaluate whether the

---

[41] Id., p.31

[42] Union Pacific FY'23 Form 10-K, p.33. "there is no known trend, demand, commitment, event, or uncertainty that is reasonably likely to occur that would have a material adverse effect on our consolidated results of operations, financial condition, or liquidity."

[43] LSH, Ch. 25, "Typical Roles of a Financial Expert in Bankruptcy Litigation", pp.28-29.

[44] Id.

[45] Id. at p.28, "Once the asset value is determined, the analyst compares that amount to the amount of the liabilities on the books, plus any amounts necessary to reflect the amount of liabilities that are contingent or off the balance sheet." "GAAP-based calculations of goodwill are rarely dispositive of the ongoing value of the business."

[46] Union Pacific FY'23 Form 10-K, p.44. Union Pacific does not have any reported goodwill or other assets requiring significant adjustments to approximate reported fair market value.

[47] Id., p.63.

[48] Id.

[49] Id., p.42.

SUBJECT TO PROTECTIVE ORDER

fair value of its properties is less than the reported value (*i.e.*, impaired).[50] Accordingly, the value of Union Pacific's properties may be higher than the reported value but is not less.

37.     Similarly, I conclude the value of the liabilities presented on the balance sheet are fairly stated for the purposes of my analysis. The majority of Union Pacific's liabilities consist of current liabilities such as accounts payable, as well as debt.[51] In consideration of Union Pacific's positive credit rating as described above (*see* § 2.d.iv), an adjustment to the reported value of debt does not appear necessary. In addition, Union Pacific has recorded liabilities for contingencies such as litigation (not including for this matter) and environmental costs.[52] Finally, Union Pacific's future contractual payment obligations, which include debt, purchase commitments, leases, and post retirements benefits such as pensions, do not reflect any abnormal commitments.[53] These obligations range from $2.7 billion to $4.2 billion annually over the period from 2024 to 2028 as compared to obligations of $4.2 billion in 2023.[54]

38.     Once this analysis has been performed, the balance sheet test is generally considered to be straightforward.[55] If the test reflects that the value of assets exceeds the amount of the liabilities—the entity is considered solvent on a balance sheet basis.[56] The table below summarizes this analysis for Union Pacific at the two most recent dates for which information is available:[57]

| Balance Sheet Test ($s in millions) | | | |
|---|---|---|---|
| As of: | December 31, 2022 | December 31, 2023 | March 31, 2024 |
| Total Assets | $69,449 | $67,132 | $67,266 |
| Total Liabilities | $53,286 | $52,344 | $51,601 |
| **Net Assets** | **12,163** | **$14,788** | **$15,665** |

---

[50] ASC 360-10-35-17.

[51] Union Pacific FY'23 Form 10-K, p.44.

[52] *Id.*, pp.69-70.

[53] *Id.*, p.34.

[54] Union Pacific FY'22 Form 10-K, p.35.

[55] LSH, Ch. 25, p.28. "Once the practitioners have properly valued the assets and determined the amount of the liabilities, the balance sheet test is straightforward."

[56] *Id.*

[57] Union Pacific 2023 Form 10-K, p.44 and Q1'24 Form 10-K, p.4. Unless otherwise noted, all numbers within my report are presented in millions.

SUBJECT TO PROTECTIVE ORDER

39.    As seen in the table above, the Balance Sheet Test indicates Union Pacific held assets significantly in excess of liabilities at the end of both FY'23 and Q1'24[58] supporting the ability to pay a judgement subject to the results of the Cash Flow Test (*see* § 3.b) and the Capital Adequacy Test (*see* § 3.c).

    b.  <u>The Cash Flow Test</u>

40.    This test asks the question: Does the entity have sufficient cash to pay its current debts as they become due?[59] This test is typically evaluated as of a date in the past, however, the test itself is prospective in nature. The test focuses on expected future cash needs and the expected future sources of cash.[60] The test incorporates consideration of future sources of cash such as cash from operations, asset sales, and other sources.[61] To answer this question, I incorporated information available in Union Pacific's statements of cash flows, which GAAP affirms to be designed for this purpose.[62]

41.    One of the cashflow metrics I use in my analysis is Net Cash Flow to Equity, which is commonly used to measure cashflows available to pay out equity holders (*e.g.*, in the form of dividends) after funding operations of the business, making necessary capital

---

[58] Union Pacific discloses that a measurement of working capital (current assets minus current liabilities) is not an indication of the Company's liquidity. *See* Union Pacific 2023 Form 10-K, p.33, "At both December 31, 2023 and 2022, we had a working capital deficit due to upcoming debt maturities. It is not unusual for us to have a working capital deficit, and we believe it is not an indication of a lack of liquidity. We generate strong cash from operations and also maintain adequate resources, including our credit facility and, when necessary, access the capital markets to meet foreseeable cash requirements."

[59] LSH, Ch. 25, "Typical Roles of a Financial Expert in Bankruptcy Litigation", pp.29-30.

[60] *Id.*

[61] *Id.*

[62] CON 8 ¶ OB 20, "Information about a reporting entity's cash flows during a period also helps users to assess the entity's ability to generate future net cash inflows. It indicates how the reporting entity obtains and spends cash, including information about its borrowing and repayment of debt, cash dividends or other cash distributions to investors, and other factors that may affect the entity's liquidity or solvency. Information about cash flows helps users understand a reporting entity's operations, evaluate its financing and investing activities, assess its liquidity or solvency, and interpret other information about financial performance."

SUBJECT TO PROTECTIVE ORDER

investments, and increasing or decreasing debt financing including interest.[63] The table below summarizes this calculation for Union Pacific's two most recent fiscal years:

| Net Cash Flow to Equity ($s in millions) | | |
|---|---|---|
| Year Ended | December 31, 2022 | December 31, 2023 |
| Net Income | $6,998 | $6,379 |
| + Non-cash (*e.g.*, depreciation) | $2,246 | $2,318 |
| - Capital expenditures | -$3,620 | -$3,606 |
| - Change in working capital | $118 | -$318 |
| Subtotal before debt | $5,742 | $4,773 |
| + Change to long-term debt, net[64] | $3,789 | -$591 |
| **Net Cash Flow to Equity** | **$9,531** | **$4,182** |

42.     As seen in the table above, Union Pacific has generated substantial positive cashflow after deducting expenses necessary to operate its business, including re-investing in its railroad infrastructure and payment of interest on outstanding debt (*i.e.*, $5.7 billion in FY'22 and $4.8 billion in FY'23 before the impact of changes in debt).[65]

43.     As seen in the table immediately below, Union Pacific has used this available cashflow for discretionary purposes—repurchasing the Company's common stock and payment

---

[63] Valuing a Business, The Analysis and Appraisal of Closely Held Companies, 4th Ed., by Shannon P. Pratt, p.158. *See also*, AICPA, Statement on Standards for Valuation Services ("SSVS"), Glossary.

[64] These amounts include repayment of $2.3 billion of debt in FY'22 and $2.2 billion in FY'23. This level of debt repayment exceeds the Company's debt maturities in any of the next five years, which range from $1.2 billion to $1.5 billion (*see* Union Pacific 2023 Form 10-K, p.66.) The reduced future debt repayment increases the likelihood of future cashflow flexibility for Union Pacific.

[65] Union Pacific employs an adjusted metric referred to as free cash flow, which is similar to Net Cash Flow to Equity but 1) removes the impact of changes in debt and 2) deducts dividends paid. *See* Union Pacific 2023 Form 10-K, p.25, "Free cash flow is defined as cash provided by operating activities less cash used in investing activities and dividends paid…We believe free cash flow is important to management and investors in evaluating our financial performance and measures our ability to generate cash without additional external financing."

SUBJECT TO PROTECTIVE ORDER

of dividends to shareholders. As observed by the credit rating analysts, Union Pacific has the ability to curtail these discretionary uses of cashflow, including to satisfy an award.

| Net Change in Cash ($s in millions) | | |
|---|---|---|
| Year Ended | December 31, 2022 | December 31, 2023 |
| Net Cash Flow to Equity | $9,531 | $4,182 |
| Repurchases of common stock | -$6,282 | -$705 |
| Dividends paid on common stock | -$3,159 | -$3,173 |
| **Net Change in Cash** | **$90** | **$304** |

44.     Additionally, I considered the outlook for Union Pacific's operations including cashflow generation, expected capital expenditures and debt repayment obligations based on current analyst estimates (*see* ¶ 24). This outlook supports my conclusion that Union Pacific will continue to experience stable financial conditions while achieving overall growth in cashflow generation over the years from 2024 to 2028:

| Future Cash Flow Projections ($s in millions) | | | | | |
|---|---|---|---|---|---|
| Fiscal Year | 2024 | 2025 | 2026 | 2027 | 2028 |
| Cash from Operations | $9,484 | $10,290 | $11,105 | $12,392 | $13,385 |
| Capital Expenditures | -$3,383 | -$3,616 | -$3,749 | -$4,027 | -$4,167 |
| Debt Repayments | -$1,427 | -$1,426 | -$1,515 | -$1,285 | -$1,235 |
| **Total** | **$4,674** | **$5,248** | **$5,841** | **$7,080** | **$7,983** |

45.     Finally, as of March 31, 2024, Union Pacific has repurchased $54.7 billion of its common stock, including $23.8 billion over the five preceding fiscal years (*see* ¶ 28). Union Pacific could liquidate treasury stock to provide capital to satisfy an award.[66] The Company also had $2.4 billion of available credit as of March 31, 2024 from the combination of its revolving credit and receivable facilities.[67]

46.     Altogether, the Cash Flow Test indicates that Union Pacific has substantial capacity to pay a judgment using profits from operations, available credit facilities, and/or the liquidation of treasury stock particularly if a time horizon longer than twelve months is considered.

---

[66] This amount reflects the cumulative repurchase price. I have not performed an analysis of the fair market value of Union Pacific's treasury stock at this time.

[67] Union Pacific Q1'24 Form 10-Q, p.25. "[The Company had] $2.0 billion of credit available under our revolving credit facility, and $400 million undrawn on the Receivables Facility."

SUBJECT TO PROTECTIVE ORDER

    c.  <u>The Capital Adequacy Test</u>

47.    This test asks the question: Does the entity have unreasonably small capital to operate its business?[68] The capital adequacy test considers the entity's existing and available sources of capital such as its ability to generate cash from operations and asset sales in comparison to its capital needs.[69] This test also takes into consideration the entity's ability to withstand a reasonable degree of stress.[70] The entity has unreasonably small capital when its cash plus the reasonable estimates of potential cash flows and borrowing capacity over the near term is insufficient for the timely payment of its obligations and continuation of its operations in the ordinary course.[71]

48.    As described above (*see* ¶ 33), the three solvency tests are interrelated. Here, Union Pacific has approximately $1.0 billion of cash-on-hand as of March 31, 2024,[72] generates substantial Net Cash Flow to Equity each period (*see* ¶ 41), and has borrowing capacity of approximately $2.4 billion as of March 31, 2024 (*see* ¶ 45).[73] Further, the Company is expected to generate significant cash flow after capital expenditures and debt repayment from 2024 through 2028 (*see* ¶ 44). Although this test contemplates the ability to liquidate assets, presently, I have not included this additional potential source of capital to Union Pacific.

49.    I also considered the Company's ability to withstand a reasonable amount of stress. To perform this analysis, I modeled a 25% reduction to Union Pacific's cash from operations, which is conservative given the absence of any similar fluctuation in at least the last

---

[68] LSH, Ch. 25, "Typical Roles of a Financial Expert in Bankruptcy Litigation", p.29 – p.30.

[69] LSH, Ch. 25, "Typical Roles of a Financial Expert in Bankruptcy Litigation", pp.29-30. "The capital adequacy test looks to the debtor's capitalization and available sources of capital (including the debtor's ability to generate enough cash from operations and asset sales) in comparison to its capital needs." *See also*, "Due Diligence and Analytical Procedures for Fraudulent Conveyance Opinions," Willamette Insights, Winter 2014, p.41, "The capital adequacy test determines whether the debtor corporation has adequate capital to meet its (1) operating expenses, (2) capital expenditure requirements, and (3) debt repayment obligations. The goal of the capital adequacy test is to evaluate the likelihood that the debtor corporation will survive potential business fluctuations over several quarters following the transfer date."

[70] *Id.*

[71] *Id.* The capital adequacy analysis typically includes evaluating all available resources, including sale of assets, borrowing capacity, and operating performance. New debt to pay existing debt is not considered capital for this purpose."

[72] Union Pacific Q1'24 Form 10-Q, p.4.

[73] For present purposes, I have conservatively not considered Union Pacific's ability to sell assets in my analysis.

SUBJECT TO PROTECTIVE ORDER

10 years.[74] Even if such a reduction occurred, Union Pacific would still comfortably generate significant cashflow after capital expenditures and debt repayments—even before accessing credit facilities:

| Future Cash Flow Projections ($s in millions) | | | | | |
|---|---|---|---|---|---|
| Fiscal Year | 2024 | 2025 | 2026 | 2027 | 2028 |
| *Cash from Operations* | *$9,484* | *$10,290* | *$11,105* | *$12,392* | *$13,385* |
| *25% Reduction* | *-$2,371* | *-$2,573* | *-$2,776* | *-$3,098* | *-$3,346* |
| Revised Cash from Operations | $7,113 | $7,718 | $8,329 | $9,294 | $10,038 |
| Capital Expenditures[75] | -$3,383 | -$3,616 | -$3,749 | -$4,027 | -$4,167 |
| Debt Repayments[76] | -$1,427 | -$1,426 | -$1,515 | -$1,285 | -$1,235 |
| **Total** | **$2,303** | **$2,675** | **$3,065** | **$3,982** | **$4,637** |

50.     In addition, I performed an analysis to compare Union Pacific's financial condition to competitive peer companies.[77] As compared to its competitors on numerous financial metrics, Union Pacific is the largest North American publicly traded railroad.[78] The table below compares Union Pacific to certain of these entities based on average financial results from 2021 to 2023:

---

[74] In fact, Union Pacific has generated more than $1.0 billion of cashflow from operations minus investing activities in each of the last 16 years—a period that includes both the global financial crisis and the COVID-19 pandemic.

[75] Based on my review, Union Pacific's rate of capital expenditures has been consistent and is unlikely to fluctuate meaningfully. In fact, if cash from operations was reduced 25%, Union Pacific could mitigate that reduction by reducing operating expenses or capital expenditures.

[76] These amounts are known which eliminates the need for stress testing.

[77] Union Pacific's 2023 Proxy, p.50.

[78] Union Pacific's Revenue, Net Income, Cash Flow from Operations and Market Capitalization as of June 14, 2024 are all industry leading for publicly traded Companies. BNSF was purchased by Berkshire Hathaway in 2010 though BNSF's audited financial statements continue to be available on their website.

SUBJECT TO PROTECTIVE ORDER

| Peer Company Financial Results and Ratio Analysis ($s in millions) | | | |
|---|---|---|---|
| Company Name | Revenue | EBITDA | Cash Flow from Operations |
| BNSF | *$23,729* | $10,813 | *$9,086* |
| CSX Corp | $14,011 | $7,071 | $5,422 |
| Canadian National Railway Co | $12,274 | $6,481 | $5,236 |
| Northfolk Southern Corp | $12,014 | $5,756 | $3,885 |
| Canadian Pacific Kansas City | $7,446 | $3,985 | $3,036 |
| | | | |
| Union Pacific Corp | $23,599 | *$11,757* | $8,924 |
| *Union Pacific Margin (Deficit)* | -$130 | $944 | -$162 |

51.     I also considered numerous financial ratios to evaluate Union Pacific's financial condition. The Altman Z-score is widely used to evaluate an entity's risk of bankruptcy. This score considers profitability, leverage, liquidity, solvency, and activity ratios.[79] A higher Altman Z-Score translates to better financial solvency and performance.[80] Union Pacific has a peer company leading Altman Z-Score of 3.69, which was significantly higher than the weighted-average (by revenue) of peer companies score of 2.67.[81]

52.     Total Debt / EBITDA is a solvency ratio that measures a company's ability to pay its debts. This ratio compares the company's total debt to EBITDA, where a lower score demonstrates a company's ability to pay off its debt more expediently. Union Pacific's 2.7x Total Debt / EBITDA ratio is consistent with the peer company weighted average by revenue ratio of 2.6x.

53.     Return on equity ("ROE") is a profitability ratio used to measure how efficiently a company generates profits from every unit of shareholders' equity, where a higher percentage demonstrates more efficient profitability.[82] Union Pacific's 47% ROE is better than its nearest competitor, and significantly exceeds the peer group weighted average of 19%. A reduction to

---

[79] The formula is 1.2 x (Working Capital / Total Assets) + 1.4 x (Retained Earnings / Total Assets) + 3.3 x (EBIT / Total Assets) + 0.6 (Market Value of Equity / Total Liabilities) + 1 x (Total Revenue / Total Assets).

[80] "Predicting Financial Distress of Companies: Revisiting the Z-Score and ZETA Models," Edward Altman, July 2000. Available at https://pages.stern.nyu.edu/~ealtman/Zscores.pdf (accessed May 9, 2024).

[81] BNSF data was not available. The above comparison is inclusive of all publicly traded peer companies.

[82] Net Income ÷ Average Shareholders Equity.

SUBJECT TO PROTECTIVE ORDER

Union Pacific's earnings of more than $2.5 billion would be required to cause Union Pacific's ROE to be in-line with the peer group average.

54.     These industry-leading financial metrics provide further support for my conclusion that Union Pacific has the ability to pay a substantial damages award, if necessary.

### 4.   **Evaluation of Union Pacific's Ability to Pay**

55.     In this section, I consider Union Pacific's ability to pay statutory damages based upon the analyses set forth in §§ 2-3 above. Specifically, I consider Union Pacific's ability to pay a judgment of approximately $2.5 billion.

56.     My selection of this amount considered Union Pacific's potential debt covenants. Union Pacific does not disclose details of current debt covenants other than the presence of a debt-to-EBITDA coverage ratio. Union Pacific does, however, disclose that the maximum allowable debt pursuant to its existing credit facilities is $44.4 billion as of December 31, 2023.[83] Accordingly, Union Pacific's maximum debt-to-EBITDA ratio is approximately 3.7x.[84] Based on Union Pacific's currently outstanding debt, the Company had a cushion of approximately $2.7 billion before the maximum debt-to-EBITDA ratio might be exceeded.[85] Accordingly, I evaluate Union Pacific's ability to pay a judgment less than this amount or approximately $2.5 billion.[86]

57.     *First*, Union Pacific's net assets exceeded net liabilities by $15.7 billion as of March 31, 2024 (*see* §3.a). Accordingly, an award of $2.5 billion would not cause Union Pacific to fail the Balance Sheet Test.

58.     *Second*, as described in § ¶ 39, Union Pacific generated Net Cash Flow to Equity of $4.8 billion during 2023 (*i.e.*, after making normal capital expenditures and payment of interest on outstanding debt). Further, even after repayment of debt, Union Pacific is expected to generate $4.7 billion of positive cash flow in 2024. In fact, Union Pacific's discretionary shareholder return-related spending has exceeded $3.8 billion in each of the two most recent

---

[83] Union Pacific 2023 Form 10-K, p.66.

[84] Union Pacific 2023 Form 10-K, p.32 indicates that 2023 EBITDA was $11.8 billion.

[85] Union Pacific's current outstanding debt totals approximately $34.3 billion. Based on a maximum debt-to-EBITDA ratio of 3.7, Union Pacific required EBITDA of approximately $9.2 billion (*i.e.*, $34.3 billion ÷ 3.7x). In 2023, Union Pacific generated EBITDA of approximately $11.9 billion (2023 Union Pacific Form 10-K, p.32). Accordingly, Union Pacific's EBITDA appears to have been approximately $2.7 billion above the debt covenant threshold.

[86] Union Pacific could seek a waiver particularly when the circumstances resulting in the potential breach of the covenant involves a one-time event.

SUBJECT TO PROTECTIVE ORDER

years (*see* ¶ 42). Thus, even before utilization of credit facilities or cash-on-hand, the Cash Flow Test would indicate that Union Pacific can pay a judgment of this magnitude.

59.     *Third*, as described in § 3.c, Union Pacific has cash-on-hand of approximately $1.0 billion and available credit of approximately $2.4 billion. These sources of capital, considered in conjunction with cashflow from operations, would enable the payment of a judgment of this magnitude without impairing Union Pacific's ability to pass the Capital Adequacy Test. Additionally, as seen in the table below, while the payment of a judgment of this size may temporarily impact Union Pacific's status as a peer group leader, the Company's financial condition would remain in the median of those entities:[87]

| Peer Company Financial Results and Ratio Analysis ($s in millions) | | | |
|---|---|---|---|
| **Company Name** | **Revenue** | **EBITDA** | **Cash Flow from Operations** |
| BNSF | $23,729 | $10,813 | $9,086 |
| CSX Corp | $14,011 | $7,071 | $5,422 |
| Canadian National Railway Co | $12,274 | $6,481 | $5,236 |
| Northfolk Southern Corp | $12,014 | $5,756 | $3,885 |
| Canadian Pacific Kansas City | $7,446 | $3,985 | $3,036 |
| | | | |
| **Union Pacific *(Adj. for $2.5B Judgement)*** | **$23,599** | **$9,257** | **$6,424** |
| *Union Pacific Lead (Deficit)* | -$130 | -$1,556 | -$2,662 |

60.     Ultimately, while a $2.5 billion judgment would impact Union Pacific's annual financial results, the impact would be temporary.[88] Such a judgement, however, would not destroy Union Pacific's business. The Company would be unlikely to need to sell assets (*e.g.*, rail cars), reduce its workforce, impair the safety of its services, or modify the services it offers to its customers.

---

[87] The table reflects three-year averages from 2021 to 2023.

[88] For clarity, Union Pacific also has the ability to pay a judgment less than $2.5 billion. Further, if the judgment was paid over a period longer than twelve months, Union Pacific would likely have the ability to pay a significantly larger judgment.

SUBJECT TO PROTECTIVE ORDER

61.     Instead, the impact would be limited to a short-term reduction (not an elimination) of amounts paid to Union Pacific's shareholders (*i.e.*, reduced share repurchases and dividends). For example, in 2024, Union Pacific is projected to generate $4.7 billion of cash from operations after repayment of debt and capital expenditures (*see* ¶ 44). This result is comparable to 2023 (*see* ¶ 41), when Union Pacific used approximately $3.8 billion for share repurchases and dividends (*see* ¶ 43). Accordingly, if, during 2024, Union Pacific used $2.5 billion for the payment of a judgment, the remaining total of approximately $2.2 billion (*i.e.*, $4.7 billion of cash from operations minus the judgment) would be available for other purposes, including share repurchases and dividends. Put differently, after the payment of a judgment of this magnitude, Union Pacific would be less profitable but retain the ability to make share repurchases and/or dividend payments.

**** ****

Greg J. Regan, CPA/CFF, CFE
June 14, 2024

Appendix A



**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

| SAN FRANCISCO OFFICE | BURLINGAME OFFICE |
|---|---|
| 201 Spear Street | Suite 1100 | 1290 Howard Ave | Suite 202 |
| San Francisco, CA 94105 | Burlingame, CA 94010 |
| T: 415.836.4000 | T: 415.836.4000 |

## GREG REGAN, CPA/CFF, MBA

HEMMING.COM

### Profile

Greg Regan is a Partner in the Forensic and Financial Consulting Services Group in the San Francisco office of Hemming Morse. In 2018, Greg became the Chair of California Society of CPAs Forensic Services Section. In 2013, Greg was appointed to the American Institute of CPA's ("AICPA") Forensic and Valuation Services Executive Committee. This 9-member committee establishes professional standards for practitioners performing consulting services that require the application of forensic or valuation-related methodologies. From 2010 to 2013, he served on the AICPA's Forensic and Litigation Services ("FLS") Committee. This 11-member committee provides professional guidance to CPA practitioners who perform accounting investigations, economic damage analyses such as lost profits calculations, and a variety of other services. Greg was the Chair of the AICPA's Damages Task Force from 2010 to 2013 and continues to be an active member. Greg received the AICPA's 2012 Award for the FLS Volunteer of the Year.

Greg has testified in federal and state courts as well as in arbitrations regarding these types of forensic analyses. Greg is a Certified Public Accountant (CPA), a Certified Financial Forensic (CFF), and a Certified Fraud Examiner (CFE). Greg serves as an Officer of the California Society of Certified Public Accountants (CalCPA) statewide Forensic Services Committee.

Greg received his B.S. degree in Accounting from Georgetown University, Washington, D.C., and his Masters in Business Administration with an Emphasis in Finance from the University of San Francisco. When he's not working, he enjoys spending time with his wife and coaching the sports teams of his two boys.

CURRICULUM VITAE

# HEMMING | MORSE
FORENSIC & FINANCIAL CONSULTANTS

**SAN FRANCISCO OFFICE**
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000

**BURLINGAME OFFICE**
1290 Howard Ave | Suite 202
Burlingame, CA 94010
T: 415.836.4000

# GREG REGAN, CPA/CFF, MBA

HEMMING.COM

## Employment & Education

- **Hemming Morse 2003 – Present**
  - Partner
  - Director, 2007-2011
  - Manager, 2003-2006

- **Golden Gate University 2009 – 2016**
  - Adjunct Professor
  - Introduction to Financial Forensic Accounting, Spring 2009-2016
  - An In-Depth Analysis of Economic Damages, Fall 2010

- **SupportSoft, Inc. (Nasdaq: SPRT) 1999 – 2003**

- **Ernst & Young, LLP 1995 – 1999**

- **University of San Francisco 2004 – 2007**
  - Masters in Business Administration with emphasis in Finance
  - Beta Gamma Sigma Honor Society

- **Georgetown University, Washington, D.C. 1995**
  - B.S. Accounting, Minor in Theology

## Professional & Service Affiliations

- **Certified Public Accountant,** State of California, 1998 State of New York, 2010

- **Certified Fraud Examiner**

- **Certified in Financial Forensics,** 2008

- **American Institute of Certified Public Accountants**
  - Forensic & Valuation Services Executive Committee, 2013-2016
  - Forensic & Litigation Services Committee, 2010-2013
  - Chair, Damages Task Force
  - National Forensic & Valuation Conference
    - Co-Chair, 2014-2015
    - Planning Committee, 2011-2016

- **California Society of Certified Public Accountants**
  - Co-chair, San Francisco Chapter Litigation Consulting Services Committee, 2006-2011
  - State Steering Committee, 2007-present Officer, 2012-2020

- **CAMICO, Risk Management Committee,** 2014-present

- **California CPA Education Foundation**
  - Accounting & Auditing Curriculum Advisory Committee, 2007-2010

- **Legal Aid of San Mateo County**
  - Board of Directors, Treasurer

- **Board of Regents,** Junipero Serra High School

Appendix A

**CURRICULUM VITAE**

# HEMMING | MORSE
## FORENSIC & FINANCIAL CONSULTANTS

**SAN FRANCISCO OFFICE**
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000

**BURLINGAME OFFICE**
1290 Howard Ave | Suite 202
Burlingame, CA 94010
T: 415.836.4000

# GREG REGAN, CPA/CFF, MBA

HEMMING.COM

## Testimony

### Trial and Deposition

- **Consumer Financial Protection Bureau v. Stratfs, LLC (2024),** U.S. District Court, Western District of New York, Case No. 1:24-cv-00040

- **DBI Beverage Inc. v. WSJ, LLC (2023),** Superior Court of California, San Francisco, Case No. CGC-20-582694

- **Knauf Ventures, LLC v. 154 Almonte Blvd, LLC (2023),** California Superior Court, Marin, Case No. CIV2003268

- **Virgin Hotels San Francisco, LLC v. 250 Fourth Development, L.P. et al. (2022),** Superior Court of California, San Francisco, Case No. CGC-20-584350

- **People of the State of California v Zovio, et al. (2021),** Superior Court of California, San Diego, Case No. 37-2018-00046134-CU-MC-CTL

- **Sumotext Corp. v. Zoove, Inc., et al. (2020)** U.S. District Court, Northern District of California, San Jose Division, Case No. 5:16-cv-01370-BLF

- **PPFA, Inc. v. Center For Medical Progress, et al. (2019),** U.S. District Court, Northern District San Francisco, Case No. 3:16-Cv-00236-Who

- **ASML US, Inc, v. XTAL (2018),** Superior Court of California, Santa Clara, Case No. 16-CV-295051

- **State of Colorado v. Center for Excellence in Higher Education, Inc., et al. (2017),** District Court, Denver City and State of Colorado, Case No. 2014cv34530

### Arbitration and Deposition

- **T.I.M.E. Service Catalyst Handling, LLC v. Scott Rogers et al. (2022),** American Arbitration Association, Case No. No. 01-18-002-3360

- **Sutter Health and Sutter Health Plan v. Optum Insight, Inc. (2017),** American Arbitration Association Case No. 011500034226

- **Cloud Cruiser, Inc. v. Cisco Systems, Inc. (2017)** JAMS Reference No. 1100085560

Appendix A



CURRICULUM VITAE

SAN FRANCISCO OFFICE
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000

BURLINGAME OFFICE
1290 Howard Ave | Suite 202
Burlingame, CA 94010
T: 415.836.4000

## GREG REGAN, CPA/CFF, MBA

HEMMING.COM

### Testimony continued

#### Deposition

- Primevere LLC v. Rezidential Development, Inc. (2024), Superior Court of California, Orange County, Case No. 30-2021-01203514-CU-BC-CJC

- Autumn Funkhouser-Ward v. Honeywell International, Inc. (2024), USDC, Southern District of Illinois, Case No. 3:21-cv-00485-SMY

- State of California ex re Mark Sersansie v. Gardens Regional Hospital Medical Center et. al. (2024), Superior Court of California, Los Angeles, Case No. BC534466

- SEC v. Barrington Asset Management (2023), U.S. District Court, Northern District of Illinois, Case No. 21-cv-3450

- Hewitt v. Google LLC (2023), U.S. District Court, Northern District of California, Case 4:21-cv-02155-YGR

- Shannon McBurnie, et al. v. RAC Acceptance East LLC (2022), U.S. District Court, Northern District of California, Case No. 3:21-cv-01429-JD

- Steven Gomo v. NetApp, Inc. (2022), Federal Court, ND CA, Case No. 5:17-cv-02990-BLF

- Stahl and Reynolds v. Orthopedic Alliance (2022), U.S. District Court, Central District of California, Case No. CV16-03966-MWF (SKx)

- Barry Forman v. Timothy Covington (2022), Superior Court of California, San Francisco, Case No. CGC-21-588962

- Don Lee Farms v. Beyond Meat (2022), Superior Court of California, Los Angeles, Case No. BC662838

- New Prime Inc. v. Amazon Logistics, Inc. (2021), U.S. District Court, Western District of Missouri, Case No. 6:19-cv-03236-MDH

- Kiva Health Brands, LLC v. Kiva Brands Inc. (2021), U.S. District Court, Northern District of California, Civil No. 3:19-cv-03459-CRB

- Class B Investors v. 8minutenergy US Manager, LLC (2021), JAMS Case Reference No. 1100110779

- Synchrony Bank v. RevPar Collective, Inc. (2021), Superior Court of California, San Francisco, Case No. CGC-18-566487

- Bridge-Folsom, LP, v. Terra Firma Development Company, LTD (2021), JAMS Arbritration, No. 1130008587

- SRS Acquiom, Inc. v. PNC Financial Services Group, Inc. (2020), U.S. District Court, District of Colorado, Civil Action No. 1:19-cv-02005-DDD-SKC

Appendix A



CURRICULUM VITAE

**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

| SAN FRANCISCO OFFICE | BURLINGAME OFFICE |
|---|---|
| 201 Spear Street I Suite 1100 | 1290 Howard Ave I Suite 202 |
| San Francisco, CA 94105 | Burlingame, CA 94010 |
| T: 415.836.4000 | T: 415.836.4000 |

## GREG REGAN, CPA/CFF, MBA

HEMMING.COM

**Testimony** continued

**Deposition** continued

- **United States ex rel. Matthew Macdowell v. Synnex Corporation (2020),** U.S. District Court, Northern District of California, Case No. 19-cv-00173-WHA

- **Ahmad Hamdan v. Dorothy Reggi, et al. (2020),** Yuba County Superior Court, Case No. CVCV18-01936

- **Aqualegacy Development LLC v. 2012 Canrow Owner (2020),** Superior Court of California, Monterey, Case No. 16CV001078

- **Cisco Systems, Inc., And Cisco Technology, Inc. v. ADSI, et al. (2020),** U.S. District Court, Northern District of California, Oakland Division, Case No. 4:18-cv-07602 YGR

- **Administrator v. Marlette Funding, LLC et al. (2020),** District Court, Denver City and State of Colorado, Case No. 17CV30376

- **In Re: Restasis Antitrust Litigation (2020),** U.S. District Court, Eastern District of New York, Case No. MDL No. 2819 18-MD-2819 (NG) (LB)

- **Wetlands Preservation Foundation v. Department of Water Resources, The Nature Conservancy (2019)** Superior Court of California, San Joaquin, Case No. STK-CV-UWM-2018-8957

- **Healthnet v. American International Specialty Lines Insurance Company, et al. (2019),** Superior Court of California, Los Angeles, Case No. Bc357436

- **Fred Sahadi v. Liberty Mutual Insurance. et al (2019),** U.S. District Court Northern District of California, Case No. 5:18-CV-04061-LHIK

- **Justice Laub v. Drone Racing League, Inc. et al. (2019),** U.S. District Court, Central District of California, Western Division, Case No. 2:17-CV-06210-JAK (KSX)

- **United States Of America v. County Of Clark And Nevada Links, Inc. (2019),** U. S. District Court District Of Nevada, Case No. 2:17-Cv-02303

- **Fuse Chicken, LLC v. Amazon.com, Inc. (2019)** U.S. District Court Northern District of Ohio, Eastern Division, Case No. 5:17-cv-01538-SL

- **Golden Gateway Center v. San Francisco Waterfront Partners II, LLC (2018),** Superior Court of California, San Francisco, Case No. CGC 15-548437

- **The Barrel Cellar v. Quince Pacific Avenue (2018),** Superior Court of California, San Francisco, Case No. CGC-17-561363

- **Just Games Interactive Entertainment, LLC v. Scopely, Inc. (2018),** JAMS Arbitration

- **Mark de Bibo Company v. Ryan & Ryan Construction, Inc. (2017),** Superior Court of California, San Mateo, Case No. CIV534040

- **Amedee Geothermal Venture I v. Lassen Municipal Utility District (2017),** Superior Court of California, Lassen, Case No. 59485

Appendix A

**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

**SAN FRANCISCO OFFICE**
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000

**BURLINGAME OFFICE**
1290 Howard Ave | Suite 202
Burlingame, CA 94010
T: 415.836.4000

## GREG REGAN, CPA/CFF, MBA

HEMMING.COM

### Publications

- "Making Sense of Forensic Accounting", CalCPA Magazine, 2020

- "Trial Testimony by Financial Experts in California Court: A Reference Guide to Hearsay Evidence Objections", CalCPA FSS, 2019

- "Calculating Lost Profits", AICPA Practice Aid, 2019

- Unblurring the Line(s) Between Accounting and Legal Opinions", The Witness Chair, Winter 2017

- "Big Data's Day in Court", Plaintiff Magazine, January 2017

- "Attaining Reasonable Certainty in Economic Damages, Calculations", AICPA Practice Aid, 2015

- "How CPAs can benefi t from Colin Powell's Rule", AICPA "FVS Insider" Article, August 2013

- "Options for Consumers in Crisis - An Economic Analysis of the Debt Settlement Industry", December 31, 2012

- "Discount Rates, Risk, and Uncertainty in Economic Damage Calculations", AICPA Practice Aid, 2012

### Awards

- AICPA, Forensic & Litigation Services Volunteer of the Year, 2012

- Georgetown University, Dean's Citation, 1995

### AICPA CFF Education, Spring 2010-Present

- Fundamentals of the Legal System & Engagement Administration

- Financial Statement Investigations

- Reporting, Expert Reports, and the Provision of Testimony

**HEMMING | MORSE**
FORENSIC & FINANCIAL CONSULTANTS

SAN FRANCISCO OFFICE
201 Spear Street | Suite 1100
San Francisco, CA 94105
T: 415.836.4000

BURLINGAME OFFICE
1290 Howard Ave | Suite 202
Burlingame, CA 94010
T: 415.836.4000

## GREG REGAN, CPA/CFF, MBA

HEMMING.COM

## Presentations

- "Aligning Damages to the Claims for Relief", AICPA National Forensic & Valuation Services Conference (2023)

- "An Exploration of Reliance Damages", AICPA National Forensic & Valuation Services Conference (2022)

- "The 'State' of Sargon: 8 Years Later", CalCPA (2020)

- "Damages - When are they Foreseeable?", AICPA National Forensic & Valuation Services Conference, 2018

- "Linking Causation to Damages", AICPA National Forensic & Valuation Services Conference, 2017

- "Un-blurring the Lines Between Legal and Expert Opinions", AICPA National Forensic & Valuation Services Conference, 2017

- "Un-blurring the Lines Between Accounting and Legal Opinions", CalCPA Forensic Services Steering Committee, June 2016

- "Examining Cross-Examination", AICPA National Forensic & Valuation Conference, 2015

- "Experts on Offense, Experts on Defense", ABA National Securities Fraud Conference, 2014

**Fleury, et al v. Union Pacific**
**Appendix B - Documents Considered**
**Expert Report of Greg J. Regan, CPA/CFF, CFE**

| Category | File |
|---|---|
| **Case Filings** | Fleury v. Union Pacific - Third Amended Complaint - 06.28.23 |
| | Dkt. 209 - Motion to Strike Class Allegations |
| **SEC Filings** | Union Pacific Corporation Presents at Barclays 41st Annual Industrial Select Conference 2024, Feb-21 |
| | 2024 Union Pacific Proxy Statement |
| | Union_Pacific_Corporation_-_Form_10-K(Feb-09-2024) |
| | Union Pacific Corporation NYSE UNP Financials |
| | Union Pacific Corporation NYSE UNP Fixed Income S P Global Ratings |
| | UnionPacificCorporationNYSEUNPEstimatesReport |
| | Union Pacific Corporation, Q1 2024 Earnings Call, Apr 25, 2024 |
| | Union Pacific Corporation, Q4 2023 Earnings Call, Jan 25, 2024 |
| | Union_Pacific_Corporation_-_Form_10-K(Feb-04-2022) |
| | Union_Pacific_Corporation_-_Form_10-K(Feb-10-2023) |
| | Union_Pacific_Corporation_-_Form_10-Q(Apr-25-2024) |
| | Union Pacific Corporation NYSE UNP Long Business Description |
| | Union Pacific Corporation Presents at J.P. Morgan 2024 Industrials Conference, Mar-13-2024 |
| **Research** | Cothron v White Castle System Inc |
| | Union Pacific Corporation NYSE UNP Fixed Income S P Global Ratings |
| | 2018.05.31 Union Pacific Corp. Corporate Credit Rating Lower _ S&P Global Ratings |
| | 2023.11.07 Fitch Affirms Union Pacific at 'A-'_'F1'; Outlook Stable |
| | S&P Global Ratings |
| | Litigation Services Handbook, The Role of the Financial Expert, 5th Ed. and 6th Ed. |
| | www.up.com |
| | AICPA Statement on Standards for Valuation Services |
| | S&P, "Examining Share Repurchasing and the S&P Buyback Indices in the U.S. Market", March 2020 |
| | Willamette, "Due Diligence and Analytical Proceduresfor Fraudulent Conveyance Opinions" Winter 2014 |
| | "Predicting Financial Distress Of Companies:Revisiting The Z-Score And Zeta® Models" |
| | PwC, Fair Value Measurements, September 2022 |
| | SEC Financial Reporting Manual |
| | FASB, Concepts Statement No. 8, Chapter 1, Conceptual Framework for Financial Reporting Chapter 1 |