# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DAVID FLEURY and ALVIN TURNER  )
individually and on behalf of a class of  )
similarly situated individuals,  )
    )
    *Plaintiffs*,  )    Case No. 20-cv-00390
    )
v.  )    Hon. LaShonda A. Hunt
    )
UNION PACIFIC RAILROAD COMPANY,  )    Magistrate Jeffrey Cole
a Delaware Corporation,  )
    )
    *Defendant*.  )
    )

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiffs David Fleury and Alvin Turner, by and through their undersigned counsel and for their Opposition to Defendant Union Pacific's Motion for Summary Judgment ("UPMSJ"), hereby submit the following Memorandum of Law.

DATED: May 23, 2025    Respectfully submitted,

    DAVID FLEURY and ALVIN TURNER,
    individually, and on behalf of similarly
    situated individuals

    By: */s/ Brendan Duffner*
    *One of Plaintiffs' Attorneys*

Myles McGuire (mmcguire@mcgpc.com)    Jonathan Loevy (jon@loevy.com)
Evan M. Meyers (emeyers@mcgpc.com)    Michael I. Kanovitz (mike@loevy.com)
David L. Gerbie (dgerbie@mcgpc.com)    Thomas M. Hanson (hanson@loevy.com)
Brendan Duffner (bduffner@mcgpc.com)    LOEVY & LOEVY
MCGUIRE LAW, P.C.    311 N. Aberdeen St., 3rd Floor
55 W. Wacker Drive, 9th Fl.    Chicago, Illinois 60607
Chicago, IL 60601    Tel: (312) 243-5900
Tel: (312) 893-7002

    *Counsel for Plaintiffs and the Putative Classes*

## <u>TABLE OF CONTENTS</u>

I.   STATEMENT OF FACTS ................................................................................. 2

II.   LEGAL STANDARD.................................................................................... 2

III.   ARGUMENT ............................................................................................. 3

  A.   The Composite Fingerprint Images and Fingerprint Templates that Union Pacific Collected, Stored and Disseminated Constitute Biometrics Under BIPA ................................. 3

    1.   The Lumidigm Devices Collect Composite Fingerprint Images from the Surface and Subsurface of the Finger ...................................................................... 3

    2.   There is no FBI Certification Requirement Contained in BIPA...................... 5

    3.   At a minimum, the Composite Fingerprint Images and Fingerprint Templates are Biometric Information ......................................................................... 6

    4.   A Finding that the Composite Fingerprint Images and Fingerprint Templates Constitute Biometrics Would not Conflict With the Private Detective Act............................ 7

  B.   Summary Judgment on Section 25(e) Should be Granted in Plaintiffs' Favor, not Defendant's ...................................................................................... 8

    1.   Union Pacific Waived or Forfeited its Ability to Raise the Government Contractor Defense ......................................................................................... 8

    2.   Even it not Waived, Defendant's § 25(e) Defense Fails on the Merits ....................... 12

      a.   Defendant's Construction of §25(e) Fails Standard Rules of Statutory Construction................................................................................. 12

      b.   The Courts have Rejected Union Pacific's Interpretation of Section 25(e).............. 15

      c.   Defendant's Alternative Interpretation is Similarly Without Merit......................... 18

i

d.    Summary Judgment on the § 25(e) Defense Should be Granted in Plaintiffs' Favor ....................................................................................... 19

3.    Union Pacific's Federal Contracts Have Nothing to do with the Conduct at Issue ...... 20

C.    ICCTA Does Not Preempt Plaintiffs' BIPA Claims.......................................................... 21

1.    Defendant has not Raised any Intervening Changes in Law that Warrant a Departure from the Court's Previous Rejections of ICCTA Preemption ............................................... 21

2.    The Facts Uncovered in Discovery Demonstrate that Compliance With BIPA does not Unreasonably Interfere with Union Pacific's Operations ...................................................... 24

D.    The Amendment to BIPA Applies Prospectively Only, But Even if the Court Applies it Retroactively, the Class Members have Multiple Claims Each Under Sections 15(b) and (d). 27

E.    Union Pacific Violated the Illegal Retention Subclass' Rights Under § 15(a). ................ 28

F.    Union Pacific Violated Section 15(d) of BIPA.................................................................. 30

1.    Defendant's Sham Affidavits do not Rescue it From Liability, Much Less Warrant Summary Judgment in Defendant's Favor. ............................................................................ 31

G.    Verification Scans Violate BIPA. ..................................................................................... 33

H.    Judicial Estoppel Does Not Apply to Bar Plaintiff Fleury's Claims, Which Were Disclosed During his Long-Since-Discharged Bankruptcy Before Union Pacific Was Even Aware the Bankruptcy Existed or had Asserted a Judicial Estoppel Defense. ........................ 36

I.    Plaintiff Fleury does not Seek to Recover Damages Based on Finger Scans that Occurred Post-Consent. ........................................................................................................................... 40

IV.    CONCLUSION............................................................................................................................ 40

## **TABLE OF AUTHORITIES**

**Cases**

*Advincula v. United Blood Svcs.*, 678 N.E.2d 1009 (Ill. 1996) .............................................. 13, 14

*Amigon v. Old Dominion Freight Line, Inc.,* No. 24−cv−01934 Dkt. 66

   (N.D. Ill. Mar. 21, 2025) ................................................................................................ 27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................... 19

*Babrocky v. Jewel Food Co.,* 773 F.2d 857 (7th Cir. 1985) ........................................... 31

*Bryant v. Compass Group USA, Inc.*, 503 F. Supp. 3d 597 (N.D. Ill. 2020) ........................ *passim*

*Cable v. Ivy Tech State College*, 200 F.3d 467 (7th Cir.1999) .................................... 38

*Calonia v. Trinity Property Consultants, LLC*, 2022 WL 2132528

   (N.D. Ill. June 14, 2022) ................................................................................. 16, 18

*Cannon–Stokes v. Potter*, 453 F.3d 446 (7th Cir. 2006) ............................................... 38

*Carmichael v. Village of Palatine*, 605 F.3d 451 (7th Cir. 2010) .................................... 3

*Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852 (7th Cir. 2017) ..................... 28, 29

*City of Cayce v. Norfolk S. Ry. Co.,* 706 S.E.2d 6 (S.C. 2011) ....................................... 23

*Clay v. Union Pacific Railroad Co.,* No. 24-cv-4194 (N.D. Ill. Apr. 10, 2025) ........................ 27

*Cothron v. White Castle System, Inc.*, 216 N.E.3d 918 (Ill. 2023). ............................. 1, 33, 34, 35

*Cothron v. White Castle System, Inc.,* 467 F. Supp. 3d 604 (N.D. Ill. 2020). ............................ 40

*Delaware v. Surface Transp. Bd.,* 859 F.3d 16 (D.C. Cir. 2017) ........................................... 21, 23

*Dunn v. Menard, Inc.,* 880 F.3d 899 (7th Cir. 2018) .................................................... 32

*Enriquez v. Navy Pier, Inc.*, 2022 IL App (1st) 211414-U, 2022 WL 4484047

   (Sep. 27, 2022) .................................................................................. 9, 16, 17

*Esparza v. Costco Wholesale Corp.*, 2011 WL 6820022 (N.D. Ill. Dec. 28, 2011) .................... 39

*Fayus Enterprises v. BNSF Ry. Co.*, 602 F.3d 444 (C.A.D.C., 2010) .......................................... 23

*Figueroa v. Kronos Inc.*, 454 F. Supp. 3d 772 (N.D. Ill. 2020)........................................................ 8

*Flores v. Motorola Sols., Inc.*, 2021 WL 232627 (N.D. Ill. Jan. 8, 2021) ........................... 8, 9, 11

*Gaertner v. Commemorative Brands, Inc.*, 2025 WL 931290 (S.D. Ill. Mar. 27, 2025)............... 8

*Georgia-Pac. Consumer Prod. LP v. Kimberly-Clark Corp.*, 647 F.3d 723 (7th Cir. 2011) ........ 4

*Giles v. Sabert Corp.*, 24-cv-2996, 2025 WL 274326 (N.D. Ill. Jan. 21, 2025)........................... 27

*Gomez v. Toledo*, 446 U.S. 635, 640–41 (1980)......................................................................... 10

*Gooch v. Young*, 24 F.4th 624 (7th Cir. 2024)............................................................................. 19

*Green Mtn. R.R. Corp. v. Vermont*, 404 F.3d 638 (2nd Cir. 2005) ....................................... 23, 24

*Gregg v. Cent. Transp. LLC*, 2025 WL 907540 (N.D. Ill. Mar. 21, 2025)................................... 27

*Heard v. Becton, Dickinson & Co.*, 524 F. Supp. 3d 831 (N.D. Ill. 2021) ................................. 8, 9

*Hernandez v. Forest Pres. Dist. of Cook Cnty.*, 2010 WL 1292499

   (N.D. Ill. Mar. 29, 2010).......................................................................................................... 39

*Howe v. Speedway,* 2024 WL 4346631 (N.D. Ill. Sep. 29, 2024) ........................................ *passim*

*In re Clearview AI, Inc. Consumer Pvcy. Litig.*, 2022 WL 2915627

   (N.D. Ill. Jul. 25, 2022)............................................................................................................. 8

*James v. Hale*, 959 F.3d 307 (7th Cir. 2020)........................................................................ 31, 32

*Keith v. Ferring Pharmaceuticals, Inc.*, 2016 WL 5391224

   (N.D. Ill. Sept. 27, 2016) .......................................................................................................... 8

*Law v. GM Corp.* 114 F.3d 908 (9th Cir. 1997) .......................................................................... 23

*Liberty Mut. Fire. Ins. Co. v. Statewide Ins.* Co., 352 F.3d 1098 (7th Cir. 2003) ...................... 34

*Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th 636 (7th Cir. 2022)............................................ 8

*Lynch v. Ne. Reg'l Commuter R.R. Corp.*, 700 F.3d 906 (7th Cir. 2012)....................................... 4

*Mayhew v. Candid Color Sys., Inc.*, 2024 WL 3650095 (S.D. Ill. Aug. 5, 2024) ......................... 8

*McDonald v. Symphony Bronzeville Park, LLC*, 193 N.E.3d 1253 (Ill. 2022).............................. 6

*Meacham v. Knolls Atomic Power Lab*, 554 U.S. 84 (2008).......................................................... 8

*Miranda v. Pexco*, Cook Cty. Cir. Ct. (Chancery) No. 2021-CH-02127........................ 17, 18, 20

*Mora v. J&M Plating, Inc.*, 2022 IL App (2d) 210692 (Ill. App. 2 Dist. 2022)......................... 40

*Navarette v. Josam Acquisitions*, No. 2019 CH 14368

   (Ill. Cir. Ct. Cook Cnty. Mar. 29, 2021) ................................................................. 17

*Norfolk S. Ry Co. v. City of Alexandria*, 608 F.3d 150 (4th Cir. 2010)................................. 21, 24

*Payton v. Union Pacific Railroad Co.*, N.D. Ill. No. 24-cv-153................................................... 12

*People v. Christopherson*, 899 N.E.2d 257 (Ill. 2008) ................................................................ 14

*Prosser v. Ross*, 70 F.3d 1005 (8th Cir. 1995)............................................................................ 32

*Rainey v. United Parcel Serv., Inc.,* 466 Fed. Appx. 542 (7th Cir. 2012) ................................... 38

*Reed v. Columbia St. Mary's Hosp.,* 915 F.3d 473 (7th Cir. 2019)................................... 8, 10, 11

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37 (7th Cir. 1992)............. 19

*Rogers v. BNSF Railway Co.*, 2019 WL 5635180 (N.D. Ill. Oct. 31, 2019) ........................ 21, 22

*Rogers v. BNSF Railway Co.*, 2022 WL 787955 (N.D. Ill. Mar. 15, 2022) ................................ 21

*Rojo v. Homer Tree Care, Inc.*, No. 23 L 8588 (Ill. Cir. Ct., Cook Cnty. May 29, 2024) .......... 17

*Rosenbach v. Six Flags Ent. Corp.*, 129 N.E. 1197, 1207 (Ill. 2019).................................... 23, 26

*Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459 (7th Cir. 2018) ..................................................... 2

*Schmees v. HC1.COM, Inc.,* 77 F.4th 483 (7th Cir. 2023) .......................................................... 29

*Schwartz v. Supply Network, Inc.,* 2024 WL 4871408

   (N.D. Ill. Nov. 22, 2024).......................................................................................... 27

*Sekura v. Krishna Schaumburg Tan, Inc.,* 115 N.E.3d 1080 (Ill. App. 2018)............................. 36

*Smith v. Am. Gen. Life Ins. Co.*, 544 F. Supp. 2d 732 (C.D. Ill. 2008)........................................... 39

*Smith v. CSX Transp., Inc.*, 247 F. Supp. 3d 952 (N.D. Ill. 2017).................................................... 22

*Tapia-Rendon v. United Tape & Finishing Co., Inc.,* 2023 WL 5228178

   (N.D.Ill. Aug. 15, 2023)........................................................................................................... 38

*Thomas Tubbs* No. 35792, 2014 WL 5508153 (S.T.B. Oct. 31, 2014) ........................................ 23

*Thompson v. Matcor Metal Fab. Inc.,* No. 2020-CH-00132

   (Cir. Ct. Tazewell Cnty., Ill. Dec. 11, 2023)................................................................... 4, 7, 33

*Thornley v. CDW-Government, LLC*, Cook Cty. Cir. Ct. (Chancery) No. 2020-CH-04346

   (June 25, 2021)..................................................................................................................... 17, 18

*Union Pacific R. Co., v. Chicago Transit Auth.,* 647 F.3d 675 (7th Cir. 2011)................ 21, 22, 26

*Van Housen v. Amazon.com*, N.D. Ill. No. 23-C-15634

   (Tr. of Proceedings, Nov. 6, 2024) ............................................................................................ 9

*Vidimos, Inc. v. Laser Lab Ltd.,* 99 F.3d 217 (7th Cir. 1996)........................................................ 30

*Watson v. Legacy Healthcare Fin. Svcs., LLC,* 196 N.E.3d 571 (Ill. App. Dist. 3 2021). ..... 34, 36

*Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889 (7th Cir. 2017) .................................................... 21

*Wood v. Milyard*, 566 U.S. 463, 470 (2012)................................................................................... 10

## Statutes

740 ILCS 14/1 ................................................................................................................................. 23

740 ILCS 14/10................................................................................................................... 6, 12, 14

740 ILCS 14/15(a) ........................................................................................................................... 37

740 ILCS 14/15(b) ........................................................................................................................... 42

740 ILCS 14/15(b)(1) ...................................................................................................................... 37

740 ILCS 14/25(d) ............................................................................................................................. 7

740 ILCS 14/25(e) ............................................................................................ 7, 8

740 ILCS 14/5 ................................................................................................... 6

740 ILCS 14/5(f) ............................................................................................... 31

11 U.S.C. §§ 1302(a) ........................................................................................ 40

11 U.S.C. §§ 1303 ............................................................................................. 40

11 U.S.C. §§ 1306(b) ........................................................................................ 40

**Rules**

Fed. R. Civ. P. 8 ................................................................................................. 9

Fed. R. Civ. P. 8(c) ............................................................................................ 9

Fed. R. Civ. P. 8(b)(1)(A-B) ............................................................................. 9

Fed. R. Civ. P. 12 .............................................................................................. 9

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 9

Fed. R. Civ. P. 56(c)(4) ..................................................................................... 33

Fed. R. Civ. P. 56(f)(1) ...................................................................................... 20

Over the five years this litigation has been pending, Union Pacific's once-favored defenses have withered and died as BIPA case law developed decidedly in Plaintiffs' favor. Over the same period, Plaintiffs have (despite Defendant's unceasing obstruction) built a detailed factual record that firmly establishes not only Defendant's liability, but also a simple method of calculating Defendant's classwide exposure. As a result, Defendant has desparately grasped for thinner and thinner defenses in an effort to stave off the significant judgment that awaits at trial.

Defendant's Motion for Summary Judgment ("UPMSJ") reflects these developments, relying on new arguments (including an unpled and forfeited affirmative defense) to replace the defenses that are no longer worth making. Union Pacific's second string arguments, however, are no better than the ones they replaced, as they have have no basis in case law or the facts:

*First,* Defendant's argument that the Composite Fingerprint Images are not "fingerprints" does not pass the eye test, as multiple courts in this District have held. Moreover, the contention that the Composite Fingerprint Images and Fingerprint Templates do not constitute biometric identifiers and/or biometric information fails in light of BIPA's broad definitions for those terms.

*Second,* Defendant's assertion of the "government contractor exemption" is an unpled affirmative defense that Union Pacific has waived or forfeit. And even if Defendant had properly preserved the defense, it would fail because it is unsupported in law or fact.

*Third,* Defendant's argument that ICCTA preempts Plaintiffs' claims has been denied repeatedly and without exception in BIPA cases against railroads using identical technology.

*Fourth,* Defendant's argument that Plaintiffs' claims for verification scans fail as a matter of law directly conflicts with the Illinois Supreme Court's ruling in *Cothron v. White Castle System, Inc.,* which held the opposite. 216 N.E. 3d 918, 920 (Ill. 2023).

1

*Fifth,* Defendant's attempt to excuse its unlawful retention of the Retention Subclass's Composite Fingerprint Images as a "best practice" ignores the fact that Union Pacific had no clue it was even collecting and retaining Composite Fingerprint Images.

*Sixth,* Defendant's argument that Plaintiffs' Section 15(d) claims fail relies on sham affidavits provided long after the close of discovery at the summary judgment stage which controvert Defendant's sworn interrogatory answers, its corporate representatives' testimony, and documents from discovery.

*Seventh,* Defendant's argument that BIPA plaintiffs are entitled to one recovery under Secitons 15(b) and (d) of BIPA rests on the universally denied argument that the 2024 amendment to BIPA applies retroactively to cases filed before its enactment.

*Eighth,* Defendant's argument that Plaintiff Fleury's claims are barred by judicial estoppel rests entirely on a verifiably inaccurate timeline of events and are in any event meritless.

Accordingly, Defendant's Motion for Summary Judgment should be denied.

## I. STATEMENT OF FACTS

Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment (Dkt. 336) and Statement of Undisputed Material Facts ("PSOMF" Dkt. 336-1) comprehensively detailed the relevant facts, and for the sake of judicial economy Plaintiffs will not repeat them. The additional facts relevant to this motion are included in Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts (Resp. to UPSOMF) and Statement of Additional Facts ("PSAMF").

## II. LEGAL STANDARD

A court reviewing a motion for summary judgment must "examine the record in the light most favorable to the [non-movant], granting them the benefit of all reasonable inferences that may be drawn from the evidence." *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir.

2018). The party seeking summary judgment has the burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010).

## III.   ARGUMENT

### A.   The Composite Fingerprint Images and Fingerprint Templates that Union Pacific Collected, Stored and Disseminated Constitute Biometrics Under BIPA

In the face of over 100,000 fingerprint images (PSOMF No. 80) and in the context of broad statutory definitions of biometric identifiers and biometric information ("any information, regardless of how it is captured, converted, stored, or shared"), Union Pacific *still* attempts to interpret BIPA around the facts of this case. Its arguments fail on the facts and the law.

### 1.   The Lumidigm Devices Collect Composite Fingerprint Images from the Surface and Subsurface of the Finger

Union Pacific's argument that the Lumidigm devices do not capture fingerprints because they capture only subdermal information rather than information from the skin's surface is both factually incorrect and immaterial. (UPMSJ at 12-13). Discovery has shown that the Lumidigm devices capture *surface and* subsurface information. (PSOMF No. 30 at Ex. Y ("The resulting data contain information about both the surface and the subsurface of the skin." "The sensor is based on multispectral imaging (MSI) and is configured to image both the surface and subsurface characteristics of the finger[.]"). This was testified to by Lumidigm's corporate representative and confirmed by the white papers that describe the multispectral technology at issue. (*Id.*) It is unclear why Union Pacific's argument charges headlong into the plain, quotable, English contained in the scientific papers regarding multispectral technology—not to mention the fingerprint images themselves shown below. (Resp. to UPSOMF Nos. 56, 60, 79, 86-87).

3

Defendant's citations to its expert Scott Swann's incorrect opinion that the Lumidigm devices capture only subsurface information need not be considered in light of the plain language in the white papers. "[E]xpert testimony is unnecessary where [a] matter is within the realm of lay understanding and common knowledge." *Lynch v. Ne. Reg'l Commuter R.R. Corp.*, 700 F.3d 906, 914 (7th Cir. 2012). Here, the record before the Court establishes the fact about which Mr. Swann is attempting to testify. *See Georgia-Pac. Consumer Prod. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 729 (7th Cir. 2011) ("[T]o the extent that the experts' opinions on how to read a patent conflict with the actual language of the patent, that conflict 'does not create a question of fact nor can the expert opinion bind the court or relieve the court of its obligation to construe the claims according to the tenor of the patent.'"). In *Howe v. Speedway,* Judge Chang found it unnecessary to rely on expert testimony at all in determining whether data at issue constituted biometrics. 2024 WL 4346631, *4 (N.D. Ill. Sep. 29, 2024); *see also Thompson v. Matcor Metal Fab. Inc.,* No. 2020-CH-00132 at 5-6 (Cir. Ct. Tazewell Cnty., Ill. Dec. 11, 2023) (Dkt. 336-44) (no expert needed to "determine[e] that such information falls within BIPA's definition of biometric information").

But beyond being factually incorrect, Union Pacific's assertion that its scanner captured only subsurface information is immaterial, because it is biological truth that fingerprints are not just surface features; rather, internal finger physiology mirrors the ridges of the skin's surface. (PSAMF No. 19). That is, a fingerprint is not just a surface feature—fingerprint ridges are reflected in the finger's subdermal structure as well. (PSAMF No. 19). Though Mr. Swann attempted to dispute this in his deposition, he admittedly has no anatomical or biological expertise. (PSAMF

4

No. 16). Accordingly, it is immaterial whether information from the skin's subsurface, surface or both subsurface *and* surface are collected because the same information (minutia of fingerprint ridges) is being captured and stored either way. (PSAMF No. 14). The Court can see for itself that there are only fingerprint ridges shown in the above images despite Defendant's passing references to other subdermal structures like papillae and blood vessels. (UPMSJ at 12). Defendant's argument thus fails on multiple levels; it is not only factually incorrect, but the fact that it is incorrect about is immaterial.

### 2.      There is no FBI Certification Requirement Contained in BIPA

Union Pacific attempts argue that for fingerprint technology to be subject to BIPA, the technology must have FBI certification or compatibility with Illinois State Police standards. (UPMSJ at 13). No such requirement is present in BIPA's text or its legislative context, and no court has found one. In *Howe,* even where it was undisputed that the technology did not collect "an entire fingerprint, akin to the full 'rolled' prints traditionally collected by law enforcement," Judge Chang nonetheless found that "BIPA's plain language contains no prerequisite that biometric information be of a particular accuracy or be capable of identifying an individual with the same level of preciseness as a complete fingerprint." 2024 WL 4346631 at *5.

Union Pacific never explains why it believes law enforcement certification of the underlying technology is required by BIPA. But it is undisputed that the outputs of multispectral imaging (Composite Fingerprint Images and Fingerprint Templates) exist in standardized formats. (PSOMF No. 41; PSAMF No. 21), and Union Pacific admits that the Composite Images can be used to create *additional* fingerprint templates using different standardizations. (UPMSJ at 28-30). So, for someone whose Composite Fingerprint Image or Fingerprint Template is stolen, the idea that the information did not meet law enforcement standards is cold comfort, as it can be readily

used in many other contexts. (*Id.*) Union Pacific has even conceded that multispectral imaging is *more effective* than traditional fingerprinting. (UPSOMF No. 58). To find that BIPA does not apply to such would completely undermine the statute's intent to protect such information.

Either way, BIPA has nothing to do with law enforcement and definitionally applies only to "private entit[ies]". BIPA was enacted when a private company that facilitated commercial consumer transactions using finger scans instead of credit cards, Pay By Touch, went out of business. BIPA Legislative Hist. May 30, 2008. Pay By Touch was not using FBI certified technology or rolled ink fingerprints—it was using ordinary finger scanners. *Id.*; 740 ILCS 14/5 Legislative Findings (detailing "finger-scan" technologies being deployed in Illinois). Union Pacific's injection of this requirement would read the broad prophylactic purpose behind BIPA out of the statute. *McDonald v. Symphony Bronzeville Park, LLC*, 193 N.E.3d 1253, 1267 (Ill. 2022) ("[BIPA] involves prophylactic measures to prevent compromise of an individual's biometrics."); 740 ILCS 14/5 ("The full ramifications of biometric technology are not fully known.")

### 3.    At a minimum, the Composite Fingerprint Images and Fingerprint Templates are Biometric Information

Even if the Court was to assume for the sake of argument that the Composite Fingerprint Images are not "fingerprints" and thus do not constitute biometric identifiers, they still constitute "biometric information" under the broad definition for that term, and so do the Fingerprint Templates. Biometric information is broadly defined as: "*any* information, *regardless* of how it is captured, converted, stored, or shared, *based on* an individual's biometric identifier used to identify an individual." *Howe,* 2024 WL 4346631 at *8 quoting 740 ILCS 14/10 (emphasis in original).

Where BIPA expressly encompasses "any information, regardless of how it is captured," there is even less room for Defendant to invent FBI certification requirements or play definitional shell games. Composite Fingerprint Images are data created by photographing a person's fingertip

using different wavelengths of light. (PSOMF Nos. 29-33). Fingerprint Templates are mathematical representations of the minutia points of a person's fingertip that represent the bifurcations and terminations of ridges on their fingertip. (*Id.*; PSAMF No. 20). Each is thus "based on" an individual's fingerprint (i.e. the tip of their finger) and used to identify that individual when they enter one of Defendant's railyards. *Thompson*, No. 2020-CH-00132 at 5-6 (collecting definitions of "fingerprint" and finding: "There is no meaningful difference between a 'fingerprint' scan and a 'fingertip' scan, and BIPA covers both.") Accordingly, because the Composite Fingerprint Images and Fingerprint Templates are both "based on" individuals' fingerprints, they constitute, at a minimum, biometric information.

### 4. A Finding that the Composite Fingerprint Images and Fingerprint Templates Constitute Biometrics Would not Conflict With the Private Detective Act

Union Pacific's Section 25(d) argument (UPMSJ at 14) fails because the Private Detective Act simply does not define "biometric identifier," "biometric information," "fingerprint," "fingerprint image," or any other term with any relevance to this case. Rather, it defines "fingerprint vendor," because the Private Detective Act provides a framework for licensing and regulating entities that provide fingerprint images to the Illinois State Police for use in the criminal context, i.e. "fingerprint vendors." The purpose of § 25(d) is to ensure that BIPA does not upend the regulatory regime set forth in the Private Detective Act or provide individuals with a basis to refuse to provide their fingerprints in connection with criminal charges. 740 ILCS 14/25(d). In this case, BIPA does not come close to doing so. Not surprisingly, Union Pacific cites no authority to support its § 25(d) argument, because none exists. And like Union Pacific's other arguments, it is upended by *Howe.* 2024 WL 4346631 at *9 (finding: "BIPA's plain language contains no

prerequisite that biometric information be of a particular accuracy or be capable of identifying an individual with the same level of preciseness as a complete fingerprint.")

### B. Summary Judgment on Section 25(e) Should be Granted in Plaintiffs' Favor, not Defendant's

#### 1. Union Pacific Waived or Forfeited its Ability to Raise the Government Contractor Defense [1]

Section 25(e) of BIPA states: "Nothing in this Act shall be construed to apply to a contractor, subcontractor, or agent of a State agency or local unit of government when working for that State agency or local unit of government." 740 ILCS 14/25(e). Courts routinely refer to this provision as BIPA's "government contractor exemption."[2] Defendant agrees with this characterization in its motion, arguing that it is "exempt under Section 25(e)." (UPMSJ at 16).

There is a "longstanding convention" that statutory exemption is an affirmative defense. *Meacham v. Knolls Atomic Power Lab*, 554 U.S. 84 (2008); *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473 (7th Cir. 2019) (ADA exemption is an affirmative defense); *Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th 636 (7th Cir. 2022) (FLSA exemption is an affirmative defense); *Keith v. Ferring Pharmaceuticals*, *Inc*., 2016 WL 5391224 (N.D. Ill. Sept. 27, 2016) (ICFA exemption is an affirmative defense). Not surprisingly, then, every court to have considered the issue has uniformly held that the § 25(e) exemption is an affirmative defense that must be pleaded and proved. *Gaertner*, 2025 WL 931290 at *8-9; *Mayhew*, 2024 WL 3650095 at *9-11; *see also*

---

[1] This argument was more fully set forth in Plaintiffs' Motion to Bar Evidence and Strike Portions of Defendant's Fourth Amended Rule 26(a)(1) Disclosures (Dkt. 340) and has been significantly truncated to comply with the page limits on summary judgment.

[2] *See, e.g., Figueroa v. Kronos Inc.*, 454 F. Supp. 3d 772, 791 (N.D. Ill. 2020) (Feinerman, J.); *Flores v. Motorola Sols., Inc.*, 2021 WL 232627, *2 (N.D. Ill. Jan. 8, 2021); *In re Clearview AI, Inc. Consumer Pvcy. Litig.*, 2022 WL 2915627, *2 (N.D. Ill. Jul. 25, 2022); *Mayhew v. Candid Color Sys., Inc*., 2024 WL 3650095, *9-11 (S.D. Ill. Aug. 5, 2024); *Gaertner v. Commemorative Brands, Inc.*, 2025 WL 931290, *8-9 (S.D. Ill. Mar. 27, 2025); *Heard v. Becton, Dickinson & Co.*, 524 F. Supp. 3d 831, 851 (N.D. Ill. 2021).

*Enriquez v. Navy Pier, Inc.*, 2022 IL App (1st) 211414-U, ¶ 18, 2022 WL 4484047, *2 (Ill. App. Dist. 1 Sep. 27, 2022) (reviewing applicability of § 25(e) as an affirmative defense).[3]

FRCP 8 and 12 require defendants to affirmatively state all affirmative defenses in their responsive pleading. Fed. R. Civ. P. 8(b)(1)(A-B); 8(c); 12(b)(6). As Defendant's counsel admitted at the hearing held on May 14, 2025, Defendant did not do so in any of the three Answers it has filed, nor did it raise it in any of its four motions to dismiss.[4] Indeed, in each of its three Answers, Defendant responded to Plaintiff's allegation that "Defendant is a private entity under BIPA" in the exact same way:

> 33. Defendant Union Pacific is a private entity as defined by BIPA.
>
> **ANSWER:** Paragraph 33 states a legal conclusion to which no response is required. To the extent a response is required, Union Pacific admits that it is a "private entity," but denies that it has undertaken any action that would subject it to liability under BIPA.

Remarkably, despite stating in its Answers "Defendant admits it is a 'private entity,'" Defendant's counsel asserted at the May 14, 2025 hearing that "Union Pacific did not admit that it is a private entity subject to BIPA,"[5] and further contended "the government contracts show that plaintiffs are not able to make their *prima facie* case that Union Pacific is a private entity subject to liability under BIPA."[6] Even more remarkably, that moment – May 14, 2025, five-plus years

---

[3] Attached as <u>Exhibit 11</u>. *See also Van Housen v. Amazon.com*, N.D. Ill. No. 23-C-15634 (Tr. of Proceedings, Nov. 6, 2024) at 14:13-17:16 (Hunt, J.) (denying motion to dismiss based on § 25(e) because "[w]e need definitely more of a record developed on that before the Court can make that determination") attached hereto as <u>Exhibit 1</u>; *Heard*, 524 F. Supp. 3d at 851 (application of § 25(e) is "purely speculative" without discovery); *Flores*, 2021 WL 232627 at *2 (denying motion to dismiss based on § 25(e) because "discovery is necessary to assess Plaintiffs' claims").

[4] <u>Exhibit 2</u>, May 14, 2025 Trans. of Proceedings at 10-11. Dkts. 17-18, 35-36, 47, 64, 131, 266, 275.

[5] <u>Exhibit 2</u>, at 14.

[6] *Id.* at 11.

into this litigation and in the midst of class certification and summary judgment briefing – was the ***first time*** Defendant contended that the private entity element was not met.

Simply put, Section 25(e) is an affirmative defense, and Defendant never pled it. Failure to plead an affirmative defense results in forfeiture of that defense, especially where the defense draws on facts ordinarily within the knowledge and control of the defendant. *Reed,* 915 F.3d at 478 (citing *Gomez v. Toledo*, 446 U.S. 635, 640–41 (1980)). "An affirmative defense, once forfeited, is 'excluded from the case.'" *Wood v. Milyard*, 566 U.S. 463, 470 (2012).

In *Reed,* the Seventh Circuit found several factors that weighed in favor of forfeiture. First, there was no excuse or explanation for the defendant's failure to assert the affirmative defense. 915 F.3d at 478. Second, the affirmative defense depended on discovery in the defendant's possession, rather than the plaintiff's. *Id.* Third, the defendant did not deploy the defense until after discovery, meaning both parties had already invested significant time and money in the case on the legitimate expectation that they knew what the issues were. *Id.* Fourth, there was no fair notice to the plaintiff that would justify the procedural failure to raise the affirmative defense. *Id.* Finally, the prejudice to the plaintiff was acute because the relevant law and facts related to the unpled defense were not clear. *Id.* Each factor from *Reed* weighs in favor of finding forfeiture here.

The first three *Reed* factors are easily dispensed with. First, Defendant knows the entities (such as state or local government entities) with which it contracts, thus it had no excuse for not pleading the defense. Second, Defendant is a party to and in possession of its alleged government contracts, and did not need discovery from Plaintiffs to assert the defense. And third, the docket in this case and the past four plus years of hard-fought litigation show that the Parties have invested thousands of attorney hours and hundreds of thousands of dollars in expenses litigating this case.

As to the fourth *Reed* factor, Defendant did not put Plaintiffs on notice of the defense. To the contrary, Defendant actively precluded any discovery into its government contracts by asserting they were irrelevant, at literally every stage of the discovery process:

- In response to Plaintiffs' request for a 30(b)(6) deposition on the topic of "Contracts between you and any third-party that relate to this litigation," Defendant refused to provide testimony on any government contracts on the grounds that such contracts were "not relevant to the claim *or defense* of any party."[7]

- In response to Plaintiffs' request for documents "Relating To any contract, agreement, or arrangement Related to Biometrics," Defendant agreed to produce only "contracts related to the Automatic Gate System in Illinois," objecting to all other contracts as irrelevant.[8]

- Defendant refused to identify or produce any purported government contracts in response to Plaintiffs' request for "All documents Related To any and all purported defenses to any of the claims asserted in the Complaint."[9]

- None of the first four iterations of Defendant's Rule 26(a)(1) Disclosures – the last of which was served on August 3, 2023 – identified Union Pacific's government contracts as relevant documents, nor did they disclose any witness with subject matter knowledge regarding government contracts.[10]

- The Parties spent months negotiating ESI searches, including custodians and search terms.[11] Defendant's counsel never suggested any such custodians or search terms related to government contracts, and thus no government contracts or ESI related to thereto was included in the approximately 600,000 pages of ESI production.

Finally, there will be acute prejudice to Plaintiffs if the Court permits Defendant to assert this defense because the lack of binding precedent relevant to its applicability means that *significant* discovery would be required to rebut the defense. *Flores,* 2021 WL 232627 at *2

---

[7] Defendant's Objections to Plaintiffs' Notice of 30(b)(6) deposition of Defendant, at Topic No. 7 (cleaned up and emphasis added), attached as <u>Exhibit 3.</u>

[8] Defendant's Answers to Plaintiff's First Set of Document Requests, at Request 10, attached as <u>Exhibit 4.</u>

[9] <u>Exhibit 4</u>, at Request 19.

[10] <u>Exhibit 5</u> & <u>6</u>. As the Court is aware from Plaintiffs' Motion to Strike, Defendant amended its disclosures again on December 26, 2024, for the first time disclosing its government contracts as relevant documents and identifying a witness with knowledge of them.

[11] *See, e.g.*, June 29, 2023 corresp. From T. Hanson to C. Hennessy, attached as <u>Exhibit 7.</u>

("None of the parties' briefs regarding Section 25(e) include any citation to binding or persuasive law on this issue.") Given the lack of binding precedent on the issue, to properly rebut the defense Plaintiffs would require additional discovery into the hundred-plus contracts Defendant has produced, including ESI discovery from as-yet unknown and unidentified custodians. Plaintiffs would also need to take additional depositions of Defendant's employees with personal knowledge of the contracts, as well as third-party document discovery and depositions from the counterparties to the contracts. Needless to say, such an effort would take many months. But more to the point, this effort should have been undertaken in conjunction with the other extensive fact discovery that occurred in this case. That bell cannot be unrung.

Accordingly, the Court should find that Defendant has forfeited any argument under 740 ILCS § 14/25(e), prohibit Defendant from entering any related testimony and evidence at class certification, summary judgment, or trial, and strike all related disclosures.

## 2. Even it not Waived, Defendant's § 25(e) Defense Fails on the Merits[12]

### a. _Defendant's Construction of §25(e) Fails Standard Rules of Statutory Construction_

On the merits, Defendant's § 25(e) argument relies on a misreading of the phrase, "working for that State agency or local unit of government." The intent of this provision is clear: because BIPA by its terms does not apply to government actors, 740 ILCS 14/10, the Legislature wanted to ensure that government agencies could engage contractors for biometric-related activities without exposing such contractors to risk of BIPA liability. _See, e.g., Bryant v. Compass Group_

---

[12] In one of the two non-class BIPA cases pending against Union Pacific, _Payton v. Union Pacific Railroad Co._, N.D. Ill. No. 24-cv-153, Defendant has moved for pre-discovery summary judgment on the § 25(e) exemption. Judge Alonso has permitted Plaintiffs Fleury and Turner to file an _amicus_ brief in opposition to that motion, which brief is attached hereto as <u>Exhibit 36</u>. Due to space limitations, the argument set forth herein is a truncated version of Plaintiffs' arguments in _Payton_, and Plaintiffs expressly reserve their right to assert any of the arguments made in _Payton_ in the unlikely event the § 25(e) defense survives summary judgment.

*USA, Inc.*, 503 F. Supp. 3d 597, 601 (N.D. Ill. 2020) (finding rational basis for §25(e) exemption because "the perceived dangers associated with possession of sensitive information are less severe vis-à-vis government agencies and *contractors subject to their supervision*") (emphasis added).

According to Defendant, however, the "when working for" limitation can mean only one thing: that any entity with a government contract is free to completely ignore BIPA, no matter how attenuated or remote the government contract is from the conduct that violates BIPA. Thus under Defendant's interpretation, selling a toilet seat to Illinois Department of Natural Resources renders a private company exempt from compliance with BIPA, or (apparently, based on counsel's statements at the May 14, 2025, hearing) alternatively renders the company no longer a private entity even after it has admitted to being one.

Defendant's "temporal only" interpretation wholly fails when considered against standard rules of statutory construction. For example, "[s]tatutes should be construed, if possible, so that no term is rendered superfluous or meaningless." *Advincula v. United Blood Svcs.*, 678 N.E.2d 1009, 1022 (Ill. 1996). Defendant's proposed interpretation of Section 25(e) directly contradicts this principle. According to Defendant, it has been a government contractor throughout the period during which it collected Plaintiffs' biometrics, *ergo*, it is exempt. But if that status alone – as Defendant contends – is sufficient to invoke the government contractor exemption, the additional phrase "when working for that State agency or local unit of government" adds nothing. The Legislature could have simply exempted any "contractor, subcontractor, or agent of a State agency or local unit of government," and Defendant's argument would still hold – as a government contractor, Union Pacific would be exempt. Thus, the Legislature clearly meant something other than Defendant's "temporal only" interpretation when it added the "when working for" phrase.

Defendant's interpretation also violates the rule that a statute must be read as a whole and all relevant parts must be considered by the court. *Advincula*, 678 N.E.2d at 1017. In enacting BIPA, the Legislature carved out "State or local government agenc[ies]." 740 ILCS 14/10. It is in this overall context that Section 25(e) must be construed to mean that the Legislature intended to exclude not only State or local government agencies, but also private entities' collection of biometrics "subject to the supervision" of such government actors. *Bryant*, 503 F. Supp. 3d at 601.

Furthermore, Courts construing Illinois statutes "presume[e] the legislature did not intend to create absurd, inconvenient or unjust results." *People v. Christopherson*, 899 N.E.2d 257, 260 (Ill. 2008). The potential absurd results of Defendant's proposed interpretation of the statute are obvious. For example, two widget making companies that collected their employees' biometrics without consent would be treated differently simply because one of them derived 2% of its revenue from selling its widgets to IDOT. Or a company that scanned tollway drivers' facial geometry for IDOT would not only be (properly) exempt from Section 15(b) liability for collecting biometrics under IDOT's supervision but could also claim immunity from Section 15(c) if it sold the drivers' biometrics to a data broker, even though nothing in the IDOT contract called for it to do so.

It does not require hypotheticals to find absurdity, however. Under Defendant's interpretation of Section 25(e), many of the highest-profile BIPA violators should have gotten away scot-free, because nearly every large company does *some* work for the government. Facebook ($650 million BIPA settlement) contracts with the government.[13] Google ($100 million BIPA settlement) contracts with the government.[14] ADP ($25 million BIPA settlement) contracts

---

[13] https://www.forbes.com/sites/patrickmoorhead/2024/11/04/meta-extends-llama-support-to-us-government-for-national-security/

[14] https://www.gsa.gov/about-us/newsroom/news-releases/gsa-secures-cost-savings-through-strategic-agreement-with-google-04102025

with the government.[15] Ultimate Kronos Group ($15 million BIPA settlement) contracts with the government.[16] Clearview AI ($52 million BIPA settlement) contracts with the government.[17] And, of course, Defendant's fellow rail operator BNSF ($75 million BIPA settlement arising from same AGS-based collection practices alleged here) contracts with the government via its participation in the same CREATE program[18] upon which Defendant relies. Defendant's inventive interpretation would adjudicate a giant hole right into the statute.

   b.   _The Courts have Rejected Union Pacific's Interpretation of Section 25(e)_

Given the principles of statutory construction discussed above, it is not surprising that the few courts to have addressed the issue have (almost) unanimously rejected Defendant's interpretation, instead analyzing the "when working for" phrase in light of the statute's overall clear distinction between government actors and private entities. In _Bryant_, for example, the defendant moved to dismiss on the grounds that Section 25(e) rendered BIPA unconstitutional "special legislation" because it "conferr[ed] a special benefit or exclusive privilege on a person or a group of persons to the exclusion of others similarly situated." 503 F. Supp. 3d at 600. Judge Kendall, applying rational basis review, held that the Section 25(e) exemption was "eminently rational" solely because the exemption applied only to government contractors who collected biometrics "subject to the supervision" of a government agency:

> Furthermore, government agencies have no profit motive to exploit individuals' biometric information, so the perceived dangers associated with possession of sensitive information are less severe vis-à-vis government agencies and _contractors subject to their supervision_."

_Id._ (emphasis added).

---

[15]    https://mediacenter.adp.com/2020-04-09-ADP-is-Working-with-Federal-Government-to-Support-Businesses-and-their-Employees-in-Securing-Timely-Relief
[16] https://www.ukg.com/industry-solutions/federal-government
[17] https://www.clearview.ai/
[18] _See_ Exhibits 8, 9, 10.

The defendant in *Calonia v. Trinity Property Consultants, LLC*, 2022 WL 2132528, * 4 (N.D. Ill. June 14, 2022) made the same argument, contending that Section 25(e) applied to any entity with a government contract, regardless of whether the BIPA-violating conduct fell within the scope of that contract.[19] Citing *Bryant*, Judge Durkin rejected this argument, and further noted that "[t]he defendants do not cite to a single BIPA case to support their argument." *Id.* at *4 fn. 4. The same pattern held in *Howe*, 2024 WL 4346631 at *14. In making the constitutional challenge, the defendant (like Union Pacific) argued that § 25(e) applied to any government contractor, and for such entities "it is as if BIPA had never been passed at all."[20] Judge Chang rejected the argument because the defendant had "offer[ed] no reason" to deviate from the reasoning in *Bryant*.

*Bryant, Calonia*, and *Howe's*[21] finding that Section 25(e) applies only to conduct "subject to the supervision" of a government agency comports with the decisions of the few courts to have directly considered the scope of the exemption. In particular, Defendant's citation to *Enriquez v. Navy Pier, Inc.* refutes, rather than supports, its argument. In *Enriquez*, the defendant's entire existence was owed to its role managing the development and operation of Navy Pier for the benefit of the Metropolitan Pier and Exposition Authority ("MPEA"), a government agency. 2022 WL 4484047 at *1-2, 2022 IL App (1st) at ¶¶ 8-10. The court found that the defendant's relationship with the MPEA accorded it status as a government contractor, thereby satisfying the first clause of Section 25(e). Under Defendant's interpretation, the court should have stopped there. Instead, the court went on to find that the "when working for" limitation was satisfied because the defendant's alleged BIPA-violating actions were "*within the scope* of its work for the MPEA" and

---

[19] *Calonia*, No. 20-cv-6130, Dkt. 21 at 11 (arguing that "[b]eing able to evade BIPA merely by contracting with the government, apparently in even a single instance, is irrational").

[20] *Howe*, No. 19-cv-1374, Dkt. 60 at 14-15.

[21] Notably, none of the defendants in *Bryant*, *Calonia* or *Howe* sought review or even reconsideration of the rejection of their constitutional arguments.

thus "concern actions of a government contractor *performed while the contractor was working for the government.*" 2022 WL 4484047 at *4; 2022 IL App (1ˢᵗ) at ¶ 25 (emphasis added). Thus, even Defendant's own cited case recognized that Section 25(e) is limited to a government contractor's conduct "within the scope of" its government contract work and "performed while the contractor was working for the government."

Multiple other courts have held that Section 25(e) does not provide the categorical exemption urged by Defendant. In *Thornley v. CDW-Government, LLC*, Cook Cty. Cir. Ct. (Chancery) No. 2020-CH-04346 (June 25, 2021)[22] the court undertook a detailed analysis of the exemption and concluded that "section 25(e) of BIPA may be understood as applying to one whom a state agency or local unit of government engages to furnish materials or provide services *concerning biometric identifiers*." *Id.* at 3 (emphasis added); *see also Navarette v. Josam Acquisitions*, No. 2019 CH 14368 (Cook Cty Cir. Ct. Mar. 29, 2021)[23] (denying motion to dismiss because § 25(e) "does not exclude an employer like the Defendant who only does some work for government via contractual obligations"); *Rojo v. Homer Tree Care, Inc.*, No. 23 L 8588 (Cook Cty. Cir. Ct. May 29, 2024)[24] (reaching the same holding and distinguishing *Enriquez*).

Simply put, the overwhelming weight of authority holds that Section 25(e) only applies to private entities who collect biometrics "under the supervision" of the government, "within the scope of" a government contract, or when furnishing materials or providing services "concerning biometric identifiers" to the government. Against this extensive and common-sense authority, Union Pacific offers the two-paragraph oral ruling from the state trial court in *Miranda v. Pexco*,

---

[22] Attached as <u>Exhibit 12</u>.
[23] Transcript of Hearing at 15:10-18; attached hereto as <u>Exhibit 13</u>.
[24] Transcript of Hearing, at 5:17-6:24; 24:1-25:2, attached hereto as <u>Exhibit 14</u>.

Cook Cty. Cir. Ct. (Chancery) No. 2021-CH-02127.[25] The parties in *Miranda*, however, appear to have only argued the *Enriquez* case to the court, and no one raised *Enriquez's* holding that Section 25(e) applied because the defendant's conduct was "within the scope" of its government contract obligations. *Bryant, Calonia* and *Thornley* had all been decided, and yet none of them were mentioned by the parties or the court. Simply put, the parties in *Miranda* did a poor job of briefing and arguing the case, and the court reached the wrong decision as a result.

      *c.   Defendant's Alternative Interpretation is Similarly Without Merit*

Perhaps recognizing the frailty of its proffered interpretation, Union Pacific suggests an alternative test for Section 25(e) applicability, i.e., that there must be a "substantive relationship" between its government contracts and its collection of truck drivers' biometrics. This argument fails for multiple reasons. First, Defendant offers no support for or explanation of this interpretation. No court has adopted this phrasing; instead, as noted above courts focus on conduct "within the scope" of a government contract, "under the supervision" of a government agency, or furnishing materials or providing services "concerning biometric identifiers" to the government.

Second, Union Pacific's made-up "substantive relationship" test appears to boil down to, in Defendant's own words, "trains must run on time," and thus every activity which furthers that goal is "substantively related." Of course, ensuring that "trains run on time" is Union Pacific's entire business purpose; casting such a broad net means that virtually any activity it undertakes will have a "substantive relationship" with every other aspect of its business, including its government contracts. In other words, Defendant's alternative test is no test at all; it is simply another argument that any government contract confers blanket immunity from BIPA.

---

[25] Dkt. 328 at 17-18.

Finally, the "substantive relationship" fails as a matter of proof. Defendant details how its work on the CREATE program helps improve efficiency, and then posits that because its collection of biometrics also improved efficiency, the two activities must be "substantively related." As Union Pacific's own witnesses have testified, however, Defendant's efficiency at its Illinois intermodal facilities has actually improved since it stopped collecting truck drivers' biometrics. (Resp. UPSOMF No. 43-44). Moreover, one of Defendant's purported experts is a former executive of Norfolk Southern Railroad. Not surprisingly, Norfolk Southern undertook similar grade crossing-type government contracts as part of the CREATE program. (Exhibit 9). And yet, Norfolk Southern never collected biometrics (or "finger scans," to use Defendant's semantics) as a means of controlling access to its facilities. (Resp. UPSOMF No. 43-44). Norfolk has the same imperative to "make the trains run on time," but it was apparently able to do so without violating BIPA.

### d.  _Summary Judgment on the § 25(e) Defense Should be Granted in Plaintiffs' Favor_

Because Section 25(e) is an affirmative defense, Defendant bears the burden of proof. _See, e.g., Gooch v. Young_, 24 F.4th 624, 627 (7th Cir. 2024) (vacating summary judgment because defendant had not satisfied burden of proof on affirmative defense). When the moving party would bear the burden of proof at trial, that party "must establish affirmatively the lack of 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" _Reserve Supply Corp. v. Owens-Corning Fiberglas Corp._, 971 F.2d 37, 42 (7th Cir. 1992) (quoting _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248 (1986)).

Here, Union Pacific has not even attempted to prove that its collection of Plaintiffs' biometrics was "within the scope" or "under the supervision" of a government contract. Instead, it simply authenticates dozens of government contracts and relies on its flawed "temporal only"

interpretation to assert it is a government contractor at all times and for all purposes and thus entitled to immunity. Under the interpretation adopted by every court but *Miranda*, Union Pacific must do more. It has not, and cannot; thus its motion for summary judgment should be denied.[26]

To the contrary, Defendant admits that its government contracts had no relationship at all to its collection of Plaintiffs' fingerprints at its intermodal facilities, but rather relate to things like warning signal devices, grade crossings, sharing rails with Metra, and hauling freight for the Department of Defense. (UPMSJ at 15-16). None concern ingress to its intermodal facilities, identifying truck drivers, biometrics, or its AG systems at all. (PSAMF Nos. 1-5). Presumably, if Defendant had any evidence that it had authority to collect, store, and disseminate Plaintiffs' biometrics "within the scope" of a government contract or "subject to a government agency's supervision," it would have produced it.[27] Having failed to do so, the Court should grant summary judgment on this issue in Plaintiffs' favor pursuant to Fed. R. Civ. P. 56(f)(1).

### 3. Union Pacific's Federal Contracts Have Nothing to do with the Conduct at Issue

Just as Defendant's argument fails with respect to its state contracts, it fails with respect to its federal "subcontracting" work.[28] None of the subcontracting work Defendant points to concerns or relates to the conduct at issue in this case at all. (PSAMF Nos. 1-5). Defendant simply notes that it ships goods though its facilities for various entities associated with the federal government.

---

[26] Indeed, even under its flawed "temporal only" definition, Union Pacific is not entitled to summary judgment on this record, as it has only offered evidence that it had contracts with various government agencies, but no evidence that it was actually "working for" those agencies at the precise moments (or even on the precise days) it collected Plaintiffs' biometrics.

[27] Given that Defendant had never asserted the Section 25(e) prior to filing its motion for summary judgment, Plaintiffs were deprived of the chance to affirmatively seek summary judgment in their concurrently-filed cross motion.

[28] Defendant never establishes how its actions as a common carrier transporting goods render it a "subcontractor" of the federal government. This undeveloped argument is waived.

None of these subcontracts relate to the AGS or how Union Pacific permits truck drivers into its facilities, or whether it collects their biometrics.

## C. ICCTA Does Not Preempt Plaintiffs' BIPA Claims

Union Pacific's as-applied ICCTA preemption argument is familiar; it's been uniformly rejected in BIPA cases brought against railroads, including twice here. Dkt. 47 (Alonso, J.) (pleading stage); *Rogers v. BNSF Railway Co.*, 2019 WL 5635180, *2 (N.D. Ill. Oct. 31, 2019) (Kennelly, J.) (pleading stage); *Rogers v. BNSF Railway Co.*, 2022 WL 787955, *5 (N.D. Ill., Mar. 15, 2022) (Kennelly, J.) (summary judgment stage). As the Court stated in denying Union Pacific's Motion to Dismiss the Third Amended Complaint (Dkt. 266), "[I]f the facts borne out in discovery, any intervening changes in law, or other compelling reasons justify raising the arguments again at class certification or summary judgment, Defendant may do so." Union Pacific's MSJ raises none of the above, so its ICCTA preemption argument should be denied again.

### 1. Defendant has not Raised any Intervening Changes in Law that Warrant a Departure from the Court's Previous Rejections of ICCTA Preemption

Under the "as-applied" preemption standard, only restrictions that "unreasonably interfere" with railroad transportation justify ICCTA preemption. *Union Pacific R. Co., v. Chicago Transit Auth.,* 647 F.3d 675, 682 (7th Cir. 2011). The burden of proof is on the party claiming preemption to show such unreasonable interference. *Id*. Additionally, the impact on railroad transportation must be "significant" for preemption to lie. *Id*. at 683. It is "well-settled that although ICCTA's preemption language is unquestionably broad, 'it does not encompass everything touching on railroads.'" Dkt. 47 (quoting *Delaware v. Surface Transp. Bd.,* 859 F.3d 16, 18 (D.C. Cir. 2017)). It is similarly well-settled that "the ICCTA does not preempt those state or local laws that have a more remote or incidental impact on rail transportation." Dkt. 47 at 14-15 (citing *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 158-160 (4th Cir. 2010)).

Defendant's ICCTA argument fails because, as the Court previously found, "BIPA has nothing to do with regulating rail transportation." Dkt. 47 at 14 (quoting *Rogers*, 2019 WL 5635180 at *2). This is because "BIPA imposes no restrictions on the movement of property by rail nor on the receipt of property at railroad facilities." Dkt. 47 at 14. Rather, BIPA is a generally applicable data privacy statute. *Rogers*, 2019 WL 5635180 at *3. Plaintiffs' claims have nothing to do with regulating rail transportation; they involve the unlawful collection and dissemination of their biometrics. Plaintiff's claims thus merely allege tortious acts committed by a defendant which "happens to be a railroad company" and are therefore not preempted by the ICCTA. *Rogers*, 2019 WL 5635180 at *3 (citing *Smith v. CSX Transp., Inc.*, 247 F. Supp. 3d 952, 956 (N.D. Ill. 2017)).

Rather than raising any new case law, Union Pacific makes the same tired "patchwork" argument that has been repeatedly rejected in this case and in *Rogers*. (UPMSJ at 22-25). Here, as in *Rogers,* Defendant's patchwork argument is completely hypothetical; Union Pacific has never used biometrics to control ingress at *all* of its facilities nationwide. (Resp. UPSOMF, Nos. 39-40). Nor did Union Pacific always require drivers to submit their biometrics using the AG Systems at its Illinois facilities. (UPSOMF, No. 71). It is thus undisputed that Union Pacific never had a uniform nationwide system, and any "patchwork" already exists as a result of Defendant's own design. Even if Union Pacific wanted a uniform system, rather than the patchwork it already has, nothing in BIPA prevented Defendant from requiring that drivers use its biometric system and refusing access to drivers who chose not to provide their biometrics.

While Defendant lists other states' biometric privacy laws and claims that this "patchwork" is preempted by ICCTA, this argument ignores that preemption requires "significant" and "unreasonable" interference. *Union Pacific R. Co.,* 647 F.3d at 682. Union Pacific complied with all the listed laws simultaneously, with one uniform consent form distributed to truck drivers

22

through its mobile application and on its website. (UPSOMF No. 106). That does not demonstrate any interference at all, much less significant or unreasonable interference.

Grasping to identify *some* interference with its operations, Defendant cites the historically unique circumstances of Covid-19 as evidence of what would happen if mass amounts of drivers refused to touch the fingerprint scanner. (UPMSJ at 26). But for years at Union Pacific, the default was for truck drivers to submit their biometrics as a condition of entry, and there is no evidence that a meaningful percentage of drivers ever refused. (PSAMF No. 22). And when Defendant implemented its BIPA compliance regime and began soliciting driver consent, there is again no evidence that meaningful percentage of drivers refused. (PSAMF Nos. 22-23.)

Illustrating that there has been no change in the law since the pleading stage, the cases cited by Union Pacific were all presented in Defendant's motion to dismiss and were all rejected because they involved attempts to directly control physical railroad property, direct restrictions on the physical movement of freight, or regulations of railroad pricing. (Dkt. 36 at 15-17). These all contrast sharply with BIPA's procedural requirements, which are nominal and administrative and do not concern freight, physical infrastructure, or prices. *Rosenbach v. Six Flags Ent. Corp.*, 129 N.E. 1197, 1207 (Ill. 2019). As a result, all are distinguishable.[29]

---

[29] *CSX Transportation,* No. 34662, 2005 WL 584026 (S.T.B. Mar. 14, 2005) (law preempted where the District of Columbia directly prohibited the shipment of certain materials via rail); *Fayus Enterprises v. BNSF Ry. Co.,* 602 F.3d 444, 454 (C.A.D.C. 2010) (preempted cause of action concerned "judicial supervision of the reasonableness and fairness of rates charged to shippers" such that it sought to directly regulate the railroad defendant's prices for its services); *Thomas Tubbs* No. 35792, 2014 WL 5508153 (S.T.B. Oct. 31, 2014) (preemption pursuant to long line of cases finding that railroads must be able to uniformly design, construct, maintain, and repair their physical railroad lines); *Law v. GM Corp.* 114 F.3d 908 (9th Cir. 1997) (state law negligence action preempted where premised on faulty construction of train itself); *City of Cayce v. Norfolk S. Ry. Co.,* 706 S.E.2d 6 (S.C. 2011) (public nuisance citation preempted where it concerned physical maintenance of railroad's bridges); *Delaware v. STB* 859 F.3d 16, 19 (D.C. Cir. 2017) (state prohibition on running trains during certain hours preempted); *Green Mtn. R.R. Corp. v. Vermont,*

### 2. The Facts Uncovered in Discovery Demonstrate that Compliance With BIPA does not Unreasonably Interfere with Union Pacific's Operations

Union Pacific has also offered no evidence that compliance with BIPA unreasonably interfered with railroad transportation. This is not for lack of motive or opportunity—Union Pacific has had five years to come up with evidence supporting its argument and every financial incentive to do so. And at all relevant times, Union Pacific has had the ability to (and does) track the average time it takes for trucks to enter and its Illinois facilities, amongst many other measures of throughput and operational efficiency. (PSAMF Nos. 24-25). Union Pacific would receive daily reports detailing, among other things, average driver turn time at each facility. (*Id.*) During this same time period, Union Pacific cycled through every conceivable status vis a vis its BIPA compliance from wholly non-compliant at the start of the class period (PSOMF Nos. 61-65); to posting a Section 15(a) BIPA policy in February 2019 (*id*); to soliciting but not requiring consent in early 2020 (*id.*), to finally requiring consent on October 15, 2020. (*Id.*)

So, during the statutory period here, Union Pacific essentially conducted an experiment that might as well be titled: Did Complying with BIPA Significantly Affect Union Pacific's Ability to Conduct its Operations? According to the evidence, or lack thereof, the answer is "No." To be sure, Union Pacific cites no actual data to support the idea that compliance with BIPA significantly or unreasonably interfered with (or even had a measurable effect on) its operations. For example, Union Pacific initiated its consent program in early 2000, and by October 15 of that year 75% of drivers that in-gated at Illinois AGS facilities had consented. (PSAMF No. 38-40). If Defendant had experienced delays as it went from 0% consent to 75% consent in eight or nine months, surely

---

404 F.3d 638, 642 (2d Cir. 2005) (state prohibition on construction within railyards was preempted pursuant to line of cases holding same); *Norfolk*, 608 F.3d at 160 (ordinance restricting rail transportation of ethanol preempted).

it would have the data to support it. Instead, Union Pacific paid an expert to invent a hypothetical delay, give it the sheen of expert testimony, and has presented *that* to the Court. (UPMSJ at 26). But that expert admitted in her deposition that she had not examined whether Union Pacific's implementation of a BIPA-compliant consent program had any impact on its average gate processing times. (PSAMF No. 40). Similarly unavailing is the self-serving declaration of its employee Mr. Hayden, who states with no foundation or support (Mr. Hayden works in Omaha, not at an intermodal AGS facility) that "Requiring consent can thus cause delays." (UPMSJ at Ex. 3, Hayden Decl.) These statements, which are not founded on any of Union Pacific's extensive efficiency tracking data, do not demonstrate "unreasonable interference" with its operations.

In short, where Judge Alonso deemed Defendant's ICCTA preemption argument as "highly speculative" at the pleading stage, Dkt. 47 at 15, now it's not even speculative—it's fanciful and fabricated, untethered to any actual data. For example, Ms. Bailey admitted she conducted no actual analysis of Union Pacific's efficiency related to consent or otherwise; to the contrary, the delay she baked into her model was a purely hypothetical simulation. (PSAMF No. 40). Such evidence is tautological: "if compliance with BIPA caused delay, there would be delay." Moreover, the method of compliance that Ms. Hayden discusses (where busy truck drivers leisurely take 3-4 minutes to study a one-paragraph consent form) also has no basis in how Union Pacific actually gained consent here. (UPSOMF 71). Union Pacific gained truck drivers' consent through its mobile application UPGO via clickwrap, and on its website. (PSAMF Nos. 7-8). Drivers did not have to go to the Administration Building or get out of their trucks; such consents did not even have to be gained on Union Pacific *property*. (*Id.*) In sum, Defendant's "unreasonable interference" argument has gotten weaker following discovery, not stronger. The facts show that compliance with BIPA was not only possible, but easy, cheap and quick.

This is unsurprising, as the Illinois Supreme Court has emphasized that compliance with BIPA "should not be difficult" and noted that the law establishes minimal burdens on private entities that collect or store biometrics. *Rosenbach*, 129 N.E.3d at 1207. Discovery has confirmed that this is true. Union Pacific became BIPA-compliant by having drivers click on a one paragraph consent form, and there is no evidence that implementation of this process caused any noticeable delays or even unnecessary expense.

Even more, the inter-organizational structure necessary for Defendant's compliance was in place as well. Defendant simply directed its service provider Nascent to add a BIPA-compliant consent screen to Union Pacific's AG System kiosks' screen flows. (Resp. UPSOMF Nos. 48-49). This was a one-time fixed cost and was easily implemented through existing processes whereby Union Pacific requested a software change to be executed by its service providers. (PSAMF No. 13). Indeed, Defendant has advanced no complaint of the approximate cost or time commitment here because this analysis does not help, as its estimated costs to come into compliance with BIPA were *far less* than the cost of even a single one of its experts in defending this case.

Even if the Court were willing to accept that ICCTA preemption could even potentially be relevant here now that discovery is complete, Defendant's argument would still fail. As-applied preemption as a "fact intensive inquiry," Dkt. 47 at 15 (citing *Union Pacific R. Co.*, 2009 WL 448897at *8), and here, material issues of fact abound. For example, Defendant claims that it would have to implement Illinois-specific compliance measures and modify its operations at each location, despite the fact that Union Pacific complied with all biometric laws in one fell swoop, with one universal consent language. (UPMSJ at 24; PSAMF No. 12). Defendant also claims that its AG Systems are uniform across the nation – but they're not. (Resp. UPSOMF Nos. 39-42). Discovery shows that Defendant already maintained a patchwork of ingress processes at its

intermodal locations. (*Id.*). Not every Union Pacific location used biometrics, and even at those facilities equipped with biometric technology, individuals were not required to use the biometric component. (*Id.*). As a result, the BIPA-driven patchwork Defendant complains of did not exist. Consequently, Defendant cannot meet its burden to show that, under the as-applied standard, BIPA "unreasonably interferes" with railroad transportation.

**D.** **The Amendment to BIPA Applies Prospectively Only, But Even if the Court Applies it Retroactively, the Class Members have Multiple Claims Each Under Sections 15(b) and (d)**

During the Parties' December 19, 2024, hearing, counsel for Union Pacific argued: "one of the legal issues that will be presented is the question about damages and whether this new amendment to BIPA applies retroactively, which I believe one judge in this building has said yes and another one has said no." (Dkt. 316 at 11:12-25). This statement is no longer correct because Judge Bucklo has reversed the orders to which counsel referred. *Gregg v. Cent. Transp. LLC*, 2025 WL 907540, *2 (N.D. Ill. Mar. 21, 2025) (Bucklo, J.) (granting motion to reconsider and concluding the Amendment "applies only prospectively"); *Amigon v. Old Dominion Freight Line, Inc.,* No. 24−cv−01934 Dkt. 66 (N.D. Ill. Mar. 21, 2025) (Bucklo, J.) (same). So, every judge in the Dirksen building to consider the issue has now found against Union Pacific's position, including in another BIPA case against Union Pacific. *Clay v. Union Pacific Railroad Co.,* No. 24-cv-4194, Dkt. 55 (N.D. Ill. Apr. 10, 2025); *see also Giles v. Sabert Corp.*, 2025 WL 274326, at *4 (N.D. Ill. Jan. 21, 2025); *Schwartz v. Supply Network, Inc.,* 2024 WL 4871408 (N.D. Ill. Nov. 22, 2024). And Illinois state courts agree.

While it is understandable for Union Pacific to preserve its argument by asserting it in its MSJ, Union Pacific fails to cite or distinguish *any* of the above cases.[30]

### E.    Union Pacific Violated the Illegal Retention Subclass' Rights Under § 15(a)

In arguing that the Illegal Retention Subclass' claims under § 15(a) fail as a matter of law, Defendant attempts to avoid the merits altogether by arguing that Plaintiffs' theory of liability amounts to an improper amendment of their complaint. (UPMSJ at 28-30 (citing *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017)). But *Chessie* concerned a case where the plaintiff's proposed new factual allegations <u>conflicted</u> with the prior allegations. 867 F.3d 852, 860 (7th Cir. 2017). Here, in contrast, the factual basis for Plaintiffs' proposed Illegal Retention Subclass does not conflict the factual basis pled in the Complaint; rather, it is based on facts identified in discovery that were unknown to Plaintiffs when the operative complaint was filed. Specifically, Plaintiffs moved to file their Third Amended Complaint on June 28, 2023. (Dkt. 167). At that time, Union Pacific was still playing keep-away with the biometric data – data which at the time (and even still) Defendant claimed *did not* include fingerprint images. (Dkt. 174). The testimony underlying the legal theory presented in Plaintiffs Motion for Class Certification was elicited even later, on February 14, 2024, when the Parties deposed the technology manufacturer, Lumidigm, and Lumidigm's corporate representative testified that the Composite Fingerprint Images were never used again after being collected and having Fingerprint Templates derived from them. (PSOMF No. 53). Plaintiffs had no way to allege the facts they uncovered after already having moved to file the Third Amended Complaint.

---

[30] Even if the Court applies the amendment prospectively, as stated in Plaintiffs' Motion for Summary Judgment, putative Class members still have multiple BIPA claims under Sections 15(b) and (d).

Moreover, *Chessie* simply stands for the idea that where a party changes the factual basis of their claims, the Court may treat that as a de-facto amendment and has discretion to allow it or not. *Id.; see also See Schmees v. HC1.COM, Inc.,* 77 F.4th 483, 489 (7th Cir. 2023) (abrogating line of cases that prohibited amendment of complaint through summary judgment briefing and instead leaving the issue to the trial court's discretion). Thus, even to the extent that the Court finds that Plaintiffs have altered their factual theory in a way that amounts to a de-facto amendment, the Court should exercise its discretion to permit the amendment. *Schmees,* 77 F.4th at 489. Importantly, none of the factors that militate against permitting a de-facto amendment are present here, as Union Pacific has not argued that such amendment would delay or frustrate trial, or require additional discovery. (See UPMSJ at 28-30).

When it finally addresses the merits of Plaintiffs' legal theory, Union Pacific meekly asserts that its general company-wide policy of positioning itself to take advantages of breakthroughs in technology permitted it to retain the Illegal Retention Subclass' Composite Fingerprint Images beyond their initial registration. (UPMSJ at 28-30). This argument turns BIPA on its head. The Legislature required prompt deletion of collected biometrics precisely *because* "[t]he full ramifications of biometric technology are not fully known." 740 ILCS 14/5(f). Union Pacific's argument that the same consideration allowed it to keep Plaintiffs' biometrics indefinitely directly contravenes this express legislative finding.

The argument also fails on the facts, because Union Pacific's corporate designee on the subject of its biometric data had no clue that the fingerprint images were even being captured. (PSOMF No. 38; Resp. UPSOMF Nos. 75-76; PSAMF No. 34) And neither did any other Union Pacific employee, or any of its attorneys. (*Id.*). Ditto for Union Pacific's vendors Nascent and Remprex. (*Id.*) In fact, even after Union Pacific examined its AG Systems to first bring them into

compliance with BIPA and later switch to another AG System, it *still* didn't discover that it was collecting Composite Fingerprint Images. (PSOMF No. 38). So, any general corporate policy to take advantage of advancements in technology was, for purposes of the Composite Fingerprint Images, completely irrelevant. Indeed, the BIPA policy that Union Pacific *did* enact did not say that Union Pacific will retain finger scans in accordance with its purported company-wide policy of taking advantage of breakthroughs in technology. (UPSOMF No. 106). It said: "UP or its vendors will retain you finger scan as long as you need it to access UP facilities and property. Your finger scan will be permanently deleted from UP's systems no later than three years from the date of your last use of the finger scan to access UP facilities and property." (*Id.*)

## F.  Union Pacific Violated Section 15(d) of BIPA

In a page-long argument, Defendant claims that Plaintiffs' claims under Section 15(d) fail as a matter of law. (UPMSJ at 31). But despite the undisputed enormity of the factual record here,[31] Union Pacific relies exclusively on sham affidavits that it produced at the summary judgment stage. (UPMSJ at 31 (relying on the affidavits of Terry Brown, Timothy Ash, Mahesh Paruchuru, Jeremy Hayden, and Scott Urban). For purposes of witness bias, it should be noted that each these individuals are current or former employees of Union Pacific and/or its service providers Nascent and Remprex, who have executed common interest agreements with Union Pacific to jointly defend this case. (*See* Dkt. 247). For the reasons set forth below, these affidavits should be disregarded completely under the sham affidavit rule. But even if they are considered, they do not even provide a basis to deny *Plaintiffs* summary judgment, let alone grant it in Defendant's favor.

There is no dispute that Remprex had access to the biometrics collected at Union Pacific's Illinois facilities. Indeed, in its Answers to Plaintiffs' Fourth Set of Interrogatories, when asked to

---

[31] Dkt. 316, at 11:18. (MR. FEINERMAN: "There's an enormous record, 21 fact depositions.")

identify who had access to the driver registration databases and biometric data thereon, Union Pacific answered: "Subject to and without waiving these defenses, employees of Remprex had primary and unlimited access to the databases and the data therein." (Dkt. 356-6 at Resp. No. 17). Union Pacific's corporate designee to testify as to its biometric data echoed this. (Resp. UPSOMF No. 50 (A. From a practical standpoint, we never had access to that data. We never went after that data. Anytime there were data questions, we engaged REMPREX and/or NASCENT to access that data and answer any questions we had about it.). This access was confirmed by Nascent. (PSOMF No. 60). It was confirmed by documents produced in discovery as well. (PSOMF No. 58) (internal Remprex communication seeking list of current and former Remprex employees who interacted with biometric data at one of Union Pacific's Illinois facilities and seeking step-by-step description of how such access occurs). This undisputed access is sufficient to grant summary judgment in Plaintiffs' favor. *Thompson,* Tazewell Cnty. No. 2020-CH-00132 at 11-12 (granting summary judgment as to § 15(d) claim in BIPA plaintiff's favor where defendant conceded that "'[third party] would have access' to employees' finger-scan data through [defendant's] payroll system").

### 1. Defendant's Sham Affidavits do not Rescue it From Liability, Much Less Warrant Summary Judgment in Defendant's Favor.

The purpose of the sham-affidavit rule is "to weed out unfounded claims, specious denials, and sham defenses." *James v. Hale,* 959 F.3d 307, 315 (7th Cir. 2020) citing *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 861 (7th Cir. 1985). Rule 56(c)(4) serves this screening function by permitting a party to use an affidavit or declaration to support or oppose a motion for summary judgment only if the affidavit (1) attests to facts of which the affiant has "personal knowledge"; (2) "set[s] out facts that would be admissible in evidence"; and (3) "show[s] that the affiant or declarant is competent to testify on the matters stated." *Id.* Affidavits offered by a party at the summary judgment stage that contradict sworn testimony are ignored under the sham affidavit

rule. *James,* 959 F.3d 307 at 316 (citing *Dunn v. Menard, Inc.,* 880 F.3d 899, 910 (7th Cir. 2018). The sham affidavit rule applies equally to third-party affidavits. *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995) (applying sham affidavit rule to third-party affidavit).

Union Pacific's sham affidavits all share a common purpose: they are designed to walk back Defendant's interrogatory response – verified by Mr. Hayden – that Remprex and Nascent had "primary and unlimited access." Each affidavit suffers from common flaws. First, each fails the first requirement that summary judgment affidavits attest to facts which the affiant has "personal knowledge." *James,* 959 F.3d 307 at 316. Each affidavit here improperly purports to speak on behalf of the companies that each affiant is/was employed by, and Union Pacific cites each affidavit for this broad and improper purpose. *Id.* If the affidavits are considered, they must be construed narrowly to the affiant's personal knowledge.

For example, Mr. Ash has signed his name to a declaration that purports to speak for all of Remprex. (UPMSJ at Ex. 49). It states:

- "The types of technical issues Remprex helped with did not require Remprex employees to access driver data from finger scans."
- "Remprex's user credentials did not provide downloading permissions."
- "I did not receive a copy, and I am not aware of anyone at Remprex that received a copy of the AGS data from finger scans."

Mr. Ash's affidavit conflicts with Union Pacific's sworn admission that "employees of Remprex had primary and unlimited access to the databases and the data therein" and its corporate representative's testimony echoing same. *James,* 959 F.3d 307 at 316. Mr. Urban apparently saw fit to use identical language to Mr. Ash in his affidavit. (UPMSJ at Ex. 50). It suffers from the same fatal flaws and is designed to walk back Nascent's testimony that Nascent receives "side-by-side" access to the biometric data through Remprex. (PSOMF No. 60).

Mr. Ash's affidavit also conflicts with Union Pacific's corporate representative testimony that Remprex routinely made copies of Union Pacific's driver databases. (Resp. UPSOMF No. 51). And Mr. Ash's new affidavit directly conflicts with his email correspondence, which acknowledges that current and former Remprex employees "interact with biometric[s]" and wherein he receives highly specific, step-by-step information about how such data is accessed. (*Id.*) Mr. Ash's statements also conflict with discovery produced in this case, which demonstrates that Remprex did receive copies of the biometric data. (PSOMF No. 59).

Even taking Ash's and Urban's affidavits at face value, their personal awareness is not dispositive, as an executive's personal awareness of whether his company received a copy of AGS data from finger scans is thin and means little. Ditto for Mr. Ash's and Mr. Urban's bald statements that: "The types of technical issues [Remprex/Nascent] helped with did not require [Remprex/Nascent] employees to access driver data from finger scans." These statements are not within the affiants' personal knowledge, as there is no chance these high ranking executives knew each technical issue that their employees assisted with.

Even if they are considered by the Court, Defendant's sham affidavits do not create an issue of material fact, much less warrant an entry of summary judgment in Union Pacific's favor. Plaintiffs are entitled to summary judgment on their Section 15(d) claims.

## G.     Verification Scans Violate BIPA

Union Pacific argues that Plaintiffs cannot recover for verification scans, but the Illinois Supreme Court and the First District Appellate Court have held the opposite. *Cothron*, 216 N.E.3d at 920 ("We hold that a separate claim accrues under the Act each time a private entity scans or transmits an individual's biometric identifier or information in violation of section 15(b) or 15(d)."); *Id.* at 925 ("Our appellate court has reached the same conclusion, determining that 'the

plain language of [section 15(b)] establishes that it applies to each and every capture and use of plaintiff's fingerprint or hand scan. Almost every substantive section of the Act supports this finding'") (citing *Watson v. Legacy Healthcare Fin. Svcs., LLC*, 196 N.E.2d 571, 578 (Ill. App. 1st Dist. 2021)). These analyses are binding, as the Court must apply "the law of Illinois as [it] believe[s] the Illinois Supreme Court would apply it." *Liberty Mut. Fire. Ins. Co. v. Statewide Ins. Co.*, 352 F.3d 1098, 1100 (7th Cir. 2003).

Here, it is undisputed that upon re-entry to Union Pacific's railyards, truck drivers' fingerprints were scanned to produce fingerprint images, from which fingerprint templates were derived and compared against the stored fingerprint template. (PSOMF Nos. 45-53). *Cothron* concerned biometric technology that operated nearly identically. 216 N.E.3d at 924.

So, on near identical facts, the Illinois Supreme Court found that a second collection/capture must occur upon a re-scan and that such scan is a violation of BIPA. *Id.* Naturally, Judge Cole made the same commonsense observation when he rejected Defendant's attempt to preclude discovery into the number of times Union Pacific scanned putative class members' fingers. Dkt. 232 at *4-5 ("Thereafter, when a driver uses the scanner at the gate, there is, the defendant insists, no collection or capture. That's counterintuitive because somehow, the driver's fingerprint has to be compared to the fingerprint "on file" from the first scan. So, what does the defendant think happens when a driver puts his finger in the scanner?") Defendant still has no answer to Judge Cole's question because what Judge Cole described is exactly what happened here. (PSOMF Nos. 45-53).

Instead, Defendant reads a non-existent storage or retention requirement for "collections" and "captures" of biometrics into Section 15(b). (UP MSJ at 27-28). The defendant in *Cothron* made the same argument, to no avail. *See* Defendant-Appellant White Castle's Petition for

Rehearing, attached hereto as <u>Exhibit 15</u>, at 8. ("[S]ubsequent authentication scans merely compare an anonymous scan with information previously collected upon enrollment. If a 'match' is found, the user may access the system. If there is no match, the scan remains anonymous. No new or additional biometrics are 'collected' and secrecy is maintained.") Defendant's position, which tracks White Castle's and the dissenting opinion in *Cothron* rather than good law*,* must be rejected, as it was in *Howe.* 2024 WL 4346631 at *10 ("[T]he Court rejects Speedway's argument for another reason too: BIPA does not have an express retention requirement, at least not for claims under Section 15(b). . .  Although the finger scans collected by the timeclock might only be retained for less than a half-second before being discarded, they are nonetheless 'gained or attained' by the timeclock to generate the Template.")

Union Pacific's argument, like White Castle's, ignores the fact that BIPA distinguishes between "collection" and "possession." *Compare* (UPMSJ at 27) (citing criminal cases regarding possession to argue that a collection did not occur here) *with* 740 ILCS 14/15 (a), (b) (regulating collection and possession separately). Relying on the misapprehension that collection necessitates possession and storage, Defendant argues that it would "make no sense to require a 'retention schedule' for data that is not retained." (UPMSJ at 28). But Section 15(a) requires a retention schedule for *possessed* biometrics, so there is no need for a retention schedule for verification scans (which are collected, but not possessed). 740 ILCS 14/15(a). Under Section 15(b), Union Pacific still has to get consent to *collect* biometrics though—no matter how short the duration of capture. Indeed, Section 15(b) requires a release where biometrics are being "captured <u>or</u> stored." 740 ILCS 14/15(b)(1) (emphasis added). The use of the disjunctive "or" in "captured or stored" again demonstrates that there the words are not synonymous, and that storage is not required for a

"capture" to have occurred. *See Watson*, 196 N.E.3d at 580 ("There is no modifier limiting 'collect' or 'capture'; thus, the requirements apply to each and every collection and capture.")

To support its limited reading of Section 15(b), Defendant narrows BIPA's entire purpose to simply "safeguarding biometric data from unauthorized disclosure." (UPMSJ at 28). But Union Pacific's own cited authority demonstrates that BIPA was created to enshrine individuals' rights to biometric privacy, not simply safeguard their biometrics from bad actors. *Sekura v. Krishna Schaumburg Tan, Inc.,* 115 N.E.3d 1080, 1092-94 (Ill. App. Dist. 1 2018). Indeed, unauthorized disclosure is addressed by Section 15(d), one of *five* sections in BIPA's broad regulatory regime. Embracing Union Pacific's argument would open the door for surreptitious biometric collection (such as widespread facial scanning) provided that the biometrics were deleted within whatever unspecified period of time Union Pacific decides is appropriate. This would cut against the rights to biometric privacy that BIPA enshrines.

### H. Judicial Estoppel Does Not Apply to Bar Plaintiff Fleury's Claims, Which Were Disclosed During his Long-Since-Discharged Bankruptcy Before Union Pacific Was Even Aware the Bankruptcy Existed or had Asserted a Judicial Estoppel Defense

Union Pacific's judicial estoppel argument rests on a verifiably inaccurate misapprehension of the record here. Judicial estoppel simply does not apply.

In its first Answer, Union Pacific asserted a generic "estoppel" defense that was lumped into the same sentence with several other defenses (release, waiver, ratification, acquiescence). (Dkt. 64 at Defense No. 4). When Mr. Fleury moved to strike Union Pacific's generic "estoppel" defense on July 30, 2021, he did so because it was unintelligible, and supported by no facts. (Dkt. 65 at 4). Mr. Fleury moved to strike Defense No. 4 entirely, along with several similarly deficient affirmative defenses. (Dkt. 65 at 4) (arguing: "Defendant's first, third, fourth, fifth, eighth, ninth, and tenth (1, 3, 4, 5, 8, 9 10) affirmative defenses contain no facts."). At that point in time, it was

impossible to tell whether the generic term "estoppel" in Defense No. 4 referred to equitable estoppel, collateral estoppel, promissory estoppel, judicial estoppel, or something else. Defense No. 4 was not a purposely pled *judicial* estoppel defense, and there is no evidence that either party understood it to be one. On August 5, 2021, Judge Alonso denied Plaintiffs' Motion to Strike without further briefing. (Dkt. 67).

Then, in December 2021, Mr. Fleury learned that he may need to disclose his BIPA claims against Union Pacific in bankruptcy. This disclosure occurred *long before* Defendant learned about Mr. Fleury's bankruptcy in January 2023. (PSAMF Nos. 30-32). Indeed, it was only after learning of Plaintiff's bankruptcy filing in early 2023 that Union Pacific moved to amend its Answer to include a non-generic *judicial* estoppel defense in February 2023. (Dkts. 127, 131 at Defense No. 12). By that time, Mr. Fleury's BIPA claims had been disclosed for over a year.

Accordingly, Union Pacific's verifiably untrue claim that there was "procedural sleight of hand" on Mr. Fleury's part is incorrect and offensive. Mr. Fleury is a truck driver who, having fallen on difficult times, was being represented by a volume bankruptcy firm. When Fleury filed for bankruptcy in 2017, he did not possess BIPA claims against Union Pacific because he had not yet been fingerprinted by Union Pacific.[32] It was not until November 2018 that Mr. Fleury was first fingerprinted by Union Pacific. (Plfs. SOAF No. 30). And in November 2018, Mr. Fleury *still* had no reason to know about the BIPA rights that Union Pacific was systematically failing to inform truck drivers of. Mr. Fleury had no reason to schedule claims he did not know about. *See*

---

[32] Union Pacific's argument that Fleury should have identified all "claims against third parties, whether or not [he had] filed a lawsuit" in 2017 despite the fact that he had not even been fingerprinted by Union Pacific yet (and would not be until November 2018) is simply nonsensical. It appears Union Pacific missed that fact.

*Tapia-Rendon v. United Tape & Finishing Co., Inc.,* 2023 WL 5228178 at *6 (defendant's "violations of BIPA are effectively surreptitious").

In December 2019, Mr. Fleury filed this case and discovery was stayed, not to reopen until June 2022. (Dkts. 21, 89). Proposed Class Counsel were not in constant contact with Mr. Fleury during that time because they had no reason to be. In December 2021, proposed Class Counsel were preparing to lift the stay of this matter (they ultimately did so in mid-February 2022). It was during that time that Mr. Fleury realized he needed to amend his bankruptcy schedule, and he ultimately did so such that he identified his BIPA claims therein. (PSAMF Nos. 30-32).

With the correct factual context, Defendant's judicial estoppel defense fails. A Chapter 13 bankruptcy estate encompasses all property, including legal claims, acquired after the petition is filed and before the case is closed. *Rainey v. United Parcel Serv., Inc.,* 466 Fed. Appx. 542, 544 (7th Cir. 2012) citing *Cable v. Ivy Tech State College*, 200 F.3d 467, 472–73 (7th Cir.1999). Although there is a trustee in a Chapter 13 bankruptcy, the trustee acts as an advisor and administrator while the debtor remains in possession of the estate. *Id*. citing 11 U.S.C. §§ 1302(a), 1303, 1306(b); *Cable* 200 F.3d at 472. The debtor can pursue legal claims for the benefit of the estate and its creditors during the pendency of a Chapter 13 bankruptcy without court approval. *Id*. Moreover, a debtor that has properly disclosed his interest in legal claims to his Chapter 13 trustee can pursue those claims for his own benefit following the closure of his bankruptcy. See *Rainey,* at 544 citing *Cannon–Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006). Accordingly, the trustee in Plaintiff's Chapter 13 bankruptcy does not need to affirmatively abandon Plaintiff's claims against Union Pacific in order for Plaintiff to pursue them, and Plaintiff can pursue his claims whether the bankruptcy is open or closed. Moreover, the bankruptcy court confirmed Plaintiff's Chapter 13 payment plan which, among other things, provided that all property of the estate would

vest in the debtor upon entry of discharge. The discharge was entered on June 16, 2022, thereby vesting all assets, including the claims in the instant litigation, with the debtor (Plaintiff).

It is thus clear from publicly-available filings, controlling case law and applicable bankruptcy provisions that Mr. Fleury: (1) timely and properly disclosed his interest in this litigation to the bankruptcy court and the trustee; and (2) has been vested with and controls his claims against Union Pacific, to the exclusion of the bankruptcy trustee and any/all creditors.

Defendant's judicial estoppel defense, which rests on a verifiably untrue timeline of facts, cites inapplicable, non-binding caselaw. Mr. Fleury proactively disclosed his BIPA claims during his bankruptcy proceedings and prior to his bankruptcy being discharged, and was never "caught" by Union Pacific with unscheduled claims. (PSAMF. Defendant did not raise Mr. Fleury's bankruptcy until long after his BIPA claims were properly scheduled with the bankruptcy court, and indeed after it was discharged. So, Union Pacific's case law is patently distinguishable because it all concerns cases where debtors failed to schedule their claims prior to their bankruptcy being discharged. *See Esparza v. Costco Wholesale Corp.*, 2011 WL 6820022, *4 (N.D. Ill. Dec. 28, 2011) (case where the debtor never amended her disclosures until after her bankruptcy was discharged and she was caught, then attempted to amend); *Hernandez v. Forest Pres. Dist. of Cook Cnty.*, 2010 WL 1292499, *5 (N.D. Ill. Mar. 29, 2010) (likewise concerned the reopening of a bankruptcy estate to include an unidentified claim); *Smith v. Am. Gen. Life Ins. Co.*, 544 F. Supp. 2d 732, 736 (C.D. Ill. 2008) ("Though the Seventh Circuit has applied judicial estoppel to unscheduled lawsuits several times, those cases involved former debtors who never scheduled their claims.") (emphasis added). And in fact, the Illinois Supreme Court has held it an abuse of discretion for a trial court to find judicial estoppel against a debtor who inadvertently failed to

schedule a legal claim, even though the debtors in that case never amended their schedules to disclose the claim prior to discharge. *Seymour v. Collins*, 39 N.E.3d 961, 980-82 (Ill. 2015).

Mr. Fleury scheduled his claims here and had absolutely no motive to conceal them. Union Pacific identifies none, nor does it identify any benefit Mr. Fleury received from the delayed disclosure of his BIPA claims. Accordingly, Defendant's judicial estoppel defense fails.

## I. Plaintiff Fleury does not Seek to Recover Damages Based on Finger Scans that Occurred Post-Consent

Union Pacific argues that Plaintiff Fleury cannot recover damages for finger scans that occurred following his consent on June 10, 2020. (UPMSJ at 39-40). Plaintiff Fleury does not seek to do so—such claims are excluded by operation of the proposed class definitions. To the extent that Defendant is arguing that its belated enaction of a BIPA policy and consent procedure forecloses BIPA claims that accrued prior to enaction, Defendant is wrong. *Mora v. J&M Plating, Inc.*, 2022 IL App (2d) 210692, ¶ 43 (Ill. App. 2 Dist., 2022); 740 ILCS 14/15(b) (requiring informed written consent *prior to* the collection of biometrics). *Cothron v. White Castle System, Inc.,* 467 F. Supp. 3d 604, 613–14 (N.D. Ill., 2020) (belated consent does not extinguish existing BIPA claims).

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court enter an Order denying Union Pacific's Motion for Summary Judgment in its entirety, granting summary in Plaintiffs' favor with respect to the unpled Section 25(e) government contractor exemption affirmative defense, and awarding such additional relief as the Court deems reasonable and just.

Dated: May 23, 2025

DAVID FLEURY and ALVIN TURNER, individually, and on behalf of similarly situated individuals

By: /s/ *Brendan Duffner*
*One of Plaintiffs' Attorneys*

40

Myles McGuire
Evan M. Meyers
David L. Gerbie
Brendan Duffner
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, Illinois 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
dgerbie@mcgpc.com
bduffner@mcgpc.com

Jon Loevy
Michael I. Kanovitz
Thomas M. Hanson
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
Tel: (312) 243-5900
jon@loevy.com
mike@loevy.com
hanson@loevy.com

*Counsel for Plaintiffs and the Putative Classes*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 23, 2025, a copy of *Plaintiffs' Opposition to Defendant's Motion for Summary Judgment* was filed electronically with the Clerk of Court, with a copy sent by Electronic Mail to all counsel of record.

/s/     *Brendan Duffner*