**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DAVID FLEURY and ALVIN TURNER, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>UNION PACIFIC RAILROAD COMPANY, a Delaware Corporation,<br><br>Defendant. | Case No. 20 C 390<br><br>Hon. LaShonda A. Hunt |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs bring this putative class action against Defendant for violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1-14/99 ("BIPA"). For the reasons discussed below, Plaintiffs' motion for class certification (Dkts. 312, 313, 318) is granted; Defendant's motion for summary judgment (Dkt. 328) is denied; Plaintiffs' motion for partial summary judgment (Dkt. 334, 336) is denied without prejudice; and the parties' respective motions to exclude expert testimony (Dkts. 349, 351, 378) are granted in part and denied in part.

**BACKGROUND**

Unless otherwise noted, the following facts are undisputed and taken from the parties' respective Local Rule 56.1 statements.

**I. Parties**

Named Plaintiffs David Fleury and Alvin Turner are truck drivers who live in Illinois. Defendant Union Pacific Railroad Company is a Delaware corporation headquartered in Nebraska that conducts business as a freight railroad throughout the United States. Defendant owns and operates intermodal facilities, including four in Illinois at various times, where shipping containers

are taken off trains and put on trucks, and vice versa. Defendant has contracted with federal, state, and local governments and their agencies and entities from time to time.

## II. <u>Automated Gate System (AGS)</u>

In 2014, Defendant installed an automated gate system (AGS) at its intermodal facilities in Illinois. The AGS verified the identities of truck drivers through a finger-scanning device manufactured by Lumidigm that used multispectral imaging technology. Defendant licensed the AGS technology from Nascent Technology through Remprex. Nascent manufactured the system and designed the software. Remprex provided project management services, including operational and maintenance support.

While the AGS was operating, truck drivers accessing Defendant's Illinois intermodal facilities for the first time were required to register by taking a picture of their face, scanning their driver's license, and scanning at least one finger. During registration, drivers pressed their fingers onto a platen, the Lumidigm device scanned their fingers, and multiple images taken during the scans were used to create composite images or "CompositeIMs"—computer files consisting of code that represents data from the scans. After the composite images were created, an algorithm was applied to create templates or "TemplateBINs"—computer files consisting of code that represents information from the scan about certain physiological features. Specifically, the algorithm identifies points in the scans called minutiae and catalogs them as a mathematical representation of the minutiae information. Composite images and templates were saved on Defendant's on-site servers after registration. Rempex had primary and unlimited access to the AGS databases and finger scan data; Nascent had side-by-side access with Remprex. Defendant stopped using finger scans for driver verification in 2021 and decommissioned the AGS in 2023.

Once registered, drivers could enter Defendant's Illinois intermodal facilities by scanning their fingers and driver's licenses. During these "verification scans," new temporary composite images were created and compared to the templates created during registration to verify drivers' identities. Composite images created during verification scans were deleted after verification was complete. Generally, composite images were deleted within 1.3 to 2 seconds after drivers scanned their fingers during verification.

Certain aspects of the technical functionality of the Lumidigm device and legal effect of the information scanned and data generated are disputed issues in this case. Plaintiffs contend that "[m]ultispectral imaging collects images of fingerprint minutiae **both at and beneath the skin surface**[,]" while Defendant insists that "the Lumidigm sensor used multispectral imaging technology to scan **subdermal information from beneath the surface** of the finger" and the "information . . . and the data . . . do not constitute fingerprints, biometric identifiers, or biometric information." (D-RSOF ¶ 30, Dkt. 357) (emphasis added). According to Plaintiffs, composite images could be run through software to generate images that look like fingerprints. However, Defendant maintains that such images are not fingerprints because they portray only subdermal information, not the friction ridge on the surface of the skin. Although Defendant disputes that the data collected constitutes biometrics, it concedes the registration data, including driver's names, dates of birth, CDL numbers, composite images, and templates, was stored in an unencrypted table titled "PartyBiometrics".

## III. **Procedural History**

This action was originally filed in state court in December 2019. Defendant removed the case to federal court in January 2020. The operative third amended complaint asserts claims for obtaining biometric information without consent in violation of 740 ILCS 14/15(b) (Count I:

Plaintiffs & Class v. Defendant); failure to develop and maintain a publicly-available biometric retention and destruction schedule in violation of 740 ILCS 14/15(a) (Count II: Plaintiffs & Class v. Defendant); failure to destroy biometric information after the original purpose for collection was satisfied in violation of 740 ILCS 14/15(a) (Count III: Plaintiff Turner and Subclass v. Defendant); and disclosure of biometric information without consent in violation of 740 ILCS 14/15(d) (Count IV: Plaintiffs & Class v. Defendant). (Third Am. Compl. (TAC), Dkt. 208). Based on these claims, Plaintiffs seek class treatment; a declaration of Defendant's BIPA violations; injunctive and equitable relief requiring compliance; statutory damages of $5,000 for each willful or reckless violation under 740 ILCS 14/20(2); statutory damages of $1,000 for each negligent violation under 740 ILCS 14/20(1); fees, costs, and expenses under 740 ILCS 14/20(3); interest; and other appropriate relief. (*Id.*) Defendant answered the third amended complaint and asserted fifteen amended affirmative defenses.[1] (Ans. & Am. Affirmative Defenses, Dkt. 275).

There have been several substantive decisions in the long history of this case, including the orders and opinions denying Defendant's motion to dismiss the first amended complaint (Dkt. 57); denying Plaintiff's motion to remand (Dkt. 89); relating to many discovery disputes (Dkts. 114, 125, 174, 179, 197, 232, 268, 273, 298); and denying Defendant's motion to dismiss the third amended complaint (Dkt. 266). The Court assumes familiarity with these rulings.

[1] Defendant's amended affirmative defenses include: federal preemption by FRSA, ICCTA, and FAAAA; preemption by federal labor law; consent; statute of limitations; release, estoppel, waiver, ratification, and/or acquiescence; laches; unclean hands; substantial compliance with BIPA; non-violation, substantial compliance, and/or absence of requisite mental state; non-entitlement to class action; assumption of risk; judicial estoppel due to Plaintiff Fleury's bankruptcy proceedings; damages sought unconstitutional due process violations of 5th and 14th Amendments and Article I § 2 of Illinois Constitution; damages sought unconstitutional under Commerce Clause; and extraterritoriality.

## IV. Post-Suit Policy and Consent

In February 2019, Defendant implemented a privacy policy relating to drivers' finger scans. On June 10, 2020, approximately six months after commencing this action, Fleury completed a "Finger Scan Collection Authorization Form," consenting to Defendant's collection and retention of his finger scan data, along with the disclosure of such data to certain third parties.

## V. Fleury's Bankruptcy Case

In December 2017, prior to commencing this action or even scanning his finger at Defendant's facility, Fleury filed a petition under chapter 13 of the bankruptcy code. Fleury first scanned his finger in November 2018, and this case was filed in December 2019. Fleury's filings were modified and amended from time to time during the bankruptcy proceeding, which is typical since a chapter 13 bankruptcy generally takes three to five years to finish. Fleury's bankruptcy filings were eventually amended to disclose this case as an asset in January 2022, and he received a discharge in June 2022. When asked why he did not disclose this lawsuit earlier, he said it was an oversight.

## VI. Pending Matters

Following unusually prolonged and contentious pleading and discovery stages, the parties moved on to briefing motions for class certification, summary judgment, and exclusion of certain experts. Currently pending before the Court are Plaintiffs' motion for class certification, (Dkts. 312, 313, 318), and the parties' cross-motions for summary judgment, (Dkts. 328, 334, 336), and motions to exclude expert testimony, (Dkt. 349, 351, 378).[2]

[2] Redacted/public and sealed/non-public versions of many of the briefs and supporting materials were filed as separate docket entries.

## DISCUSSION

A brief overview of BIPA is necessary before addressing the parties' motions. Due to the growing use of biometrics in the business and security screening sectors, the biologically unique nature of biometrics, and consequences if they are compromised, the Illinois legislature enacted BIPA to serve the public welfare, security, and safety by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information. 740 ILCS 14/5(a), (c), (g). "Biometric identifier" is defined as "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10. "Biometric information" is defined as "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.* The Court will use the term "biometrics" when referring collectively to "biometric identifiers" and "biometric information" in this ruling.

Among other things, BIPA requires private entities to publish a retention and destruction policy for biometrics, 740 ILCS 14/15(a), and prohibits private entities from obtaining biometrics without first receiving written informed consent, 740 ILCS 14/15(b), or disseminating biometrics without first receiving consent, 740 ILCS 14/15(d). The statute creates a right of action for an person aggrieved by a BIPA violation and provides that a prevailing party may recover: for each negligent violation, liquidated damages of $1,000 or actual damages, whichever is greater, 740 ILCS 14/20(a)(1); for each intentional or reckless violation, liquidated damages of $5,000 or actual damages, whichever is greater, 740 ILCS 14/20(a)(2); reasonable attorneys' fees and costs, 740 ILCS 14/20(a)(3); and other appropriate relief, including an injunction, 740 ILCS 14/20(a)(4).

The legislature amended BIPA, effective August 2, 2024, to clarify that "a private entity that, in more than one instance . . . obtains the same biometric identifier or biometric information

from the same person using the same method of collection in violation of [740 ILCS 14/15(b)] has committed a single violation of [740 ILCS 14/15(b)] for which the aggrieved person is entitled to, at most, one recovery under this Section." 740 ILCS 14/20(b). The amendment made an analogous clarification with respect to dissemination without prior consent under 740 ILCS 14/15(d). 740 ILCS 14/20(c). The amendment effectively eliminated so-called "per scan" liability and "applies retroactively to cases pending at the time it was enacted." *Clay v. Union Pac. R.R. Co.*, 171 F.4th 975, 979 (7th Cir. 2026).

## I. Class Certification

Before addressing experts and summary judgment, the Court must consider whether the case should proceed as a class action. Plaintiffs seek class certification and appointment of Plaintiffs' attorneys as class counsel and propose the following class and subclass definitions:

> **Class:**
>
> All individuals whose composite fingerprint images and/or fingerprint templates were obtained by Defendant in Illinois at any time since December 11, 2014 and prior to any written consent according to Defendant's records.
>
> **Policy Subclass:**
>
> All Class members whose composite fingerprint images and/or fingerprint templates were stored at one of Union Pacific's Illinois facilities prior to January 31, 2019.
>
> **Retention Subclass:**
>
> All Class members who had one or more composite fingerprint images stored in one of the AGS databases maintained at Union Pacific's Illinois facilities.

(Pls.' Mot. Class Cert., Dkt. 312, 313, 318).

A class must meet all prerequisites identified in Rule 23(a) and one of the three subsections of Rule 23(b) to be certified. *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). Rule 23(a)

requires numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). Rule 23(b)(3), which Plaintiffs invoke in this case, requires predominance and superiority. Fed. R. Civ. P. 23(b)(3). In addition, "a class must be sufficiently definite that its members are ascertainable." *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 577 (N.D. Ill. 2018). A class may be divided into subclasses when appropriate to protect divergent interests. Fed. R. Civ. P. 23(c)(5); *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 940 (7th Cir. 2016). A subclass must meet the same requirements as a regular class to be certified. *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 599 (7th Cir. 1993). Plaintiffs bears the burden of proving that class certification is proper by a preponderance of the evidence. *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843 (7th Cir. 2022). Class actions are an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979).

**A. Rule 23(a)**

Rule 23(a) provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a) (generally referred to as numerosity, commonality, typicality, and adequacy). Each requirement will be addressed in turn.

**1. Numerosity**

"The key numerosity inquiry under Rule 23(a)(1) is not the number of class members alone but the practicability of joinder." *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021). "Answering that question requires evaluation of 'the nature of the action, the size of the

individual claims, and the location of the members of the class or the property that is the subject matter of the dispute.'" *Id.* (quoting 7A Wright & Miller's Federal Practice & Procedure § 1762 (3d ed.)).

Here, the proposed class consists of approximately 22,402 individuals who scanned their fingers through Defendant's AGS during the relevant time period and are now located throughout the country. Defendant does not dispute that the numerosity requirement is satisfied. Accordingly, the Court concludes that "the class is so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1).

**2. <u>Commonality</u>**

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury[.]'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-350 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). Class "claims must depend upon a common contention" that "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

Plaintiffs allege that Defendant collected, stored, and disclosed their biometrics in the same systematic and uniform manner in violation of BIPA. Although Defendant contests predominance, which "builds on commonality[,]" *Svoboda v. Amazon.com Inc.*, 168 F.4th 956, 961 (7th Cir. 2026) (quoting *Eddlemon v. Bradley Univ.*, 65 F.4th 335, 338 (7th Cir. 2023)), it does not dispute that the basic commonality requirement is satisfied. The Court therefore concludes that "there are questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2).

### 3. Typicality

"As a general matter, '[a] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.'" *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 605 (7th Cir. 2021) (quoting *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998)). "The claims of the representatives need not be identical to those of the class members, but they should have the 'same essential characteristics as the claims of the class at large.'" *T.S. v. Twentieth Century Fox Television*, 334 F.R.D. 518, 530 (N.D. Ill. 2020) (quoting *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006)).

Plaintiffs' claims arise from the Defendant allegedly collecting, retaining, and disclosing their biometrics in an identical manner (i.e., through AGS registration) and under identical circumstances (i.e., without consent and without a policy). Defendant's response brief collapses this requirement together with adequacy, but the issues raised relate more closely to considerations relevant to adequacy, so they will be addressed there. Otherwise, Defendant does not meaningfully dispute that Plaintiffs satisfy the typicality requirement.

Accordingly, the Court finds that Plaintiffs claims are typical because they arise from the same underlying facts that give rise to the claims of other potential class members and their claims are all based on the same legal theories.

### 4. Adequacy

Rule 23(a)(4)'s adequacy requirement "consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011), *as modified* (Sept. 22, 2011). "A 'named plaintiff

who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative.'" *Rogers v. BNSF Ry. Co.*, No. 19 C 3083, 2022 WL 854348, at *3 (N.D. Ill. Mar. 22, 2022) (quoting *Stampley v. Altom Transp., Inc.*, 958 F.3d 580, 585 (7th Cir. 2020)). "[C]ounsel for the class representative must be competent, experienced, qualified and generally able to conduct the proposed litigation vigorously." *Baxter v. Kawasaki Motors Corp.*, 259 F.R.D. 336, 342 (N.D. Ill. 2009) (quoting *Lifanda v. Elmhurst Dodge,* No. 99 C 5830, 2001 WL 755189, at *3 (N.D. Ill. July 2, 2001)).

As an initial matter, Defendant did not contest the adequacy of proposed class counsel. Given the history of this case, counsel's experience in other class actions, including BIPA cases in this district, and the resources already committed to this suit, the Court has no reason to doubt counsel's adequacy.

As to the named Plaintiffs, however, Defendant does dispute that they are capable of adequately representing the class. Defendant maintains that Plaintiffs lack of concern for data privacy substantially undercuts their argument for discretionary statutory damages. Specifically, Defendant claims that Fleury provided finger scans to Disney World and Busch Gardens and never objected to providing those scans or inquired if they were destroyed, while Turner has no security settings on his phone and was upset by the AGS finger scans, not because of privacy concerns, but because it reminded him of a prior criminal conviction. According to Defendant, these facts render Plaintiffs particularly vulnerable to a jury verdict holding that they are not entitled to discretionary statutory damages. Plaintiffs respond that Defendant is reading a requirement of "caring about privacy" that does not exist into BIPA's statutory damages provision. Instead, Plaintiffs assert statutory damages can be calculated based on simple math and then adjusted in the Court's discretion.

The Illinois Supreme Court's ruling in *Rosenbach v. Six Flags Ent. Corp.* is dispositive of this issue. 2019 IL 123186. There, the Court held that "an individual need not allege some actual injury or adverse effect, beyond violation of his or her rights under [BIPA], in order to qualify as an 'aggrieved' person and be entitled to seek liquidated damages and injunctive relief . . . ." *Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, ¶ 40. To hold otherwise would "require that [the Court] disregard the commonly understood and accepted meaning of the term 'aggrieved,' depart from the plain and . . . unambiguous language of the law, read into the statute conditions or limitations the legislature did not express, and interpret the law in a way that is inconsistent with the objectives and purposes the legislature sought to achieve." *Id.* ¶ 38. Thus, despite Defendant's insistence, how much Plaintiffs care about their privacy is irrelevant to whether they may recover statutory damages. The statute includes no requirement of actual injury or adverse effect for that purpose. Those facts, therefore, have no bearing on Plaintiffs' adequacy as class representatives.

Defendant also argues that Fleury, specifically, is an inadequate representative because he is subject to a unique judicial estoppel defense. As discussed below, that defense is without merit. Even so, that is not the end of the story because the defense may follow the plaintiff through judgment and on appeal. *See, e.g.*, *S. Ferry LP No. 2 v. Killinger*, 271 F.R.D. 653, 659 (W.D. Wash. 2011) ("Even if the Court were to conclude that the assignments cured [the plaintiff's] standing deficiency, the Court of Appeals could hold otherwise."). But, for a defense to render a named-plaintiff inadequate, he must be "subject to a *substantial* defense unique to him." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1027-1028 (7th Cir. 2018) (emphasis added); *see also Al Haj v. Pfizer Inc.*, 347 F.R.D. 212, 215 (N.D. Ill. 2020) ("the court will examine whether [the plaintiff] is subject *not just to any arguable defense, but to an arguable defense that is substantial*.") (emphasis added). In this regard, "trivial credibility problems or insubstantial

defenses unique to the class representative" will not suffice. *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 728 (7th Cir. 2011). If Defendant's thin summary judgment reply on the judicial estoppel issue is any indication of the strength of the defense, it does not meet the "arguable" and "substantial" standard. As explained in detail below, the judicial estoppel defense is without merit and unsupported by any evidence. Accordingly, it does not preclude a finding of adequacy for Fleury.

Accordingly, the Court concludes that Plaintiffs and their counsel will fairly and adequately protect the interests of the class and, therefore, they satisfy the requirements of Rule 23(a)(4) and Rule 23(g).

### B. Predominance and Superiority

Having determined that Rule 23(a) is satisfied, the Court turns to Rule 23(b), which provides that:

> A class action may be maintained if Rule 23(a) is satisfied and if:
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>
>> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>
>> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

"Predominance tests whether the class is 'sufficiently cohesive' to justify class adjudication." *Svoboda*, 168 F.4th at 961 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). The predominance inquiry requires a "rigorous analysis[,]" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013), which involves "identify[ing] the elements of each claim, the proof necessary for each, the manageability of those issues at trial, and alternative procedural tools[,]" along with "scrutiniz[ing] the relationship between common and individual questions and assess[ing] their relative importance." *Svoboda*, 168 F.4th at 961. "[A] court weighing class certification must walk a balance between *evaluating* evidence to determine whether a common question exists and predominates, *without weighing* that evidence to determine whether the plaintiff class will ultimately prevail on the merits." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020) (quoting *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 377 (7th Cir. 2015) (emphasis added)). The "predominance and superiority analyses often overlap." *Svoboda*, 168 F.4th at 962. Where "key common questions related to [a defendant's] liability predominate and will streamline [the] litigation, superiority is less likely to present a barrier to class certification." *Svoboda*, 168 F.4th at 966.

Plaintiffs assert claims under BIPA sections 15(a) (policy and retention), 15(b) (collection), and 15(c) (disclosure). All claims involve identical questions of law and fact across the proposed class and subclasses regarding whether Defendant collected data that constitutes biometrics, Defendant's initial purpose for collecting biometrics, whether Defendant's conduct constitutes disclosure, and the number of violations and corresponding recoveries available. Because the AGS system was essentially uniform to all drivers, the proof on these questions will be the same for all drivers who scanned their fingers. Similarly, except for two defenses specific to Fleury that are rejected below, all other asserted defenses would apply on a class-wide basis. Given the uniform

nature of the conduct at issue in this case, the common questions of law and fact, proof, and defenses undoubtedly predominate over any individual issues. In this regard, the class and subclasses will "prevail or fail in unison[.]" *Svoboda*, 168 F.4th at 964. The uniformity of conduct and proof across the claims also indicates that considering such matters on a class-wide basis would be far more manageable than assessing them individually for over 20,000 drivers.

Defendant's main argument against certification is that individualized issues predominate over common questions because statutory damages cannot be evaluated on a classwide basis. Defendant cites other laws for the contention that various factors, including the severity of a violation, actual damage, extent of intrusion of privacy, nature of violation and intrusion, and individualized preferences regarding privacy, are relevant because statutory damages are discretionary.

However, Defendant's position is inconsistent with the developing body of case law regarding calculation of statutory damages in BIPA class actions. In *Bayeg v. Admiral at the Lake*, an Illinois appellate court held that "calculation of damages in this case should be straightforward and formulaic: the number of times Admiral violated each class member's rights under the Act multiplied by either $1000 or $5000, depending on whether Admiral acted negligently, recklessly, or intentionally." 2024 IL App (1st) 231141, ¶ 40 *appeal denied*, 244 N.E.3d 267 (Ill. 2024). Similarly, in *Doe v. Apple Inc.*, another district court held that "BIPA permits liquidated damages for a defendant's violation of the statute, and the amount of damages available depends on the defendant's state of mind. Whether a putative class member knows how the technology works is irrelevant to the damages analysis. If Plaintiffs can establish liability and intent on a classwide basis, 'the damages calculation will be formulaic, and no individual issues need be considered.'" No. 20 C 421, 2026 WL 1615260, at *11 (S.D. Ill. June 5, 2026) (quoting *Zaluda v. Apple Inc.*,

2019 CH 11771 at 17 (Ill. Cir. Ct. Cook Cty. Jan. 29, 2026)). The Seventh Circuit's decision in *Svoboda* is in accord with these cases. 168 F.4th at 966 ("The district court was also on solid ground in observing that it retained discretion on a finding of liability to award damages on a classwide basis by, for example, assessing the amount of damages on a common per-scan basis."). Notwithstanding the case law indicating that calculation of statutory damages under BIPA should be formulaic, "[e]ven if individual questions about the remaining defenses and damages remain, they do not defeat class certification, particularly where other common questions predominate." *Id.* at 966. Neither do concerns about due process and disproportionately large damages, because "the district court can reduce the award to ensure it is not unconstitutionally punitive." *Id.* at 966 (citing *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006)).

Finally, if there was any room for doubt, *Clay's* holding that the 2024 amendment to BIPA eliminating per-scan damages applies retroactivity to cases like this one, 171 F.4th at 979, confirms that pursuing Plaintiffs' claims as a class action is vastly *superior* to prosecuting them on an individual basis. Post-*Clay*, there is little incentive for individual plaintiffs to bring BIPA claims in light of the relatively limited potential individual recovery and high cost of litigation. *See Svoboda*, 168 F.4th at 967 (finding "no infirmity in the district court's conclusion based on these observations that affected users may be unable or unwilling to undertake this costly litigation alone without any guarantee of recovery"); *see also Willis v. Universal Intermodal Servs., Inc.*, No. 21 C 1716, 2026 WL 1810320, at *7 (N.D. Ill. June 24, 2026) (noting that "since the Seventh Circuit held in *Clay* . . . that the 2024 amendment to the BIPA limiting individuals to 'one recovery' is retroactive, the value of individual class members' claims is small. A class action is the superior method of adjudicating these claims."). At bottom, just like *Svoboda* and many other BIPA cases that have proceeded as class actions, "this class action will resolve virtually identical claims for

potentially thousands of people. It will ensure uniform resolution of complex issues about the operation of [Defendant's AGS], preserve judicial resources, and promote efficiency." 168 F.4th at 967. Accordingly, the Court concludes that Rule 23(b)(3)'s predominance and superiority requirements are satisfied.

### C. Ascertainability

It is well-settled in this circuit that Rule 23 imposes an additional requirement, "regardless of whether certification [is] sought under Rule 23(b)(1), (2), or (3)[,]" sometimes referred to as "ascertainability", meaning that a class "must be defined clearly and that membership be defined by objective criteria[.]" *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015).

Plaintiffs' proposed class and subclass definitions are defined clearly and based on objective criteria, including whether a member's fingerprint was scanned and stored without prior consent and the date on which a BIPA policy was published. Defendant does not dispute that the ascertainability requirement is satisfied. The Court therefore concludes that the class and subclasses are defined clearly and membership is defined by objective criteria.

Having determined that the requirements of Rule 23(a), 23(b), and 23(g) are satisfied, the class and subclasses defined in Plaintiffs' motion, as set forth above, are certified, Plaintiffs are appointed as class representatives, and Plaintiffs' counsel are appointed as class counsel.

## II. Expert Testimony

Because the parties' summary judgment arguments depend on expert testimony regarding the AGS technology and finger scans, the Court will next address *Daubert* motions before turning to the merits. The admissibility of expert testimony is governed by Rule 702 and the Supreme Court's landmark decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Specifically, expert testimony is admissible if the witness "is qualified as an expert by knowledge, skill, experience, training, or education" and "the proponent demonstrates . . . that it is more likely

than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. In other words, experts must be qualified and their testimony both relevant and reliable. *Daubert*, 509 U.S. at 589; *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012) ("expert testimony is admissible only if (1) the expert testifies to valid technical, scientific, or other specialized knowledge; and (2) that testimony will assist the trier of fact."). Under this standard, "[t]he district court plays a crucial role as 'evidentiary gatekeeper,' admitting expert evidence only after evaluating: '(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony.'" *Hillman v. Toro Co.*, 164 F.4th 971, 979 (7th Cir. 2026) (quoting *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778-779 (7th Cir. 2017)).

With respect to factual issues, "expert testimony is unnecessary where the matter is within the realm of lay understanding and common knowledge[,]" *Lynch v. Ne. Reg'l Commuter R.R. Corp.*, 700 F.3d 906, 914 (7th Cir. 2012), but it is "required for claims that involve "technical matters beyond the common knowledge and experience of jurors."' *Vill. of Sauk Vill. v. Roadway Express, Inc.*, No. 15 C 9183, 2017 WL 378277, at *3 (N.D. Ill. Jan. 25, 2017) (quoting *Klootwyk v. DaimlerChrysler Corp.*, No. 01 C 6127, 2003 WL 21038417, at *3 (N.D. Ill. May 7, 2003)). Importantly, however, "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

Defendant moves to exclude Plaintiffs' computer database and forensics expert, Joseph Caruso, and Plaintiffs move to exclude Defendant's biometrics expert, B. Scott Swann. The parties make several arguments, but most of them boil down to this: Caruso and Swann should not be allowed to offer expert testimony regarding whether the AGS used "biometric identifiers" (i.e., fingerprints) or "biometric information" as defined by BIPA.

Plaintiffs concede that Caruso is not qualified to opine as to whether something constitutes biometrics and state that his use of terms such as "fingerprint" was just his use of plain English to describe what he was talking about. Instead, Plaintiffs maintain that the question of whether something constitutes biometrics is a legal issue for the Court to decide without the assistance of expert testimony. But Defendant claims that the testimony of its biometrics expert is necessary because "[t]he question whether the Lumidigm finger scanner collected 'fingerprints' is a question of fact[.]" (Def.'s Resp. Pls.' Mot. to Exclude Swann at 13886,[3] Dkt. 385).

Another court in this district recently excluded expert testimony under very similar circumstances, concluding that "[w]hether the scanned image captured by the timeclocks ultimately constitutes a 'fingerprint' protected as a biometric identifier under BIPA is not a question of fact that requires testimony from a technical expert." *Howe v. Speedway LLC*, No. 19 C 1374, 2024 WL 4346631, at *4 (N.D. Ill. Sept. 29, 2024) (Chang, J.). There, the issue was "a question of statutory interpretation for the Court to decide, because no underlying constituent facts [were] disputed[,]" and the parties "agree[d] that the scan from the timeclocks [did] not capture a full image or photograph of an entire finger, but a smaller portion of it." (*Id.* at *5) (referencing an illustration of what essentially appeared like a rectangle in the middle of a fingerprint). Thus, because "[m]atters of statutory interpretation are questions of law[,]" the court could decide the

[3] Unless otherwise noted, page numbers in docket citations reference the "PageID #" in the CM/ECF header.

issue when ruling on summary judgment. *Id.* (quoting *Harvey v. Resurrection Univ.*, No. 21 C 3203, 2022 WL 3716213, at *3 (N.D. Ill. Aug. 29, 2022)).

At least one Illinois court is in accord with *Howe*. In *Thompson v. Matcor Metal Fabrication (Illinois) Inc.*, the defendant argued that there was "a difference between the 'fingertip' scans it took and the type of 'fingerprint' scans covered by BIPA" and expert testimony was necessary to assess what its timeclocks collected. No. 2020 CH 132, 2023 WL 9019107, at *3 (Ill. Cir. Ct. Tazewell Cnty. Dec. 8, 2023). The trial court found that "[t]here is no meaningful difference between a 'fingerprint' scan and a 'fingertip' scan, and BIPA covers both[,]" and concluded "[n]o expert [was] needed to assist . . . in determining that such information falls within BIPA's definition of biometric information." *Id.*

To distinguish these cases, Defendant focuses on the whether the underlying facts are disputed, arguing that its expert is necessary to resolve questions about the functionality of the Lumidigm scanner. According to Defendant, Swann's testimony explains that "fingerprints are impressions made by the pattern of ridges on the *surface* of a finger" and "the sensor captured only subdermal information (from *beneath* the surface of the skin), not the skin's surface ridges and patterns, and manipulated that subdermal data by fusing multiple images into one." (Swann Resp. at 13888). In support of its argument, Defendant points to several cases involving fingerprints where expert testimony was appropriate and notes that multi-spectral imaging technology does not satisfy standards used by certain law enforcement agencies for fingerprints.

But Defendant misinterprets the nature of this dispute. Plaintiffs do not dispute that the Lumidigm scanner uses multi-spectral imaging technology to capture subdermal features of the finger. Rather, Plaintiffs argue that images and information derived from such scans constitute fingerprints and biometric information. Like in *Howe*, that is an issue of statutory interpretation

for the Court to decide, not a question of fact for the jury. True, Plaintiffs contend that the Lumidigm scanner also captures features on the surface of the skin. But, as explained below in connection with summary judgment, the question of whether the scanner captures only subdermal or both subdermal and surface features is immaterial to the analysis.

The cases cited by Defendant involving expert testimony regarding fingerprints are not persuasive. The expert testimony in those cases related to identifying criminal defendants through fingerprint analysis and comparison and the ability of evidence technicians to obtain fingerprint evidence from certain objects, not what constituted a fingerprint in the first place. *See, e.g.*, *United States v. Herrera*, 704 F.3d 480, 486 (7th Cir. 2013) (discussing role of experts in examining and matching fingerprints in criminal cases). Defendant's point regarding whether multispectral imaging technology meets law enforcement standards for fingerprint collection or analysis is a nonstarter as well. BIPA has no language even suggesting that law enforcement standards bear on its application or interpretation. Defendant is a publicly traded company controlling access to its facilities defending an action under a preponderance of evidence standard, not a law enforcement agency attempting to identify and prosecute perpetrators of crimes under a reasonable doubt standard. Simply put, law enforcement fingerprint collection standards are irrelevant.

Accordingly, the Court rejects Defendant's contention that expert testimony is necessary to resolve a factual dispute regarding whether technology used by the AGS scans "fingerprints" within the meaning of BIPA. The question of whether the images and information collected by the Lumidigm finger scanner constitute fingerprints and biometric information is a legal one for the Court to decide. The motions to exclude Caruso and Swann are therefore granted to the extent that they offer opinions regarding what constitutes biometrics under BIPA.

Swann's other challenged opinions fare no better. With respect to his opinion that images and information from verification scans was discarded within a couple seconds, expert testimony on that issue is unnecessary because will not assist the trier of fact—the timing and functionality of the technology at issue is undisputed in that regard. To the extent Defendant believes such testimony would support its argument that it did not exercise sufficient control over the verification scan data to have "collected," "captured" or "obtained" it for purposes of BIPA, that too is a matter of law for the Court to decide. In any event, Plaintiffs are no longer pursuing claims based on verification scans, so the issue is largely moot. Any opinion by Swann regarding what constitutes collection, capture, or the like would be testimony as to an outcome-determinative legal conclusion and is therefore inadmissible.

As to Swann's claim that "substantial expertise" is necessary to render actual images from the composite image data, that opinion appears not only to be unhelpful but also wrong. BIPA applies to both "biometric identifiers" and "biometric information". The latter is defined as "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Absent from that definition is any language regarding the method or process of accessing such information or the level of expertise necessary to do so. Thus, regardless of whether substantial expertise is necessary to extract images from the data or composite images can be easily rendered into an image by anyone with a mobile device and internet access, the Court sees no reason why expert testimony regarding the level of skill necessary to access the images is relevant. As a result, Plaintiffs' additional argument that Swann misleadingly used partial fingerprint images rendered from the composite images in his initial report is moot.

The Court does not conclude that expert testimony is never required to resolve questions about whether technology employed by a defendant obtains biometric identifiers or information. To the contrary, the Seventh Circuit has at least acknowledged that the requirement that a BIPA claimant prove a defendant obtained biometric data raises questions that "may require expert discovery[.]" *Svoboda*, 168 F.4th at 962-963 ("Sections 15(a) and (b) of BIPA both require proof that Amazon collected, captured, obtained, or possessed biometric data. As the district court recognized, this requirement, in turn, raises two common questions that *may require expert discovery* on the VTO software: (1) whether the facial data used by the operation of the VTO application constitutes biometric identifiers or information within the meaning of BIPA and (2) whether the use of the VTO means Amazon collected, captured, obtained, or possessed it.") (emphasis added). But here, with the benefit of that discovery and briefing on summary judgment as well as class certification and experts, the Court concludes that the relevant material facts are undisputed and expert testimony is therefore unnecessary to resolve the purely legal questions of whether the finger scan data used by the AGS constitutes biometric identifiers and information within the meaning of BIPA.

In sum, the parties' respective motions to exclude Caruso's and Swann's expert testimony are granted to the extent that each offers an opinion regarding whether the images and information obtained through the AGS constitutes a biometric identifier or biometric information under BIPA. In addition, Plaintiffs' motion to exclude Swann's opinions regarding the timing and functionality of the AGS during verification scans and the level of skill necessary to render images from the information in the AGS is granted because such opinions will not assist the trier of fact in resolving any issue relevant under BIPA.

## III. **Summary Judgment**

Last, the Court turns to the parties' cross-motions for summary judgment. Both sides move for summary judgment on issues essential to establishing liability and relevant to calculation of damages. Defendant also raises several potentially dispositive arguments.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there is a genuine dispute of material fact, the Court must resolve all disputes and draw all reasonable inferences in favor of the nonmovant. *Dietchweiler v. Lucas*, 827 F.3d 622, 627 (7th Cir. 2016). In doing so, the court must refrain from weighing evidence or making credibility determinations. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). In addition, "[s]peculation cannot create a genuine issue of fact that defeats summary judgment." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

Summary judgment is warranted against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. Indeed, the nonmoving party "must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Domka v. Portage Cnty., Wis.*, 523 F.3d 776, 783 (7th Cir. 2008) (quoting *United States v. Ritz*, 721 F.3d 825, 827

(7th Cir. 2013)) (internal quotations and citations omitted). "In determining whether a moving party has met its burden of persuasion, the court is obliged to take account of the entire setting of the case and must consider all papers of record as well as any materials prepared for the motion." *Celotex*, 477 U.S. at 331 n.2.

"The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: [courts] construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Tokio Marine Specialty Ins. Co. v. Altom Transp., Inc.*, 618 F. Supp. 3d 791, 795 (N.D. Ill. 2022) (quoting *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017)). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Tokio*, 618 F. Supp. 3d at 795 (quoting *Bloodworth v. Vill. of Greendale*, 475 F. App'x 92, 95 (7th Cir. 2012)).

**A. Plaintiffs' Motion for Partial Summary Judgment**

As an initial matter, Plaintiffs ask the Court to reserve ruling on the merits of their motion for partial summary judgment until after class certification and distribution of class notice to avoid application of the rule against one-way intervention. (Pls.' Reply at 14188-14189, Dkt. 391). Defendant did not address this request, although it did respond that one of Plaintiffs' arguments is premature because no class has been certified, which seems consistent with Plaintiffs' request.

"The rule against one-way intervention prevents plaintiffs from moving for class certification after acquiring a favorable ruling on the merits of a claim . . . because it is 'unfair to allow members of a class to benefit from a favorable judgment without subjecting themselves to the binding effect of an unfavorable one.'" *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1057 (7th Cir. 2016) (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974)); *see also Bakov v. Consol. World Travel, Inc.*, 68 F.4th 1053, 1058 (7th Cir. 2023) ("Rule 23(c)(1)(A)'s requirement

of certification 'at an early practicable time,' coupled with the rule against one-way intervention, typically prohibit a plaintiff from obtaining a favorable judgment on her individual claim and then seeking to multiply her good fortune by belatedly certifying a class."). Thus, plaintiffs who move for class certification and summary judgment contemporaneously come "dangerously close to precluding review of the class certification decision[.]" *Id.* at 1058. The Seventh Circuit has therefore "urge[d] plaintiffs to exercise caution when seeking a ruling on the merits of an individual plaintiff's claim before the district court has ruled on class certification and given notice of the ruling to absent class members." *Id.*

Here, Plaintiffs' motion for partial summary judgment seeks favorable rulings on several issues, including the merits of their Section 15(a), 15(b), and 15(d) claims and the scope of damages recoverable under Section 20 for any such violations. To rule for or against Plaintiffs on those issues before class certification and notice would be unfair, because it would potentially allow class members to either benefit from a favorable ruling by joining the suit or avoid the consequences of an unfavorable ruling by opting out and pursuing individual claims. The rule against one-way intervention does not permit such a procedure. That said, the rule does not prohibit consideration of Defendant's motion for summary judgment. Indeed, denial would indicate only that Defendant had not carried its burden on the claims and defenses raised and not necessarily indicate that Plaintiffs are entitled to judgment on the merits of any claim.

Accordingly, the Court will not rule on Plaintiffs' motion for partial summary judgment at this time. But in lieu of reserving ruling as requested, the motion will be denied as premature without prejudice to renewal or reinstatement after class notice has been provided.

### B. Biometric Identifiers and Information

Turning to Defendant's motion, it first seeks summary judgment on the issue of whether the finger scans and composite images constitute biometric identifiers and the templates constitute

biometric information. As set forth above, BIPA defines "biometric identifier" to mean "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10. "Biometric information" is defined as "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.* BIPA does not include a separate definition of "fingerprint." Courts answering this question, however, have used the following definitions:

> The term fingerprint refers to the ridges of the finger (or a portion of the distinctive pattern of lines on a finger), as long as that portion of the finger's ridges or pattern is sufficient to be unique to a particular individual and is capable of being used to identify a particular person.

*Howe*, 2024 WL 4346631, at *7.

> [T]here is no difference between a "fingerprint" scan and a "fingertip" scan. 2 CHAMBERS DICTIONARY(13th ed.) (a "fingerprint" is "an impression of the ridges of the fingertip"); BLACK'S LAW Dictionary (11th ed. 2019) (a fingerprint is the "distinctive pattern of lines on a human fingertip"); *United States v. Herrera,* 704 F.3d 480, 483 (7th Cir. 2013) ("[F]ingerprints are made by pressing a fingertip covered with ink on a white card or similar white surface."). The Merriam-Webster dictionary, likewise, defines a "fingerprint" as "the impression of a *fingertip* on any surface." www.merriam-webster.com/dictionary/fingerprint (emphasis added) (last visited November 21, 2023). There is no meaningful difference between a "fingerprint" scan and a "fingertip" scan, and BIPA covers both.

*Thompson*, 2023 WL 9019107, at *3. Considering the statute's plain language and legislative findings, 740 ILCS 14/5, the throughline is that "a biometric identifier is a unique personal feature that can be used to identify a person." *Konow v. Brink's, Inc.*, 721 F. Supp. 3d 752, 755 (N.D. Ill. 2024) (quoting *Carpenter v. McDonald's Corp.*, 580 F. Supp. 3d 512, 515 (N.D. Ill. 2022)). Importantly, for purposes of meeting the definition of a biometric identifier under BIPA, it is irrelevant how a fingerprint is obtained:

> Nothing in the statute says, one way or the other, *how* the biometric measurements must be obtained (or stored, for that matter) in order to meet the definition of "biometric identifier." The definition simply lists the specific identifiers that are covered. And the particular biometric identifiers can, in fact, be collected in various ways without altering the fact that the measurements still are biometric identifiers. Consider, for example, fingerprints: the definition is indifferent as between inked fingerprints versus digital images of fingerprints. Nor does the definition say whether a scan of face geometry has to be in person or may be generated from a photograph or a video. Indeed, because advances in technology are what drove the Illinois legislature to enact the Privacy Act in the first place, it is unlikely that the statute sought to limit the definition of biometric identifier by limiting *how* the measurements are taken. Who knows how iris scans, retina scans, fingerprints, voiceprints, and scans of faces and hands will be taken in the future? It is not the how that is important to the Privacy Act; what's important is the potential intrusion on privacy posed by the unrestricted gathering of biometric information. The bottom line is that a "biometric identifier" is not the underlying medium itself, or a way of taking measurements, but instead is a set of measurements of a specified physical component (eye, finger, voice, hand, face) used to identify a person.

*Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1095-1096 (N.D. Ill. 2017).

The primary disagreement between the parties in this regard is whether the definition of a "fingerprint" under BIPA is limited to the impression or mark made by the ridges and valleys on the surface of a person's fingertips or if it also encompasses physiological features beneath the surface that depict the unique pattern of ridges and valleys on the surface. It is undisputed that the Lumidigm device scanned drivers' fingers when they initially registered and later accessed Defendant's facilities. The basic functionality of the multispectral imaging technology used by the device is also undisputed. During a scan, multiple wavelengths of light penetrate the skin at different levels. Pictures are taken in each wavelength, at each level, and then these "raw" images are combined into one composite image.

A whitepaper published by the manufacturer and a representative of the manufacturer state that the multispectral imaging technology used by the Lumidigm device captures images of both

the surface and subsurface of the skin. (P-SOF, Ex. Y (Whitepaper) at 10823-10825, Dkt. 336-28 (Sealed); (P-SOF, Ex. O (Fabbrizio Dep.) at 10596-10601, Dkt. 336-18 (Sealed)). A comparison of a multispectral imaging scan and a conventional fingerprint scan is below.




**Fig. 5.** On the left is a composite fingerprint image generated from the raw MSI images shown in Fig. 4. On the right is a conventional TIR image collected on the same finger used to generate the MSI fingerprint.

(P-SOF, Ex. Y at 10823-10829).

Swann, Defendant's biometrics expert, concedes that the device detects the surface but contends that the surface image is used for other purposes and the composite images are primarily based on subsurface images. (D-SOF, Ex. 23 (Swann Dep.) at 8802, Dkt. 331-7) ("And while surface area is detected as part of the overall sensor process, it's only used to capture the tone, colors, and the liveness. It supports the liveness detection algorithm for this device. The optics path is tuned and built as part of their design, primarily to focus on the multispectral subdermal collection of the finger scan.").

Nonetheless, the Court views the surface versus subsurface issue as a red herring, not a genuine dispute of material fact that would preclude summary judgment. Regardless of whether the device scans images of the skin's surface, subsurface, or both, the undisputed evidence shows that the resulting scans indisputably depict and represent patterns of ridges and valleys on the finger unique to each person and capable of being used to identify them. *Howe*, 2024 WL 4346631,

at *7. Whether the physiological features on which the raw images are based exist on the surface or just below it, there is no doubt that the composite images generated from them are "fingerprints" as the word is plainly and ordinarily understood. *Thompson*, 2023 WL 9019107, at *3.

Despite the various words used by the parties to describe the what is scanned by the Lumidigm device (e.g., finger, fingertip, fingerprint, tip of the finger, end of the finger, finger scan data, etc.), there is no meaningful difference between a scan completed through the device, a traditional rolled-ink impression, or a scan by a conventional device that captures only the surface of the finger for purposes of BIPA. *See Howe*, 2024 WL 4346631, at *8 ("As this Court has observed, *how* the identifier is collected is beside the point[.]"); *see also Rivera*, 238 F. Supp. 3d at 1095 ("Consider, for example, fingerprints: the definition is indifferent as between inked fingerprints versus digital images of fingerprints."). BIPA covers all fingerprints, no matter how they are obtained or presented, so long as the ink print, scan, image, or other medium shows a pattern of ridges and valleys of the finger sufficiently unique to the person and capable of being used to identify them. To exclude from BIPA scans of features of fingers that exist just below the surface but nonetheless produce a fingerprint consisting of patterns that are biologically unique and can be used to identify a person "would undermine the fundamental purpose of the statute and leave large swaths of identifying biometric information uncovered." *Howe*, 2024 WL 4346631, at *8. The fact that the scans were in fact used by Defendant to identify drivers is telling. Just as timeclocks were used to identify employees in *Howe*, Plaintiffs here scanned their fingers so that Defendant could identify drivers as they sought entry to its facilities.

Even if the surface versus subsurface dispute was material, the result would be the same. To preclude summary judgment, a dispute must not only be material, but also genuine, meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party[.]"

*Anderson*, 477 U.S. at 248. Viewing Swann's testimony and all other supporting evidence in the light most favorable to Plaintiffs, no reasonable jury could find that the Lumidigm device did not scan fingerprints, regardless of the technical functionality as to which layer of the skin it scanned, especially in light of evidence of the composite images themselves and the purpose and operation of the AGS, among other things.

Many of Plaintiffs' other contentions support these conclusions, and none of Defendant's additional arguments cause the Court to conclude otherwise. First, it is undisputed that Defendant and third parties involved with the AGS repeatedly used terminology such as biometrics, fingerprints, biometric scanner, biometric server, fingerprint server, and biometric data when referring to the technology. Of course, the terminology used in the past does not mean that the scans, composite images, and templates meet the relevant statutory definitions, but use of such words sheds light on the nature and purpose of the AGS, which in turn informs whether the scans and composite images were sufficiently unique to each person and capable of being used to identify them. Furthermore, Defendant's argument that Plaintiffs position is weakened by their reliance on fact witness testimony and documents in which laypeople refer colloquially to the AGS data as fingerprints or biometrics actually cuts against Defendant's own position, because the Court must give BIPA's language its plain and ordinary meaning when interpreting the statute. *Cothron v. White Castle Sys., Inc.*, 2023 IL 128004, ¶ 20, *as modified on denial of reh'g* (July 18, 2023) ("The best indicator of legislative intent is the statutory language itself, given its plain and ordinary meaning."). Here, the fact that the terms "fingerprints" and "biometrics" were consistently and repeatedly used to describe the technology at issue reinforces that the AGS scans fall within the plain and ordinary meaning of those words as they are used in BIPA.

Defendant's argument regarding conflicts with other Illinois laws is also without merit. BIPA provides that "[n]othing in this Act shall be construed to conflict with the Private Detective, Private Alarm, Private Security, Fingerprint Vendor, and Locksmith Act of 2004 [(the "Private Detective Act")] and the rules promulgated thereunder." 740 ILCS 14/25(d). The Private Detective Act defines "Fingerprint vendor" as "a person that offers, advertises, or provides services to fingerprint individuals, through electronic or other means, for the purpose of providing fingerprint images and associated demographic data to the Illinois State Police for processing fingerprint based criminal history record information inquiries." 225 ILCS 447/5-10. Elsewhere, the statute requires that "[e]ach applicant for a fingerprint vendor license shall have the applicant's fingerprints submitted to the Illinois State Police *in an electronic format that complies with the form and manner for requesting and furnishing criminal history record information as prescribed by the Illinois State Police.*" 225 ILCS 447/31-10(b) (emphasis added). The statute does not define the word "fingerprint" or any other term relevant to this case. *See* 225 ILCS 447/5-10.

According to Defendant, to interpret the word "fingerprint" for purposes of BIPA to include fingerprints obtained through means or in a format that the Illinois State Police would not accept to process criminal history inquiries would conflict with the Private Detective Act. The Court disagrees. "When an apparent conflict exists between statutes, courts must construe the statutes in harmony if possible." *Mermelstein v. Rothner*, 349 Ill. App. 3d 800, 803 (2004). BIPA does not include any provisions relating to criminal history record information inquiries conducted by the Illinois State Police, which is the express focus of the fingerprint-related provisions of the Private Detective Act. And, although the Private Detective Act refers to "an electronic format that complies with the form and manner for requesting and furnishing criminal history record information as prescribed by the Illinois State Police[,]" it does not itself prescribe such means or

broadly impose a requirement for purposes beyond criminal history inquiries. An interpretation of the word "fingerprint" in BIPA that includes fingerprints obtained through means that do not comply with those as prescribed by the Illinois State Police for criminal history inquiries does not conflict with the Private Detective Act. Thus, there is no apparent conflict, but even if there were, BIPA and the Private Detective Act can be construed in harmony.

Last, the parties quibble over the impact of *Rogers v. BNSF*, No. 19 C 3083 (N.D. Ill.) on this case, because the defendant in *Rogers* used the exact same AGS technology, was found liable under BIPA, and faced a substantial damages award before settling. To be sure, *Rogers* is relevant, as would be any case that involves the same claims and technology at issue here. But liability in *Rogers* does not mean the same result is a forgone conclusion in this action. Just as Defendant is entitled to learn from BNSF's loss in *Roger*s and adjust its defense strategy accordingly, Plaintiffs' counsel, having prevailed so successfully before, cannot be blamed for using that case as a template for aspects of the litigation here. Nevertheless, the Court urges both sides to consider their presentation. Neglecting to update the signature block of a brief is sloppy, just as recycling arguments that have already been repeatedly rejected only serves to unreasonably multiply proceedings and delay resolution on the merits.

In short, the Court concludes that the AGS scans and composite images constitute fingerprints (i.e., biometric identifiers) under BIPA. It follows that the templates based on those scans and composite images constitute biometric information. *See* 740 ILCS 14/10 (defining "biometric information" as "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual."). Accordingly, Defendant's motion for summary judgment on the ground that the scans were not fingerprints is denied.

### C. Section 25(e) Government Contractor Exemption

Next, Defendant argues that it is exempt from BIPA under Section 25(e), which states that "[n]othing in this Act shall be construed to apply to a contractor, subcontractor, or agent of a State agency or local unit of government when working for that State agency or local unit of government." 740 ILCS 14/25(e). Defendant contends that the exemption applies because it contracted with government agencies during the relevant time period and the plain and ordinary meaning of the phrase "when working for" is purely temporal, not indicative of a substantive relationship between the government contracts and the subject matter of the BIPA action. Even so, Defendant claims that there was a substantive relationship between its government contracts and finger scanning technology because both were aimed at improving efficiency and safety in freight transport.

Plaintiffs first assert that the government contractor exemption is an affirmative defense that Defendant forfeited by failing to raise earlier in the litigation. On the merits, Plaintiffs maintain Defendant's purely temporal interpretation of "when working for" would be superfluous and lead to absurd results. Rather, the phrase should be interpreted to mean that the exemption applies only to a defendant's conduct that is under the supervision of a governmental agency or within the scope of the work being performed under a government contract. Plaintiffs point to a slew of federal and state court rulings rejecting Defendant's position and note that the only case aligned with Defendant did not consider the majority of case law on the issue. In addition, although Plaintiffs did not seek summary judgment on this issue in their motion, they ask the Court to grant summary judgment in their favor under Rule 56(f)(1).

In the parties' supplemental briefs, they make additional arguments and requests with regard to this issue. Defendant asks the Court to stay this decision pending a ruling in *Payton v. Union Pac. R.R. Co.*, No. 26-1946 (7th Cir.), which they say involves this precise question. But

Plaintiffs claim the *Payton* appeal is only a vehicle for Defendant to get a favorable decision on the government contracts exemption issue for use in this case. For now, Plaintiff argues that an Illinois appellate court decision is binding on the point and should be followed by this Court. *See Thomas v. Cornerstone Servs., Inc.*, 2026 IL App (3d) 240568. Although the Court understands the potential impact of a Seventh Circuit decision in Defendant's favor in *Payton*, given the long, drawn-out history of this case, the Court believes that justice would not be served by delaying a decision even further.

It is undisputed that Defendant was a government contractor during the relevant time period. It is also undisputed that none of Defendant's government contracts were related specifically to the AGS and the finger scanning device or process. Given these undisputed facts, the question is purely legal: Does Section 25(e) exempt a contractor from liability for BIPA violations outside the scope of its government contracts? The answer is no.

In *Thomas v. Cornerstone Servs., Inc.*, the state appellate court heard an interlocutory appeal on this exact issue and concluded "the government contractor exemption applies only to exempt a contractor from liability when acting within the scope of its government contract." 2026 IL App (3d) 240568, ¶ 4. Specifically, the court held that "the unambiguous construction of the phrase 'when working for' is not merely temporal; rather, it also qualifies the conduct exempted such that a government contractor is immunized from liability under the Act only when its violation occurred when acting within the scope of its governmental contractual relationship." *Id.* In other words, "[a] government contractor is not exempt when it violates the Act while pursuing private undertakings outside of its government contractual responsibilities." *Id.* ¶ 27. Another court in this district considered the same exact issue and reached the same conclusion. *Payton v. Union Pac. R.R. Co.*, No. 24 C 153, 2025 WL 2462963, at *3 (N.D. Ill. Aug. 25, 2025) (Alonso, J.)

(interpreting the phrase "when working for" in Section 25(e) to "require a nexus between the BIPA violation and the scope of the defendant's work with the government."), *motion to certify appeal granted*, No. 24 C 153, 2025 WL 3012662 (N.D. Ill. Oct. 28, 2025).

Neither the arguments raised by Defendant nor the facts of this case give the Court any reason to depart from *Thomas* and *Payton*. Section 25(e)'s use of the phrase "when working for" limits applicability of the government contractor exemption to cases where the alleged BIPA violations occurred within the scope of the government contract. Some of the government contracts held by Defendant in this case may have been broadly aligned with the goals of the AGS and its finger scanning process, but it is a stretch to say that the finger scans were within the scope of any of the contracts referenced by Defendant. Judge Alonso reached the same conclusion on nearly, if not identical facts and arguments in *Payton*. 2025 WL 2462963, at *3. Because Defendant's government contract exemption argument fails on the merits as a matter of law, the Court need not reach the issues of forfeiture or applicability to federal government contracts.

Accordingly, Defendant's motion for summary judgment under BIPA's government contractor exemption is denied. Plaintiffs' request for summary judgment in their favor on this issue under Rule 56(f)(1) is denied, again to avoid application of the rule against one-way intervention.

**D. <u>ICCTA Preemption</u>**

Defendant also moves for summary judgment on the issue of whether the Interstate Commerce Commission Termination Act ("ICCTA") preempts Plaintiffs' claims. This argument has been rejected twice already in this case, but those rulings were made at the pleadings stage and expressly permitted Defendant to reassert the argument at a later stage "if the facts borne out in discovery, any intervening changes in law, or other compelling reasons justify raising the arguments again at class certification or summary judgment[.]" (Dkts. 47, 266). Relying on

evidence of supposed inefficiencies caused by BIPA compliance and a patchwork of state biometric privacy laws, Defendant again claims that the ICCTA preempts this action.

The ICCTA "confer[s] 'exclusive' jurisdiction over the regulation of railroad transportation on[] the Surface Transportation Board[.]" *Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 894 (7th Cir. 2017). Specifically, the preemption provision states:

> (b) The jurisdiction of the Board over--
>
> > (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
> >
> > (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b). "Transportation" is defined "broadly to include railroad property, facilities, and equipment 'related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use.'" *Wedemeyer*, 850 F.3d at 894 (quoting 49 U.S.C. § 10102(9)). The ICCTA does not define "regulation," but the Seventh Circuit has "observed that 'Congress's intent in the [ICCTA] to preempt state and local regulation of railroad transportation has been recognized as broad and sweeping.'" *Id.* (quoting *Union Pac. R.R. Co. v. Chi. Transit Auth.*, 647 F.3d 675, 678 (7th Cir. 2011)).

There are two types of preemption under ICCTA: categorical and as applied, the latter of which Defendant asserts in this case. *Id.* A state law can be preempted "as applied" depending "on the degree of interference that it has on railroad transportation—that is, if the [law] would have

the effect of preventing or unreasonably interfering with railroad transportation." *Id.* at 895 (citing *Union Pac.*, 647 F.3d at 679 & n.3). To establish unreasonable interference, the impact must be "significant." *Rogers v. BNSF Ry. Co.*, No. 19 C 3083, 2022 WL 787955, at *5 (N.D. Ill. Mar. 15, 2022) (citing *Union Pac.*, 647 F.3d at 683). As Judge Alonso previously recognized in this case, it is well-settled that ICCTA does not "preempt those state or local laws that have a more remote or incidental impact on rail transportation[,]" *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 158 (4th Cir. 2010), and, "[n]otwithstanding the 'expansive' definition of transportation, all of the circuits have concluded that [ICCTA] 'does not encompass everything touching on railroads[,]'" *Delaware v. Surface Transp. Bd.*, 859 F.3d 16, 18 (D.C. Cir. 2017) (quoting *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1129 (10th Cir. 2007) (citing *Wedemeyer*, 850 F.3d at 894-895).

Defendant argues that BIPA unreasonably interferes with railroad transportation because a patchwork of state biometric privacy laws (e.g., Illinois, Texas, California, Washington, and New York) set different standards for facilities in different states, thereby making compliance overly burdensome. Operationally, Defendant claims that compliance with BIPA would cause delays and inefficiencies transporting freight at its intermodal facilities. Specifically, Defendant's industry expert opines that requiring consent would cause delays of three to four minutes per driver during registration, which in turn would cause back-up and missed connections. As an example, Defendant points to delays during the COVID-19 pandemic, when its employees had to confirm drivers' identities through alternative means because many refused to use the finger scanning device due to health concerns.

Although some of the arguments advanced by Defendant in this case differ from those made in *Rogers*, a case essentially involving the same underlying facts and issues, the Court

reaches the same conclusion. Setting aside immaterial factual disputes, Defendant's claimed adverse impact of BIPA compliance remains highly speculative and the current record does not support a finding of unreasonable interference. As Plaintiffs note, Defendant's regulatory patchwork argument is unsupported by any actual evidence because it does not use biometrics at all of its facilities around the country and is also belied by Defendant's post-suit consent regime, which employed a uniform consent to satisfy the biometric privacy laws of various states in a single process. Defendant's inefficiency and delay argument fails because it relies on conjecture and anecdotal evidence, both of which are insufficient for a reasonable jury to find that BIPA compliance would have a significant impact on Defendant's operations such that it would unreasonably interfere with railroad transportation. As the court in *Rogers* suggested, "[e]vidence about compliance costs relative to transportation costs, for example, could shed light on the reasonableness of having to implement such changes[,]" but no such evidence has been offered here. 2022 WL 787955, at *6. At bottom, the Court agrees that "BIPA has nothing to do with regulating rail transportation[,]" (Dkt. 47 at 294) (quoting *Rogers v. BNSF Ry. Co.*, No. 19 C 3083, 2019 WL 5635180 at *2 (N.D. Ill. Oct. 31, 2019)), and the arguments and evidence put forth by Defendant show, at most, that BIPA compliance may have a remote or incidental impact on its rail transportation operations. This is not enough to establish ICCTA as-applied preemption based on unreasonable interference. Accordingly, Defendant's motion for summary judgment based on ICCTA preemption is denied.

**E. <u>Verification Scans</u>**

Next, Defendant's summary judgment motion seeks a determination that the amendment to BIPA adding Sections 20(b) and 20(c) applies retroactively to this case and Plaintiffs therefore are not entitled to separate recoveries for verification scans. Since briefing the matter, the Seventh Circuit addressed retroactivity, holding that Sections 20(b) and (c) "appl[y] retroactively to cases

pending at the time [they were] enacted." *Clay*, 171 F.4th 97at 979. As a result, Plaintiffs now concede that they cannot recover damages for verification scans and have thus amended their Rule 26(a)(1) disclosures to remove damages calculations based on verification scans. (Pls.' Supp. Brief at 14557, Dkt. 403). Accordingly, the question of whether Sections 20(b) and 20(c) apply retroactively to this case and foreclose additional recoveries based on verification scans is moot.

**F. Section 15(a) Retention Claims**

Turing to arguments aimed at specific claims, Defendant moves for summary judgment on Plaintiffs' illegal retention claims under Section 15(a), which provides that "[a] private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the *initial purpose* for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." 740 ILCS 14/15(a) (emphasis added).

According to Defendant, the initial purpose of collecting composite images at registration was to facilitate the efficient verification of drivers entering its Illinois intermodal facilities, and the best practice is to keep composite images to ensure that it could later use a newer algorithm to more reliably extract templates from them, if such an algorithm became available. Plaintiffs respond that Defendant should not have retained composite images of their fingerprints after being used to create templates during the AGS registration process because verification scans used only templates, not composite images, so the initial purpose for collecting them had been satisfied. Because the allegations of the third amended complaint (i.e., retaining Plaintiff Turner's biometrics after he stopped accessing Defendant's facilities) assert a different basis for the retention claims than Plaintiffs advance in their briefs (i.e., retaining composite images after templates were

created), Defendant argues that Plaintiffs should not be allowed change the allegations through their summary judgment briefs.

As an initial matter, although Plaintiffs' briefs shift the theory of their illegal retention claims from the operative complaint, the Court will allow them to constructively amend the pleading. *See Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023) (holding "that district courts retain discretion to interpret new factual allegations or claims presented in a plaintiff's briefs as a constructive motion to amend."); *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017) (noting that "the district court has discretion to deny the *de facto* amendment and to refuse to consider the new factual claims[,]" if, "when a new argument is made in summary judgment briefing," the plaintiff "may be attempting in effect to amend its complaint" by changing "the complaint's factual theory," as opposed to "just the legal theories plaintiff has pursued so far."). Although "[i]t will rarely be appropriate to [treat new claims presented for the first time in briefing as a constructive motion to amend,]" *Schmees*, 77 F.4th at 490, the Court concludes that constructive amendment should be permitted because the general principles governing amendment of a complaint are satisfied here.

The third amended complaint alleges that "[t]he initial purpose of collecting and obtaining Plaintiff Turner's and the Subclass's biometrics was to permit their entry for the purpose of picking up and/or dropping off their employers' freight" and claims Defendant violated BIPA section 15(a)'s retention and destruction requirements by failing to destroy biometrics after Defendant learned the drivers were no longer registered to haul freight with the employer they worked for when accessing Defendant's facilities. (TAC ¶¶ 72-74). After filing the third amended complaint, Plaintiffs obtained evidence of the composite images of the fingerprints, discovered that Defendant was unaware the AGS even saved composite images, and learned that Turner's employer never

informed Defendant that he was no longer registered to haul freight. Thus, the change to the illegal retention claim Plaintiffs seek to make through their briefs is based on facts identified through discovery that were previously unknown, does not conflict with the prior allegations, and is consistent with the operative pleading. The consequences of this constructive amendment are not unjust for Defendant. The underlying facts could have been known by Defendant throughout the case, so they should not come as a surprise. Discovery and briefing on class certification and summary judgment are complete, so Defendant has already had an opportunity to address the claims and there will be no added cost, delay, or undue prejudice associated with it. Accordingly, Plaintiffs are permitted to update the theory of their retention claims from focusing on whether Defendant timely destroyed biometrics after a driver stopped accessing the facility to when composite images of the fingerprints themselves were no longer useful.

On the merits, Defendant's arguments fail as well. It is undisputed that the initial purpose of collecting composite images was "to facilitate the efficient verification of the identity of drivers seeking to access [its] intermodal facilities." (P-RSOAF ¶ 4, Dkt. 391-1). However, Defendant attempts to bootstrap the purposes of "continually evaluat[ing] the gate access processes at [Defendant's] Illinois intermodal facilities and looking for ways to improve those processes, including technological improvements[,]" and "keep[ing] CompositeIMs to ensure that [Defendant] could later use a newer algorithm to more reliably extract templates from existing CompositeIMs, if such an algorithm became available." (Pls.' Resp. to Def.'s Stmt. of Facts (P-RSOF) ¶¶ 75-76, Dkt. 360-1). Besides the declaration of Defendant's representative generally confirming that the company continually evaluates gate access processes for technological improvement, (D-SOF, Ex. 3 (Hayden Decl.) ¶ 16, Dkt. 331-1 (Sealed)), there has not been any evidence submitted of this purpose existing during the relevant time period, let alone actually being

acted upon. Furthermore, although Defendant disputes that composite images appeared as images because they were stored as computer code, Defendant does not dispute that none of its employees even knew composite images were stored as part of the AGS registration process. (*See* P-RSOAF ¶ 34, Dkt. 383). If Defendant did not know the AGS stored composite images, how could Defendant have had the purpose of retaining them to continually evaluate its gate access processes through technological improvements? Clearly, that was not Defendant's purpose for retaining the images.

More importantly, Defendant's stated purpose for retaining the images does not give rise to a defense under the plain language of the statute. Section 15(a) requires destruction after the *initial* purpose has been satisfied. Here, the undisputed facts show that the initial purpose for scanning Plaintiffs' fingerprints and creating composite images of them was, in turn, to create a template that could be used in the future to verify their identity during subsequent visits to Defendant's facilities. Even assuming Defendant did in fact retain composite images for the purpose of evaluating and importing their gate access technology, that purpose was *additional* and *subsequent* to the initial purpose of registering drivers with the AGS.

Defendant's motion for summary judgment on Plaintiffs' Section 15(a) illegal retention claims is therefore denied.

### G. <u>Section 15(d) Claims</u>

Next, Defendant moves for summary judgment on Plaintiffs' Section 15(d) claims, arguing that it did not disclose, redisclose, and/or disseminate Plaintiffs' biometrics in violation of 740 ILCS 14/15(d) because it merely granted access to Remprex and Nascent and did not affirmatively transfer biometrics to them. Specifically, although Defendant concedes that it granted Remprex temporary access to its servers, Defendant maintains that it did not hand that data over to Remprex or provide Remprex with a copy of the data and neither Remprex nor Nascent personnel possessed

or received copies of the finger scan data on the AGS servers, nor did they have the ability to download finger scan data from the databases. On the other hand, Plaintiffs claim that Defendant violated Section 15(d) by giving Remprex and Nascent access to the biometric databases, including "primary and unlimited access to the AGS databases and the data therein" for Remprex and "side-by-side" access for Nascent through Remprex. (P-RSOAF ¶¶ 22-23, Dkt. 391-1).

Section 15(d) of BIPA provides that "[n]o private entity in possession of a biometric identifier or biometric information may *disclose, redisclose, or otherwise disseminate* a person's . . . biometric identifier or biometric information unless" the person consents. " 740 ILCS 14/15(d) (emphasis added). "The ordinary meaning of 'disclose' connotes a new revelation." *Cothron v. White Castle Sys., Inc.*, 20 F.4th 1156, 1163 (7th Cir. 2021) (citing *Disclose*, Black's Law Dictionary (11th ed. 2019) ("To make (something) known or public; to show (something) after a period of inaccessibility or of being unknown; to reveal.")). To "reveal," means "to open up to view," *Reveal*, Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/reveal (last visited Aug. 10, 2026). "[T]he catchall language . . . mak[ing] it unlawful to ". . . *otherwise disseminate*" a person's biometric identifier . . . may simply be a way to ensure that all disclosure-like acts are covered." *Id.* at 1164. Transferring biometrics to third parties, including vendors, counts as disclosure. *Thompson*, 2023 WL 9019107, at *5 (citing *Namuwonge v. Kronos, Inc.*, 418 F. Supp. 3d 279, 285 (N.D. Ill. 2019); *Dixon v. Washington & Jane Smith Cmty.-Beverly*, No. 17 C 8033, 2018 WL 2445292, at *9 n.5 (N.D. Ill. May 31, 2018)). Under the plain and ordinary meaning of the statute, so does granting access.

In *Thompson*, the court granted summary judgment to the plaintiff on its Section 15(d) claims where the evidence showed that the defendant's payroll vendor "would have access" to the data through the payroll system, but that is because the "timeclocks were 'always live' and

'connected to the server with [the vendor.]'" *Id.* Here, it is undisputed that the composite images and templates were saved on Defendant's on-site servers, so it is not quite the same. Remprex and Nascent had *access* to the data, but the data was never *transferred* to their servers from Defendant.

Still, by *granting access* to the biometrics database to Remprex and Nascent, Plaintiff took an affirmative step "to show [the biometrics] after a period of *inaccessibility* or of being unknown[.]" *See Disclose*, Black's Law Dictionary (emphasis added). Indeed, Defendant "revealed" the biometrics database to Remprex and Nascent by "opening it up" for them "to view." *See Reveal*, Merriam-Webster. In *Namuwonge*, the court compared BIPA's use of the terms "transmission" and "disclosure," finding that "transmit" means "[t]o send or transfer (a thing) from one person or place to another" but that the meaning of the word "disclosure" "is broader and more varied." *Namuwonge*, 418 F. Supp. 3d at 285 (citing Black's Law Dictionary and comparing language of BIPA Sections 15(d) and 15(e)). *Namuwonge* supports the Court's broad interpretation of the word "disclose" to include actions like affirmatively granting access to biometrics.

Accordingly, Defendant's motion for summary judgment on the issue of whether it disclosed Plaintiffs' biometrics in violation of 740 ILCS 14/15(d) is denied.

### H. <u>Damages for Violations of Sections 15(b) and 15(d)</u>

With respect to damages, Defendant seeks a determination limiting the number of BIPA violations and corresponding recoveries. Although *Clay's* holding that Sections 20(b) and 20(c) are retroactive mooted the issue of whether Plaintiffs may be entitled to separate recoveries for verification scans, two important questions regarding the potential damages available remain unanswered: (1) whether Plaintiffs are entitled to separate recoveries for composite images and templates; and (2) whether Plaintiffs are entitled to separate recoveries for each finger they scanned. Defendant argues that each driver is entitled to, at most, one recovery under Sections 15(b) and 15(d) regardless of how many composite images and templates were created and how

many fingers were scanned. Plaintiffs maintain that each driver is entitled to separate recoveries for each composite image and each template of each different finger. Under Plaintiffs' theory of damages, there would be a total of 207,901 separate violations, which entitle them to, at most, the same number of recoveries. Under Defendant's theory, damages would essentially be available on a per-person basis only.

Defendant's motion raises the first issue of whether composite images and templates constitute separate violations and therefore give rise to separate recoveries, (Dkt. 328 at 5692), but the second question of whether scans of different fingers constitute separate violations giving rise to separate recoveries is addressed primarily through the briefing on Plaintiffs' summary judgment motion. Because the issues are so closely intertwined, to rule on one but not the other could violate the rule against one-way intervention. Accordingly, the Court declines to resolve those issues at this time and denies Defendant's motion as to the number of violations and corresponding recoveries as premature.

## I. <u>Judicial Estoppel</u>

Shifting to affirmative defenses, Defendant argues Fleury's claims are barred under the doctrine of judicial estoppel because he failed to initially disclose his BIPA claims as assets in his chapter 13 bankruptcy case. Judicial estoppel prohibits a person from recovering on a cause of action, if that person concealed or denied owning the claim in an earlier bankruptcy proceeding. *Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006). However, judicial estoppel generally does not apply where a person timely amends their bankruptcy filings to disclose the asset. *Id.* at 449 ("[A] debtor in bankruptcy is bound by her own representations, no matter why they were made, at least until the debtor moves to amend the disclosures and pay the creditors their due."). Because "[a] Chapter 13 estate encompasses all property, including legal claims, acquired after the petition is filed and before the case is closed[,]" *Rainey v. United Parcel Serv., Inc.*, 466 F. App'x

542, 544 (7th Cir. 2012) (citing 11 U.S.C. §§ 541(a)(1), 1306(a)(1)), a debtor has a duty to disclose claims that accrue during the pendency of a chapter 13 case, *id.* (citing *In re Waldron*, 536 F.3d 1239, 1244 (11th Cir. 2008)). As long as an asset is disclosed while a chapter 13 bankruptcy is pending, trustees and creditors have an opportunity to seek relief, and debtors, who manage their own assets during chapter 13 cases, can pursue any disclosed claims. *Id.*

Defendant claims Fleury engaged in "procedural sleight-of-hand" by failing to initially list his BIPA claims as an asset in his bankruptcy case and only eventually disclosed them "after being caught[.]" (Def.'s MSJ at 5694). Essentially, Defendant argues that Fleury did not disclose this action as early as possible and waited until it was advantageous to do so. Fleury responds that it was simply an "oversight" and the sequence of events demonstrates as much. After Plaintiffs pointed out inaccuracies with Defendant's timeline vis-à-vis the scheduling of Fleury's BIPA claims in his bankruptcy case, Defendant replied with generic statements of law regarding judicial estoppel and did not meaningfully address Plaintiffs' response.

The record and undisputed facts regarding Fleury's bankruptcy and BIPA claims do not support the application of judicial estoppel to bar his BIPA claims. The undisputed timeline is as follows: Fleury filed chapter 13 bankruptcy in December 2017, first scanned his finger during AGS registration with Defendant in November 2018, and filed this suit in December 2019; Defendant asserted a generic estoppel defense in July 2021; Fleury amended his bankruptcy schedules to disclose his BIPA claims in January 2022, and ultimately received a discharge in June 2022; Defendant learned of Fleury's bankruptcy case in January 2023, and amended its responsive pleading to add a bankruptcy-specific judicial estoppel defense in February 2023.

As an initial matter, the Court agrees with Plaintiffs that the timeline defeats the main thrust of Defendant's position. Fleury's BIPA claims had not accrued when he initially filed his

bankruptcy case and there is nothing in the record to suggest that he concealed or delayed disclosure of those claims for any improper purpose. Unlike many of the cases cited by Defendant where courts applied judicial estoppel based on a plaintiff/debtor's failure to schedule a claim in an earlier bankruptcy, Fleury did not have knowledge of the BIPA claims when the bankruptcy was filed in December 2017, and he amended his schedules while the case was still open. Fleury (and his bankruptcy counsel) would not have known about the BIPA claims until as early as November 2018, when he first scanned his finger, or as late as December 2019, when he filed this case. Fleury amended his schedule to disclose the BIPA claims as an asset in January 2022, and there is no evidence contradicting his position that it was simply an oversight resulting from disconnect between Fleury, his bankruptcy counsel, and his counsel in this case. Critically, because Fleury amended his bankruptcy schedules to disclose the BIPA claims during his bankruptcy case, any concerns about "perversion of the judicial process," *Cannon-Stokes*, 453 F.3d at 448 (quoting *In re Cassidy,* 892 F.2d 637, 641 (7th Cir. 1990)), or him benefiting from the delayed disclosure at the expense of creditors, *Rainey*, 466 F. App'x at 544-545, are alleviated. The trustee and creditors would have had an opportunity to seek relief in the bankruptcy case before Fleury completed his plan and received a discharge. Accordingly, Defendant's motion for summary judgment against Fleury under the doctrine of judicial estoppel is denied.

### J. <u>Post-Suit Consent</u>

Finally, Defendant argues that it is entitled to summary judgment on any Section 15(b) and 15(d) claims arising from finger scans Fleury provided and any disclosures made after June 10, 2020, when he consented to Defendant's biometric policy. Plaintiffs respond that Fleury does not seek damages for finger scans or disclosures that occurred after consent, and such claims are excluded by operation of the proposed class definition, which sets an outer limit for claims prior

to any written consent according to Defendant's records. Accordingly, Defendant's motion for summary judgment based on post-suit consent is moot.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for class certification (Dkts. 312, 313, 318) is granted; Defendant's motion for summary judgment (Dkt. 328) is denied; Plaintiffs' motion for summary judgment (Dkt. 334, 336) is denied without prejudice; and the parties' respective motions to exclude expert testimony (Dkts. 349, 351, 378) are granted in part and denied in part.

**DATED**: August 20, 2026

**ENTERED**:

LaShonda A Hunt

LASHONDA A. HUNT
United States District Judge