**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DAVID FLEURY and ALVIN TURNER, individually and on behalf of similarly situated individuals,

Plaintiffs,

v.

UNION PACIFIC RAILROAD COMPANY, a Delaware corporation,

Defendant.

Case No. 1:20-cv-00390

District Judge LaShonda A. Hunt

# DEFENDANT UNION PACIFIC RAILROAD COMPANY'S OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

Sean M. Berkowitz
Gary Feinerman
Johanna Spellman
Kathryn A. Running
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700

Michael S. Rubin
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600

*Counsel for Defendant Union Pacific Railroad Company*

**TABLE OF CONTENTS**

**Page**


I. INTRODUCTION ........ 1

II. FACTUAL BACKGROUND ........ 2

A. UP Implemented The AGS At Its Illinois Intermodal Facilities ........ 2

B. The Lumidigm Device Scanned Subdermal Information Only, Not The Friction Ridges From The Surface Of The Finger That Are Essential Components Of Fingerprints Under All Accepted Standards ........ 3

C. UP's Federal Subcontracts Covered Drivers' Handling Of Shipments Through Its Illinois Intermodal Facilities ........ 6

D. Certain Employees of UP Contractors Remprex And Nascent Had Access To The AGS Servers In Order To Troubleshoot Technical Issues, But Not To Access The Data Stored On Those Servers ........ 8

E. Plaintiffs Misrepresent A Good-Faith Discovery Dispute Regarding The Scope Of AGS Data Relevant And Proportionate To The Case ........ 9

III. ARGUMENT ........ 9

A. The Drivers' Finger Scans Were Not Fingerprints (MSJ Issue 1) ........ 10

1. Whether The Lumidigm Device Captured Fingerprints Is A Factual Question Requiring Expert Testimony ........ 11

2. The Lumidigm Device Did Not Capture Fingerprints ........ 14

3. Images Rendered From CompositeIMs Do Not Establish That The Data Are Fingerprints Or Images Of Fingerprints. ........ 17

4. The Evidence Cited By Plaintiffs Does Not Establish The Lumidigm's Multispectral Imaging Technology Captured Fingerprints. ........ 20

5. This Case Is Not A Replay Of *Rogers v. BNSF Railway*. ........ 21

B. UP Was Not Subject to BIPA (MSJ Issues 2-6) ........ 22

1. UP Is Exempt From BIPA Liability As A Federal Subcontractor ........ 23

2. ICCTA Preempts Plaintiffs' BIPA Claims In Their Entirety ........ 28

C. UP Retained Registration Finger Scan Data Consistent With The Initial Purpose For Which It Was Collected (MSJ Issue 4) ....33

D. UP Did Not Disclose Finger Scan Data To Remprex Or Nascent (MSJ Issue 5) ....34

E. Plaintiffs Have Not Established UP Committed Any Violations Of Sections 15(a), 15(b), Or 15(d) (Plaintiffs' MSJ Issues 2-6) ....37

IV. CONCLUSION ....40

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Andersen v. City of Chicago*,
454 F. Supp. 3d 801 (N.D. Ill. 2020) ....................12

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................10

*Castro v. DeVry Univ., Inc.*,
786 F.3d 559 (7th Cir. 2015) ....................36

*Cisneros v. Nuance Communications, Inc.*,
-- F.4th --, 2026 WL 2542772 (7th Cir. Aug. 28, 2026) ....................23

*City of Cayce v. Norfolk S. Ry. Co.*,
706 S.E.2d 6 (S.C. 2011) ....................31

*Clay v. Union Pac. R.R. Co.*,
171 F.4th 975 (7th Cir. 2026) ....................38, 39, 40

*Contour PAK, Inc. v. Expedice, Inc.*,
2009 WL 2490138 (D. Colo. Aug. 14, 2009) ....................27

*Cothron v. White Castle Sys., Inc.*,
20 F.4th 1156 (7th Cir. 2021) ....................34, 38

*Cothron v. White Castle Sys., Inc.*,
216 N.E.3d 918 (Ill. 2023) ....................18

*Cox Enters. v. Hiscox Ins. Co.*,
478 F. Supp. 3d 1335 (N.D. Ga. 2020) ....................34

*CSX Transp. Inc.*,
2005 WL 584026 (S.T.B. May 3, 2005) ....................29, 30

*Delaware v. STB*,
859 F.3d 16 (D.C. Cir. 2017) ....................31

*Doe v. Apple Inc.*,
2026 WL 3024809 (S.D. Ill. Sept. 30, 2026) ....................21

*Drabinsky v. Actors' Equity Ass'n*,
106 F.4th 206 (2d Cir. 2024) ....................24

*Fayus Enters. v. BNSF Ry. Co.*,
602 F.3d 444 (D.C. Cir. 2010) ....................29, 31

*Ferris v. Convergent Outsourcing, Inc.*,
2019 WL 13254372 (N.D. Ill. July 15, 2019)....................23

*Fleury v. Union Pac. R.R. Co.*,
528 F. Supp. 3d 885 (N.D. Ill. 2021) ....................28

*Green Mtn. R.R. Corp. v. Vermont*,
404 F.3d 638 (2d Cir. 2005)....................31

*Howe v. Speedway*,
2024 WL 4346631 (N.D. Ill. Sept. 29, 2024) ....................12, 13, 19

*Johnson v. Advoc. Health & Hosp. Corp.*,
892 F.3d 887 (7th Cir. 2018) ....................10

*Kislov v. Am. Airlines, Inc.*,
2022 WL 846840 (N.D. Ill. Mar. 22, 2022)....................30

*Konow v. Brink's, Inc.*,
2024 WL 942553 (N.D. Ill. Mar. 5, 2024)....................18

*Law v. GM Corp.*,
114 F.3d 908 (9th Cir. 1997) ....................31

*Marctante v. City of Chicago*,
657 F.3d 433 (7th Cir. 2011) ....................10

*McHenry Cnty. v. Raoul*,
44 F.4th 581 (7th Cir. 2022) ....................26

*Mid-America Reg'l Bargaining Ass'n v. Will Cnty. Carpenters Dist. Council*,
675 F.2d 881 (7th Cir. 1982) ....................24

*Mid-Continent Cas. Co. v. Basdeo*,
742 F. Supp. 2d 1293 (S.D. Fla. 2010) ....................27, 28

*Moore v. Astrue*,
851 F. Supp. 2d 1131 (N.D. Ill. 2012) ....................27

*N.Y. Susquehanna & W. Ry. Corp. v. Jackson*,
500 F.3d 238 (3d Cir. 2007)....................31, 33

*Norfolk S. Ry Co. v. City of Alexandria*,
608 F.3d 150 (4th Cir. 2010) ....................31

*Payton v. Union Pacific Railroad Company*,
192 F.4th 796 (7th Cir. 2026) ....................24, 25, 26

*Rep. Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*,
2019 WL 12536877 (N.D. Ill. Mar. 28, 2019)....................10, 34

*Rivera v. Google Inc.*,
238 F. Supp. 3d 1088 (N.D. Ill. 2017) ....................18, 19

*Rogers v. BNSF Railway Co.*,
No. 19-cv-3083 (N.D. Ill.) ....................14, 21

*Thompson v. Matcor Metal Fabrication (Ill.) Inc.*,
No. 2020-CH-00132 (Tazewell Cnty., Ill.) (Dec. 7, 2023)....................19, 20

*United States v. Glover*,
479 F.3d 511 (7th Cir. 2007) ....................13

*United States v. Herrera*,
704 F.3d 480 (7th Cir. 2013) ....................13

*United States v. Ware*,
69 F.4th 830 (11th Cir. 2023) ....................13

*United States v. Washington*,
596 U.S. 832 (2022)....................26

*Vance v. IBM*,
2020 WL 5530134 (N.D. Ill. Sept. 15, 2020) ....................19

*Vill. of Sauk Vill. v. Roadway Exp., Inc.*,
2017 WL 378277 (N.D. Ill. Jan. 25, 2017)....................12

*Wagoner v. CSX Transp., Inc.*,
246 F. Supp. 2d 1002 (N.D. Ind. 2003) ....................37

*Wedemeyer v. CSX Transp. Inc.*,
850 F.3d 889 (7th Cir. 2017) ....................28, 31

## STATUTES

225 ILCS 447/5-10 ....................11

740 ILCS
14/1 *et seq.* ....... 1
14/10 ....... *passim*
14/15 ....... 10
14/15(a) ....... 33
14/20(b) ....... 38, 39, 40
14/20(c) ....... 38, 39, 40
14/25(c) ....... 23
14/25(e) ....... 23

49 U.S.C. § 10501(a)-(b) ....... 28

Cal. Civ. Code § 1798 ....... 29

N.Y. Gen. Bus. Law
§ 899-aa ....... 29
§ 899-aa(b)(5) ....... 30

Tex. Bus. & Com. Code Ann. § 503.001 ....... 29

Wash. Rev. Code Ann.
§ 19.375 ....... 29
§ 19.375.010(1) ....... 30

**RULES**

Fed. R. Civ. P.
26(e)(1) ....... 7
56(c) ....... 10

**TREATISES**

Black's Law Dictionary ....... 34

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article VI, cl. 2 ....... 26

**OTHER AUTHORITIES**

CSX Transportation, Inc.--Petition for Declaratory Order, 2005 WL 1024490 (2005) ....... 31

S. Rep. No. 104-176 ....... 30

Thomas Tubbs—Petition for Declaratory Order, No. 35792, 2014 WL 5508153 (S.T.B. Oct. 31, 2014) ....... 30

## I. INTRODUCTION

Ignoring fundamental facts about Union Pacific's ("UP") finger scanning device and settled Illinois law, Plaintiffs ask the Court to hold that UP violated the Illinois Biometric Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA" or the "Act"), simply because the device was used to verify drivers' identifications. Plaintiffs do not grapple with the technology the device used, and instead urge the Court to adopt their "I-know-it-when-I-see-it" approach to determining whether it captured fingerprints and to accept the word of a non-expert in biometrics and fingerprints whose opinions on those subjects have been excluded. Dkt. 405 at 23. Plaintiffs also resort to disparaging UP's integrity—and that of its counsel and witnesses—but intemperate rhetoric is no substitute for evidence and legal support. Plaintiffs' motion should be denied.

*First*, UP did not scan Plaintiffs' "fingerprints," and thus did not collect their "biometric identifiers" or "biometric information." Scott Swann, a biometrics and fingerprint expert, opined that the finger scanning device scanned only subdermal information, which does not constitute "fingerprints" under any accepted law enforcement or scientific fingerprint standard. Even setting aside Swann,[1] Michael French, a biometric technology expert, concluded that the images generated by the device did not satisfy FBI standards for what constitutes a fingerprint. And lay witness testimony confirms that the device did not capture fingerprints.

*Second*, UP was not subject to BIPA for two separate reasons: (1) at all relevant times, it was a government contractor under Section 25(e) and thus not covered by the Act; and (2) the

[1] Plaintiffs' renewed motion repeats the issues and arguments presented in their initial motion for partial summary judgment. While the August 20, 2026 Order, Dkt. 405, includes rulings relevant to those issues, including its exclusion of Swann's opinions on this subject, UP reasserts its arguments in opposition to Plaintiffs' renewed motion for completeness and, if necessary, to preserve its positions for appeal. UP also notes that it contemporaneously (i) moves to clarify the August 20, 2026 Order as it pertains to certain opinions of UP expert Scott Swann and (ii) moves for partial reconsideration of the August 20, 2026 Order or, in the alternative, to certify it for interlocutory appeal.

federal Interstate Commerce Commission Termination Act ("ICCTA") preempts Plaintiffs' claims. Because it was not subject to BIPA, and regardless of whether the finger scans were in fact fingerprints, UP was not obligated to obtain consent from drivers before they provided their finger scans or to have a BIPA-compliant retention and destruction policy.

*Third*, as to the Section 15(a) claim, UP retained Plaintiffs' finger scan data consistent with the purposes for which it was obtained—to facilitate the efficient verification of drivers entering its Illinois intermodal facilities. Retaining that data enabled UP to take advantage of technological developments that could lead to more accurate and efficient identification verification.

*Fourth*, as to the Section 15(d) claim, UP did not disclose Plaintiffs' finger scans to third parties. Rather, UP merely provided two contractors with access to databases to provide technological support for the automated gate system ("AGS") at issue. Such access was not disclosure, redisclosure, or dissemination of biometric data under Section 15(d). And Plaintiffs fail to cite evidence showing any third-party employee accessed the finger scan data.

*Fifth*, putting aside the foregoing and assuming liability, the 2024 BIPA amendment limits them to "one recovery" for a "single violation" each of Sections 15(b) and 15(d).

In sum, Plaintiffs fall far short of carrying their summary judgment burden.

## II. FACTUAL BACKGROUND

### A. UP Implemented The AGS At Its Illinois Intermodal Facilities

As a Class I interstate railroad, UP owns and operates intermodal facilities throughout the United States. *See* UP LR 56.1(b)(3) Statement of Additional Material Facts ("UP SAMF") ¶ 1. During the class period, UP owned and operated four intermodal facilities in the Chicago area: Global I, Global II, Global III, and Global IV. *Id.* ¶¶ 1-2. To ensure the safety and security of individuals, physical infrastructure, and customer cargo, UP verifies the identities of commercial truck drivers who deliver cargo to and remove cargo from its intermodal facilities. *Id.* ¶ 4.

In 2013, UP began using an automated gate system ("AGS"), which used a system and software manufactured by Nascent Technology, LLC, at its intermodal facilities to facilitate the efficient verification of driver identities. *Id.* ¶¶ 5, 8. UP licensed Nascent's system through Remprex, LLC, an "operations service provider" that provided project management services, including maintenance and support relating primarily to the system's hardware—*i.e.*, a physical finger scanning device. *Id.* ¶ 9. By the end of 2021, UP no longer used the AGS for driver verification at its intermodal facilities. *Id.* ¶ 22.

**B. The Lumidigm Device Scanned Subdermal Information Only, Not The Friction Ridges From The Surface Of The Finger That Are Essential Components Of Fingerprints Under All Accepted Standards**

The AGS incorporated a sensor developed by Lumidigm Inc. that used multispectral imaging technology to scan drivers' fingers to verify their identities. *Id.* ¶¶ 11-12, 17.[2] The sensor used multispectral imaging technology to visually penetrate the skin and scan "subdermal" information—not the friction ridge skin of the fingertip. *Id.* ¶ 12. In doing so, the sensor imaged physical structures below the skin's surface, such as papillae (tissue that connects the outer layer of skin to subsurface layers) and capillaries (blood vessels). *Id.* ¶¶ 32-33.

Truck drivers using the AGS for the first time underwent a registration process. *Id.* ¶ 10. Drivers would place their commercial driver's license ("CDL") face down on a scanner and place at least one finger on the Lumidigm sensor to be scanned. *Id.* ¶ 11. The sensor used multispectral imaging to scan subdermal information—which, as noted, came from beneath the finger's surface—and encode it into "CompositeIM," a string of hexadecimal code representing the subdermal information detected by the sensor. *Id.* ¶¶ 12-14. The sensor then translated the

[2] Lumidigm was acquired by HID Global Corporation in 2014. *See* UP LR 56.1(b)(2) Response to Plaintiffs' Local Rule 56.1(a)(2) Statement ("UP SUMF Resp.") ¶ 13.

CompositeIM into "TemplateBIN," a shorter template code. *Id.* ¶¶ 15-16.[3] Data from the registration process, including CompositeIMs and TemplateBINs, were stored on servers owned by UP and accessible only to UP employees and its contractors. *See* UP SUMF Resp. ¶¶ 36, 58, 60.

Once a driver registered, he could enter a UP intermodal facilities by scanning his finger on a Lumidigm device at an entrance lane kiosk. UP SAMF ¶ 17. As part of this verification process, drivers entered their CDL number on the device, which pulled the relevant template data (*i.e.*, TemplateBIN) collected during registration. *Id.* Drivers then scanned their finger on the Lumidigm sensor, generating a CompositeIM. *Id.* The AGS would then extract a template from the new CompositeIM and compare the new template with the registration TemplateBIN. *Id.* At that point, the AGS would indicate whether the driver's identity had been verified. *Id.*

The CompositeIM and TemplateBIN from the verification process existed only fleetingly in temporary random access memory ("RAM") on the local, in-lane device, and was deleted immediately after verification. UP SUMF Resp. ¶¶ 47-48; UP SAMF ¶ 18.[4] That data was never stored. UP SUMF Resp. ¶¶ 47-48. The entire process, from scanning a driver's finger on the sensor to deletion of the data, took "between 1.3 and 2 seconds." UP SAMF ¶ 18. While the CompositeIM from the registration scan was not used in the driver verification process, storing the registration CompositeIM could have enabled UP to use a newer algorithm to more reliably extract templates from existing CompositeIMs, if such an algorithm became available. UP SUMF Resp. ¶ 53. That

---

[3] Hexadecimal code is a system in which data is expressed using 16 possible symbols (0-9 and A-F)—unlike binary code, which uses only two symbols (0 and 1). *See* UP SUMF Resp. ¶ 69; UP SAMF ¶ 13. TemplateBIN is a series of hexadecimal code that represents the digitization of only some subdermal information, and reflects the location and angles at which certain physiological structures below the skin exist. UP SUMF Resp. ¶ 32; UP SAMF ¶ 15.

[4] RAM is temporary computer storage where applications can process data on a short-term basis—often instantaneously—without storing or retaining the data. *See* UP SAMF ¶ 18.

was consistent with best practices and with UP's practice of continually evaluating the gate access processes at its intermodal facilities to find ways to improve those processes. *Id.*

Plaintiffs assert that because TemplateBINs were "stored as ANSI 378 fingerprint templates," the data itself must be fingerprints. Pl. Ren. Mot. at 8. As Scott Swann explained, however, the fact that data complies with ANSI 378 standards does not mean that the data is or comes from a fingerprint. *See* UP SAMF ¶¶ 42-45. In fact, Mr. Swann took a publicly-available image of a zebra, manipulated it to conform with ANSI 378 standards, and submitted it to an automated fingerprint identification system, which purported to identify "fingerprint minutiae" on the zebra fur. *Id.* ¶¶ 42-44. Zebra fur is not a fingerprint, and the fact that a zebra fur image can be packaged consistent with ANSI 378's technical standards does not change this fact. By the same token, the fact that TemplateBINs were stored consistent with ANSI 378 standards does not mean that the data are fingerprints.

Plaintiffs also assert "it is possible to reverse-engineer a fingerprint image from a Fingerprint Template" and "the reverse-engineered image could then be used to create a matching Fingerprint Template." Pl. Ren. Mot. at 9. In other words, Plaintiffs state that TemplateBIN can be reverse-engineered to create CompositeIM, which then can be used to create new TemplateBIN that matches the original TemplateBIN. Plaintiffs further state that the new TemplateBIN would be compatible with "many other fingerprint readers," presumably to suggest that TemplateBINs are fingerprints or data obtained from fingerprints. *Id.*

In so asserting, Plaintiffs ignore the fact that such a process does not *exist*, as the sources they cite make clear. Plaintiffs rely on the deposition testimony of HID Global corporate representative Vito Fabbrizio. *See* Pl. LR 56.1(a)(2) Statement of Undisputed Material Facts ("Pl. SUMF," Dkt. 335) ¶ 54. But Mr. Fabbrizio testified that, although there is some literature "that

talks about the possibility" of reverse engineering TemplateBIN in this way, actually doing so is purely theoretical. *See* UP SUMF Resp. ¶ 54. Plaintiffs' expert Joseph Caruso similarly could speak only to the possibility of reverse engineering TemplateBIN to create CompositeIM and recreating matching TemplateBIN. *Id.* (testifying that he is "working on a piece of software that reverses templates into usable fingerprints."). Plaintiffs cite no evidence showing this has been done—not to mention that the Court excluded Mr. Caruso's opinions on this subject after Plaintiffs conceded he is not a biometrics expert. Dkt. 405 at 19, 21.

Further, even if it were possible to "reverse-engineer" CompositeIM from TemplateBIN and then create new TemplateBIN from the CompositeIM, that exercise—recreating the very same data the person started with—would serve no purpose. Moreover, there would be no use for the CompositeIM or TemplateBIN, whether reverse engineered or not. The Lumidigm sensor uses *liveness* detection to ensure that a live human finger—not reverse-engineered data like CompositeIM—is being presented. *See* UP SUMF Resp. ¶¶ 30, 33; UP SAMF ¶ 39. In other words, even if a bad actor presented the Lumidigm sensor with CompositeIM or TemplateBIN from a driver who had already registered with the AGS—and Plaintiffs cite no evidence as to how this could even be done—the Lumidigm sensor would identify that it was *not* being presented with a live human finger and thus would deny entry. UP SUMF Resp. ¶¶ 30, 33; UP SAMF ¶ 39 Nor do Plaintiffs cite any evidence showing how such data could supposedly be used for any other purpose, and as Mr. Swann explained, it could not. UP SAMF ¶¶ 39-40.

### C. UP's Federal Subcontracts Covered Drivers' Handling Of Shipments Through Its Illinois Intermodal Facilities

Throughout the class period, UP was a federal government subcontractor, handling shipments through its Illinois intermodal facilities for federal agencies, including the Department of Defense ("DOD") and the U.S. Postal Service. *Id.* ¶¶ 51-52 (at least 18,904 federal shipments

through its Illinois intermodal facilities from 2014-2023); Dkt. 329-2 ¶¶ 37-44.[5]

UP used the AGS in the course of performing its federal government subcontracts to improve the safety and security of operations at its intermodal facilities, allowing drivers quick access while verifying they were authorized to be there. UP SAMF ¶ 53. Driver verification was important because UP's intermodal facilities—and the cargo passing through them—are potential targets of theft and terrorism, as well as critical infrastructure that implicate significant national security concerns. *Id.* ¶ 54. The Chicago metropolitan area, where UP's Illinois intermodal terminals are located, is a cargo-theft "hotspot." *Id.* ¶ 55.

Under UP's Master Intermodal Transportation Agreement ("MITA") and Intermodal Terms and Conditions, UP is liable for loss, theft, damage, or destruction of cargo within its intermodal facilities. *Id.* ¶¶ 58-59. The MITA was in effect from at least 2014 through 2021, when it was replaced by the Intermodal Terms and Conditions. *Id.* ¶ 58. UP's liability does not depend on the type of cargo or the identity of the cargo's beneficial owner. *Id.* ¶ 60. Thus, under the MITA and Intermodal Terms and Conditions, UP was obligated to ensure the security of federal freight passing through its intermodal facilities. *Id.* ¶¶ 58-60. Using the AGS to confirm the identity of all drivers entering the facilities was a reasonable method of doing just that. *Id.* ¶ 7.

---

[5] Paul Rathgeber, UP's then-Director of Industry & Public Projects, previously averred that he knew from experience that UP handled shipments for federal agencies prior to 2019, but that due to what he understood at the time to be data retention limitations, UP had records only for federal shipments since 2019. Dkt. 329-2 ¶ 38. Mr. Rathgeber based his averment on data available in UP's Total Business Value database. *Id.* ¶¶ 38-44. After the Seventh Circuit issued *Payton*, UP conducted additional investigation into whether it had records reflecting shipments that passed through its Illinois intermodal facilities from 2014-2019. The investigation determined that data sources outside the Total Business Value database include data about shipments from 2014 forward. UP SAMF ¶ 51. Pursuant to Civil Rule 26(e)(1), UP has produced to Plaintiffs a report generated from those data sources, which was filtered to show federal agency shipments that passed through its Illinois intermodal facilities from 2011-present.

### D. Certain Employees of UP Contractors Remprex And Nascent Had Access To The AGS Servers In Order To Troubleshoot Technical Issues, But Not To Access The Data Stored On Those Servers

When UP first deployed the AGS at its Illinois intermodal facilities, it stored AGS data only in local databases at the facilities. *See* UP SAMF ¶ 23. These databases were highly secure and password protected, and the finger scan data therein (CompositeIMs and TemplateBINs) were maintained as Large Binary Encoded Objects ("BLOBs"). *Id.* ¶¶ 23-28, 36. A BLOB "do[es] not follow any imaging standard" and is "meaningless to a person in the format that it is stored." *Id.* ¶ 36. Indeed, to render a BLOB in a viewable manner "would require extensive programing skills and domain knowledge." *Id.*

In 2014, Remprex helped UP set up a central database in Omaha to hold AGS registration data from all UP intermodal facilities. *Id.* ¶ 23. By setting up a central database, UP enabled drivers to register with the AGS at one facility and undergo the verification process at another without re-registering. *Id.* ¶ 24.[6] Like the local databases, the central database was highly secure and password protected, and the finger scan data was maintained as BLOBs. *Id.* ¶¶ 23-28, 36.

UP granted Remprex temporary access to its servers to set up the central database, but did not hand over the finger scan data to Remprex or provide it with a copy. *Id.* ¶ 25. Indeed, Remprex would not have been able to accept a copy of the AGS data because it "doesn't have servers" on which to maintain it. *See* UP SUMF Resp. ¶ 59. Nor did Nascent ever receive the AGS data. *See* UP SAMF ¶ 26. Nascent did not have regular access to finger scan data; instead, it had only temporary access to the AGS servers when providing technical support to UP with Remprex personnel. *Id.*

---

[6] *See* UP SAMF ¶ 25 (Remprex Change Order Request Form stating that the purpose of the request was to "enable[e] drivers to register at one facility and save registration information for use at other facilities").

Although certain Remprex and Nascent employees were able to access AGS servers, they did so only to troubleshoot technical issues with the AGS and related databases. *See* UP SUMF Resp. ¶ 58. Neither Remprex nor Nascent personnel possessed or received copies of the finger scan data on UP's servers, nor did they have the ability to download that data from the databases. *Id.* ¶ 59; UP SAMF ¶ 26. Plaintiffs cite no evidence that any Remprex or Nascent employee downloaded any such data (because they could not have done so) or accessed the finger scan data (which were strings of code). *See* Pl. Ren. Mot. at 28-30; UP SAMF ¶ 26.

### E. Plaintiffs Misrepresent A Good-Faith Discovery Dispute Regarding The Scope Of AGS Data Relevant And Proportionate To The Case

Plaintiffs spill much ink on a long-ago resolved discovery dispute concerning the scope of UP's production of data from the AGS databases. *See* Pl. Ren. Mot. at 13-15. Plaintiffs seek to portray UP (and its former counsel) as obstructionist and assert that it refused to produce AGS data, "contending that because the data could not be rendered into fingerprint images, the data could not be biometric identifiers or biometric information subject to BIPA." *Id.* at 14.

Plaintiffs' characterization is false. UP objected to producing certain AGS data because it was beyond the scope of Plaintiffs' discovery requests and not relevant or proportional to the needs of the case, including because it related to drivers with no arguable connection to the Illinois facilities. Dkt. 162. After Plaintiffs moved to compel, the Court held that Plaintiffs' requests were overbroad and ordered a narrower production—*i.e.*, data related to individuals who visited the Illinois intermodal facilities. Dkt. 174 at 11-12. While Plaintiffs make thinly veiled accusations of bad faith against UP and its former counsel, the Court denied Plaintiffs' request for fees incurred bringing their motion to compel, refuting that accusation. *Id.* at 13.

## III. ARGUMENT

Summary judgment is proper only where the record shows "no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the burden to make that showing, and the nonmovant can defeat summary judgement by "set[ting] forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court views the facts and draws reasonable inferences in the light most favorable to the nonmoving party. *Id.* at 249. At summary judgment, courts do "not make credibility determinations [or] weigh the evidence." *Johnson v. Advoc. Health & Hosp. Corp*., 892 F.3d 887, 893 (7th Cir. 2018).

The denial of one side's summary judgment motion on an issue does not entitle the other side to summary judgment on that issue. *See Marctante v. City of Chicago*, 657 F.3d 433, 439 (7th Cir. 2011) (noting courts treat cross-motions for summary judgment "separately in determining whether judgment should be entered in accordance with Rule 56"); *Rep. Techs. (NA), LLC v. BBK Tobacco* & Foods, LLP, 2019 WL 12536877, at *2 (N.D. Ill. Mar. 28, 2019) (denying cross-motions for summary judgment). As this Court held, the denial of UP's summary judgment motion "indicate[s] only that [it] had not carried its burden on the claims and defenses raised and [does] not necessarily indicate that Plaintiffs are entitled to judgment on the merits of any claim." Dkt. 405 at 26.

### A. The Drivers' Finger Scans Were Not Fingerprints (MSJ Issue 1)

BIPA applies only to "biometric identifiers" or "biometric information." 740 ILCS 14/15. A "biometric identifier" is expressly limited to a "retina or iris scan, *fingerprint*, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10 (emphasis added).[7] "Biometric information"

---

[7] The definition of "biometric identifier" is limited to those six enumerated items. *See* 740 ILCS 14/10. In contrast, BIPA defines "confidential and sensitive information" in a broad manner followed by illustrative, non-exclusive examples. *See id.* ("Confidential and sensitive information means personal information that can be used to uniquely identify an individual or an individual's account or property. *Examples of confidential and sensitive information include, but are not limited to*, a genetic marker, genetic testing

means "any information … based on an individual's biometric identifier used to identify an individual." *Id*. Plaintiffs' claims rest on the following premises: (i) the Lumidigm device collected fingerprints, *i.e.*, biometric identifiers; and (ii) the device generated, and the AGS database stored, biometric identifiers (CompositeIMs) and biometric information derived from those fingerprints (TemplateBINs). *See* Pl. Ren. Mot. at 1; Dkt. 208 ¶ 3.[8]

Plaintiffs assert there is no dispute that the AGS data includes fingerprints. *See* Pl. Ren. Mot. at 13. This is wrong. *First*, Section 25(d) of BIPA directs that the Act be construed consistent with the Illinois Private Detective, Private Alarm, Private Security, Fingerprint Vendor, and Locksmith Act of 2004 ("Private Detective Act"), which in turn defines fingerprints as images that the Illinois State Police ("ISP") can use to conduct criminal background checks. *See* 225 ILCS 447/5-10. Finger scans from the Lumidigm device indisputably are not (and cannot be) used by the ISP, and thus are not "fingerprints" under the Private Detective Act and, in turn, under BIPA. *See* UP SAMF ¶¶ 46-50.[9] *Second*, the record evidence shows that the Lumidigm sensor did not capture fingerprints, and thus that the data stored in the AGS—CompositeIMs and TemplateBINs—are not biometric identifiers or biometric information. *See* UP SUMF Resp. ¶ 13; UP SAMF ¶¶ 29-35, 41-50.

### 1. Whether The Lumidigm Device Captured Fingerprints Is A Factual Question Requiring Expert Testimony

As an initial matter, the technology the Lumidigm device uses to scan fingers, and whether the data captured by the device is a "fingerprint," are topics requiring expert testimony. "Expert

---

information, a unique identifier number to locate an account or property, an account number, a PIN number, a pass code, a driver's license number, or a social security number.") (emphasis added).

[8] Plaintiffs use the terms "Composite Images of fingerprints" to refer to CompositeIMs and "fingerprint templates" to refer to TemplateBINs. UP uses the terms "CompositeIM" and "TemplateBIN" here.

[9] The Court denied UP's summary judgment argument based on the Private Detective Act. Dkt. 405 at 32-33. UP reasserts the argument here to preserve, if necessary, its position for appeal.

testimony is required for claims that involve 'technical matters beyond the common knowledge and experience of jurors.'" *Vill. of Sauk Vill. v. Roadway Exp., Inc.*, 2017 WL 378277, at *3 (N.D. Ill. Jan. 25, 2017). The functionality of multispectral imaging technology and the data it scans are beyond common knowledge and experience, requiring expert analysis.[10] *See Andersen v. City of Chicago*, 454 F. Supp. 3d 801, 806 (N.D. Ill. 2020) (expert testimony may be required for matters that are beyond the common understanding of a lay juror).

Plaintiffs rely on *Howe v. Speedway*, 2024 WL 4346631, at *5 (N.D. Ill. Sept. 29, 2024), which held that whether the data in *that* case qualified as a "fingerprint" was a matter of statutory interpretation, and thus a question of law for the court that did not require expert testimony. But in *Howe*, there was no dispute that the data came from the surface of a finger. *Id.* ("[T]he parties do not have a factual dispute on what information the timeclocks collect."). The parties merely disputed whether or not an image that indisputably was a *portion* of an *actual* fingerprint—that is, a partial fingerprint—constituted a "fingerprint" under BIPA. *Id.* at *2 (side-by-side images of the complete and partial fingerprints); *id.* at *4-5 (describing parties' dispute). The court resolved that purely legal question by holding that the partial fingerprint there qualified as a "fingerprint." *Id.* at *7-9.

Here, by contrast, UP disputes whether the finger scans captured and stored by the AGS are fingerprint data in the first place. Mr. Swann, a biometric expert with over 27 years of experience—including setting standards for the use of biometric technologies such as fingerprints and managing the FBI's certification of products capable of capturing fingerprints—has

---

[10] The Court rejected this argument when denying UP's summary judgment motion and excluding Mr. Swann's opinions on whether the data constituted fingerprints. Dkt. 405 at 20-21, 28-31. UP reasserts its arguments here, as necessary, to preserve it for appeal. Moreover, UP notes that it presents evidence beyond Mr. Swann's opinions to show that the finger scans are not fingerprints.

indisputably established the Lumidigm device uses proprietary multispectral imaging technology to image information from beneath the skin of a finger and manipulates that data by fusing multiple images into one. *See* UP SAMF ¶¶ 32-34. How the Lumidigm device works is beyond a lay person's understanding and requires expert explanation, as does the import of that finding—*i.e.*, a fingerprint is an impression or mark made by the unique ridges and valleys on the *surface* of a person's fingertips, and a device that does not capture information from those unique surface ridges and valleys does not capture fingerprints. *See* UP SAMF ¶¶ 32-34. And Mr. Swann's conclusions are corroborated by expert Michael French, who determined that the images generated by the Lumidigm device do not satisfy FBI standards for fingerprints. *Id.* at 46-50. Given the unique backdrop in *Howe*—where the parties agreed that the image was a *bona fide* fingerprint, with the only question being whether a partial fingerprint qualified—the case does not and cannot eviscerate the countless cases finding that fingerprint issues are well within the domain of expert testimony. Indeed, fingerprint analysis is a paradigmatic example of evidence beyond the common knowledge and experience of jurors that requires expert testimony. *See United States v. Ware*, 69 F.4th 830, 847 (11th Cir. 2023) ("Fingerprint comparison has long been accepted as a field worthy of expert opinions in this Circuit, as well as in almost every one of our sister circuits."); *United States v. Herrera*, 704 F.3d 480, 486 (7th Cir. 2013) (fingerprint analysis "requires the sponsorship of an expert witness"); *United States v. Glover*, 479 F.3d 511, 518 (7th Cir. 2007) ("This Court has long accepted the scientific validity of fingerprint testing.").[11]

In arguing otherwise, Plaintiffs inexplicably continue to cite Mr. Caruso's testimony that AGS finger scans are biometrics, despite disclaiming their reliance on his opinions. *Compare* Pl.

---

[11] Further, the defendant in *Howe* did not raise an argument under the Private Detective Act. Because data from the Lumidigm device cannot be used by the ISP to conduct criminal background checks, the data do not constitute fingerprints for BIPA purposes. *See* UP SAMF ¶¶ 49-55; Dkt. 328 at 11-12.

Ren. Mot. at 15 n.9 (citing Caruso's testimony in *Rogers v. BNSF Ry. Co.* that he "found fingerprints stored in the data" to support the claim that UP "could not *actually* have been surprised that the AGS Databases contained images of fingerprints"), *with id.* at 15 n.8 ("In accordance with the Court's Order (Dkt. 405), Mr. Caruso is not offering expert testimony as to the legal conclusion that the data at issue in this case is regulated by BIPA."). As the Court noted in its Order, Plaintiffs "concede[d] that Caruso is not qualified to opine as to whether something constitutes biometrics," and his opinions on that topic were excluded. Dkt. 405 at 19, 21.

### 2. The Lumidigm Device Did Not Capture Fingerprints

Plaintiffs assert that the Lumidigm device collected fingerprints and generated biometric identifiers and/or information (CompositeIMs and TemplateBINs) based on those purported fingerprints. *See* Pl. Ren. Mot. at 13. That is incorrect; as shown, a fingerprint is an impression or mark left by the unique ridges and patterns on the surface of a finger. *See* UP SAMF ¶ 29.

It is undisputed that the Lumidigm sensor obtained data from *beneath* the surface of the finger. Plaintiffs cite no contrary evidence. Rather, Plaintiffs describe the general process by which drivers registered with the AGS using the Lumidigm device. *See* Pl. Ren. Mot. at 7. They note that a driver would press his finger onto a surface for scanning, a series of images would be taken using different wavelengths of light and those images would be digitally stitched together to create a CompositeIM. *Id.* Plaintiffs then summarily conclude that those images were images of fingerprints. *Id.* That conclusion is not based on analysis of the technical functioning of the Lumidigm device, *e.g.*, what data is captured from a finger and how it is captured; nor do they explain what a "fingerprint" is or how any particular definition supposedly applies to that data.

By contrast, Mr. Swann analyzed the Lumidigm device and the data it generated. *See* UP SAMF ¶ 30. Mr. Swann has over 27 years of experience in biometric technology, including 18 years with the FBI. *Id.* ¶ 31. Mr. Swann was the Unit Chief of Research, Development, Test, and

Evaluation for the FBI's biometric and identification technologies, where he developed FBI biometric standards and testing programs used around the world to measure biometric accuracy and effectiveness. *Id.* He also was responsible for managing the FBI's Certified Products List to ensure that only products meeting fingerprint image quality specifications are used in the criminal justice system. *Id.* HID Global tried and failed to get the Lumidigm device approved for entry on the FBI's Certified Products List. *Id.* ¶¶ 48-49. HID Global's corporate designee confirmed that "[t]he FBI has not certified the Lumidigm V-Series product, and therefore [it] cannot be used or cannot be source for application or use cases where [FBI certification] is necessary." *Id.* ¶ 48.

After analyzing a Lumidigm sensor and data in the AGS database, Mr. Swann determined that the sensor captured only subdermal information, not the skin's surface ridges and patterns. *Id.* ¶ 32. The sensor did so through the use of multispectral imaging technology, which uses various wavelengths of light to extract specific properties beneath an object's physical surface. *Id.* When a driver placed his finger on the Lumidigm sensor, it used wavelengths of light to penetrate the skin's outer layer and take multiple images of physiological structures below the surface, such as papillae (tissue that connects the outer layer of skin to subsurface layers) and capillaries (blood vessels). *Id.* ¶ 33. Using a proprietary algorithm, the device fused this data to create CompositeIM. *Id.* ¶ 34. The data came from subdermal information, *not* from the skin surface ridges and patterns necessary to generate a fingerprint. *Id.* ¶ 34.

Plaintiffs assert the Lumidigm sensor collected physical data from the finger's surface, *see* Pl. SUMF ¶ 30, but that is wrong; the Lumidigm sensor detected color and tone information from the skin's surface to confirm it was with a live human finger, but such data does not include the fingertip's friction ridge skin, and thus does not render the finger scans fingerprints. *See* UP SUMF Resp. ¶¶ 30, 33. Nor was that data used in CompositeIM or otherwise incorporated into finger scan

data stored on the AGS server. *Id*.

The leading scientific and law enforcement bodies with expertise on fingerprints, including the FBI and National Institute of Standards and Technology, have created standards that define collection, storage, and image quality requirements for fingerprints. UP SAMF ¶¶ 45-48. The Lumidigm device does not satisfy any of those standards, because it does not capture fingerprints. *Id.* Because CompositeIMs are not fingerprints, TemplateBINs—which are derived from CompositeIMs—are not fingerprints, biometric identifiers, or biometric information either. *See* UP SUMF Resp. ¶ 10; *see also* UP SAMF ¶ 41.

Unable to rebut Mr. Swann on the merits, Plaintiffs resort to unfairly smearing his integrity, claiming that he "initially suggested that he was unable to render fingerprint images from the data, but during his deposition was forced to admit that he, too, was able to render fingerprint images from the data." Pl. Ren. Mot. at 14-15. Plaintiffs go on to assert that Mr. Swann chose to "mislead Plaintiffs, and, ultimately, the Court." *Id.*

Plaintiffs' claims are baseless. In his opening report, Mr. Swann made clear that, while it would be difficult, an expert could render images from CompositeIMs, though such images would not be images of fingerprints. UP SAMF ¶ 36 ("[I]t is possible for an expert to reconstruct the sensor information from it and render it in a viewable manner, but doing so requires access, programming skills, and domain knowledge."); *id.* ¶¶ 36-38. At no point did Mr. Swann indicate it would not be possible to render images from CompositeIM. Moreover, whether an image can be rendered from a CompositeIM is a *non sequitur*, because even if someone with access to the data and a great deal of "programming skills" and "domain expertise" (*i.e*., a high degree of familiarity with the relevant databases) can render a CompositeIM into an image, that image is not a *fingerprint* image because the CompositeIM does not contain data from the finger's surface, and

thus does not contain fingerprint data. *Id.* at ¶¶ 29-41, 46-50.

**3. Images Rendered From CompositeIMs Do Not Establish That The Data Are Fingerprints Or Images Of Fingerprints.**

Plaintiffs paste into their summary judgment motion images that Mr. Caruso rendered from their CompositeIMs, and assert it is "self-evident" that the images are fingerprints. *See* Pl. Ren. Mot. at 17.[12] But, as noted, the Court excluded Mr. Caruso's opinions on whether the AGS data constitute a biometric data. Dkt. 405 at 21, 23. Moreover, as also noted above, Mr. Caruso's presentation is not how data was actually stored in the AGS databases. CompositeIMs were stored as BLOBs—strings of code composed of numbers and letters. *See* UP SAMF ¶ 12. It takes substantial access and expertise, along with a complex process requiring dozens of steps, to render images from CompositeIM. *Id.* ¶¶ 36-37. And in any event, as Mr. Swann's zebra fur exercise illustrates, whether an image *resembles* a fingerprint does not determine whether that image is *in fact* a fingerprint. *See supra* at p. 5.

Plaintiffs next suggest that a biometric identifier—including a fingerprint—is any "unique personal feature that can be used to identify a person." Pl. Ren. Mot. at 18. In doing so, Plaintiffs seek to rewrite BIPA and broaden its scope beyond its clear terms. BIPA broadly defines "confidential and sensitive information" as "personal information that can be used to uniquely identify an individual or an individual's account or property." 740 ILCS 14/10. The definitions of "biometric identifier" and "biometric information"—which, as noted, set forth only six categories of data to which BIPA applies—are far narrower and do not include all "confidential and sensitive information." *Id.*; *supra* at p. 10 n.7. Rather, those definitions include only data that is or based on

[12] As noted, Plaintiffs represented that "[i]n accordance with this Court's Order (Dkt. 405), Mr. Caruso is not offering expert testimony as to the legal conclusion that the data at issue in this case is regulated by BIPA." Pl. Ren. Mot. at 15 n.8. The images that Plaintiffs characterize as "self-evident[ly]" fingerprints come from Mr. Caruso's expert report, even though the Court excluded Mr. Caruso's opinions "regarding what constitutes biometrics under BIPA." Dkt. 405 at 21.

a "retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." *Id*. Personal information that can be used to uniquely identify a person—such as a "genetic marker, genetic testing information" or, here, finger scan data that are *not* fingerprints—may be "confidential and sensitive information," but they are not biometric identifiers or biometric information under BIPA.

Plaintiffs also misapply their cited cases. In *Konow v. Brink's, Inc.*, 2024 WL 942553, at *5 (N.D. Ill. Mar. 5, 2024), decided at the pleading stage, there was no dispute over whether the technology there captured facial geometry data under BIPA. Instead, the parties disputed whether the purpose for which the defendant collected that data was relevant to whether the plaintiff stated a BIPA claim. *Id*. at *4. The court held it was not. *Id.* at *3. *Konow* does not support Plaintiffs' effort to disregard BIPA's requirement that data must be "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10; *cf. Cothron v. White Castle Sys., Inc.*, 216 N.E.3d 918, 923 (Ill. 2023) ("The best indicator of legislative intent is the statutory language itself, given its plain and ordinary meaning.").

Plaintiffs' other authorities are likewise inapposite. In *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1091 (N.D. Ill. 2017), the plaintiff alleged that Google scanned her facial features from photographs she uploaded to a cloud-based photograph service. Google moved to dismiss, arguing that because the facial scans were derived from photographs, and photographs are excluded from BIPA's definition of "biometric identifier," the facial scans were not "biometric identifiers." *Id.* at 1092. In denying that motion, the court rejected Google's argument that to fall under BIPA, facial scans must be obtained in person, reasoning that "nothing in [BIPA] says, one way or the other, how the biometric measurement must be obtained (or stored, for that matter) in order to meet the definition of 'biometric identifier,'" and that "[t]he definition simply lists the specific identifiers that are covered." *Id.* at 1095. While the captured data was derived from photographs, there was

no dispute it consisted of "scan[s] of … face geometry," and was a "biometric identifier." *Id.*

Plaintiffs try to extract from *Rivera* the principle that any finger scan that can be used to identify a person constitutes a fingerprint, regardless of how the scan is taken or its composition. *See* Pl. Ren. Mot. at 18. But in *Rivera*, a pleadings-stage decision in which the court had to accept at true the plaintiff's well-pleaded factual allegations, there was no dispute over whether Google collected facial geometry data. Here, by contrast, UP disputes that the Lumidigm device captures fingerprints—*i.e.*, data from the surface of the finger—and has adduced evidence in the summary judgment record showing it does not. *Vance v. IBM*, 2020 WL 5530134, at *4 (N.D. Ill. Sept. 15, 2020), also decided at the pleadings stage, is inapposite for the same reason.

Similarly, in *Howe*, the court held that "fingerprints" included "partial impressions or partial scans of finger ridges so long as those scans are capable of being used to identify a particular person." 2024 WL 4346631, at *8. Thus, as noted above, there was no dispute that the device at issue captured data from the finger's surface and thus was *bona fide* fingerprint data. *See id*. at *5, *7 (noting "the parties do not have a factual dispute on what information the timeclocks collect" and that the device scanned a "portion of ridges" on a finger).

Finally, Plaintiffs cite *Thompson v. Matcor Metal Fabrication (Ill.) Inc.*, No. 2020-CH-00132 at 6 (Tazewell Cnty., Ill.) (Dec. 7, 2023) (reproduced at Dkt. 335-44), to argue that even if the AGS captured "fingertip scans," there is "no difference between a 'fingerprint' scan and a 'fingertip' scan." The defendant argued that the "fingertip" scans taken by its device were not "fingerprints" covered by BIPA. *Id.* at 6. In granting summary judgment to the plaintiffs, the court determined that a fingerprint and fingertip are synonymous because "a 'fingerprint' merely is 'an impression of the ridges of the fingertip.'" *Id.* There was no discussion of the technology the scanner used, and the parties did not dispute that the scanner captured information from the surface

of a finger—unlike the Lumidigm device used at UP's facilities. *Id.* at 5-7.

### 4. The Evidence Cited By Plaintiffs Does Not Establish The Lumidigm's Multispectral Imaging Technology Captured Fingerprints.

Plaintiffs next rely on fact witness testimony and documents in which laypeople refer colloquially to the AGS data as "fingerprints" or "biometric." *See* Pl. Ren. Mot. at 20-21. But those laypeople lack the technical expertise to evaluate the Lumidigm device's proprietary multispectral imaging technology. As detailed above, Mr. Swann analyzed the Lumidigm sensor and multispectral technology and determined that it captured only subdermal information. *See* disc. *supra* at pp. 3-6, 15. Mr. French determined that the images generated by the sensor do not satisfy FBI standards for what constitutes a fingerprint. *See* UP SAMF ¶¶ 46-50. The individuals whose deposition testimony Plaintiffs quote undertook no such analysis.

If the Court determines lay witness evidence should be considered in determining whether the AGS finger scans were fingerprints, there is ample lay testimony to create a genuine dispute. UP Principal Consultant Jeremy Hayden testified that he did not believe the AGS stored fingerprints, as did UP General Director Katrina King-Lopes. *See* UP Resp. SUMF ¶ 35; UP SAMF ¶¶ 35, 41. And Nascent corporate representative Linda Parillo testified that while she "kn[e]w people use that term fingerprint a lot" in referring to the finger scans, that's "not really what [the device] is." *See* UP Resp. SUMF ¶ 35; UP SAMF ¶ 35.

Plaintiffs also cite the deposition testimony of Jeremy Hayden, who testified as a corporate representative, wrongly asserting that UP's "equivocations" and "evasiveness" about the data collected by the Lumidigm device led to "intellectually dishonest testimony." Pl. Ren. Mot. at 19-20. His testimony shows nothing of the sort. As Plaintiffs note, when Hayden was asked if the Lumidigm device scanned "the tip of the finger," Hayden confirmed that it did. *See* UP SAMF ¶ 41. Hayden was then asked if this was "because the tip of the finger has had uniquely identifying

fingerprints," to which Hayden replied, "I don't know." *See id.*. There is nothing intellectually dishonest about this testimony; in fact, as a non-expert, that answer was indisputably honest. While Hayden had a lay understanding that the Lumidigm device scanned fingers, he is not a biometric expert—as Plaintiffs emphasize elsewhere in their motion. *See* Pl. Ren. Mot. at 28.

* * *

In sum, it cannot be that data failing to satisfy scientific or law enforcement standards for a fingerprint can nonetheless be deemed—by a jury or a court—to be a fingerprint. On what basis could such a finding possibly be made? The fact that an image—say, a manipulated image of zebra fur—*looks* like a fingerprint to a lay person does not *make* it a fingerprint. A ruling for Plaintiffs here could rest only on the farfetched premise that by "fingerprint," BIPA means something other than what the scientific and law enforcement communities understand to be a fingerprint. Because Plaintiffs do not indisputably prove their finger scans qualify as fingerprints, their motion should be denied. *See Doe v. Apple Inc.*, 2026 WL 3024809, at *9 (S.D. Ill. Sept. 30, 2026) (denying summary judgment where record contained conflicting testimony about whether technology at issue captured facial geometry).

### 5. This Case Is Not A Replay Of *Rogers v. BNSF Railway.*

Finally, Plaintiffs rely on *Rogers v. BNSF Railway Co.*, No. 19-cv-3083 (N.D. Ill.), in which Plaintiffs' counsel represented plaintiffs bringing BIPA claims arising from BNSF's use of the same AGS at issue in this case. *See* Pl. Ren. Mot. at 3-4, 15, 28. Plaintiffs' implicit message is that because BNSF was found liable under BIPA, and because this case involves the same AGS that BNSF used, liability here should be a foregone conclusion. But as much as Plaintiffs might wish this case were a carbon-copy of *Rogers*, it is not. There are important differences between the two cases, including that UP makes several arguments—including that the AGS finger scans were not fingerprints, UP did not disclose or disseminate biometric information to others, and UP

is exempt from BIPA liability as a government contractor—that BNSF did not. *See supra* at pp. 10-20; *infra* at pp. 23-28, 34-37.

**B. UP Was Not Subject to BIPA (MSJ Issues 2-6)**

Plaintiffs seek summary judgment on whether (1) UP collected Plaintiffs' fingerprint information without first gaining informed written consent in violation of Section 15(b); (2) UP possessed the subclass members' alleged fingerprint data without timely developing a retention policy compliant with Section 15(a); (3) UP retained subclass members' finger scan images after the purpose for collecting them was satisfied; (4) UP disclosed class members' finger scan data without consent; and (5) UP collected 101,637 distinct CompositeIMs and 106,264 distinct TemplateBINs from class members without written consent. *See* Pl. Ren. Mot. at 22-33.

Plaintiffs are not entitled to judgment on those claims for three reasons. *First*, because UP did not collect fingerprints, it did not collect "biometric identifiers" or "biometric information," and thus was not required to seek consent before collecting drivers' finger scan data or have a publicly-available policy compliant with Section 15(a).[13] *See supra* at pp. 10-20. *Second*, it is undisputed that UP was a federal subcontractor throughout the class period, creating at least a genuine dispute on whether UP was subject to BIPA in the first place.[14] *Third*, ICCTA preempts

---

[13] In denying UP's summary judgment motion, the Court held that UP did not indisputably establish that the finger scan data did not qualify as fingerprints. Dkt. 405 at 26-33. The evidence cited herein raises a genuine issue of material fact precluding summary judgment for Plaintiffs on that issue. *See supra* at pp. 10-20; Dkt. 405 at 26 (noting that denial of UP's summary judgment motion does "not necessarily indicate that Plaintiffs are entitled to judgment on the merits of any claim").

[14] In denying UP's summary judgment motion, the Court held that UP did not indisputably establish that it was a government contractor under Section 25(e). Dkt. 405 at 34-36. The Court did not address Section 25(e)'s "applicability to federal government contracts," *id.* at 36, and UP argues here that its federal subcontracts require denying Plaintiffs' summary judgment motion, *id.* at 26 (noting that denial of UP's summary judgment motion does "not necessarily indicate that Plaintiffs are entitled to judgment on the merits of any claim")—and in its motion for reconsideration and certification that those federal subcontracts warrant summary judgment in UP's favor.

Plaintiffs' claims in their entirety, precluding summary judgment in Plaintiffs' favor.[15] The first reason is addressed above, and the second and third are addressed below.

**1. UP Is Exempt From BIPA Liability As A Federal Subcontractor**

**a. Section 25(e) Is Not An Affirmative Defense**

Plaintiffs previously argued that Section 25(e) is an affirmative defense for which UP bears the burden of proof. Dkt. 361 at 8-10. That argument is untenable under *Cisneros v. Nuance Communications, Inc.*, -- F.4th --, 2026 WL 2542772 , at *2 (7th Cir. Aug. 28, 2026). *Cisneros* held that the Section 25(c) financial institution exemption is not an affirmative defense, reasoning that it "is not on the list in Rule 8(c) and is not similar to things on the list, such as contributory negligence, laches, and release," that "a contention that a statutory exception blocks a plaintiff's claim may be raised without the need to plead it as an affirmative defense," and that "[c]alling one rule of law an exception to another rule of law does not turn it into an affirmative defense." *Id.*

That reasoning applies with equal force to Section 25(e). Sections 25(c) and 25(e) sit side by side as BIPA rules of "[c]onstruction," and each removes a category of entities from BIPA's reach. 740 ILCS 14/25(c), (e). Like Section 25(c), Section 25(e) is not on Rule 8(c)'s list and bears no resemblance to the defenses that are. Thus, *Cisneros* defeats Plaintiffs' argument that Section 25(e) is an affirmative defense that UP forfeited. Dkt. 360 at 8-12. And because Section 25(e) is not an affirmative defense, Plaintiffs bear the burden of proving that it does not apply. *See Ferris v. Convergent Outsourcing, Inc.*, 2019 WL 13254372, at *2 (N.D. Ill. July 15, 2019) (plaintiff bears burden as to provision that "excludes from the FDCPA definition of 'debt collector'" certain

---

[15] In denying UP's summary judgment motion, the Court held that UP did not indisputably establish that ICCTA preempted Plaintiffs' claims. Dkt. 405 at 36-39. The evidence cited herein raises a genuine issue of material fact precluding summary judgment for Plaintiffs on that issue, and thus on their claims. *Id.* at 26 (noting that denial of UP's summary judgment motion does "not necessarily indicate that Plaintiffs are entitled to judgment on the merits of any claim")

entities); *Drabinsky v. Actors' Equity Ass'n*, 106 F.4th 206, 213 (2d Cir. 2024) (labor exemption "is not an affirmative defense" and "the plaintiff bears the burden of proving that the exemption does not apply"); *Mid-America Reg'l Bargaining Ass'n v. Will Cnty. Carpenters Dist. Council*, 675 F.2d 881, 890 n.22 (7th Cir. 1982) (same).

#### b. UP's Federal Subcontracts Preclude Summary Judgment In Plaintiffs' Favor

To meet their the burden of showing that UP's federal subcontracts do not exempt it from BIPA under Section 25(e), Plaintiffs must show that their finger scans were unrelated to UP's work under its federal subcontracts. Plaintiffs cannot carry that burden.

In *Payton v. Union Pacific Railroad Company*, 192 F.4th 796, 798 (7th Cir. 2026), the Seventh Circuit read the phrase "when working for" in Section 25(e) to mean "in the course of," explaining that the provision "could point to a contract covering the work in which biometric information was collected." The court held that UP's *state and local contracts* fell outside Section 25(e) because they "had nothing to do with intermodal freight." *Id.* at 799. Here, by contrast, UP's federal subcontracts relate entirely to intermodal freight and covered the work in which Plaintiffs' finger scans were collected.

It is undisputed that UP "regularly transports shipments through [its] Illinois intermodal facilities as a subcontractor for DOD, the U.S. Postal Service ('USPS'), and other federal agencies." Dkt. 329 ¶¶ 19, 38; Dkt. 383 ¶ 4; Dkt. 329-2 ¶ 43; *id.* Ex. 9-DD; UP SAMF ¶ 51. It necessarily follows that UP's federal subcontracts have everything "to do with intermodal freight," *Payton*, 192 F.4th at 799. Thus, the only remaining question under Section 25(e), as interpreted by *Payton*, is whether Plaintiffs can prove that UP's collection of their finger scans are not related to those federal subcontracts.

While *Payton* did not limn all of Section 25(e)'s contours, what the Seventh Circuit did say

makes clear that Section 25(e) applies here if "the work in which biometric information was collected" occurred in connection with UP's performance of its federal subcontracts at its intermodal facilities. *Id.* at 798. That condition is satisfied—or, at a minimum, Plaintiffs cannot show it is *not* satisfied. UP performed its federal subcontracts in part by utilizing the AGS to collect finger scans from all drivers entering those facilities. Through the AGS, UP verified the identity of those drivers to ensure the safety and security of individuals at its facilities, its physical infrastructure, and its customers' cargo. UP SAMF ¶¶ 53-57. The AGS helped UP meet its obligation to secure federal freight by verifying that drivers seeking to enter its intermodal facilities were in fact authorized to do so. *See supra* at pp. 6-7; UP SAMF ¶¶ 7, 53, 57.[16]

Verifying the identity of *only* those drivers who at the time were hauling federal freight—while waving everyone else through—would have left the federal cargo at the facility exposed to every unverified driver entering the premises. Gate security works only if applied to everyone. For instance, during a period when the AGS was not in use, at least three drivers were banned from UP's intermodal facilities for deceptively using another driver's CDL to enter. UP SAMF ¶ 57. Freight can include "hazardous materials" and "explosive material," which pose serious public-safety and national-security concerns related to "[t]errorism," potential "derailments," and "attempts to steal" these materials from the intermodal facilities. *Id.* ¶ 54. And pertinent here, Chicago is a cargo theft "hotspot." *Id.* ¶ 55.

With federal shipments passing through UP's intermodal facilities, and with the MITA and ITC making UP responsible for securing those shipments, security was essential to the facilities'

[16] "Failure to properly identify and clear drivers" could lead to "theft (e.g., stealing high-value shipment loads)." UP SAMF ¶ 55. The Chicago area has seen boxes of guns stolen from locked containers at rail facilities. *Id.* Theft incidents are more frequent near freight hubs (such as intermodal terminals). *Id.* In one instance, a gang utilized a "phony pickup order" to drive a container out of a Jersey City rail terminal, "making off with more than 17,000 Sony Playstations valued at $5 million." *Id.* ¶ 56. UP itself experienced a rash of thefts from intermodal containers in the Los Angeles area in 2015. *Id.*

proper functioning. UP SAMF ¶¶ 46, 55. Because collecting drivers' finger scans was part of "the work" UP performed under its federal subcontracts, Section 25(e) defeats Plaintiffs' claims. *Payton*, 192 F.4th at 798. At a minimum, Plaintiffs cannot indisputably show otherwise.

Plaintiffs may argue that because Section 25(e) mentions only "state and local" government contracts, it does not apply to federal subcontractors. However, the Supremacy Clause, U.S. Const. art. VI, cl. 2, forecloses any reading of Section 25(e) that does not apply equally to federal subcontractors. U.S. Const. art. VI, cl. 2. Dkt. 328 at 20. "[A] state law discriminates against the Federal Government or its contractors if it singles them out for less favorable treatment." *United States v. Washington*, 596 U.S. 832, 839 (2022). As the Supreme Court explained, the "intergovernmental immunity doctrine" applies not only to discrimination "against the Federal government," but also to "those with whom it deals (e.g., contractors)." *Id.* at 838; *see McHenry Cnty. v. Raoul*, 44 F.4th 581, 593 (7th Cir. 2022) (impermissible to single out federal subcontractors "for less favorable treatment," as doing so would "not impose[] … costs in a neutral, nondiscriminatory way").

Thus, Illinois may not exempt state and local contractors from BIPA while applying the Act to federal subcontractors. To remedy this constitutional flaw, it is necessary to interpret Section 25(e) to apply with equal force to federal subcontractors. *See Washington*, 596 U.S. at 838. Plaintiffs did not respond to this argument at the prior summary judgment stage, Dkt. 389, as there is no response, and their summary judgment motion should be denied based on UP's Section 25(e) defense.

#### c. Plaintiffs Refused To Take Discovery On UP's Federal Subcontracts And Cannot Now Claim Prejudice

Plaintiffs may claim that they were unable to take discovery on UP's federal subcontracts. Dkt. 360 at 11. Such a claim would be baseless, as UP repeatedly offered discovery on the issue,

to no avail. When Plaintiffs deposed UP expert Adriene Bailey on November 19, 2024, they asked her about UP's government contracts—which UP had produced—and expressly reserved the right to depose a percipient fact witness on them. Dkt. 390-2, Ex. 1-A (Bailey Dep.) at 15:19-18:17, 97:17-22. On December 26, 2024, UP offered to make available a Rule 30(b)(6) witness on that subject. Dkt. 390-2, Ex. 1-B. Plaintiffs did not respond, so UP emailed again on February 17, 2025, reiterating its offer. Dkt. 390-2, Ex. 1-C. Plaintiffs again, and inexplicably, ignored that offer.

"[A] party cannot create its own prejudice and thereby benefit from it." *Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1338 (S.D. Fla. 2010). Yet that is what Plaintiffs did by refusing to take discovery they asked for and that UP repeatedly offered. *See Contour PAK, Inc. v. Expedice, Inc.*, 2009 WL 2490138, at *6 (D. Colo. Aug. 14, 2009) (plaintiff cannot benefit from prejudice it created by failing to pursue discovery). As Plaintiffs note, the parties have invested significant resources in this case. Dkt. 360 at 10. Plaintiffs would not have been prejudiced by taking one additional deposition in a case seeking over $3 billion. Dkt. 325 (Ex. 27) (disclosing that Plaintiffs seek over $3 billion in statutory damages for registration scans); Dkt. 403 at 2 (conceding that "Plaintiffs cannot recover damages" for verification scans). Instead, Plaintiffs sat on their hands, hoping to manufacture a prejudice argument. *See Moore v. Astrue*, 851 F. Supp. 2d 1131, 1145 (N.D. Ill. 2012) ("[A] party can hardly be heard to complain about the consequences of her own actions.").

Any prejudice claim rings particularly hollow given that Plaintiffs spent significant resources litigating as amici in *Payton*. Plaintiffs had time to file an amicus brief in *Payton* opposing UP's summary judgment motion. *Payton v. Union Pac. R.R. Co.*, No. 24-cv-153 (N.D. Ill. May 5, 2025), Dkt. 79. They also filed an amicus brief in the *Payton* appeal, and even took 10 of the *Payton* plaintiffs' 15 minutes of oral argument time. *See Payton v. Union Pac. R.R. Co.*, No.

26-1946 (7th Cir.), Dkts. 19, 30. As their active participation in *Payton* makes clear, Plaintiffs had ample resources to take the deposition they requested. Their strategic decision not to do so should not be rewarded. *See Mid-Continent Cas.*, 742 F. Supp. 2d at 1338.[17]

**2. ICCTA Preempts Plaintiffs' BIPA Claims In Their Entirety**

UP previously moved to dismiss Plaintiffs' claims based on ICCTA preemption. Dkt. 36 at 11-17. In denying the motion, this Court explained that although it could not evaluate ICCTA's "fact-intensive inquiry" at the pleading stage, "Union Pacific [wa]s free to renew its arguments at a later stage." *Fleury v. Union Pac. R.R. Co.*, 528 F. Supp. 3d 885, 896 (N.D. Ill. 2021). Because the factual record shows that BIPA subjects UP to "the sort of 'patchwork' regulation that would unreasonably interfere with its operations," *id.* at 895-96, and also that applying BIPA would otherwise unreasonably burden UP, ICCTA preempts BIPA as applied here—or, at a minimum, Plaintiffs cannot indisputably show otherwise.

ICCTA expressly preempts state law "with respect to regulation of rail transportation" by creating "exclusive" federal jurisdiction "over transportation by rail carriers." 49 U.S.C. § 10501(a)-(b). There are two principal categories of ICCTA preemption: categorical and as applied. Regarding the latter, state law claims may "be preempted 'as applied' based on the degree of interference that it has on railroad transportation—that is, if the action would have the effect of preventing or unreasonably interfering with railroad transportation." *Wedemeyer v. CSX Transp. Inc.*, 850 F.3d 889, 894-95 (7th Cir. 2017). By threatening to impose a patchwork of state and local rules inconsistent with the uniform regulation demanded by ICCTA, applying BIPA here would

[17] Plaintiffs assert that UP admitted in its Answer that it is a "private entity" to which BIPA applies. *See* Pl. Ren. Mot. at 13 n.7. That is incorrect. What UP did was admit "that is a 'private entity,' but den[y] that it has undertaken any action that would subject it to liability under BIPA." Dkt. 174 at 12. That is, UP admitted that it is "private" (as in privately held) and an "entity" (as in not a person), but denied that it is liable under BIPA—a denial that encompasses an argument that it is not subject to BIPA in the first instance because, under Section 25(e), its status as a government contractor exempts it from BIPA.

unreasonably burden the efficient operation of rail transportation, and that burden would be exacerbated by the inefficiencies and delays it causes to UP's operations.

Because ICCTA envisions consistent regulation across the nation, BIPA's application to UP is preempted here because it would impose a "patchwork of railroad regulation" at the state or local level. *Fayus Enters. v. BNSF Ry. Co.*, 602 F.3d 444, 445 (D.C. Cir. 2010) (quotations and citation omitted); *see also CSX Transp. Inc.*, 2005 WL 584026, at *9 (S.T.B. May 3, 2005) (ICCTA was "intended to prevent a patchwork of local regulation from unreasonably interfering with interstate commerce."). If applied to UP's Illinois intermodal facilities, BIPA would introduce a burdensome Illinois-specific regulatory regime that would force UP to develop processes and procedures unique to their Illinois-based operations. *See Fayus*, 602 F.3d at 445 (affirming dismissal of claim where applying state law would "creat[e] just the patchwork of railroad regulation that ICCTA sought to preempt").

As a Class I rail carrier, UP transports goods and freight in interstate commerce—a single rail car might pass through a dozen different states (or more) before reaching its destination. *See* UP SAMF ¶ 3. Other states have privacy laws that mirror BIPA in some respects but differ in others. *See* Capture or Use Biometric Identifier Act (CUBI), Tex. Bus. & Com. Code Ann. § 503.001; Washington Biometric Privacy Act (WBPA), Wash. Rev. Code Ann. § 19.375; Stop Hacks and Improve Electronic Data Security (SHIELD) Act, N.Y. Gen. Bus. Law § 899-aa; California Consumer Privacy Act (CCPA), Cal. Civ. Code § 1798. UP at all relevant times had intermodal facilities in Texas, California, and Washington and operated the AGS in those states (among others). *See* UP SAMF ¶ 5. As a result, applying BIPA here would contribute to UP being subject to the very patchwork of regulations that Congress enacted ICCTA to prevent.

The differences between BIPA and the other state biometric privacy laws are material.

BIPA defines biometric identifiers to include "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10. WBPA has a broader definition, including all "automatic measurements of an individual's biological characteristics." Wash. Rev. Code Ann. § 19.375.010(1). And SHIELD defines biometric identifier to include "data generated by electronic measurements of an individual's unique physical characteristics." N.Y. Gen. Bus. Law § 899-aa(b)(5). Due to differences in what the different statutes cover, the collection of certain information might be unregulated in one state but heavily regulated in another.

By defining biometrics differently than other state laws, and by prohibiting conduct in Illinois that would be allowed elsewhere, applying BIPA here would violate ICCTA's command that freight transportation operators in interstate commerce not be subject to a "patchwork" of state and local regulations that would impede the seamless operation of interstate transportation. *CSX Transp.*, 2005 WL 584026, at *9. The regulatory patchwork would unreasonably interfere with UP's interstate operation of its national rail network, especially its intermodal facilities. *See Kislov v. Am. Airlines, Inc.*, 2022 WL 846840, at *5, *7 (N.D. Ill. Mar. 22, 2022) (BIPA preempted by the Airline Deregulation Act because "BIPA requirement[s] … necessarily involve[d] wholesale changes to [defendant's] customer service practices").

In enacting ICCTA, Congress recognized that "[s]ubjecting rail carriers to regulatory requirements that vary among the States would greatly undermine the industry's ability to provide the 'seamless' service that is essential to its shippers and would weaken the industry's efficiency and competitive viability." S. Rep. No. 104-176, at 6. As the STB noted, "[t]he interstate rail network could not function properly if states and localities could impose their own potentially differing standards for … activities … which are an integral part of, and directly affect, rail transportation." Thomas Tubbs—Petition for Declaratory Order, No. 35792, 2014 WL 5508153,

at *5 (S.T.B. Oct. 31, 2014); *see also Law v. GM Corp.*, 114 F.3d 908, 910 (9th Cir. 1997) ("with most railroad routes wending through interstate commerce," the "virtue of uniform national regulation 'is self-evident'"); *City of Cayce v. Norfolk S. Ry. Co.*, 706 S.E.2d 6, 11-12 (S.C. 2011) (crediting testimony that "it would be difficult to operate a system of over 20,000 miles of track if the regulations in each community were different," and affirming ICCTA preemption because "[t]he need for uniformity is readily apparent"). If BIPA's application were not preempted by ICCTA—and assuming (incorrectly) that BIPA, by its terms, governed the finger scans at issue here—UP would have had to modify its operations at each location to meet the unique and potentially fluid requirements imposed by California, Washington, Texas, and—relevant here—Illinois. As a result, applying BIPA here would threaten precisely the kind of regulatory chaos that ICCTA was enacted to prevent, and thus is preempted as applied. *See Fayus*, 602 F.3d at 445.

Applying BIPA here would further burden UP in a manner prohibited by ICCTA by imposing delays and inefficiencies that would have hampered UP's operations. *See CSX Transp.*, 2005 WL 1024490, at *3 (holding a state requirement preempted as applied under ICCTA where it "would have the effect of preventing or unreasonably interfering with railroad transportation"); *Delaware v. STB*, 859 F.3d 16, 19 (D.C. Cir. 2017) (same). ICCTA burden analysis demands "a factual assessment," *CSX*, 2005 WL 1024490, at *3, that looks to several factors, including whether the regulations "entail … extended or open-ended delays." *Green Mtn. R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005); *see also Norfolk S. Ry Co. v. City of Alexandria*, 608 F.3d 150, 160 (4th Cir. 2010) (quoting *Green Mountain* in finding a truck hauling permitting scheme preempted as applied); *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 254 (3d Cir. 2007) (applying *Green Mountain* to hold that state regulations may not "be used unreasonably to delay or interfere with rail carriage"); *Delaware*, 859 F.3d at 19 (applying *Green*

*Mountain* in the as-applied preemption context).

In addition to preventing UP from operating its intermodal facilities in a uniform manner, applying BIPA to UP's use of the AGS would impose a severe burden on the efficient operation of freight transportation at its intermodal facilities. The AGS deployed at UP's intermodal facilities prevented unauthorized visitors from accessing those facilities and increased efficiency of driver processing, which conferred additional safety benefits by decreasing exposure to potentially dangerous rail movement and operation. *See* UP SAMF ¶ 6. The AGS system was reasonably designed to increase "safety, security, and efficiency at Union Pacific's facilities." *Id.* ¶ 7.

Plaintiffs' invocation of BIPA here would hamper these goals—by prohibiting UP from scanning drivers' fingers to quickly confirm their identities and to prevent unauthorized access to its intermodal facilities. For example, requiring consent before registering for the AGS would cause delays of three to four minutes per driver, which in turn would cause in-gate back-ups and even missed cargo connections. *Id.* ¶ 20. Adriene Bailey, an expert on intermodal rail operations with 38 years in the industry, demonstrated how a seemingly modest delay in a driver's entering UP's intermodal gate can compound to create a significant burden to UP's operations, and to interstate commerce broadly. *Id.* ¶ 21. She demonstrated that when the average in-gate processing time was 1.7 minutes, only about ten percent of drivers spent more than three minutes in-gating. *Id.* But if the average in-gate processing time increased by 80 seconds—to just three minutes—it would take ten percent of drivers more than 29 minutes to enter the facility. *Id.* Similarly, if a BIPA consent regime applied to UP, drivers could withhold consent, which would require an alternative and more time-intensive mode of identity verification.

This is not idle speculation. During the pandemic, many drivers declined to use the finger scanner to enter facilities due to potential health risks. *Id.* ¶ 19. UP employees therefore had to

confirm drivers' identities using alternative methods, causing considerable delays. *Id.* This phenomenon illustrates how applying BIPA to UP's finger scan technology at its Illinois intermodal facilities would slow the efficient transportation of interstate freight and jeopardize the safety of critical facilities. *Id.* ¶¶ 19-22. Therefore, because applying BIPA in this context operates to "unreasonably … delay or interfere" with "rail carriage," it is preempted under ICCTA. *N.Y. Susquehanna & W. Ry. Corp.*, 500 F.3d at 254. At a minimum, Plaintiffs have not, and could not, indisputably show otherwise, warranting denial of summary judgment.

### C. UP Retained Registration Finger Scan Data Consistent With The Initial Purpose For Which It Was Collected (MSJ Issue 4)

Even if CompositeIMs constituted biometric identifiers under BIPA, Plaintiffs are wrong for purposes of their Section 15(a) claim that the initial purpose of collecting registration CompositeIMs was satisfied once they were used to created TemplateBINs. *See* Pl. Ren. Mot. at 26-28.[18] The initial purpose of collecting CompositeIMs and TemplateBINs at registration was to facilitate the efficient verification of drivers entering UP's Illinois intermodal facilities. *See* UP SAMF ¶ 53. UP continually evaluated the gate access processes at its Illinois intermodal facilities and looked for ways to improve those processes, including by making technological improvements. *See* UP SUMF Resp. ¶ 53. As Mr. Swann explained, best practice is to keep CompositeIMs to ensure that UP could later use a newer algorithm to more reliably extract templates from existing CompositeIMs. *Id*. Indeed, "[i]f you don't keep the original image, you'll have no way to take advantage of the latest breakthroughs in technology for matching." *Id*. Thus, maintaining CompositeIM after registration served the "initial purpose" for which it was collected. *See* 740 ILCS 14/15(a). That evidence creates a genuine dispute precluding summary judgment

[18] The Court denied UP's motion for summary judgment on Plaintiffs' Section 15(a) retention claims. Dkt. 405 at 40-43. UP reasserts its arguments here, as necessary, to preserve them for appeal.

for Plaintiffs. *See Rep. Techs.*, 2019 WL 12536877, at *2; Dkt. 405 at 26.

In an effort to save their Section 15(a) claim, Plaintiffs cite Jeremy Hayden's deposition testimony that it would be a "horrible design choice" to store fingerprint images. Pl. Ren. Mot. at 28. Just one page prior to that testimony, however, Mr. Hayden testified that he did not believe that UP collected fingerprints at all—much less that it stored fingerprint images. *See* UP SAMF ¶ 41. And to the extent Plaintiffs suggest Mr. Hayden's testimony refers to storage of CompositeIMs—which it does not, as they are not fingerprint images—Plaintiffs themselves concede that Mr. Hayden is not a biometrics expert. Dkt. 405 at 19; Pl. Ren. Mot. at 27.

**D. UP Did Not Disclose Finger Scan Data To Remprex Or Nascent (MSJ Issue 5)**

Plaintiffs assert UP violated Section 15(d) by disclosing, disseminating, and redisclosing finger scan data to Remprex and Nascent.[19] As Plaintiffs note, to "disclose" finger scan data requires an affirmative "revelation" of such data. Pl. Ren. Mot. at 29; *see also Cothron v. White Castle Sys., Inc.*, 20 F.4th 1156, 1163 (7th Cir. 2021) (disclosure "connotes a new revelation," as Black's Law Dictionary defines the term to mean "[t]o make (something) known or public; to show (something) after a period of inaccessibility or of being unknown; to reveal."). And "disseminate" means "spreading, diffusing, or dispersing." *Cox Enters. v. Hiscox Ins. Co.*, 478 F. Supp. 3d 1335, 1344 (N.D. Ga. 2020) (citing Black's Law Dictionary). There is no evidence that UP showed, revealed, or disseminated Plaintiffs' finger scan data to anyone from Remprex or Nascent—let alone evidence that would warrant summary judgment for Plaintiffs on this issue.

The record shows that UP maintained the finger scan data on its own servers. *See* UP SUMF Resp. ¶ 35. Certain Remprex or Nascent employees accessed AGS servers to troubleshoot

---

[19] The Court denied UP's motion for summary judgment on Plaintiffs' Section 15(d) claims. Dkt. 405 at 43-45. UP reasserts its arguments here, as necessary, to preserve them for appeal.

technical issues with the AGS and its databases. *Id.* ¶ 58. They did not, however, receive copies of the data stored on those servers, nor did they have the ability to download finger scan data from them. *See* UP SAMF ¶ 26. And the types of technical issues that Remprex and Nascent assisted with did not require access to finger scan data. *Id.* ¶ 27.

In 2014, Remprex helped UP set up a central database in Omaha. *Id.* ¶ 23. Plaintiffs rely on a draft document produced by Remprex to suggest that as part of that work, UP provided Remprex with database backups containing drivers' finger scan data. *See* Pl. Ren. Mot. at 29-30. But the record, including testimony from Remprex corporate representative Timothy Ash, shows that UP did not hand over a database backup to Remprex. Specifically, when asked "[d]id UP provide the servers that would become the central servers to REMPREX to ensure that they would be compatible with the local servers," Mr. Ash answered, "I take the word 'provide' to mean handed over, you know, physically, things like that. No." UP SAMF ¶ 259; *see id.* (Mr. Ash attesting that "I did not receive a copy, and I am not aware of anyone at Remprex that received a copy of the AGS data from finger scans."). Mr. Ash later stated that "there would be no position that REMPREX would be in possession of a -- of a database like that." *Id.* ¶ 26. Indeed, Mr. Ash questioned the accuracy of the draft document when asked about it at his deposition, pointing to its "DRAFT" footer and noting "all kinds of information that [was] not accurate" within the document. UP SUMF Resp. ¶ 59.

UP's witnesses corroborate Mr. Ash's testimony. UP System Engineer Mahesh Paruchuru, who worked to set up the central database, attested that "UP did not provide Remprex with a copy of AGS data, nor did it provide Remprex with backups of AGS data to be restored. UP never provided Nascent with a copy of the AGS data." UP SAMF ¶¶ 26-27. UP Senior Systems Consultant Terry Brown likewise attested that "Remprex and Nascent employees did not receive

copies of the data on the AGS servers, nor did they have the ability to download the data from the databases. Although Remprex helped set up a central database … it did not receive copies of the AGS data or backups of the AGS data. … Nascent did not receive the AGS data." *Id.* ¶ 26.

Plaintiffs cite no evidence that Remprex or Nascent employees accessed any finger scan data. Plaintiffs assert that "Remprex and Nascent were able to and did access the [AGS] data in the normal course of business." UP SUMF Resp. ¶ 58. But they cite no evidence showing that anyone from Remprex or Nascent accessed AGS finger scan data. Instead, Plaintiffs rely on deposition testimony from Jeremy Hayden about how UP controlled and accessed the AGS data that says nothing about Remprex or Nascent's alleged access. *Id*. They also cite a Remprex email thread discussing Remprex's "level of access" to the AGS data. *Id*. But as Remprex's 30(b)(6) representative explained, that email thread did not establish that anyone from Remprex in fact accessed the AGS finger scan data. *See id.* ¶ 58. Plaintiffs point to no other record evidence showing that anyone from Remprex or Nascent accessed finger scan data while providing maintenance services for the AGS. *See id*.

Plaintiffs have urged the Court to disregard the sworn statements from UP, Remprex and Nascent witnesses as "sham" affidavits. Dkt. 361 at 31-32. But "an affidavit can be excluded as a sham only where" it contradicts "clear answers to unambiguous questions which negate the existence of any genuine issue of material fact." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571-72 (7th Cir. 2015). The deposition testimony and UP interrogatory response on which Plaintiffs rely are consistent with the declarations, which aver that Remprex and Nascent had access to the AGS databases in order to troubleshoot technical issues. *See* UP Resp. SUMF ¶ 58. That evidence does not suggest that the technical issues they assisted with would require access to finger scan data. *See* UP SAMF ¶ 28. Plaintiffs have argued that the Remprex and Nascent declarants exceed

their personal knowledge by "speak[ing] on behalf of the companies." Dkt. 361 at 32. But the declarants explained why they have personal knowledge, including from years working on the AGS system. Courts regularly admit averments about company matters where, as here, the witness has the experience to show personal knowledge. *See Wagoner v. CSX Transp., Inc.*, 246 F. Supp. 2d 1002, 1007 (N.D. Ind. 2003) (affidavit established affiant's personal knowledge of railroad crossing project).

In sum, the evidence does not indisputably show that Remprex or Nascent accessed the AGS finger scan data, precluding summary judgment for Plaintiffs on the Section 15(d) claim.

### E. Plaintiffs Have Not Established UP Committed Any Violations Of Sections 15(a), 15(b), Or 15(d) (Plaintiffs' MSJ Issues 2-6)

Plaintiffs assert that because the AGS databases contained 101,637 CompositeIMs and 106,264 TemplateBINs, UP violated: (i) Section 15(a) 101,637 times by retaining CompositeIMs; (ii) Section 15(b) "at least" 207,901 times by obtaining 101,637 CompositeIMs and 106,264 TemplateBINs before obtaining written consent from the drivers in question; and (iii) Section 15(d) "at least" 207,901 times by disclosing to Remprex and Nascent 101,637 CompositeIMs and 106,264 TemplateBINs. *See* Pl. Ren. Mot. at 30-33.[20] Plaintiffs are wrong.

*First*, Plaintiffs are entitled to no judgment because the CompositeIMs and TemplateBINs are not biometric identifiers or information under BIPA. *See supra* at pp. 9-20.

*Second*, in their Section 15(d) argument, Plaintiffs rely heavily on their incorrect claim that UP provided Remprex with backups of AGS databases in 2014 when Remprex helped UP set up the central AGS database. *See* Pl. Ren. Mot. at 29-30. The record is clear that UP did not provide Remprex with a database backup during that process. *See supra* at pp. 35-36. But even if it had,

[20] Plaintiffs concede they are not entitled to damages for verification scans, *i.e.*, when their fingers were scanned upon reentering UP's facilities. Dkt. 403 at 2.

Plaintiffs adduce no evidence regarding the number of CompositeIMs or TemplateBINs that were in the AGS databases at that time, and thus no basis to find that they included 101,637 CompositeIMs and 106,264 TemplateBINs. *See* Pl. Ren. Mot. at 26. Nor do Plaintiffs cite any evidence regarding when any Remprex or Nascent employee supposedly accessed the AGS finger scan data at any other time, let alone the number of CompositeIMs or TemplateBINs (if any) in the databases on such occasion. *See Cothron*, 20 F.4th at 1163 (disclosure means "[t]o make (something) known or public; to show (something) after a period of inaccessibility or of being unknown; to reveal.").

*Third*, Plaintiffs (and class members) are entitled to, at most, one recovery of statutory damages under Section 15(b) and one recovery under Section 15(d). *Clay* held that the 2024 BIPA amendment—which limits a plaintiff to one recovery when a defendant violates Section 15(b) by repeatedly collecting the plaintiff's same biometric data using the same collection method, and one recovery when a defendant violates Section 15(d) by repeatedly distributing the plaintiff's same biometric data using the same distribution method, *see* 740 ILCS 14/20(b), (c)—applies retroactively. 171 F.4th 975, 985 (7th Cir. 2026). As *Clay* explained, "[a] plaintiff who alleges thousands of claims under BIPA Section 15 is only 'entitled to, at most, one recovery under' Section 20." *Id.* (quoting 740 ILCS 14/20(b)-(c)). Plaintiffs' more than $3 billion damages calculation (Dkt. 325 (Ex. 27))—premised on multiple recoveries for each class member—is thus untenable.

*Clay* makes clear Plaintiffs and class members are not entitled to damages for both CompositeIMs *and* TemplateBINs collected by the AGS. When a driver registered with the AGS, he would place a finger on the Lumidigm sensor. *See* UP SAMF ¶ 11. The sensor used multispectral imaging to scan his subdermal information and encode the information into

CompositeIM—a string of hexadecimal code. *Id.* ¶¶ 12-14. The sensor then translated the CompositeIM into TemplateBIN, a shorter template code. *Id.* ¶ 15. Even if the sensor scanned a "fingerprint" (it did not), that would mean the strings of code it generated (CompositeIM and TemplateBIN) are different formats of the same information derived from the same fingerprint. *See* 740 ILCS 14/10 (defining "biometric information" as "any information … based on an individual's biometric identifier used to identify an individual"). That is, CompositeIM and TemplateBIN were the "same [alleged] biometric information from the same person" obtained "using the same method of collection," entitling Plaintiffs and class members to, "at most, one recovery" under Section 15(b), not separate recoveries for each. 740 ILCS 14/20(b). For the same reason, Plaintiffs and class members are entitled, at most, to "one recovery" under Section 15(d). 740 ILCS 14/20(c).

*Clay* also makes clear that Plaintiffs and class members are not entitled to damages for each finger they scanned during AGS registration. Plaintiffs assert that the AGS database contained CompositeIM and TemplateBIN from four of Turner's fingers, entitling him to statutory damages for each finger. *See* Pl. Ren. Mot.at 30 n.14. But the same type of alleged biometric information (data based on an alleged fingerprint) was scanned from each of Turner's fingers using the same method of collection. *See* 740 ILCS 14/20(b)-(c) (limiting recovery where defendant "in more than one instance" collects, or discloses to the "same person," "the same biometric identifier or biometric information from the same person"). That is, Turner challenges the same conduct by UP—obtaining and disclosing his alleged fingerprint data without his consent—and the BIPA amendment provides that, under such circumstances, "damages should be evaluated on a per-person basis." *Clay*, 171 F.3d at 977. Indeed, as *Clay* held, "[a] plaintiff who alleges thousands of claims under BIPA Section 15 is only 'entitled to, at most, one recovery under' Section 20," *id.* at

985 (quoting 740 ILCS 14/20(b)-(c))—not, as Plaintiffs would have it, one recovery per finger.[21] Plaintiffs (and class members) are thus entitled to, at most, one recovery under Sections 15(b) and 15(d) regardless of how many of their fingers were scanned.

## IV. CONCLUSION

The Court should deny Plaintiffs' Renewed Partial Motion for Summary Judgment.

[21] In their *Payton* amicus brief, Plaintiffs raised a subject matter jurisdiction challenge based on the premise that each *Payton* plaintiff is entitled to, at most, $5,000 for each BIPA section UP allegedly violated. *See* Amicus Br., *Payton v. Union Pac. R.R. Co.*, No. 26-1946, Dkt. 19 at 1, 3-4 (July 9, 2026). Plaintiffs thus agreed—at least when it suits their purposes—that BIPA statutory damages are available solely "on a per-person basis." *Clay*, 171 F.3d at 977.

Date: November 18, 2026

Respectfully submitted,

/s/ *Johanna Spellman*
Johanna Spellman, One of the Attorneys for Defendant Union Pacific Railroad Company

Sean M. Berkowitz (Illinois Bar No. 6209701)
sean.berkowitz@lw.com
Gary Feinerman (Illinois Bar No. 6206906)
gary.feinerman@lw.com
Johanna Spellman (Illinois Bar No. 6293851)
johanna.spellman@lw.com
Kathryn A. Running (Illinois Bar No. 6330369)
kathryn.running@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

Michael H. Rubin (*pro hac vice*)
michael.rubin@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

*Counsel for Defendant Union Pacific Railroad Company*

**CERTIFICATE OF SERVICE**

I, Johanna Spellman, hereby certify that on November 18, 2026, I caused a copy of the foregoing to be filed using the Court's CM/ECF system, which provides service to all counsel of record.

Dated: November 18, 2026

*/s/ Johanna Spellman*
Counsel for Defendant